UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

MUSALLI FACTORY FOR GOLD & JEWELLRY CO.,:

                         **Plaintiff,**     :

                                :        **1:08-cv-01720 (LAP)**

                                :

        **-against-**              :       <ins>**NOTICE OF FILING**</ins>

                                :       <ins>**AMENDED COMPLAINT**</ins>

JPMORGAN CHASE BANK, N.A.,       :       <ins>**JURY TRIAL DEMANDED**</ins>

CHASE INVESTMENT SERVICES CORPORATION, :

and NICHOLAS GAMBELLA,           :

                                :

                                :

                   **Defendants.**    :

-------------------------------------------------------------------X

      Please take notice that the undersigned counsel for Musalli Factory For Gold & Jewellry Co. hereby files as Exhibit A, the attached Amended Complaint and Demand for Jury Trial in the above entitled matter.

Dated:       May 30, 2008
             New York, New York

                                Respectfully Submitted,

                                **LAURO LAW FIRM**

                                By: _____/s/John F. Lauro_____
                                John F. Lauro, Esq. (NY Bar JFL-2635)
                                101 E. Kennedy Blvd., Su ite 3100
                                Tampa, Florida 33602
                                P: 813 222 8990  F: 813 222 8991
                                1540 Broadway, Suite 1604
                                New York, NY 10036
                                P: 646 746 8659  F: 212 938 0858
                                E-mail: jlauro@laurolawfirm.com
                                *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system and was sent by U.S. mail May 30, 2008 to:

Andrea Likwornik Weiss
1185 Avenue of the Americas
17th Floor
New York, NY 10036
*Counsel for Defendants*

<div align="right">

/s/John F. Lauro
John F. Lauro

</div>

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

MUSALLI FACTORY FOR GOLD & JEWELLRY CO.,:
                                              :

                    **Plaintiff,**          :

                                                :        **1:08-cv-01720 (LAP)**

                                                  :

           -against-                     :       <u>**AMENDED COMPLAINT**</u>

                                                  :       <u>**JURY TRIAL DEMANDED**</u>

                                                  :

JPMORGAN CHASE BANK, N.A.,             :
CHASE INVESTMENT SERVICES CORPORATION, :
and NICHOLAS GAMBELLA,                 :

                                                  :

                           **Defendants.**     :

------------------------------------------------------------------X

        Plaintiff, Musalli Factory For Gold & Jewellry Co. ("Musalli"), through its undersigned

counsel, the Lauro Law Firm, for its amended complaint against defendants JPMorgan Chase

Bank, N.A., Chase Investment Services Corporation (collectively "JPMorgan"), and Nicholas

Gambella ("Gambella") alleges as follows:

## I. PRELIMINARY STATEMENT

       1.      This case is about trusted investment advisors, and those who assisted them, who

diverted $5 million of Musalli's investment funds, which were to be maintained in a safe and

secure JPMorgan investment program.  The advisors – New York Financial LLC ("NYF") and

Amir Boktor ("Boktor") – fraudulently induced Musalli to transfer $5 million to JPMorgan, and

then unlawfully converted the investment funds to their own use.

       2.      JPMorgan and Gambella (collectively "defendants") knew of the investment

advisors' wrongful actions, and they did nothing to prevent the diversion or advise Musalli of the

missing investment funds.  Instead, at every opportunity, defendants and other employees of

JPMorgan knowingly participated in a scheme to conceal and perpetuate the fraud, causing Musalli to lose its invested funds. If defendants had disclosed the wrongful diversion of funds, then Musalli would have been able to recover the invested funds and would have ceased investing (and losing) additional funds with JPMorgan.

3.      Defendants' repeated affirmative misrepresentations and failure to disclose the wrongful diversion not only violated their duties of care to Musalli, but constituted fraud and commercial bad faith for which Musalli is entitled to damages.

## II. PARTIES

4.      Musalli is a corporation organized under the laws of the Kingdom of Saudi Arabia and is engaged in the business of manufacturing gold and jewelry products. Musalli has been in business for over 80 years and has over 700 employees. Its principal place of business is in Jeddah, Saudi Arabia. Abubaker El-Nagar ("El-Nagar") is the chief financial officer for Musalli and resides in Saudi Arabia. Defendants knew that Musalli and El-Nagar were not familiar with the U.S. legal and financial systems.

5.      JPMorgan Chase & Co., Inc. ("JPMorgan Chase") is the corporate parent of defendants JPMorgan Chase Bank, N.A., and Chase Investment Services Corporation. It is a full-service global financial firm organized under the laws of the State of Delaware, with its principal place of business at 270 Park Avenue, New York, New York. JPMorgan Chase is a financial holding company created by the merger of J.P. Morgan & Co., Inc. and the Chase Manhattan Corporation. It also uses the brand names "JPMorgan Chase" and "Chase" when marketing to and servicing its clients.

6.      JPMorgan Chase is a leading global financial services firm and one of the largest

financial institutions in the United States, with over $1 trillion in assets and $100 billion in stockholders' equity. It has operations in more than 50 countries, and is a worldwide leader in investment banking, financial services, and private and retail banking. JPMorgan Chase serves more than 90 million customers, including consumer and wholesale clients. Its retail banking business includes consumer banking, small business banking, and consumer lending activities.

7.     JPMorgan Chase Bank, N.A. ("JPMorgan Bank") is a national banking association with its designated main office in Columbus, Ohio. It is one of the principal bank subsidiaries of JPMorgan Chase. JPMorgan Bank has branches throughout the world, including in this district and elsewhere, and provides consumer banking, business banking, and lending services. It serves more than 30,000 customers, including corporations, municipalities, financial institutions, and not-for-profit entities. JPMorgan Bank represents that it offers customers industry knowledge, experience, a dedicated service model, comprehensive solutions to financial issues, and local expertise.

8.     JPMorgan Chase offers securities and investment advisory services through Chase Investment Services Corporation ("Chase Investment"), an affiliate of JPMorgan Bank. Chase Investment is organized under the laws of the State of Delaware and has its principal place of business in Chicago, Illinois. Chase Investment has offices throughout the United States, including in this district and elsewhere. It provides a full range of investment and brokerage services, including developing investment strategies, structuring securities portfolios, and advising private clients on securities transactions.

9.     In short, JPMorgan through its various subsidiaries and affiliates, is a fully integrated financial firm with worldwide reach. Its various components work closely to provide

comprehensive financial and banking services. JPMorgan Chase and its affiliates, including JPMorgan Bank and Chase Investment, collect customer information from a number of sources and share that information with each other.   Indeed, JPMorgan Chase markets itself and constituent entities such as JPMorgan Bank and Chase Investment as a "family" of related financial services companies.   In this case, each member of the "family" was aware of each other's activities.

10.    Gambella is a citizen of New York and a vice president of Chase Investment.  At all relevant times, Gambella's office was in a JPMorgan Bank branch located at 127 Seventh Avenue, Brooklyn, New York., and he acted as an agent of JPMorgan Bank and Chase Investment.  Gambella was the individual at JPMorgan primarily responsible for the safekeeping of Musalli's investment funds.  His acts described herein were carried out to benefit JPMorgan Bank and Chase Investment and were within the scope of his employment duties.

### III. NON-PARTIES

11.    NYF is a Nevada limited liability company with its principal place of business in New York. Boktor formed NYF to carry out the fraudulent scheme and conversion described herein. On its business stationery, NYF identified a primary office at 369 1st Street, Brooklyn, New York. Moreover, NYF had accounts at JPMorgan Bank and Chase Investment and assured Musalli that it would place the Musalli investment funds with JPMorgan.  Although NYF purports to be an investment advisor, it is not properly registered as one with either the U.S. Securities and Exchange Commission or the State of New York. NYF also represented that it had offices in Manhattan.

12.    Boktor is the principal of NYF and a self-described broker, corporate consultant,

4

and investment advisor. Boktor used NYF as his alter ego in order to achieve his unlawful objectives and convert Musalli's investment funds.    Also, acting in his individual capacity, Boktor made numerous false representations to Musalli and converted its investment funds. Boktor is believed to be a citizen of Egypt.

13.    Upon information and belief, Martin Stokes is a resident of London, England and is a former vice-president with JPMorgan Bank's London branch.  At all relevant times, Stokes acted as an agent of JPMorgan.

14.    Upon information and belief, Karim Tannir is a resident of London, England and is employed as an investment banker by JPMorgan Bank's London branch.  Tannir specializes in mergers and acquisitions in the Middle East.  At all relevant times, Tannir acted as an agent of JPMorgan.

<div align="center">

### IV. JURISDICTION AND VENUE

</div>

15.    Subject matter jurisdiction is founded upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).  Musalli is a citizen of Saudi Arabia. JPMorgan Bank is a citizen of Ohio pursuant to 28 U.S.C. § 1348.  Chase Investment is a citizen of Delaware.  Gambella is a citizen of New York. The amount in controversy exceeds $75,000 exclusive of interest and costs.

16.    This Court has personal jurisdiction over defendants under Article 3 of New York's CPLR, which provides for jurisdiction over defendants who are New York citizens, who transact any business in New York, or who engage in tortious acts in New York. In this case, defendants regularly engage in business in this State. Furthermore, defendants committed tortious acts in New York such that exercising personal jurisdiction over them would not offend traditional notions of fair play and substantial justice.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## V. THE "KNOW-YOUR-CUSTOMER" REQUIREMENTS FOR JPMORGAN

18.    JPMorgan is subject to certain laws, rules, and self-imposed obligations that are commonly referred to under the term "Know-Your-Customer" ("KYC").

### A.    The Patriot Act

19.    Following the events of September 11, 2001, the United States enacted section 352 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, Pub. L. 107-56, § 352, 115 Stat. 296, 322 (2001) (codified as amended at 31 U.S.C. § 5318(h)) ("the Patriot Act"), which requires, among other things, that financial institutions guard against unlawful activities of its customers by establishing KYC policies, procedures, and controls; designating a compliance officer knowledgeable about KYC requirements; providing ongoing KYC training programs; and engaging an independent auditor to test KYC internal controls.

20.    Under the Patriot Act and otherwise, JPMorgan must verify customer identity, understand customer business and account activities, and assess the potential for illegal activities carried out by customers.

21.    The Patriot Act also requires JPMorgan to determine customers' sources of funds, identify customers' normal and expected transactions, and monitor customer transactions.

22.    Upon information and belief, JPMorgan uses specialized transaction monitoring software, including "names analysis" and "trend monitoring" software, to carry out its KYC

obligations. Also, JPMorgan uses internal and external sources of information to identify suspicious activities that would require the filing of a Suspicious Activity Report ("SAR") with the Financial Crimes Enforcement Network ("FinCEN").

23.    In sum, based on the requirements of the Patriot Act, we believe that JPMorgan has established comprehensive KYC policies, procedures, and controls consistent with the requirements of federal law.

**B.    The Financial Action Task Force and Wolfsberg Group**

24.    All banks with international operations must also adopt KYC policies in accordance with the Financial Action Task Force ("FATF"). The FATF is an inter-governmental body that develops and promotes policies for financial institutions to combat illegal activities by customers. The United States is a participant in the FATF, and JPMorgan is bound by its standards.

25.    FATF issues written principles requiring financial institutions to exercise due diligence to identify customers and monitor account activities. Financial institutions, such as JPMorgan, must identify transactions that do not conform with identified customer norms. KYC policies must constitute a core feature of risk management and control procedures, and financial institutions must complete regular compliance reviews and internal audits. These obligations exist independently of any particular transaction.

26.    The FATF's Special Recommendations on Terrorist Financing ("FATF Recommendations") provide that financial institutions should take certain KYC actions, including those set forth in FATF Recommendation 5:

The customer due diligence (CDD) measures to be taken are as follows:

a) Identifying the customer and verifying that customer's identity using reliable, independent source documents, data or information.

b) Identifying the beneficial owner, and taking reasonable measures to verify the identity of the beneficial owner such that the financial institution is satisfied that it knows who the beneficial owner is. For legal persons and arrangements this should include financial institutions taking reasonable measures to understand the ownership and control structure of the customer.

c) *Obtaining information on the purpose and intended nature of the business relationship.*

d) *Conducting ongoing due diligence on the business relationship and scrutiny of transactions undertaken throughout the course of that relationship to ensure that the transactions being conducted are consistent with the institution's knowledge of the customer, their business and risk profile, including, where necessary, the source of funds.*

*See Exhibit 1* at ¶ 5 (emphasis added).

27.    Moreover, JPMorgan is a leading member of the Wolfsberg Group, which is an association of twelve global financial institutions that develop financial services industry standards for KYC, Anti-Money Laundering, and Counter-Terrorist Financing policies.

28.    The Wolfsberg Group formulated strict policies to prevent illegal activities carried out in the international financial system. JPMorgan adheres to the KYC policies and procedures developed by the Wolfsberg Group.

29.    The Wolfsberg Statement on the Suppression of the Financing of Terrorism provides at statement 6:

Recognising the difficulties inherent in identifying financial transactions linked to the financing of terrorism (many of which appear routine in relation to information known at the time) *the Wolfsberg Group is committed to the continued application of existing monitoring procedures for identifying unusual or suspicious transactions*. The Wolfsberg Group recognises that while the motive for such transactions may be unclear, monitoring and then identifying and reporting unusual or suspicious transactions may assist government agencies by linking seemingly unrelated activity to the financing of terrorism.

8

In addition, the Wolfsberg Group is committed to:

*• Exercising heightened scrutiny in respect of customers engaged in sectors identified by competent authorities as being widely used for the financing of terrorism.*
• Monitoring account and transactional activity (to the extent meaningful information is available to financial institutions) against lists generated by competent authorities of known or suspected terrorists or terrorist organisations.
• Working with governments and agencies in order to recognise patterns and trends identified as related to the financing of terrorism.
• Considering the modification of existing monitoring procedures as necessary to assist in the identification of such patterns and trends.

*See Exhibit 2* (emphasis added).

30.     The KYC regulations and policies are particularly important in this case because JPMorgan was required to investigate NYF and its business activities. JPMorgan thus had a duty to determine the reasons for transfers of funds to and from NYF. Moreover, in carrying out its policies and sharing information with the corporate members of its "family," defendants knew, or should have known, about the financial transactions engaged in by NYF on behalf of Musalli. Indeed, under the strict KYC requirements for financial institutions, such knowledge should be presumed as a matter of law.

## VI. MUSALLI'S RELATIONSHIP WITH JPMORGAN

### A.     Boktor and NYF Agree To Act as Musalli's Investment Advisors with JPMorgan

31.     In 2002, Boktor visited Saudi Arabia looking for business opportunities. He used his cultural ties to the region to ingratiate himself with Musalli and gain its trust. At his initiative, Boktor met with El-Nagar in Jeddah to discuss Musalli's investment and credit needs. He represented that he could help Musalli establish banking relationships outside of Saudi Arabia and could obtain gold loans on favorable terms. For a variety of reasons, however, at first

Musalli decided not pursue any business with Boktor.

32.    At the time, Musalli had substantial gold loans with Saudi banks for working capital, which required the placement of 20% cash collateral. The collateral, however, was deposited interest-free and there was no opportunity for growth.  Moreover, as the price of gold increased, Musalli was required to place additional collateral, creating cash flow problems for the company.

33.    In early 2004, Boktor re-initiated contact with El-Nagar, and once again proposed a business relationship with Musalli. Specifically, Boktor represented that he had a company, NYF, which could act as Musalli's investment advisor in the United States and could place Musalli's investment funds with U.S. entities such as JPMorgan.  Further, Boktor claimed that he could obtain substantial profits for Musalli and develop safe and secure investment strategies. He also stated that NYF had been in business for many years and could also assist in obtaining credit facilities for Musalli.

34.    Boktor told Musalli that he had a special relationship with JPMorgan and urged Musalli to place its funds in a "JPMorgan Investment Program" through NYF. Indeed, Boktor stated that investing with JPMorgan would result in substantial returns and also lead to obtaining a credit facility. Boktor promised to develop a strategy through JPMorgan that would maximize growth, and then use an investment portfolio to collateralize a gold loan from the bank.

35.    Boktor sent El-Nagar two particularly important documents.[1] The first is an e-mail dated February 7, 2004, containing a request for a delegation of authority and a detailed description of NYF as a "full investment services firm" that could provide "investment banking strategies through its connected network of sound business partners . . . [such as JPMorgan]."

---

[1] As set forth below, Boktor communicated regularly with El-Nagar, whether by e-mail, telephone, or express mail, from his offices in New York.

Boktor represented NYF as having a "talented group of financial advisors, analysts and bankers . . . [who have been] consistent with their recommendations and track record." Moreover, NYF claimed that it had a team capable of producing investment returns "even upward by 30%," while ensuring an investment strategy "with the highest security and return." All of these statements were false.

36.    The second key document is a letter dated March 26, 2004, which Boktor drafted and sent to Musalli under the name of NYF's "compliance director." In the letter, Boktor suggested a two-phase program in which he would develop an investment program for Musalli, and then use those investment funds to collateralize a gold loan on favorable terms for the company.

37.    This proposal had an obvious benefit for Musalli, which up until that time was unable to realize any gains on its loan collateral. Boktor proposed that the investment funds should be placed in an account "under an American firm name and management [that] will let you enjoy . . . benefits that are only granted for American companies . . . higher credit facilities; preferential rates; discounts on gold purchases, better interest rates . . . not accessible by foreign entities." Boktor also represented that "we will need to open and maintain accounts for you under New York Financial, LLC name as an American company sponsoring your firm and acting as your US local guarantor."

### B.    Musalli Places Its Investment Funds with JPMorgan

38.    In August 2004, Musalli executed an Investment Management Agreement (the "First Agreement"), in substantially the form proposed by NYF. *See Exhibit 3.* In the First Agreement, NYF and Boktor assured Musalli that they would: (1) "manage and direct the

investments . . . consistent with [Musalli's] Investment Objectives;" (2) "act as [Musalli's] agent and attorney-in-fact;" (3) "act with due consideration, care, prudence and diligence . . . that a fiduciary . . . would use under such circumstances;" (4) "monitor, supervise, and direct the investments of [Musalli] in accordance with [Musalli's] investment objectives;" and (5) provide Musalli with a written report, on at least a quarterly basis, of the valuation of its investments.

39.    The First Agreement identified the bank of record as JPMorgan and Nicholas Gambella as the JPMorgan vice-president responsible for the JPMorgan Investment Program. Needless to say, having the investment with a major financial institution such as JPMorgan gave Musalli trust and confidence that the funds would be handled appropriately. Simply stated, Musalli wanted to place its funds in a secure JPMorgan Investment Program, as promised by Boktor.

40.    In order to proceed with the JPMorgan Investment Program, however, Boktor insisted that Musalli give him a power of attorney in a form issued by JPMorgan. To that end, in June 2004, Boktor sent Musalli a JPMorgan power of attorney, to be translated into Arabic, and a proposed Investment Management Agreement.    Musalli translated and executed a power of attorney and returned it to Boktor. *See Exhibit 4.*

41.    The power of attorney is particularly significant because it allowed Boktor and NYF to act on behalf of Musalli in their dealings with JPMorgan.  The power of attorney was to be used only in connection with Musalli's placement of funds in the JPMorgan Investment Program and in order to facilitate transactions with JPMorgan.  It limited the type of investments Boktor and NYF were permitted to make on Musalli's behalf. The Power of Attorney did not allow Boktor or NYF to transfer funds out of the JPMorgan Investment Program for their own

benefit or to a speculative currency trading account. Gambella knew that Musalli limited Boktor's use of the power of attorney to investing its funds in the JPMorgan Investment Program.

42. In connection with the JPMorgan Investment Program, NYF and Boktor also sent Musalli an "Investment Strategy Report" dated September 2, 2004 (the "First Strategy Report") containing a JPMorgan logo and bank stamp. The First Strategy Report provided an itemization of investment objectives as well as a portfolio "mix" that would be the centerpiece of a JPMorgan Investment Program. The First Strategy Report was signed by NYF, and provided Musalli with additional comfort that its funds were to be invested with JPMorgan. *See Exhibit 5.*

43. In August of 2004, Musalli wired $2.05 million to NYF's JPMorgan Bank account #XXX-XXXXX77-65 (the "JPMorgan Bank Account")[2] to be invested in the JPMorgan Investment Program. Musalli completed wire transfer applications indicating that the funds came from Musalli through the National Commercial Bank and the Saudi British Bank, both of which are located in Saudi Arabia.

44. Consistent with its KYC obligations, the collective knowledge of its "family" members, and Gambella's personal knowledge of the Musalli-NYF relationship, JPMorgan knew the source of the funds and purpose of the investment. Upon receipt of these funds, JPMorgan also assumed a duty to maintain the Musalli investment funds in accordance with Musalli's wishes. Further, JPMorgan internal documents and account statements tracked the investment funds from Musalli to JPMorgan.

---

[2] This account was maintained at the JPMorgan Bank branch at 127 Seventh Avenue, Brooklyn, New York. The account numbers in this complaint and on the exhibits have been partially redacted to preserve the confidentiality of the financial information contained in the documents.

45.    NYF also maintained an investment account with Chase Investment (Account ##XXXXX4375; XXXXX4170; XXXXX4189; and XXXXX4197 – the "JPMorgan Investment Account"), and Gambella was the representative for the account.[3]

46.    On September 22, 2004, NYF transferred $1 million of Musalli's investment funds from the JPMorgan Bank Account to the JPMorgan Investment Account. Gambella invested 50% of the Musalli funds in bonds and the remaining 50% in equities. JPMorgan internal documents and account statements tracked the transfer of the Musalli investment funds from the JPMorgan Bank Account to the JPMorgan Investment Account.

47.    At the time of these transfers, Gambella knew that Boktor and NYF held themselves out as "investment advisors" for Musalli, had a limited power of attorney in favor of Musalli, and maintained a fiduciary relationship with Musalli. Through Gambella and otherwise, defendants all knew that funds NYF and Boktor placed in the JPMorgan Investment Account belonged to Musalli, and that NYF and Boktor invested them for the benefit of Musalli.

### C.    The Conversion of Musalli's JPMorgan Investment Program Funds and the Use of Sham JPMorgan Account Statements

48.    Although Boktor made preliminary inquiries of JPMorgan regarding a credit facility for Musalli, this effort went nowhere in late 2004. Rather, Boktor provided various excuses why he could not proceed with obtaining a gold loan, including purported "regulatory" problems. In any event, despite Musalli's clear objective to pledge the JPMorgan Investment Program funds as collateral for a gold loan, initially Boktor and NYF did nothing to pursue such a credit facility.

49.    Instead, unknown to Musalli, in the fall of 2004, Boktor and NYF began converting the JPMorgan Investment Program funds by transferring them to a currency trading

---

[3] The JPMorgan Investment Account was maintained by Gambella at the JPMorgan Bank branch at 127 Seventh Avenue, Brooklyn, New York.

firm – Refco FX ("Refco") -- and for Boktor's personal expenses, including transfers to his wife. In the fall of 2004, Boktor transferred about $800,000 of the investment funds to a secret Refco currency trading account. The surreptitious diversion of investment funds was not authorized by Musalli, which would have never allowed its funds to be placed in a risky and speculative currency trading account. Further, the transfers were not permitted by the limited power of attorney executed by Musalli. Neither JPMorgan, Gambella, Boktor, nor NYF gave Musalli written notice of the transfer of funds, nor did they provide Musalli with account statements or documentation showing the unlawful transfer of the funds.

50.     JPMorgan and Gambella knew that the purpose of the JPMorgan Investment Program was to collateralize the gold loan and that the transfer of funds for Boktor's personal uses and into a speculative and risky currency trading account directly contradicted Musalli's investment plan.  Neither Gambella nor JPMorgan prevented or disclosed the obviously wrongful diversion of funds, even though they assumed a duty to safeguard Musalli's investment funds in the JPMorgan Investment Program.  Indeed, JPMorgan generated and maintained account statements showing the movement of the funds coming into the JPMorgan Investment Program from Musalli and transferred out to Refco and Boktor.

51.     Upon information and belief, defendants, NYF and Boktor conspired and agreed to participate in a scheme to aid Boktor and NYF to unlawfully convert Musalli's investment funds out of the JPMorgan Investment Program for their personal uses, and further agreed to conceal and perpetuate the scheme, causing Musalli to invest (and lose) its investment funds. Defendants, NYF, and Boktor took overt and parallel steps in furtherance of this common purpose by misrepresenting and failing to disclose that NYF and Boktor had diverted the funds.

Instead, defendants, NYF, and Boktor lulled Musalli into a false sense of security that its funds were safe and secure in the JPMorgan Investment Program. Because of the common plan and purpose of the defendants, NYF, and Boktor, the acts (and omissions) of each of the co-conspirators are attributable to the others.

52.    In order to keep the conversion hidden, and to further the fraudulent scheme, Boktor and NYF sent Musalli fictitious JPMorgan Investment Program account statements. In October 2004, Musalli requested a statement regarding its investment funds, and Boktor provided a sham account statement showing Musalli's funds in a JPMorgan account held: "Care of: New York Financial, LLC, Musalli Factory Sub." The statement indicates that Musalli's "Relationship Manager" was the "JPMorgan Branch Manager" and that Musalli's funds were placed in a "JPMorgan Investment." The account statement is an entirely false document. A copy is attached as *Exhibit 6.*

53.    In December of 2004, following the initial diversion of investment funds, Gambella had a telephone conversation with El-Nagar and Boktor. Gambella and Boktor were at JPMorgan's office in Brooklyn, New York, and El-Nagar was in Saudi Arabia. Boktor introduced Gambella as the vice-president of the investment department of JPMorgan New York and the representative for the JPMorgan Investment Program. Gambella described in detail the benefits of a JPMorgan Investment Program and his role at JPMorgan in an effort to further the business relationship between Musalli and JPMorgan. In this respect, Gambella had unique and specialized expertise regarding the JPMorgan investment services and the JPMorgan Investment Program.

54.    At the time of the call, JPMorgan and Gambella knew, or should have known, that

Boktor and NYF had breached their fiduciary duties to Musalli by fraudulently diverting Musalli's funds in the JPMorgan Investment Program contrary to Musalli's specific investment objectives. JPMorgan documents reveal that between November 1, 2004, and December 23, 2004, Boktor removed over $840,000 from the JPMorgan Investment Program, including $25,000 for his wife and $800,000 to Refco, a speculative and secret currency trading account. JPMorgan and Gambella possessed superior knowledge with respect to the diverted funds, which information was not readily available to Musalli; nor was Musalli aware of the diversion of its funds. Further, JPMorgan and Gambella knew that Musalli was unaware of the diversion and that Musalli was acting (or failing to take appropriate action to protect its invested funds) on the mistaken belief that its investment funds were safe and secure in the JPMorgan Investment Program.

55.    During the call, Gambella also intentionally failed to advise El-Nagar that Boktor and NYF had diverted the Musalli investment funds, contrary to the investment objectives the parties discussed on the call. At no time did Gambella or JPMorgan tell Musalli that a significant amount of its investment funds were no longer in the JPMorgan Investment Program. Instead, Gambella knowingly lulled Musalli into believing that the full amount of its investment funds were safe with JPMorgan, and that it should continue to do business with Boktor, NYF and JPMorgan. Gambella made these statements (or failed to make necessary material disclosures) with the intent of having Musalli rely on them and in furtherance of an agreement with NYF and Boktor to prevent Musalli from recovering its invested funds and to deceive Musalli into transferring additional funds to the JPMorgan Investment Program.

56.    Musalli reposed trust and confidence in the expertise of Gambella and JPMorgan

in creating and managing the JPMorgan Investment Program. Indeed, Musalli invested its funds with JPMorgan so that it could use this expertise to maximize its returns and obtain a favorable credit facility. However, JPMorgan breached its duties to Musalli by, among other things, knowingly concealing the wrongful diversion of funds by Boktor and NYF.

57.    Musalli justifiably relied on Gambella's statements and omissions by continuing to transfer funds to be invested through NYF in the JPMorgan Investment Program. If Gambella or JPMorgan had advised Musalli that its funds had been diverted by Boktor, then Musalli would have been able to recover the diverted funds and would not have invested additional funds with the JPMorgan Investment Program.

58.    Gambella possessed a financial motive and opportunity to make these statements described above and to neglect to make necessary disclosures of material information to Musalli. If Musalli continued to transfer funds to NYF to invest with JPMorgan, Gambella would earn additional commissions.

59.    Gambella's statements and omissions substantially assisted Boktor's and NYF's breach of fiduciary duty to Musalli and their scheme to defraud Musalli.

### D.    Musalli Negotiates a Proposed Gold Loan with JPMorgan

#### 1)    The Second Agreement Between Musalli and NYF

60.    In late 2004 and early 2005, Boktor informed Musalli that NYF's "regulatory issues" had been resolved, and proposed to move forward to arrange a gold loan with JPMorgan bankers in London. Boktor further stated that he, along with JPMorgan, would design an expanded JPMorgan Investment Program that could be pledged as collateral for the loan. Indeed, Boktor contacted JPMorgan bankers in London, including Martin Stokes and Karim Tannir, who

would help to arrange the credit facility.

61.    Boktor assured Musalli that the expanded investment program would be highly profitable and would enable Musalli to secure financing on favorable terms. He also claimed that, based on his contacts with the JPMorgan Bank representatives in London, he would be able to arrange for the investment funds held in New York to serve as collateral for a London loan.

62.    In addition, Boktor advised that JPMorgan Bank would need to conduct "due diligence" on Musalli. As a result, Musalli provided the JPMorgan Bank representatives in London with extensive information about its business activities. To track Musalli in its internal system, JPMorgan Bank assigned Musalli a client identification number and Boktor was designated Musalli's principal contact.

63.    Because Boktor anticipated that the JPMorgan Investment Program would be pledged directly to JPMorgan, he also proposed that the parties enter into a new Investment Management Agreement. NYF's counsel prepared a draft agreement and Boktor sent it to Musalli in Saudi Arabia, along with a new JPMorgan Investment Strategy Report (the "Second Strategy Report"). *See Exhibit 7.*

64.    Musalli redrafted the proposed agreement by correcting various errors. On March 12, 2005, Musalli sent NYF and Boktor an Exclusive Investment Management and Representation Agreement (the "Second Agreement"), which provided that NYF and Boktor would act as investment managers and advisors for Musalli, and "supervise and direct the investments of [Musalli] in accordance with investment objectives communicated to [NYF] ...." Furthermore, NYF was to serve as Musalli's "attorney-in-fact" with respect to its investment decisions, and the Second Agreement tracks the parties' understanding that NYF and Boktor

would continue to serve as investment advisors with respect to Musalli's funds placed in the JPMorgan Investment Program. *See Exhibit 8.*

65.    The Second Strategy Report sets forth a blended portfolio for the JPMorgan Investment Program. It also confirmed that NYF and Boktor would invest Musalli's funds with JPMorgan using a "proprietary technical model" and a "well designed asset allocation strategy [as] the foundation of a sound investment portfolio."

66.    Musalli again requested an "official document" from NYF confirming the investment with JPMorgan. Boktor had no choice but to manufacture another false JPMorgan document, since he had already diverted about $800,000 to Refco. Boktor then created a second sham account statement, again lulling Musalli into a false sense of security that its funds were in the JPMorgan Investment Program. A copy of this statement is attached as *Exhibit 9*. The second false statement, like the first, is remarkably similar to the statements JPMorgan sent to NYF, and indicates that the investment funds were being held by NYF on behalf of Musalli in a "sub" JPMorgan account.  The sham account statements, though, clearly link JPMorgan to the investment funds, which was exactly the false impression Boktor and NYF sought to create.

67.    Thereafter, Musalli was assured by Boktor and NYF that the JPMorgan Investment Program would be managed in accordance with the Second Agreement and the Second Strategy Report.

### 2) *The JPMorgan Bankers Conduct Due Diligence on the Gold Loan*

68.    By March 2005, Boktor represented that the negotiations with JPMorgan had moved forward and that the JPMorgan Bank representatives were prepared to visit Musalli in Jeddah. Indeed, Boktor suggested that this meeting was a mere formality and that JPMorgan had

substantially agreed to the gold loan along the lines suggested by Boktor.

69.    In particular, Boktor advised that funds in the JPMorgan Investment Program would be pledged as part of a JPMorgan Bank gold loan. He assured Musalli that he had communicated directly with the JPMorgan Bank representatives in London and that, acting as Musalli's representative, he would be able to secure a credit facility with JPMorgan.

70.    In an e-mail dated March 4, 2005, Karim Tannir at JPMorgan Bank in London requested Boktor to provide certain information about Musalli that was needed to satisfy JPMorgan's internal KYC requirements. Tannir also copied El-Nagar and Martin Stokes with the e-mail. Tannir and Stokes thus had actual knowledge that Boktor was acting on Musalli's behalf in a fiduciary capacity.

71.    On March 6, 2005, El-Nagar responded by e-mail to Tannir indicating that "according to arrangements between New York Financial LLC and JPMorgan Investments New York," Musalli was prepared to collateralize 110% of the gold loan by using "25% to 35% upfront cash collateral to be placed with JPMorgan Investments" and the remaining collateral would be treasury bonds and other investments pledged directly to JPMorgan Bank in London. El-Nagar indicated that more information would be provided at the meeting in Jeddah.

72.    The JPMorgan bankers – Martin Stokes and Karim Tannir – met with Musalli representatives in mid-March 2005 to discuss the gold loan. The gold loan transaction required extensive due diligence, regulatory investigation, and substantial interaction between the parties. During the negotiations, Stokes and Tannir discussed how Musalli's funds in the JPMorgan Investment Program would be used to collateralize a gold loan from JPMorgan Bank in London. Stokes confirmed to El-Nagar that Musalli had already invested $2.05 million with the JPMorgan

Investment Program.

73.     Besides completing a significant amount of due diligence on Musalli, Stokes and Tannir possessed unique and specialized expertise regarding JPMorgan's loan programs and the contemplated gold loan.   Thus, Musalli justifiably relied on this expertise in maintaining its funds and continuing to invest in the JPMorgan Investment Program.

74.     Stokes's statements to Musalli, however, were false since the JPMorgan Investment Program only contained approximately $1 million due to the diversion of $1.05 million to Refco and to Boktor. Stokes knew, or should have known, that Boktor and NYF had improperly transferred money out of the JPMorgan Investment Program contrary to Musalli's investment objectives.   Musalli reasonably relied on the statements (and omissions) made by Stokes and Tannir.

75.     Thus, at the time of the gold loan negotiations, defendants knew that Musalli was acting on the mistaken belief that Boktor and NYF were loyal fiduciaries and that all of Musalli's funds were in the JPMorgan Investment Program.

76.     Therefore, defendants possessed superior knowledge with respect to all matters discussed in connection with the JPMorgan Investment Program and the proposed gold loan.

77.     Musalli placed trust and confidence in the expertise and knowledge of Stokes, Tannir, and JPMorgan, who betrayed that trust by knowingly or negligently providing false information and concealing the true status of the JPMorgan Investment Program.

78.     Further, Stokes made these statements (or omissions) intending to have Musalli rely on them and to invest additional funds in the JPMorgan Investment Program.

79.     Stokes's statements and omissions substantially assisted Boktor's and NYF's

breach of fiduciary duty to Musalli and their scheme to defraud Musalli.

80.    Musalli justifiably relied on Stokes's statements to its detriment by continuing to transfer funds to NYF for the JPMorgan Investment Program, and by failing to recover the invested funds already diverted by Boktor and NYF.

81.    After this meeting in Jeddah, JPMorgan conducted further due diligence on Musalli and communicated with Gambella and Boktor about how the JPMorgan Investment Program would be used as collateral for the gold loan from JPMorgan Bank in London. Indeed, in a subsequent telephone conversation with El-Nagar, Boktor again confirmed that the JPMorgan bankers were well aware of Musalli's funds in the JPMorgan Investment Program.

82.    By mid-April, Musalli became anxious to move forward with the deal. On April 17, 2005, El-Nagar sent an e-mail to Tannir confirming the outline of the transaction and asking if JPMorgan required any further information. *See Exhibit 10.*  In addition, El-Nagar confirmed that "[t]he investment program with JPMORGAN NEW YORK is ready, and we are waiting your credit facility contract to advise JPMORGAN NEW YORK to pledge the investment program in favor of JPMORGAN LONDON." The e-mail recounts that Boktor and Gambella had put the JPMorgan Investment Program in place and it was ready to serve as collateral for the JPMorgan gold loan.

83.    On April 29, 2005, Tannir responded to El-Nagar, with a copy to Boktor and Stokes, in the following e-mail:

Thank you for your email.

I apologize for not coming back to you earlier as we have been trying to sort out the internal constraint that we have *regarding the use of moneys placed in NY as a collateral for transaction done out of London.*

We are still in the process of finalizing these discussions internally and we are meeting again early next week with an update on the situation.

I sincerely apologize for the delay in getting the transaction completed but we have some Fed regulations and Legal compliance points that we need to finalize. *From your side you have supplied us with all the information we need* and given us most of the assurance required. So the ball is in our court to get back to you.

Again I would like to assure you that we are doing all we can to speed up the process and make sure we are ready to transact. I appreciate your patience and your assistance as well as the warm hospitality that you and the Musalli family have showed us and we endeavor to get back to you on this as soon as we can.

*See Exhibit 11.* (emphasis added). Tannir thus confirmed once again that the funds placed in the JPMorgan Investment Program were to be used to collateralize a gold loan with JPMorgan Bank in London.

### E.     JPMorgan Fails to Offer a Gold Loan
### Upon Terms Acceptable to Musalli

84.     Despite extensive negotiations, JPMorgan Bank in London was unwilling to make a suitable loan proposal. For one thing, the JPMorgan bankers concluded that banking regulations would allow funds held in the JPMorgan Investment Program in New York to be used as collateral for a London loan. Instead, the bankers suggested placing cash collateral in London equal to 120% of the loan. This proposal was not significantly different from – or even worse than – the credit terms Musalli had with Saudi banks. Putting up cash collateral, rather than having its funds grow in a suitable investment program, did not meet Musalli's objectives. This arrangement, then, was completely unacceptable to Musalli.

85.     Although for a time, Musalli believed that the gold loan could be worked out with JPMorgan Bank, and the parties continued to negotiate a possible resolution, the transaction was never completed. Thus, by mid-2005, Boktor and NYF had not been able to successfully

negotiate a gold loan with JPMorgan on Musalli's behalf.

**F.    Boktor Suggests Using the JPMorgan Investment Program
to Collateralize a Standby Letter of Credit**

86.    When it appeared that JPMorgan Bank would not offer a suitable gold loan,
Boktor proposed another strategy to Musalli:  JPMorgan Bank could issue a standby letter of
credit against the existing JPMorgan Investment Program and the letter of credit would then be
used as collateral for a gold loan with another banking institution.

87.    Thus, Boktor suggested that he could obtain a standby letter of credit from
JPMorgan Bank and could also negotiate a credit facility with a new lending institution, such as
the National Bank of Dubai. Boktor told Musalli, however, that the JPMorgan Investment
Program would need to be increased from $2.05 million to $5 million in order for the strategy to
work. Boktor proposed using the letter of credit to free-up Musalli's pre-existing cash collateral,
which would then be placed in the JPMorgan Investment Program.

88.    Boktor sent an e-mail dated May 31, 2005, to Stephen Abbriano of the Bank of
Nova Scotia (which acted as the Bank of Dubai's representative for gold loans) under the subject
"JPMorgan Investment Program."  In the e-mail, Boktor confirms that he is acting as Musalli's
U.S. representative and he sets forth his new proposal, including using a letter of credit issued
against the JPMorgan Investment Program funds as collateral for a gold loan. In this e-mail,
Boktor states that the collateral to be used would be the "JP Morgan Investment, New York,
investment portfolio . . . $5 million [plus] future returns  . . . to be increased gradually as
mentioned [in the] strategy contract issued by JP Morgan copy attached." Further, Boktor told
Abbriano that he could contact Gambella at JPMorgan in order to "discuss the collateralization

of [the Musalli] JP Morgan investment portfolio . . . ." *See Exhibit 12.*

**G.    Musalli Places a Total of $5 Million in the JPMorgan Investment Program**

89.    As described above, Boktor insisted that Musalli would need to fund the JPMorgan Investment Program with a total of $5 million. Musalli had discussed with representatives of JPMorgan Bank that it already had $2.05 million in the JPMorgan Investment Program. Thus, Musalli believed it needed to transfer an additional $2.95 million to the JPMorgan Investment Program.

90.    In July 2005, relying on Boktor's representations, and on the previous false statements and omissions of JPMorgan representatives, Musalli transferred additional funds to the JPMorgan Bank Account, bringing its total investment in the JPMorgan Investment Program up to $3.95 million. These transfers were tracked by internal JPMorgan documents and account statements. Upon receipt of the funds, JPMorgan was under a duty to maintain them in a safe and secure JPMorgan Investment Program.

91.    In making the transfers, Musalli noted on its wire applications that the funds were "for our investment program with JPMorgan New York." Upon receiving the funds, JPMorgan Bank issued an advice of credit and sent it to Boktor and NYF, indicating that the funds were sent by Musalli "FOR OUR INVESTMENT PROG WITH CHASE," thus confirming that the funds should go into the JPMorgan Investment Program. *See Exhibit 13.* These documents further confirm JPMorgan's responsibility to safeguard Musalli's funds in a safe and secure JPMorgan Investment Program.

92.    Again, consistent with its KYC policies, the collective knowledge of its "family," including JPMorgan Bank and Chase Investment, and Gambella's personal knowledge,

JPMorgan was well aware that Musalli's funds were to be maintained in the JPMorgan Investment Program in accordance with Musalli's instructions.

93.     At or about the time Musalli wired its investment funds to JPMorgan, bank employees were also working on issuing a letter of credit supported by the JPMorgan Investment Program.  JPMorgan also engaged in further due diligence regarding Musalli's desire to use a JPMorgan letter of credit to obtain a credit facility.  During this time, JPMorgan employees and Boktor exchanged draft letters of credit.

94.     In reliance upon the previous statements (and omissions) made by JPMorgan, by the end of August 2005, Musalli wired an additional $1.05 million to JPMorgan Bank in order to fully fund the $5 million JPMorgan Investment Program.  Thus, internal JPMorgan documents tracked all of the transfers from Musalli as described above; as well as transfers into and out of the JPMorgan Investment Program accounts.  *See Exhibit 14.*

### H.     Boktor and NYF Induce Musalli To Execute a Non-Circumvention Agreement

95.     Also, in August of 2005, Boktor represented falsely that, in order to move forward with a standby letter of credit, Musalli would need a signed "non-circumvention" agreement.  Boktor sent to El-Nagar by e-mail a proposed Non-Circumvention Agreement along with an application for a letter of credit. At that time, Boktor and NYF were acting as Musalli's trusted advisors.

96.     Because Musalli believed reasonably that the agreement was needed in order to obtain a letter of credit, it signed the Non-Circumvention Agreement and sent it to Boktor and NYF.

97.    However, the Non-Circumvention Agreement was procured by fraud and was intended to be used for an unlawful purpose, it is void and not legally binding. Nevertheless, as discussed below, the investment advisors, with defendants' assistance, later used the Non-Circumvention Agreement to try to conceal the theft of Musalli's investment funds.

**I.    The Theft of Musalli's Investment Funds on September 9**

98.    On September 9, 2005, Boktor spoke by telephone from Brooklyn with El-Nagar regarding obtaining the standby letter of credit from JPMorgan Bank. Boktor appeared nervous and out of breath and told El-Nagar that he was going to JPMorgan Bank to obtain the standby letter of credit.

99.    On that same day, and unknown to Musalli, Boktor and NYF transferred $3 million of Musalli's investment funds from the JPMorgan Investment Program to a secret Refco account controlled by NYF and Boktor.

100.    To try to justify the theft, Boktor sent Musalli by Federal Express an "Invoice and Statement" dated September 9, 2005, claiming, among other things, that Musalli had breached the Non-Circumvention Agreement by having an undisclosed banking relationship with JPMorgan. Although there was absolutely no basis for Boktor's "demand," he tried to claim he was owed about as much as Musalli had invested with JPMorgan Investment Program.

101.    As part of the Federal Express package, Boktor also included a JPMorgan computer "screen shot" that Boktor alleged showed an undisclosed banking relationship between Musalli and JPMorgan. Boktor later claimed he obtained the screen shot from Gambella. In any event, the screen shot was a confidential document that Boktor was not entitled to possess.

102.    The screen shot was used by NYF and Boktor as part of a subterfuge to justify the

theft. There was never any undisclosed banking relationship between Musalli and JPMorgan, and the screen shot merely reflected internal client identification numbers that JPMorgan established when Boktor first approached JPMorgan about obtaining a gold loan on behalf of Musalli.

103.    El-Nagar made a very personal appeal to obtain answers from Boktor, and Musalli sent numerous correspondence to Boktor and NYF in order to find out what happened.

104.    On September 12, 2005, El-Nagar spoke by telephone with Gambella in Brooklyn. El-Nagar tried to explain that Musalli did not have an undisclosed relationship with JPMorgan. Gambella stated falsely that Musalli had participated in a direct business relationship with JPMorgan Bank in London. Gambella further misrepresented that he was in possession of a June 2005 e-mail from Martin Stokes indicating that Musalli was a JPMorgan Bank client in London and had therefore violated the Non-Circumvention Agreement. Gambella knew that these statements were false. Moreover, although he knew that Boktor wrongfully had diverted Musalli's funds, Gambella never disclosed these facts to El-Nagar.

105.    Gambella made the above statements to intimidate Musalli, to falsely suggest that Musalli breached a legal obligation to NYF, and to aid NYF and Boktor in its fraudulent schemes. Gambella intended Musalli to rely on these statements in order to further the conspiracy and to substantially assist Boktor's and NYF's breach of fiduciary duties to Musalli and their scheme to defraud Musalli.

106.    If Gambella had disclosed the true circumstances, then Musalli could have taken steps immediately to recover its funds from NYF and Boktor.

107.    In the conversation with El-Nagar, Gambella further feigned disappointment with Musalli over its purported dealings with the JPMorgan Bank in London because he and others

had spent considerable time creating the JPMorgan Investment Program for Musalli in New York. Thus, once again, defendants perpetuated and concealed the fraud, rather than making full disclosure to Musalli.

108.     In a subsequent telephone conversation (secretly recorded by Boktor), Gambella and Boktor joked about how Boktor obtained the "screen shot" and the implications of such a document being released by JPMorgan. This conversation confirmed Gambella's active and knowing participation in the effort to conceal the diversion and perpetuate the fraud by misleading Musalli about an alleged "circumvention."

109.     Thereafter, Boktor threatened Musalli with legal action and referred the matter to Jacques Catafago, NYF's lawyer. Trying to be completely cooperative, Musalli provided Mr. Catafago with all the information it had been able to accumulate regarding the purported circumvention and confirmed that there was no secret relationship with JPMorgan Bank in London.

110.     On October 5, 2005, Catafago and Musalli representatives met with the JPMorgan Bank representatives in London to discuss the screen shot and whether there was any undisclosed relationship with the bank. At the meeting, Mr. Catafago was advised, in no uncertain terms, that no such secret accounts existed and that there was no undisclosed banking relationship between JPMorgan Bank in London and Musalli.

111.     After Boktor and NYF diverted about $3.8 million to Refco, the firm later filed for bankruptcy and Musalli's investment funds were lost.

J.      **JPMorgan's Actual Notice of the Diversion
and Breach of Its Duties to Musalli**

112.    Since neither Gambella nor Boktor would inform Musalli about the status of its investment funds, on October 21, 2005, El-Nagar called Stokes inquiring about the $5 million that Musalli had transferred to the JPMorgan Investment Program.  Stokes replied that he would investigate the circumstances of Musalli's transfer of funds to JPMorgan through NYF.  Stokes knew that Musalli trusted him to carefully investigate the matter.

113.    Stokes e-mailed Gambella that same day with a copy to Karim Tannir, stating that Musalli transferred $5 million to Gambella and asking him to confirm that the funds remained in the JPMorgan Investment Program.

114.    Gambella responded to Stokes by denying that Musalli had ever placed funds in the JPMorgan Investment Program.  Gambella knew these statements were false because he had personal knowledge that Musalli transferred the funds to JPMorgan Bank with explicit instructions to place them in "our investment program with Chase."  Gambella also knew, or should have known, that Boktor and NYF had fraudulently diverted Musalli's investment funds from the JPMorgan Investment Program to themselves and to Refco.

115.    In an e-mail that same day, Stokes replied to Gambella that "NO accounts were opened" at JPMorgan Bank in London for Musalli.  Stokes reiterated to Gambella – again with a copy to Tannir – that the Musalli "funds were sent to you via NY Financial." Stokes further stated that he was "somewhat concerned about what has happened to this money."  He also wondered how JPMorgan's confidential "internal paperwork" (e.g., the screen shots) had been released from the bank.

116.    Gambella responded by again falsely denying that he was aware of Musalli placing any funds in the JPMorgan Investment Program.  Gambella knew that his statements

31

were intentionally misleading and part of an effort to fraudulently conceal NYF's and Boktor's

unlawful scheme. Gambella intended Stokes to convey this false information to Musalli in order

to aid the agreement with NYF and Boktor to perpetuate and conceal NYF's and Boktor's fraud

and breach of fiduciary duty.

117.    Gambella's statements and omissions substantially assisted Boktor's and NYF's

breach of fiduciary duty to Musalli and their scheme to defraud Musalli.

118.    Further, on December 15, 2005, El-Nagar e-mailed Stokes stating that he needed

his help regarding the JPMorgan Investment Program. El-Nagar told Stokes that Musalli's

"relationship with New York Financial LLC (Mr. Amir Boktor) is under investigation from

JPMorgan New York legal counsel" and that Musalli's lawyer had written to JPMorgan counsel

to investigate the location of the funds Musalli transferred to NYF for the JPMorgan Investment

Program.

119.    Defendants had a duty to inquire of Boktor's and NYF's actions and to protect

Musalli's funds, however they breached those duties. If defendants had exercised their duty of

care to Musalli, they would have safeguarded the funds in the JPMorgan Investment Program.

Instead, JPMorgan closed the JPMorgan Investment Account on or about December 31, 2005,

and transferred the remaining Musalli investment funds (about $1 million) into Boktor's personal

accounts.

120.    Defendants were aware of the unlawful diversion of Musalli's investment funds,

and they failed to inform Musalli of the theft and prevent further diversion of Musalli's funds

from the JPMorgan Investment Program. If Gambella had disclosed NYF's and Boktor's

diversion of funds, Musalli would have prevented the diversion of the remaining $1 million to

Boktor and NYF.

121.    Based upon the above facts, JPMorgan and its employees had a duty to safeguard the funds placed in the JPMorgan Investment Program.  By virtue of its KYC obligations and the collective knowledge of its employees, JPMorgan knew that the funds were invested on Musalli's behalf and were to be maintained in a manner consistent with Musalli's investment objectives.  By accepting these funds and using its collective expertise and knowledge to assist Musalli in achieving its investment objectives, JPMorgan not only became an agent of Musalli's but was a fiduciary that had a duty to safeguard and protect the investment funds.  JPMorgan breached it's duties to Musalli by failing to protect those funds from the unlawful diversion by Boktor and NYF.

122.    As a direct and proximate result of the defendants' misrepresentations, actions, and omissions, Musalli lost all of the $5 million placed in the JPMorgan Investment Program

## VII. CAUSES OF ACTION

### COUNT 1 – COMMON LAW FRAUD

123.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

124.    Defendants intentionally made various material misrepresentations and non-disclosures to Musalli, including, but not limited to, the statements described above.

125.    Defendants knew of the falsity of their misrepresentations and materiality of their non-disclosures when made, and at the time of making the misrepresentations, made them with the intent of deceiving and defrauding Musalli.

126.    Musalli was unaware of the falsity of the representations, believed them to be

true, and reasonably relied upon them.

127.    As a result of defendants' misrepresentations and omissions, Musalli has suffered economic harm.

## COUNT 2 – AIDING AND ABETTING FRAUD

128.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

129.    NYF and Boktor committed fraud against Musalli as described herein.

130.    Gambella and JPMorgan, through its employees, had actual knowledge of NYF's and Boktor's fraud against Musalli.

131.    Defendants provided substantial assistance to NYF and Boktor to advance the commission of the fraud.

132.    As a result of the defendants' actions, Musalli has suffered economic harm.

## COUNT 3 – CONSPIRACY TO DEFRAUD

133.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

134.    NYF, Boktor, and defendants, through their employees, agreed to induce Musalli to transfer funds to NYF in order to effectuate the fraudulent scheme described herein.

135.    NYF, Boktor, and defendants, through their employees, performed one or more overt acts in furtherance of this agreement as described herein.

136.    NYF, Boktor, and defendants, through their employees, intentionally participated in the furtherance of their common plan or purpose of inducing Musalli to transfer funds to NYF in order to effectuate the fraudulent scheme described herein.

137.    Musalli was damaged as a result of the actions of Boktor, NYF, and defendants.

## COUNT 4 – FRAUDULENT CONCEALMENT

138.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

139.    The relationship between defendants and Musalli imposed a duty on defendants to disclose that NYF and Boktor were diverting Musalli's funds.

140.    Defendants possessed superior knowledge of the diversion that was not readily available to Musalli.

141.    Defendants further knew that Musalli was unaware of the diversion and was acting on the basis of a mistaken belief that NYF and Boktor were investing its funds as specifically directed by Musalli.

142.    Defendants also made intentionally false statements or omitted material facts, as described above, which misled Musalli into believing that its investment funds were being maintained and safeguarded in a JPMorgan investment program.

143.    Musalli was unaware of NYF and Boktor's diversion of its investment funds, and reasonably relied upon defendants' false statements and omissions.

144.    As a result of defendants' misrepresentations and omissions, Musalli has suffered economic harm.

145.    In view of the flagrant, wanton, and intentionally fraudulent conduct on the part of the defendants, Musalli is entitled to punitive damages in an amount to be determined at trial.

## COUNT 5 – NEGLIGENT MISREPRESENTATION/NONDISCLOSURE

146.    Musalli repeats and realleges each and every allegation contained and set forth in

paragraphs 1 through 119 as though fully set forth herein.

147.    Defendants and their employees possessed unique or specialized expertise and had a duty to use reasonable care to impart correct information to Musalli due to a special relationship of trust and confidence between the parties.

148.    Defendants breached that duty by imparting false information, and/or failing to impart correct information to Musalli, upon which Musalli and others were expected to rely, as described above.

149.    Musalli, unaware of the misstatements and nondisclosures made by defendants, reasonably and justifiably relied on the representations and nondisclosures of defendants. Defendants were aware of Musalli's reliance, and Musalli's reliance caused it to act or fail to act.

150.    Defendants induced Musalli to act on the basis of information that defendants and others supplied to Musalli or failed to disclose to Musalli.

151.    As a result of defendants' misrepresentations and nondisclosures, Musalli has suffered economic harm.

### COUNT 6 – NEGLIGENCE

152.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

153.    Musalli placed its investment funds with JPMorgan through NYF and Boktor, who defendants knew to be fiduciaries of Musalli.

154.    Defendants knew the purpose of the funds that Musalli transferred to JPMorgan.

155.    Defendants acquired actual knowledge that Boktor and NYF were diverting Musalli's funds to themselves and a secret foreign currency trading account.

156.    Having such knowledge, defendants owed Musalli, at a minimum, a duty to make a reasonable inquiry and prevent the diversion.

157.    Defendants breached the duty owed to Musalli as described herein by failing to make a reasonable inquiry and prevent the diversion.

158.    As a proximate result of defendants' breach, Musalli has been damaged.

<div align="center">

**COUNT 7 – BREACH OF FIDUCIARY DUTY**

</div>

159.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 though fully set forth herein.

160.    At all times relevant hereto, defendants had control over Musalli's investment funds, which were to be placed in the JPMorgan Investment Program, and then to be used as collateral for a credit facility with JPMorgan.

161.    Defendants knew that Musalli reposed trust and confidence in defendants with respect to the funds Musalli placed with JPMorgan.

162.    Defendants owed Musalli a fiduciary duty to act in Musalli's best interest with respect the investment funds placed with JPMorgan.  Defendants were bound to exercise the utmost good faith and reasonable care in the performance of the duties owed to Musalli.

163.    Musalli trusted and relied upon defendants to act in Musalli's best interest.

164.    Defendants breached their fiduciary duty and betrayed Musalli's trust by, among other things, the actions described herein.

165.    By reason of defendants' failure to serve Musalli in a proper, skillful, prudent, and diligent manner as alleged herein and because defendants directly breached their fiduciary duty, Musalli has been damaged in an amount not yet fully determined.

## COUNT 8 – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

166.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

167.    NYF and Boktor owed a fiduciary duty to Musalli to act in Musalli's best interest with respect to its funds.  NYF and Boktor were bound to exercise the utmost good faith and reasonable care in the performance of the duties owed to Musalli.

168.    Musalli trusted and relied upon NYF and Boktor to provide financial and investment advice with reasonable skill, care, and diligence and to act in Musalli's best interest.

169.    In breach of those fiduciary duties, NYF and Boktor, among other things, (1) failed to safeguard the investment funds; (2) failed to create a portfolio for the investments based on a profile of Musalli's risk tolerance level; (3) failed to maintain the investment funds in the JPMorgan Investment Program as promised; (6) made false and misleading oral and written statements to Musalli; (7) placed their own interests ahead of Musalli's; (8) failed to make and preserve account records and information concerning the investment funds; (9) diverted Musalli's funds to themselves and a speculative currency trading firm; and (10) concealed their unlawful conduct through false statements and sham legal positions.

170.    Defendants knew of the fiduciary relationship between Musalli and NYF and Boktor.

171.    Further, defendants knew of NYF's and Boktor's diversion of the Musalli investment funds.

172.    Defendants knowingly induced or participated in the breach of the fiduciary duties NYF and Boktor owed to Musalli as described herein.

173.    As a result of defendants' actions, Musalli has suffered economic harm.

## COUNT 9 – COMMERCIAL BAD FAITH

174.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

175.    Defendants, NYF, and Boktor engaged in a scheme or acts of wrongdoing against Musalli, for the purpose of wrongfully diverting Musalli's funds, as described herein

176.    Defendants had actual knowledge of the fraudulent diversion of funds that amounts to bad faith.

177.    Defendants and their employees were complicit in and knowingly participated with NYF and Boktor in effectuating the fraudulent diversion of funds in the JPMorgan Investment Program.

178.    Musalli was damaged as a result of the actions of Boktor, NYF, and defendants.

## VIII. DEMAND FOR RELIEF

By reason of the foregoing, Musalli requests relief with respect to all of the counts as follows:

(i)    Awarding Musalli damages in the amount of at least $5 million with interest;

(ii)    Awarding Musalli pre-judgment and post-judgment interest as a result of the wrongs complained of herein;

(iii)    Awarding Musalli its costs, expenses and reasonable attorney's fees;

(iv)    Awarding Musalli punitive damages in the amount of compensatory damages trebled in view of the flagrant, wanton, and intentional fraudulent conduct described herein; and

(v)    Awarding Musalli such other relief as the Court shall deem just and proper.

## IX. DEMAND FOR JURY TRIAL

Musalli hereby demands a jury trial in this action as to all claims so triable under law.

Dated:    May 30, 2008
          New York, New York

                              Respectfully Submitted,

                              **LAURO LAW FIRM**

                              By: _____
                              John F. Lauro, Esq. (NY Bar JFL-2635)
                              101 E. Kennedy Blvd., Su ite 3100
                              Tampa, Florida 33602
                              P: 813 222 8990  F: 813 222 8991
                              1540 Broadway, Suite 1604
                              New York, NY 10036
                              P: 646 746 8659  F: 212 938 0858
                              E-mail: jlauro@laurolawfirm.com
                              *Attorneys for Plaintiff*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system and was sent by U.S. mail May 30, 2008 to:

Andrea Likwornik Weiss
1185 Avenue of the Americas
17th Floor
New York, NY 10036
*Counsel for Defendants*

                              _____
                                        John F. Lauro

Exhibit 1



**Financial Action Task Force
on Money Laundering**
Groupe d'action financière
sur le blanchiment de capitaux

# THE FORTY

# RECOMMENDATIONS

20 June 2003
(incorporating the amendments of 22 October 2004)

All rights reserved.
Applications for permission to reproduce all or part of this publication should be made to:
FATF Secretariat, OECD, 2 rue André Pascal 75775 Paris Cedex 16, France

## INTRODUCTION

Money laundering methods and techniques change in response to developing counter-measures. In recent years, the Financial Action Task Force (FATF) [1] has noted increasingly sophisticated combinations of techniques, such as the increased use of legal persons to disguise the true ownership and control of illegal proceeds, and an increased use of professionals to provide advice and assistance in laundering criminal funds. These factors, combined with the experience gained through the FATF's Non-Cooperative Countries and Territories process, and a number of national and international initiatives, led the FATF to review and revise the Forty Recommendations into a new comprehensive framework for combating money laundering and terrorist financing. The FATF now calls upon all countries to take the necessary steps to bring their national systems for combating money laundering and terrorist financing into compliance with the new FATF Recommendations, and to effectively implement these measures.

The review process for revising the Forty Recommendations was an extensive one, open to FATF members, non-members, observers, financial and other affected sectors and interested parties. This consultation process provided a wide range of input, all of which was considered in the review process.

The revised Forty Recommendations now apply not only to money laundering but also to terrorist financing, and when combined with the Eight Special Recommendations on Terrorist Financing provide an enhanced, comprehensive and consistent framework of measures for combating money laundering and terrorist financing. The FATF recognises that countries have diverse legal and financial systems and so all cannot take identical measures to achieve the common objective, especially over matters of detail. The Recommendations therefore set minimum standards for action for countries to implement the detail according to their particular circumstances and constitutional frameworks. The Recommendations cover all the measures that national systems should have in place within their criminal justice and regulatory systems; the preventive measures to be taken by financial institutions and certain other businesses and professions; and international co-operation.

The original FATF Forty Recommendations were drawn up in 1990 as an initiative to combat the misuse of financial systems by persons laundering drug money. In 1996 the Recommendations were revised for the first time to reflect evolving money laundering typologies. The 1996 Forty Recommendations have been endorsed by more than 130 countries and are the international anti-money laundering standard.

In October 2001 the FATF expanded its mandate to deal with the issue of the financing of terrorism, and took the important step of creating the Eight Special Recommendations on Terrorist Financing. These Recommendations contain a set of measures aimed at combating the funding of terrorist acts and terrorist organisations, and are complementary to the Forty Recommendations[2].

A key element in the fight against money laundering and the financing of terrorism is the need for countries systems to be monitored and evaluated, with respect to these international standards. The mutual evaluations conducted by the FATF and FATF-style regional bodies, as well as the assessments conducted by the IMF and World Bank, are a vital mechanism for ensuring that the FATF Recommendations are effectively implemented by all countries.

---

[1] The FATF is an inter-governmental body which sets standards, and develops and promotes policies to combat money laundering and terrorist financing. It currently has 33 members: 31 countries and governments and two international organisations; and more than 20 observers: five FATF-style regional bodies and more than 15 other international organisations or bodies. A list of all members and observers can be found on the FATF website at http://www.fatf-gafi.org/Members_en.htm

[2] The FATF Forty and Eight Special Recommendations have been recognised by the International Monetary Fund and the World Bank as the international standards for combating money laundering and the financing of terrorism.

# THE FORTY RECOMMENDATIONS

## A.    LEGAL SYSTEMS

### *Scope of the criminal offence of money laundering*

1.    Countries should criminalise money laundering on the basis of the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, 1988 (the Vienna Convention) and the United Nations Convention against Transnational Organized Crime, 2000 (the Palermo Convention).

Countries should apply the crime of money laundering to all serious offences, with a view to including the widest range of predicate offences. Predicate offences may be described by reference to all offences, or to a threshold linked either to a category of serious offences or to the penalty of imprisonment applicable to the predicate offence (threshold approach), or to a list of predicate offences, or a combination of these approaches.

Where countries apply a threshold approach, predicate offences should at a minimum comprise all offences that fall within the category of serious offences under their national law or should include offences which are punishable by a maximum penalty of more than one year's imprisonment or for those countries that have a minimum threshold for offences in their legal system, predicate offences should comprise all offences, which are punished by a minimum penalty of more than six months imprisonment.

Whichever approach is adopted, each country should at a minimum include a range of offences within each of the designated categories of offences[3].

Predicate offences for money laundering should extend to conduct that occurred in another country, which constitutes an offence in that country, and which would have constituted a predicate offence had it occurred domestically. Countries may provide that the only prerequisite is that the conduct would have constituted a predicate offence had it occurred domestically.

Countries may provide that the offence of money laundering does not apply to persons who committed the predicate offence, where this is required by fundamental principles of their domestic law.

2.    Countries should ensure that:

a)    The intent and knowledge required to prove the offence of money laundering is consistent with the standards set forth in the Vienna and Palermo Conventions, including the concept that such mental state may be inferred from objective factual circumstances.

b)    Criminal liability, and, where that is not possible, civil or administrative liability, should apply to legal persons. This should not preclude parallel criminal, civil or administrative proceedings with respect to legal persons in countries in which such forms of liability

---

[3] See the definition of "designated categories of offences" in the Glossary.

are available. Legal persons should be subject to effective, proportionate and dissuasive sanctions. Such measures should be without prejudice to the criminal liability of individuals.

*Provisonal measures and confiscation*

3. Countries should adopt measures similar to those set forth in the Vienna and Palermo Conventions, including legislative measures, to enable their competent authorities to confiscate property laundered, proceeds from money laundering or predicate offences, instrumentalities used in or intended for use in the commission of these offences, or property of corresponding value, without prejudicing the rights of bona fide third parties.

Such measures should include the authority to: (a) identify, trace and evaluate property which is subject to confiscation; (b) carry out provisional measures, such as freezing and seizing, to prevent any dealing, transfer or disposal of such property; (c) take steps that will prevent or void actions that prejudice the State's ability to recover property that is subject to confiscation; and (d) take any appropriate investigative measures.

Countries may consider adopting measures that allow such proceeds or instrumentalities to be confiscated without requiring a criminal conviction, or which require an offender to demonstrate the lawful origin of the property alleged to be liable to confiscation, to the extent that such a requirement is consistent with the principles of their domestic law.

**B. MEASURES TO BE TAKEN BY FINANCIAL INSTITUTIONS AND NON-FINANCIAL BUSINESSES AND PROFESSIONS TO PREVENT MONEY LAUNDERING AND TERRORIST FINANCING**

4. Countries should ensure that financial institution secrecy laws do not inhibit implementation of the FATF Recommendations.

*Customer due diligence and record-keeping*

5.* Financial institutions should not keep anonymous accounts or accounts in obviously fictitious names.

Financial institutions should undertake customer due diligence measures, including identifying and verifying the identity of their customers, when:

- establishing business relations;
- carrying out occasional transactions: (i) above the applicable designated threshold; or (ii) that are wire transfers in the circumstances covered by the Interpretative Note to Special Recommendation VII;
- there is a suspicion of money laundering or terrorist financing; or
- the financial institution has doubts about the veracity or adequacy of previously obtained customer identification data.

The customer due diligence (CDD) measures to be taken are as follows:

a) Identifying the customer and verifying that customer's identity using reliable, independent source documents, data or information[4].

b) Identifying the beneficial owner, and taking reasonable measures to verify the identity of the beneficial owner such that the financial institution is satisfied that it knows who the beneficial owner is. For legal persons and arrangements this should include financial institutions taking reasonable measures to understand the ownership and control structure of the customer.

c) Obtaining information on the purpose and intended nature of the business relationship.

d) Conducting ongoing due diligence on the business relationship and scrutiny of transactions undertaken throughout the course of that relationship to ensure that the transactions being conducted are consistent with the institution's knowledge of the customer, their business and risk profile, including, where necessary, the source of funds.

Financial institutions should apply each of the CDD measures under (a) to (d) above, but may determine the extent of such measures on a risk sensitive basis depending on the type of customer, business relationship or transaction. The measures that are taken should be consistent with any guidelines issued by competent authorities. For higher risk categories, financial institutions should perform enhanced due diligence. In certain circumstances, where there are low risks, countries may decide that financial institutions can apply reduced or simplified measures.

Financial institutions should verify the identity of the customer and beneficial owner before or during the course of establishing a business relationship or conducting transactions for occasional customers. Countries may permit financial institutions to complete the verification as soon as reasonably practicable following the establishment of the relationship, where the money laundering risks are effectively managed and where this is essential not to interrupt the normal conduct of business.

Where the financial institution is unable to comply with paragraphs (a) to (c) above, it should not open the account, commence business relations or perform the transaction; or should terminate the business relationship; and should consider making a suspicious transactions report in relation to the customer.

These requirements should apply to all new customers, though financial institutions should also apply this Recommendation to existing customers on the basis of materiality and risk, and should conduct due diligence on such existing relationships at appropriate times.

6.*   Financial institutions should, in relation to politically exposed persons, in addition to performing normal due diligence measures:

   a)   Have appropriate risk management systems to determine whether the customer is a politically exposed person.

   b)   Obtain senior management approval for establishing business relationships with such customers.

---

[4] Reliable, independent source documents, data or information will hereafter be referred to as "identification data".

* Recommendations marked with an asterisk should be read in conjunction with their Interpretative Note.

3

    c)    Take reasonable measures to establish the source of wealth and source of funds.

    d)    Conduct enhanced ongoing monitoring of the business relationship.

7.    Financial institutions should, in relation to cross-border correspondent banking and other similar relationships, in addition to performing normal due diligence measures:

    a)    Gather sufficient information about a respondent institution to understand fully the nature of the respondent's business and to determine from publicly available information the reputation of the institution and the quality of supervision, including whether it has been subject to a money laundering or terrorist financing investigation or regulatory action.

    b)    Assess the respondent institution's anti-money laundering and terrorist financing controls.

    c)    Obtain approval from senior management before establishing new correspondent relationships.

    d)    Document the respective responsibilities of each institution.

    e)    With respect to "payable-through accounts", be satisfied that the respondent bank has verified the identity of and performed on-going due diligence on the customers having direct access to accounts of the correspondent and that it is able to provide relevant customer identification data upon request to the correspondent bank.

8.    Financial institutions should pay special attention to any money laundering threats that may arise from new or developing technologies that might favour anonymity, and take measures, if needed, to prevent their use in money laundering schemes. In particular, financial institutions should have policies and procedures in place to address any specific risks associated with non-face to face business relationships or transactions.

9.*    Countries may permit financial institutions to rely on intermediaries or other third parties to perform elements (a) – (c) of the CDD process or to introduce business, provided that the criteria set out below are met. Where such reliance is permitted, the ultimate responsibility for customer identification and verification remains with the financial institution relying on the third party.

The criteria that should be met are as follows:

    a)    A financial institution relying upon a third party should immediately obtain the necessary information concerning elements (a) – (c) of the CDD process. Financial institutions should take adequate steps to satisfy themselves that copies of identification data and other relevant documentation relating to the CDD requirements will be made available from the third party upon request without delay.

    b)    The financial institution should satisfy itself that the third party is regulated and supervised for, and has measures in place to comply with CDD requirements in line with Recommendations 5 and 10.

It is left to each country to determine in which countries the third party that meets the conditions can be based, having regard to information available on countries that do not or do not adequately apply the FATF Recommendations.

10.*    Financial institutions should maintain, for at least five years, all necessary records on transactions, both domestic or international, to enable them to comply swiftly with information requests from the competent authorities.    Such records must be sufficient to permit

4

reconstruction of individual transactions (including the amounts and types of currency involved if any) so as to provide, if necessary, evidence for prosecution of criminal activity.

Financial institutions should keep records on the identification data obtained through the customer due diligence process (e.g. copies or records of official identification documents like passports, identity cards, driving licenses or similar documents), account files and business correspondence for at least five years after the business relationship is ended.

The identification data and transaction records should be available to domestic competent authorities upon appropriate authority.

11.* Financial institutions should pay special attention to all complex, unusual large transactions, and all unusual patterns of transactions, which have no apparent economic or visible lawful purpose. The background and purpose of such transactions should, as far as possible, be examined, the findings established in writing, and be available to help competent authorities and auditors.

12.* The customer due diligence and record-keeping requirements set out in Recommendations 5, 6, and 8 to 11 apply to designated non-financial businesses and professions in the following situations:

   a)   Casinos – when customers engage in financial transactions equal to or above the applicable designated threshold.

   b)   Real estate agents - when they are involved in transactions for their client concerning the buying and selling of real estate.

   c)   Dealers in precious metals and dealers in precious stones - when they engage in any cash transaction with a customer equal to or above the applicable designated threshold.

   d)   Lawyers, notaries, other independent legal professionals and accountants when they prepare for or carry out transactions for their client concerning the following activities:

   - buying and selling of real estate;
   - managing of client money, securities or other assets;
   - management of bank, savings or securities accounts;
   - organisation of contributions for the creation, operation or management of companies;
   - creation, operation or management of legal persons or arrangements, and buying and selling of business entities.

   e)   Trust and company service providers when they prepare for or carry out transactions for a client concerning the activities listed in the definition in the Glossary.

*Reporting of suspicious transactions and compliance*

13.* If a financial institution suspects or has reasonable grounds to suspect that funds are the proceeds of a criminal activity, or are related to terrorist financing, it should be required, directly by law or regulation, to report promptly its suspicions to the financial intelligence unit (FIU).

14.* Financial institutions, their directors, officers and employees should be:

a) Protected by legal provisions from criminal and civil liability for breach of any restriction on disclosure of information imposed by contract or by any legislative, regulatory or administrative provision, if they report their suspicions in good faith to the FIU, even if they did not know precisely what the underlying criminal activity was, and regardless of whether illegal activity actually occurred.

b) Prohibited by law from disclosing the fact that a suspicious transaction report (STR) or related information is being reported to the FIU.

15.* Financial institutions should develop programmes against money laundering and terrorist financing. These programmes should include:

a) The development of internal policies, procedures and controls, including appropriate compliance management arrangements, and adequate screening procedures to ensure high standards when hiring employees.
b) An ongoing employee training programme.
c) An audit function to test the system.

16.* The requirements set out in Recommendations 13 to 15, and 21 apply to all designated non-financial businesses and professions, subject to the following qualifications:

a) Lawyers, notaries, other independent legal professionals and accountants should be required to report suspicious transactions when, on behalf of or for a client, they engage in a financial transaction in relation to the activities described in Recommendation 12(d). Countries are strongly encouraged to extend the reporting requirement to the rest of the professional activities of accountants, including auditing.

b) Dealers in precious metals and dealers in precious stones should be required to report suspicious transactions when they engage in any cash transaction with a customer equal to or above the applicable designated threshold.

c) Trust and company service providers should be required to report suspicious transactions for a client when, on behalf of or for a client, they engage in a transaction in relation to the activities referred to in Recommendation 12(e).

Lawyers, notaries, other independent legal professionals, and accountants acting as independent legal professionals, are not required to report their suspicions if the relevant information was obtained in circumstances where they are subject to professional secrecy or legal professional privilege.

*Other measures to deter money laundering and terrorist financing*

17. Countries should ensure that effective, proportionate and dissuasive sanctions, whether criminal, civil or administrative, are available to deal with natural or legal persons covered by these Recommendations that fail to comply with anti-money laundering or terrorist financing requirements.

18. Countries should not approve the establishment or accept the continued operation of shell banks. Financial institutions should refuse to enter into, or continue, a correspondent banking relationship with shell banks. Financial institutions should also guard against establishing relations with respondent foreign financial institutions that permit their accounts to be used by shell banks.

19. Countries should consider the feasibility and utility of a system where banks and other financial institutions and intermediaries would report all domestic and international currency transactions above a fixed amount, to a national central agency with a computerised data base, available to competent authorities for use in money laundering or terrorist financing cases, subject to strict safeguards to ensure proper use of the information.

20. Countries should consider applying the FATF Recommendations to businesses and professions, other than designated non-financial businesses and professions, that pose a money laundering or terrorist financing risk.

Countries should further encourage the development of modern and secure techniques of money management that are less vulnerable to money laundering.

*Measures to be taken with respect to countries that do not or insufficiently comply with the FATF Recommendations*

21. Financial institutions should give special attention to business relationships and transactions with persons, including companies and financial institutions, from countries which do not or insufficiently apply the FATF Recommendations. Whenever these transactions have no apparent economic or visible lawful purpose, their background and purpose should, as far as possible, be examined, the findings established in writing, and be available to help competent authorities. Where such a country continues not to apply or insufficiently applies the FATF Recommendations, countries should be able to apply appropriate countermeasures.

22. Financial institutions should ensure that the principles applicable to financial institutions, which are mentioned above are also applied to branches and majority owned subsidiaries located abroad, especially in countries which do not or insufficiently apply the FATF Recommendations, to the extent that local applicable laws and regulations permit. When local applicable laws and regulations prohibit this implementation, competent authorities in the country of the parent institution should be informed by the financial institutions that they cannot apply the FATF Recommendations.

*Regulation and supervision*

23.* Countries should ensure that financial institutions are subject to adequate regulation and supervision and are effectively implementing the FATF Recommendations. Competent authorities should take the necessary legal or regulatory measures to prevent criminals or their associates from holding or being the beneficial owner of a significant or controlling interest or holding a management function in a financial institution.

For financial institutions subject to the Core Principles, the regulatory and supervisory measures that apply for prudential purposes and which are also relevant to money laundering, should apply in a similar manner for anti-money laundering and terrorist financing purposes.

Other financial institutions should be licensed or registered and appropriately regulated, and subject to supervision or oversight for anti-money laundering purposes, having regard to the risk of money laundering or terrorist financing in that sector. At a minimum, businesses providing a service of money or value transfer, or of money or currency changing should be licensed or registered, and subject to effective systems for monitoring and ensuring compliance with national requirements to combat money laundering and terrorist financing.

24. Designated non-financial businesses and professions should be subject to regulatory and supervisory measures as set out below.

a) Casinos should be subject to a comprehensive regulatory and supervisory regime that ensures that they have effectively implemented the necessary anti-money laundering and terrorist-financing measures. At a minimum:

- casinos should be licensed;
- competent authorities should take the necessary legal or regulatory measures to prevent criminals or their associates from holding or being the beneficial owner of a significant or controlling interest, holding a management function in, or being an operator of a casino
- competent authorities should ensure that casinos are effectively supervised for compliance with requirements to combat money laundering and terrorist financing.

b) Countries should ensure that the other categories of designated non-financial businesses and professions are subject to effective systems for monitoring and ensuring their compliance with requirements to combat money laundering and terrorist financing. This should be performed on a risk-sensitive basis. This may be performed by a government authority or by an appropriate self-regulatory organisation, provided that such an organisation can ensure that its members comply with their obligations to combat money laundering and terrorist financing.

25.* The competent authorities should establish guidelines, and provide feedback which will assist financial institutions and designated non-financial businesses and professions in applying national measures to combat money laundering and terrorist financing, and in particular, in detecting and reporting suspicious transactions.

## C. INSTITUTIONAL AND OTHER MEASURES NECESSARY IN SYSTEMS FOR COMBATING MONEY LAUNDERING AND TERRORIST FINANCING

*Competent authorities, their powers and resources*

26.* Countries should establish a FIU that serves as a national centre for the receiving (and, as permitted, requesting), analysis and dissemination of STR and other information regarding potential money laundering or terrorist financing. The FIU should have access, directly or indirectly, on a timely basis, to the financial, administrative and law enforcement information that it requires to properly undertake its functions, including the analysis of STR.

27.* Countries should ensure that designated law enforcement authorities have responsibility for money laundering and terrorist financing investigations. Countries are encouraged to support and develop, as far as possible, special investigative techniques suitable for the investigation of money laundering, such as controlled delivery, undercover operations and other relevant techniques. Countries are also encouraged to use other effective mechanisms such as the use of permanent or temporary groups specialised in asset investigation, and co-operative investigations with appropriate competent authorities in other countries.

28. When conducting investigations of money laundering and underlying predicate offences, competent authorities should be able to obtain documents and information for use in those investigations, and in prosecutions and related actions. This should include powers to use compulsory measures for the production of records held by financial institutions and other persons, for the search of persons and premises, and for the seizure and obtaining of evidence.

29. Supervisors should have adequate powers to monitor and ensure compliance by financial institutions with requirements to combat money laundering and terrorist financing, including the authority to conduct inspections. They should be authorised to compel production of any information from financial institutions that is relevant to monitoring such compliance, and to impose adequate administrative sanctions for failure to comply with such requirements.

30. Countries should provide their competent authorities involved in combating money laundering and terrorist financing with adequate financial, human and technical resources. Countries should have in place processes to ensure that the staff of those authorities are of high integrity.

31. Countries should ensure that policy makers, the FIU, law enforcement and supervisors have effective mechanisms in place which enable them to co-operate, and where appropriate co-ordinate domestically with each other concerning the development and implementation of policies and activities to combat money laundering and terrorist financing.

32. Countries should ensure that their competent authorities can review the effectiveness of their systems to combat money laundering and terrorist financing systems by maintaining comprehensive statistics on matters relevant to the effectiveness and efficiency of such systems. This should include statistics on the STR received and disseminated; on money laundering and terrorist financing investigations, prosecutions and convictions; on property frozen, seized and confiscated; and on mutual legal assistance or other international requests for co-operation.

*Transparency of legal persons and arrangements*

33. Countries should take measures to prevent the unlawful use of legal persons by money launderers. Countries should ensure that there is adequate, accurate and timely information on the beneficial ownership and control of legal persons that can be obtained or accessed in a timely fashion by competent authorities. In particular, countries that have legal persons that are able to issue bearer shares should take appropriate measures to ensure that they are not misused for money laundering and be able to demonstrate the adequacy of those measures. Countries could consider measures to facilitate access to beneficial ownership and control information to financial institutions undertaking the requirements set out in Recommendation 5.

34. Countries should take measures to prevent the unlawful use of legal arrangements by money launderers. In particular, countries should ensure that there is adequate, accurate and timely information on express trusts, including information on the settlor, trustee and beneficiaries, that can be obtained or accessed in a timely fashion by competent authorities. Countries could consider measures to facilitate access to beneficial ownership and control information to financial institutions undertaking the requirements set out in Recommendation 5.

## D.   INTERNATIONAL CO-OPERATION

35. Countries should take immediate steps to become party to and implement fully the Vienna Convention, the Palermo Convention, and the 1999 United Nations International Convention for the Suppression of the Financing of Terrorism. Countries are also encouraged to ratify and implement other relevant international conventions, such as the 1990 Council of Europe Convention on Laundering, Search, Seizure and Confiscation of the Proceeds from Crime and the 2002 Inter-American Convention against Terrorism.

*Mutual legal assistance and extradition*

36. Countries should rapidly, constructively and effectively provide the widest possible range of mutual legal assistance in relation to money laundering and terrorist financing investigations, prosecutions, and related proceedings. In particular, countries should:

   a) Not prohibit or place unreasonable or unduly restrictive conditions on the provision of mutual legal assistance.

   b) Ensure that they have clear and efficient processes for the execution of mutual legal assistance requests.

   c) Not refuse to execute a request for mutual legal assistance on the sole ground that the offence is also considered to involve fiscal matters.

   d) Not refuse to execute a request for mutual legal assistance on the grounds that laws require financial institutions to maintain secrecy or confidentiality.

   Countries should ensure that the powers of their competent authorities required under Recommendation 28 are also available for use in response to requests for mutual legal assistance, and if consistent with their domestic framework, in response to direct requests from foreign judicial or law enforcement authorities to domestic counterparts.

   To avoid conflicts of jurisdiction, consideration should be given to devising and applying mechanisms for determining the best venue for prosecution of defendants in the interests of justice in cases that are subject to prosecution in more than one country.

37. Countries should, to the greatest extent possible, render mutual legal assistance notwithstanding the absence of dual criminality.

   Where dual criminality is required for mutual legal assistance or extradition, that requirement should be deemed to be satisfied regardless of whether both countries place the offence within the same category of offence or denominate the offence by the same terminology, provided that both countries criminalise the conduct underlying the offence.

38.* There should be authority to take expeditious action in response to requests by foreign countries to identify, freeze, seize and confiscate property laundered, proceeds from money laundering or predicate offences, instrumentalities used in or intended for use in the commission of these offences, or property of corresponding value. There should also be arrangements for co-ordinating seizure and confiscation proceedings, which may include the sharing of confiscated assets.

39. Countries should recognise money laundering as an extraditable offence. Each country should either extradite its own nationals, or where a country does not do so solely on the grounds of nationality, that country should, at the request of the country seeking extradition, submit the case without undue delay to its competent authorities for the purpose of prosecution of the offences set forth in the request. Those authorities should take their decision and conduct their proceedings in the same manner as in the case of any other offence of a serious nature under the domestic law of that country. The countries concerned should cooperate with each other, in particular on procedural and evidentiary aspects, to ensure the efficiency of such prosecutions.

   Subject to their legal frameworks, countries may consider simplifying extradition by allowing direct transmission of extradition requests between appropriate ministries, extraditing persons based only on warrants of arrests or judgements, and/or introducing a simplified extradition of consenting persons who waive formal extradition proceedings.

*Other forms of co-operation*

40.* Countries should ensure that their competent authorities provide the widest possible range of international co-operation to their foreign counterparts. There should be clear and effective gateways to facilitate the prompt and constructive exchange directly between counterparts, either spontaneously or upon request, of information relating to both money laundering and the underlying predicate offences. Exchanges should be permitted without unduly restrictive conditions. In particular:

   a)    Competent authorities should not refuse a request for assistance on the sole ground that the request is also considered to involve fiscal matters.

   b)    Countries should not invoke laws that require financial institutions to maintain secrecy or confidentiality as a ground for refusing to provide co-operation.

   c)    Competent authorities should be able to conduct inquiries; and where possible, investigations; on behalf of foreign counterparts.

   Where the ability to obtain information sought by a foreign competent authority is not within the mandate of its counterpart, countries are also encouraged to permit a prompt and constructive exchange of information with non-counterparts. Co-operation with foreign authorities other than counterparts could occur directly or indirectly. When uncertain about the appropriate avenue to follow, competent authorities should first contact their foreign counterparts for assistance.

   Countries should establish controls and safeguards to ensure that information exchanged by competent authorities is used only in an authorised manner, consistent with their obligations concerning privacy and data protection.

# GLOSSARY

In these Recommendations the following abbreviations and references are used:

**"Beneficial owner"** refers to the natural person(s) who ultimately owns or controls a customer and/or the person on whose behalf a transaction is being conducted. It also incorporates those persons who exercise ultimate effective control over a legal person or arrangement.

**"Core Principles"** refers to the Core Principles for Effective Banking Supervision issued by the Basel Committee on Banking Supervision, the Objectives and Principles for Securities Regulation issued by the International Organization of Securities Commissions, and the Insurance Supervisory Principles issued by the International Association of Insurance Supervisors.

**"Designated categories of offences"** means:

- participation in an organised criminal group and racketeering;
- terrorism, including terrorist financing;
- trafficking in human beings and migrant smuggling;
- sexual exploitation, including sexual exploitation of children;
- illicit trafficking in narcotic drugs and psychotropic substances;
- illicit arms trafficking;
- illicit trafficking in stolen and other goods;
- corruption and bribery;
- fraud;
- counterfeiting currency;
- counterfeiting and piracy of products;
- environmental crime;
- murder, grievous bodily injury;
- kidnapping, illegal restraint and hostage-taking;
- robbery or theft;
- smuggling;
- extortion;
- forgery;
- piracy; and
- insider trading and market manipulation.

When deciding on the range of offences to be covered as predicate offences under each of the categories listed above, each country may decide, in accordance with its domestic law, how it will define those offences and the nature of any particular elements of those offences that make them serious offences.

**"Designated non-financial businesses and professions"** means:

a) Casinos (which also includes internet casinos).
b) Real estate agents.
c) Dealers in precious metals.
d) Dealers in precious stones.
e) Lawyers, notaries, other independent legal professionals and accountants – this refers to sole practitioners, partners or employed professionals within professional firms. It is not meant to refer to 'internal' professionals that are employees of other types of businesses, nor to professionals working for government agencies, who may already be subject to measures that would combat money laundering.

12

f)    Trust and Company Service Providers refers to all persons or businesses that are not covered elsewhere under these Recommendations, and which as a business, provide any of the following services to third parties:

- acting as a formation agent of legal persons;
- acting as (or arranging for another person to act as) a director or secretary of a company, a partner of a partnership, or a similar position in relation to other legal persons;
- providing a registered office; business address or accommodation, correspondence or administrative address for a company, a partnership or any other legal person or arrangement;
- acting as (or arranging for another person to act as) a trustee of an express trust;
- acting as (or arranging for another person to act as) a nominee shareholder for another person.

**"Designated threshold"** refers to the amount set out in the Interpretative Notes.

**"Financial institutions"** means any person or entity who conducts as a business one or more of the following activities or operations for or on behalf of a customer:

1. Acceptance of deposits and other repayable funds from the public.[5]
2. Lending.[6]
3. Financial leasing.[7]
4. The transfer of money or value.[8]
5. Issuing and managing means of payment (e.g. credit and debit cards, cheques, traveller's cheques, money orders and bankers' drafts, electronic money).
6. Financial guarantees and commitments.
7. Trading in:
   (a) money market instruments (cheques, bills, CDs, derivatives etc.);
   (b) foreign exchange;
   (c) exchange, interest rate and index instruments;
   (d) transferable securities;
   (e) commodity futures trading.
8. Participation in securities issues and the provision of financial services related to such issues.
9. Individual and collective portfolio management.
10. Safekeeping and administration of cash or liquid securities on behalf of other persons.
11. Otherwise investing, administering or managing funds or money on behalf of other persons.
12. Underwriting and placement of life insurance and other investment related insurance[9].
13. Money and currency changing.

---

[5] This also captures private banking.
[6] This includes inter alia: consumer credit; mortgage credit; factoring, with or without recourse; and finance of commercial transactions (including forfaiting).
[7] This does not extend to financial leasing arrangements in relation to consumer products.
[8] This applies to financial activity in both the formal or informal sector e.g. alternative remittance activity. See the Interpretative Note to Special Recommendation VI. It does not apply to any natural or legal person that provides financial institutions solely with message or other support systems for transmitting funds. See the Interpretative Note to Special Recommendation VII.
[9] This applies both to insurance undertakings and to insurance intermediaries (agents and brokers).

When a financial activity is carried out by a person or entity on an occasional or very limited basis (having regard to quantitative and absolute criteria) such that there is little risk of money laundering activity occurring, a country may decide that the application of anti-money laundering measures is not necessary, either fully or partially.

In strictly limited and justified circumstances, and based on a proven low risk of money laundering, a country may decide not to apply some or all of the Forty Recommendations to some of the financial activities stated above.

"**FIU**" means financial intelligence unit.

"**Legal arrangements**" refers to express trusts or other similar legal arrangements.

"**Legal persons**" refers to bodies corporate, foundations, anstalt, partnerships, or associations, or any similar bodies that can establish a permanent customer relationship with a financial institution or otherwise own property.

"**Payable-through accounts**" refers to correspondent accounts that are used directly by third parties to transact business on their own behalf.

"**Politically Exposed Persons**" (PEPs) are individuals who are or have been entrusted with prominent public functions in a foreign country, for example Heads of State or of government, senior politicians, senior government, judicial or military officials, senior executives of state owned corporations, important political party officials. Business relationships with family members or close associates of PEPs involve reputational risks similar to those with PEPs themselves. The definition is not intended to cover middle ranking or more junior individuals in the foregoing categories.

"**Shell bank**" means a bank incorporated in a jurisdiction in which it has no physical presence and which is unaffiliated with a regulated financial group.

"**STR**" refers to suspicious transaction reports.

"**Supervisors**" refers to the designated competent authorities responsible for ensuring compliance by financial institutions with requirements to combat money laundering and terrorist financing.

"**the FATF Recommendations**" refers to these Recommendations and to the FATF Special Recommendations on Terrorist Financing.

**ANNEX**

**INTERPRETATIVE NOTES TO
THE FORTY RECOMMENDATIONS**

# INTERPRETATIVE NOTES

## General

1.  Reference in this document to "countries" should be taken to apply equally to "territories" or "jurisdictions".

2.  Recommendations 5-16 and 21-22 state that financial institutions or designated non-financial businesses and professions should take certain actions. These references require countries to take measures that will oblige financial institutions or designated non-financial businesses and professions to comply with each Recommendation. The basic obligations under Recommendations 5, 10 and 13 should be set out in law or regulation, while more detailed elements in those Recommendations, as well as obligations under other Recommendations, could be required either by law or regulation or by other enforceable means issued by a competent authority.

3.  Where reference is made to a financial institution being satisfied as to a matter, that institution must be able to justify its assessment to competent authorities.

4.  To comply with Recommendations 12 and 16, countries do not need to issue laws or regulations that relate exclusively to lawyers, notaries, accountants and the other designated non-financial businesses and professions so long as these businesses or professions are included in laws or regulations covering the underlying activities.

5.  The Interpretative Notes that apply to financial institutions are also relevant to designated non-financial businesses and professions, where applicable.

## Recommendations 5, 12 and 16

The designated thresholds for transactions (under Recommendations 5 and 12) are as follows:

*   Financial institutions (for occasional customers under Recommendation 5) - USD/EUR 15,000.
*   Casinos, including internet casinos (under Recommendation 12) - USD/EUR 3000
*   For dealers in precious metals and dealers in precious stones when engaged in any cash transaction (under Recommendations 12 and 16) - USD/EUR 15,000.

Financial transactions above a designated threshold include situations where the transaction is carried out in a single operation or in several operations that appear to be linked.

## Recommendation 5

### Customer due diligence and tipping off

1.  If, during the establishment or course of the customer relationship, or when conducting occasional transactions, a financial institution suspects that transactions relate to money laundering or terrorist financing, then the institution should:

    a)  Normally seek to identify and verify the identity of the customer and the beneficial owner, whether permanent or occasional, and irrespective of any exemption or any designated threshold that might otherwise apply.

    b)    Make a STR to the FIU in accordance with Recommendation 13.

2.    Recommendation 14 prohibits financial institutions, their directors, officers and employees from disclosing the fact that an STR or related information is being reported to the FIU. A risk exists that customers could be unintentionally tipped off when the financial institution is seeking to perform its customer due diligence (CDD) obligations in these circumstances. The customer's awareness of a possible STR or investigation could compromise future efforts to investigate the suspected money laundering or terrorist financing operation.

3.    Therefore, if financial institutions form a suspicion that transactions relate to money laundering or terrorist financing, they should take into account the risk of tipping off when performing the customer due diligence process. If the institution reasonably believes that performing the CDD process will tip-off the customer or potential customer, it may choose not to pursue that process, and should file an STR. Institutions should ensure that their employees are aware of and sensitive to these issues when conducting CDD.

### CDD for legal persons and arrangements

4.    When performing elements (a) and (b) of the CDD process in relation to legal persons or arrangements, financial institutions should:

    a)    Verify that any person purporting to act on behalf of the customer is so authorised, and identify that person.

    b)    Identify the customer and verify its identity - the types of measures that would be normally needed to satisfactorily perform this function would require obtaining proof of incorporation or similar evidence of the legal status of the legal person or arrangement, as well as information concerning the customer's name, the names of trustees, legal form, address, directors, and provisions regulating the power to bind the legal person or arrangement.

    c)    Identify the beneficial owners, including forming an understanding of the ownership and control structure, and take reasonable measures to verify the identity of such persons. The types of measures that would be normally needed to satisfactorily perform this function would require identifying the natural persons with a controlling interest and identifying the natural persons who comprise the mind and management of the legal person or arrangement. Where the customer or the owner of the controlling interest is a public company that is subject to regulatory disclosure requirements, it is not necessary to seek to identify and verify the identity of any shareholder of that company.

The relevant information or data may be obtained from a public register, from the customer or from other reliable sources.

### Reliance on identification and verification already performed

5.    The CDD measures set out in Recommendation 5 do not imply that financial institutions have to repeatedly identify and verify the identity of each customer every time that a customer conducts a transaction. An institution is entitled to rely on the identification and verification steps that it has already undertaken unless it has doubts about the veracity of that information. Examples of situations that might lead an institution to have such doubts could be where there is a suspicion of money laundering in relation to that customer, or where there is a material change in the way that the customer's account is operated which is not consistent with the customer's business profile.

*Timing of verification*

6.   Examples of the types of circumstances where it would be permissible for verification to be completed after the establishment of the business relationship, because it would be essential not to interrupt the normal conduct of business include:

- Non face-to-face business.
- Securities transactions. In the securities industry, companies and intermediaries may be required to perform transactions very rapidly, according to the market conditions at the time the customer is contacting them, and the performance of the transaction may be required before verification of identity is completed.
- Life insurance business. In relation to life insurance business, countries may permit the identification and verification of the beneficiary under the policy to take place after having established the business relationship with the policyholder. However, in all such cases, identification and verification should occur at or before the time of payout or the time where the beneficiary intends to exercise vested rights under the policy.

7.   Financial institutions will also need to adopt risk management procedures with respect to the conditions under which a customer may utilise the business relationship prior to verification. These procedures should include a set of measures such as a limitation of the number, types and/or amount of transactions that can be performed and the monitoring of large or complex transactions being carried out outside of expected norms for that type of relationship. Financial institutions should refer to the Basel CDD paper[10] (section 2.2.6.) for specific guidance on examples of risk management measures for non-face to face business.

*Requirement to identify existing customers*

8.   The principles set out in the Basel CDD paper concerning the identification of existing customers should serve as guidance when applying customer due diligence processes to institutions engaged in banking activity, and could apply to other financial institutions where relevant.

*Simplified or reduced CDD measures*

9.   The general rule is that customers must be subject to the full range of CDD measures, including the requirement to identify the beneficial owner. Nevertheless there are circumstances where the risk of money laundering or terrorist financing is lower, where information on the identity of the customer and the beneficial owner of a customer is publicly available, or where adequate checks and controls exist elsewhere in national systems. In such circumstances it could be reasonable for a country to allow its financial institutions to apply simplified or reduced CDD measures when identifying and verifying the identity of the customer and the beneficial owner.

10.  Examples of customers where simplified or reduced CDD measures could apply are:

- Financial institutions – where they are subject to requirements to combat money laundering and terrorist financing consistent with the FATF Recommendations and are supervised for compliance with those controls.

---

[10] "Basel CDD paper" refers to the guidance paper on Customer Due Diligence for Banks issued by the Basel Committee on Banking Supervision in October 2001.

- Public companies that are subject to regulatory disclosure requirements.
- Government administrations or enterprises.

11. Simplified or reduced CDD measures could also apply to the beneficial owners of pooled accounts held by designated non financial businesses or professions provided that those businesses or professions are subject to requirements to combat money laundering and terrorist financing consistent with the FATF Recommendations and are subject to effective systems for monitoring and ensuring their compliance with those requirements. Banks should also refer to the Basel CDD paper (section 2.2.4.), which provides specific guidance concerning situations where an account holding institution may rely on a customer that is a professional financial intermediary to perform the customer due diligence on his or its own customers (i.e. the beneficial owners of the bank account). Where relevant, the CDD Paper could also provide guidance in relation to similar accounts held by other types of financial institutions.

12. Simplified CDD or reduced measures could also be acceptable for various types of products or transactions such as (examples only):

- Life insurance policies where the annual premium is no more than USD/EUR 1000 or a single premium of no more than USD/EUR 2500.
- Insurance policies for pension schemes if there is no surrender clause and the policy cannot be used as collateral.
- A pension, superannuation or similar scheme that provides retirement benefits to employees, where contributions are made by way of deduction from wages and the scheme rules do not permit the assignment of a member's interest under the scheme.

13. Countries could also decide whether financial institutions could apply these simplified measures only to customers in its own jurisdiction or allow them to do for customers from any other jurisdiction that the original country is satisfied is in compliance with and has effectively implemented the FATF Recommendations.

Simplified CDD measures are not acceptable whenever there is suspicion of money laundering or terrorist financing or specific higher risk scenarios apply.

**Recommendation 6**

Countries are encouraged to extend the requirements of Recommendation 6 to individuals who hold prominent public functions in their own country.

**Recommendation 9**

This Recommendation does not apply to outsourcing or agency relationships.

This Recommendation also does not apply to relationships, accounts or transactions between financial institutions for their clients. Those relationships are addressed by Recommendations 5 and 7.

**Recommendations 10 and 11**

In relation to insurance business, the word "transactions" should be understood to refer to the insurance product itself, the premium payment and the benefits.

**Recommendation 13**

1. The reference to criminal activity in Recommendation 13 refers to:

   a) all criminal acts that would constitute a predicate offence for money laundering in the jurisdiction; or

   b) at a minimum to those offences that would constitute a predicate offence as required by Recommendation 1.

   Countries are strongly encouraged to adopt alternative (a). All suspicious transactions, including attempted transactions, should be reported regardless of the amount of the transaction.

2. In implementing Recommendation 13, suspicious transactions should be reported by financial institutions regardless of whether they are also thought to involve tax matters. Countries should take into account that, in order to deter financial institutions from reporting a suspicious transaction, money launderers may seek to state *inter alia* that their transactions relate to tax matters.

**Recommendation 14 (tipping off)**

Where lawyers, notaries, other independent legal professionals and accountants acting as independent legal professionals seek to dissuade a client from engaging in illegal activity, this does not amount to tipping off.

**Recommendation 15**

The type and extent of measures to be taken for each of the requirements set out in the Recommendation should be appropriate having regard to the risk of money laundering and terrorist financing and the size of the business.

For financial institutions, compliance management arrangements should include the appointment of a compliance officer at the management level.

**Recommendation 16**

1. It is for each jurisdiction to determine the matters that would fall under legal professional privilege or professional secrecy. This would normally cover information lawyers, notaries or other independent legal professionals receive from or obtain through one of their clients: (a) in the course of ascertaining the legal position of their client, or (b) in performing their task of defending or representing that client in, or concerning judicial, administrative, arbitration or mediation proceedings. Where accountants are subject to the same obligations of secrecy or privilege, then they are also not required to report suspicious transactions.

2. Countries may allow lawyers, notaries, other independent legal professionals and accountants to send their STR to their appropriate self-regulatory organisations, provided that there are appropriate forms of co-operation between these organisations and the FIU.

**Recommendation 23**

Recommendation 23 should not be read as to require the introduction of a system of regular review of licensing of controlling interests in financial institutions merely for anti-money laundering purposes, but as to stress the desirability of suitability review for controlling shareholders in financial institutions (banks and non-banks in particular) from a FATF point of view. Hence, where shareholder suitability (or "fit and proper") tests exist, the attention of supervisors should be drawn to their relevance for anti-money laundering purposes.

**Recommendation 25**

When considering the feedback that should be provided, countries should have regard to the FATF Best Practice Guidelines on Providing Feedback to Reporting Financial Institutions and Other Persons.

**Recommendation 26**

Where a country has created an FIU, it should consider applying for membership in the Egmont Group. Countries should have regard to the Egmont Group Statement of Purpose, and its Principles for Information Exchange Between Financial Intelligence Units for Money Laundering Cases. These documents set out important guidance concerning the role and functions of FIUs, and the mechanisms for exchanging information between FIU.

**Recommendation 27**

Countries should consider taking measures, including legislative ones, at the national level, to allow their competent authorities investigating money laundering cases to postpone or waive the arrest of suspected persons and/or the seizure of the money for the purpose of identifying persons involved in such activities or for evidence gathering. Without such measures the use of procedures such as controlled deliveries and undercover operations are precluded.

**Recommendation 38**

Countries should consider:

a)   Establishing an asset forfeiture fund in its respective country into which all or a portion of confiscated property will be deposited for law enforcement, health, education, or other appropriate purposes.

b)   Taking such measures as may be necessary to enable it to share among or between other countries confiscated property, in particular, when confiscation is directly or indirectly a result of co-ordinated law enforcement actions.

**Recommendation 40**

1.   For the purposes of this Recommendation:

•   "Counterparts" refers to authorities that exercise similar responsibilities and functions.

•   "Competent authority" refers to all administrative and law enforcement authorities concerned with combating money laundering and terrorist financing, including the FIU and supervisors.

2.  Depending on the type of competent authority involved and the nature and purpose of the co-operation, different channels can be appropriate for the exchange of information. Examples of mechanisms or channels that are used to exchange information include: bilateral or multilateral agreements or arrangements, memoranda of understanding, exchanges on the basis of reciprocity, or through appropriate international or regional organisations. However, this Recommendation is not intended to cover co-operation in relation to mutual legal assistance or extradition.

3.  The reference to indirect exchange of information with foreign authorities other than counterparts covers the situation where the requested information passes from the foreign authority through one or more domestic or foreign authorities before being received by the requesting authority. The competent authority that requests the information should always make it clear for what purpose and on whose behalf the request is made.

4.  FIUs should be able to make inquiries on behalf of foreign counterparts where this could be relevant to an analysis of financial transactions. At a minimum, inquiries should include:

    •  Searching its own databases, which would include information related to suspicious transaction reports.
    •  Searching other databases to which it may have direct or indirect access, including law enforcement databases, public databases, administrative databases and commercially available databases.

    Where permitted to do so, FIUs should also contact other competent authorities and financial institutions in order to obtain relevant information.

Exhibit 2

# The Suppression of the Financing of Terrorism

# Wolfsberg Statement

## 1    Preamble

The Wolfsberg Group of financial institutions (the "Wolfsberg Group")[1] is committed to contributing to the fight against terrorism and is making the following statement to describe the role of financial institutions in preventing the flow of terrorist funds through the world's financial system.

This fight presents new challenges. Funds used in the financing of terrorism do not necessarily derive from criminal activity, which is a requisite element of most existing money laundering offences. Successful participation in this fight by the financial sector requires global cooperation by governments with the financial institutions to an unprecedented degree.

## 2    Role of Financial Institutions in the Fight Against Terrorism

Financial institutions can assist governments and their agencies in the fight against terrorism. They can help this effort through prevention, detection and information sharing. They should seek to prevent terrorist organizations from accessing their financial services, assist governments in their efforts to detect suspected terrorist financing and promptly respond to governmental enquiries.

## 3    Rights of the Individual

The Wolfsberg Group is committed to participating in the fight against terrorism in a manner which is non-discriminatory and is respectful of the rights of individuals.

## 4    Know Your Customer

The Wolfsberg Group recognises that adherence to existing "Know Your Customer" policies and procedures is important to the fight against terrorism. Specifically the proper identification of customers by financial institutions can improve the efficacy of searches against lists of known or suspected terrorists issued by competent authorities having jurisdiction over the relevant financial institution ("applicable lists").

In addition to the continued application of existing customer identification, acceptance and due diligence procedures, the Wolfsberg Group is committed to:

- Implementing procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list.
- Reporting to the relevant authorities matches from lists of known or suspected terrorists or terrorist organisations consistent with applicable laws and regulations regarding the disclosure of customer information.
- Exploring with governmental agencies ways of improving information exchange within and between jurisdictions.
- Exploring ways of improving the maintenance of customer information to facilitate the timely retrieval of such information.

## 5    High Risk Sectors and Activities

The Wolfsberg Group is committed to applying enhanced and appropriate due diligence in relation to those of their customers engaged in sectors and activities which have been identified by competent authorities as being widely used for the financing of terrorism, such as underground banking businesses or alternative remittance systems. This will include the adoption, to the extent not already in place, of specific policies and procedures on acceptance of business from customers engaged in such sectors or activities, and increased monitoring of activity of customers who meet the relevant acceptance criteria.

---

[1] The Wolfsberg Group consists of the following leading international banks ABN Amro N.V., Banco Santander Central Hispano, S.A., Bank of Tokyo-Mitsubishi, Ltd., Barclays Bank, Citigroup, Credit Suisse Group, Deutsche Bank AG, Goldman Sachs, HSBC, J.P. Morgan Chase, Société Générale, UBS AG and became known when they, together with Transparency International and Mark Pieth, agreed to a set of global anti-money-laundering guidelines for international private banks in October 2000. Wolfsberg is the location in Switzerland where an important working session to formulate the guidelines was held

In particular the Wolfsberg Group is committed to restricting their business relationships with remittance businesses, exchange houses, casas de cambio, bureaux de change and money transfer agents to those which are subject to appropriate regulation aimed at preventing such activities and businesses from being used as a conduit to launder the proceeds of crime and/or finance terrorism.

The Wolfsberg Group recognises that many jurisdictions are currently in the process of developing and implementing regulations with regard to these businesses and that appropriate time needs to be given for these regulations to take effect.

## 6   Monitoring

Recognising the difficulties inherent in identifying financial transactions linked to the financing of terrorism (many of which appear routine in relation to information known at the time) the Wolfsberg Group is committed to the continued application of existing monitoring procedures for identifying unusual or suspicious transactions. The Wolfsberg Group recognises that while the motive for such transactions may be unclear, monitoring and then identifying and reporting unusual or suspicious transactions may assist government agencies by linking seemingly unrelated activity to the financing of terrorism.

In addition, the Wolfsberg Group is committed to:

- Exercising heightened scrutiny in respect of customers engaged in sectors identified by competent authorities as being widely used for the financing of terrorism.

- Monitoring account and transactional activity (to the extent meaningful information is available to financial institutions) against lists generated by competent authorities of known or suspected terrorists or terrorist organisations.

- Working with governments and agencies in order to recognise patterns and trends identified as related to the financing of terrorism.

- Considering the modification of existing monitoring procedures as necessary to assist in the identification of such patterns and trends.

## 7   Need for Enhanced Global Co-operation

The Wolfsberg Group is committed to co-operating with and assisting law enforcement and government agencies in their efforts to combat the financing of terrorism. The Wolfsberg Group has identified the following areas for discussion with governmental agencies, with a view to enhancing the contribution financial institutions are able to make:

- The provision of official lists of suspected terrorists and terrorist organisations on a globally co-ordinated basis by the relevant competent authority in each jurisdiction.

- The inclusion of appropriate details and information in official lists to assist financial institutions in efficient and timely searches of their customer bases. This information should ideally include (where known) in the case of individuals: date of birth; place of birth; passport or identity card number; in the case of corporations; place of incorporation or establishment; details of principals; to the extent possible, reason for inclusion on the list; and geographic information, such as the location, date and time of the transaction.

- Providing prompt feedback to financial institutions on reports made following circulation of such official lists.

- The provision of meaningful information in relation to patterns, techniques and mechanisms used in the financing of terrorism to assist with monitoring procedures.

- The provision of meaningful information about corporate and other types of vehicles used to facilitate terrorist financing.

- The development of guidelines on appropriate levels of heightened scrutiny in relation to sectors or activities identified by competent authorities as being widely used for terrorist financing.

- The development by governments and clearing agencies of uniform global formats for funds transfers that require information which may assist their efforts to prevent and detect the financing of terrorism.

- Ensuring that national legislation:

  - Permits financial institutions to maintain information derived from official lists within their own databases and to share such information within their own groups.

  - Affords financial institutions protection from civil liability for relying on such lists.

  - Permits financial institutions to report unusual or suspicious transactions that may relate to terrorism to the relevant authorities without breaching any duty of customer confidentiality or privacy legislation.

  - Permits the prompt exchange of information between governmental agencies of different nation states.

The Wolfsberg Group supports the FATF Special Recommendations on Terrorist Financing as measures conducive to the suppression of the financing of terrorism.

Exhibit 3

*FIRST AGREEMENT*

*item 18*

# NEW YORK FINANCIAL, LLC
## INVESTMENT NETWORK – INDEPENDENT CONSULTANTS

### INVESTMENT/CREDIT MANAGEMENT AGREEMENT
Reference no. 144/Musalli/AGS3/604

**I - Client Objectives**
**Investment Limitations**
[ ] Equities [ ] Corporate Debt / Equities [ ] Government and Government Agencies [ ] Options & Futures
[ ] Municipal Securities [ ] Currency [ ] Commodities [ ] Forex [ ] Real Estate [ ] Private Placements
[ ] Mutual Funds [ ] ETF

**Investment Objectives**
[ ] Growth [ ] Business Risk [ ] Trading [ ] Speculation [ ] Income [ ] Others

**Investment Return**
Investment                                    Return
[ ] $ 1,000,000.00 – $ 9,999,999.00           12% annually, payable monthly at rate of 1% per month
[ ] $10,000,000.00 – $19,999,999.00           36% annually, payable monthly at rate of 3% per month
[ ] $20,000,000.00 – Above                    60% annually, payable monthly at rate of 5% per month

Return is to be mobilized by NEW YORK FINANCIAL to offset any debit interest due on MUSALLI FACTORY
FOR GOLD AND JEWELLERY as a result of its credit utilization and the remaining balance is to be used as an
increase in required margin. Until margin reach 100% then the investment return will be paid to musalli
factory.

**Reduction of gold loan facilities:**
The client has the right to do at any time he wishes to reduce the gold loan facilities withdrawn,
by purchasing gold and reducing the outstanding gold loan balance due to New York Financial,
LLC. By debiting return investment account or reducing related margin due to  MUSALLI
FACTORY FOR GOLD AND JEWELLERY by the same value of gold purchased.

**Credit Volume Debit Interest**
Volume                                        Interest
[ ] Cash Credit                               1% + Monthly LIBOR
[ ] Gold Credit                               1.43% + Monthly gold lease rate

**Debit Interest Calculations**
(Value of gold ounces outstanding monthly, ending balance) X (1.43% + First day of each month published
gold lease rate on www.kitco.com):
*outstanding balance means total value of gold loan less margin held by NEW YORK FINANCIAL, LLC.

**Credit Type**
Revolving 10 years on annual basis, with debit interest payable monthly, as above.

**Transaction credit Volume**
Total of 325,000 Ounces payable to MUSALLI FACTORY FOR GOLD AND JEWELLERY upon settlement of
cash margin security starting by 35% of total gold value on the day of drawn down, and margin will be
increased by 10% each year until reach 100% of total gold value by the end of year 7 (seven).

**Personal Information:**
Client Date of Birth:           Client Place of Birth:           Client Nationality:
Annual Income: $                Net Worth Liquid: $

369 First Street, Brooklyn, New York 11215
+1-646-662-0240 + 1-718-369-7945

Form 251 (Rev 03/2001)



Create PDF with GO2PDF for free, if you wish to remove this line, click here to buy Virtual PDF Printer

MUS 0318

# NEW YORK FINANCIAL, LLC
## INVESTMENT NETWORK – INDEPENDENT CONSULTANTS

Client Information - Individual and Corporate Accounts:
Name / Authorized Signatory: AHMED A. MUSALLI
Corporate Name: Musalli factory for gold and jewellery      Commercial Registration #: 4030085465
Address:
City: JEDDAH    Country: KINGDOM OF SAUDI ARABIA    Zip Code: 21413    P. O. Box: 9087
Telephone: (+966) 26292222    Cell Phone: (+966) 505355760    Fax: (+966) 26292222 Ext:110

Program Information
Plan Name: Investment Management & Banking Financial Solutions Program
Purpose: Treasury Management
Plan Methodology:
Providing Cash Flow Investment Management and Banking Financial Solutions to Musalli different
Current Projects and Intended Projects and Investments (See Appendix A: clarifying client's
business nature and sources of funds - submitted by client on his company letter head)

Pre-Requisite:
1. All funds exchanged and / or transferred including but not limited to loans or
   investment returns collection should be conducted through bank-to-bank transactions.
2. Client should obtain a certificate from his bank certifies that his funds are clean, clear
   and of legal origin or in replacement can provide 3 years financial statements.

Investment Manager Contacts:
Address: 369 1st Street, Brooklyn
New York City, State of New York, Zip Code: 11215
Telephone: 1-646-662-0240 / 718-369-7945
Plan Administrator: New York Financial, LLC

Bank of Record:
JP Morgan Chase Bank, New York
JP Morgan Chase Investment Contact:
Nicholas Gambella
Vice President JP Morgan Investments
127 Seventh Avenue, New York 11215
Telephone: 1-718-789-3034 Fax: 1-718-638-7493

Investment Manager Bank Coordinates:
JP Morgan Chase Bank
New York 11215-2299
Routing Number: 021000021
Swift Code: CHASUS33
New York Financial, LLC
A/C: 101083017765

Client Signature(s):                        Date:                        Stamp:

II. TERMS OF AGREEMENT:

Fee Arrangement
(See Section II. (3) or II. (6) hereunder.)

369 First Street, Brooklyn, New York 11215
+1-646-662-0240 +1-718-369-7945

Form 251 (Rev 03/2001)                                                      2

MUS 0319

Create PDF with GO2PDF for free, if you wish to remove this line, click here to buy Virtual PDF Printer

# NEW YORK FINANCIAL, LLC
## INVESTMENT NETWORK – INDEPENDENT CONSULTANTS

**Percentage of Assets under Management:**
- 35% of Portfolio under New York Financial, LLC. (This percentage gradually increasing by 10% per year reaching 100% by ending of year 7).

**Investment Manager Compensation.**
- Fixed Fees: $260,000.00/aorium Investment/Credit setup fee for investment management and services related to financial solutions provided by New York Financial including Banking & Investment Solutions, Trade Services, and / or Credit Facilities extended to the client through any of New York Financial, LLC Business Partners and / or Banks, based on the client's requests; due upon signature.
- Success Rate Fee payable to NEW YORK FINANCIAL, LLC.: 10% of invested portfolio balance proceeds payable to MUSALLI FACTORY FOR GOLD AND JEWELLERY.

The undersigned ("Client") hereby retains New York Financial, LLC ("Manager"), a registered United States of America Company acting through Banks, Advisers, Registered Brokers, and Dealers to perform Investment Management Services and provide Financial Solutions for the Client in accordance with the terms and conditions set forth hereafter.

The Client specifically requests New York Financial, LLC to provide the following:
[ ] Investment Management Services
[ ] Banking Credit Management Services (gold credit)
[ ] Business Consultation & Financial Planning Services
[ ] Financial Analysis or Evaluation Services
[ ] Other:

For the purposes of this provision, a contract is considered entered into when all parties to the contract has signed on it and stamped two original copies with a notarized photocopy delivered to JP Morgan Chase Investment Division.

Client Signature(s):                                    Date:

**1. Investment Management Services**
- Manager agrees to monitor, supervise and direct the investments of Client in accordance with the Investment Objectives of the Client as communicated to Manager, in writing by the Client, from time to time. Manager agree to provide Client a written report of valuation of the Client's investments under the supervision and management of Manager on at least a quarterly basis, and consultations as requested by Client.
- Client hereby agrees and authorizes manager to have discretion to supervise and instruct the bank brokers, dealers, or issuers designated to Client (and custodian, if applicable) copies of all Investment confirmations promptly after execution of all transactions, and to manage and direct the investments and cash assets made available to manager by the client, consistent with Client's Investment Objectives. Client further authorizes Manager to act as Client's(s) agent and attorney-in-fact, without prior consultation, to (a) purchase, sell, invest, reinvest, write options, exchange, convert, trade in and otherwise deal with such assets, including limited partnerships investing in financial futures, consistent with the Investment Limitations and Objectives as stated above-in, regardless of the length of time such assets have

369 First Street, Brooklyn, New York 11215
+1-646-662-0240 +1-718-369-7945

Form 251 (Rev 03/2001)



3.

MUS 0320

Create PDF with GO2PDF for free, if you wish to remove this line, click here to buy Virtual PDF Printer

# NEW YORK FINANCIAL, LLC
## INVESTMENT NETWORK – INDEPENDENT CONSULTANTS

been held and regardless of the resulting rate of portfolio turnover, and (b) place all orders for the purchase or sale of portfolio securities for Client with or through brokers, dealers or issuers selected by Manager or which the Client may designate. Manager may take any action or non-action as they deem appropriate, without specific authorization from the Client, and may exercise their discretion and deal in and with such assets as they may receive from the Client as could the Client, but in accordance with the Client's Investment Objectives.
Client may change Investment Objectives, in consultation with manager, but must provide manager with written notification of such change of objectives.

**2. Banking Credit Management Services**
Manager agrees to review, analyze and provide recommendations with respect to the financial situation of the client and his companies and to other investments not managed by the manager in accordance with the Investment Objectives (see section I) of the Client as communicated to Manager, in writing by the Client, from time to time. Manager further agrees to provide the client with general banking and financial credit services as made available by NEW YORK FINANCIAL and the manager's business partners and banks to provide any trade services and/ or finance and/ or credit facilities subject to banks and client's approval to cases, terms and conditions applicable to the client's situation by the time of this service need.

**3. Fees for Investment Management Services**
Investment Management and Portfolio Management Services are generally provided for a fee based upon a percentage of the total account value gains of the client's assets under management. All fee due to New York Financial, LLC, should be deducted / paid from the investment return account.
Should either Manager or the client seek to terminate their advisory relationship, upon at least thirty (30) days prior written notice, fees paid is refunded by the manager.

3.1 The Client hereby authorizes the payment of management fees by automatic deduction at the beginning of each month. Unpaid fees and expenses payable to Manager shall in any case constitute a lien upon the assets of Client.
3.2 The Client hereby approves NEW YORK FINANCIAL with an irrevocable general power of attorney (Appendix B) to deal with any third party, approve and implement any transaction that will help it realize client's objectives.
3.3 The client herby accept NEW YORK FINANCIAL receiving its rights to debit on the clients accounts any debit interest or charges in excess to the fees mentioned in this contract after submitting related documents to the client for approval.
3.4 In case the client violated any of this contract terms and conditions, New York Financial have the right to call back any credit facility given out to the client as a result of this contract after settling the margin account due to the client.
3.5 Client have to sign promissory note(s) to New York Financial equal to the amounts that the client needs to utilize before utilization, if any.
3.6 Client agree that no withdrawals of invested principal should be made before 5 years unless the manager approved such action after settlement of penalties to be paid by client.

**4. Standard of Care**
Manager/Client hereby agree that the sole standard of care imposed upon Manager by this Agreement is to act with due consideration, care, prudence and diligence, under the circumstances then prevailing, that a fiduciary acting in a like capacity and familiar with such matters, would use under such circumstances. The federal laws, as well as certain state statutes.

369 First Street, Brooklyn, New York 11215
+1-646-662-0240 +1-718-369-7945

Form 251 (Rev 03/2001)

4

MUS 0321

Create PDF with GO2PDF for free, if you wish to remove this line, click here to buy Virtual PDF Printer

Create PDF with GO2PDF for free, if you wish to remove this line, click here to buy Virtual PDF Printer.

# NEW YORK FINANCIAL, LLC
## INVESTMENT NETWORK – INDEPENDENT CONSULTANTS

impose liabilities, under, certain, circumstances on persons who act in good faith, and therefore, nothing herein shall, in, any, way, constitute a waiver or limitation of any, rights which the client may have under any Federal or State laws.

5. Assignment and Termination. This Agreement may not be assigned, in whole or in part, by Manager or Client, without the prior written consent of all parties hereto. This Agreement may be terminated by either Manager or Client upon thirty (30) days prior written notice to the other party. All written notices, assignments, and terminations required hereunder, shall be deemed, effective when actually received by Manager at its office at 369 First Street, New York 11215, and the client address: Jeddah, kingdom, of Saudi Arabia, p. o. box 9082, Jeddah 21413. Each party shall be obligated to pressure, the validity, of the authority, of the individual who purports to act on, behalf of, Client or Manager and correctness of such address until notified in writing to the contrary. Client agrees to indemnify Manager against reasonable fees of traveling expenses of trips conducted for the purpose of the client business representation, if any.

6. Confidentiality. All information and advice furnished by any of the parties hereto, including their respective agents or employees, shall be treated as confidential, and shall not be disclosed, to outside parties except upon written request of the Client, or as may be required or proper, in fulfilling his, responsibilities, hereunder, or, by operation of law, notwithstanding the foregoing, Client securities pursuant to the provisions of Article III, Section 10, of the Rules of Fair Practice, and as a consequence will be available to the employees direct, and to federal, state and regulatory entities.

7. Governing Laws. This Agreement shall be construed and interpreted in accordance with the laws of the State of New York.

8. Arbitration Clause. Client agrees, and by acknowledgment and acceptance of this Agreement, Manager agrees, that all controversies, which, may arise, between, or amongst the parties, hereto, broken, of this agreement, shall be determined, by arbitration, before American Arbitration Association. At least one, of the arbitrators, shall be then employed, or, associated, with, a member, firm, of the New York Stock Exchange. Any arbitration under this Agreement shall be governed by the laws of the State of New York. The award of the arbitrators, or of the majority of them, shall be final and judgment upon the award rendered may be entered, in any court, state or federal, having jurisdiction. Arbitration is final and binding on the parties. The parties are waiving their right to seek remedies in court, including the right to jury trial. Pre-arbitration discovery is generally more limited than and different from court proceedings. The arbitrators' award is not required to include factual findings or legal reasoning, and, any, party's right, to appeal, or, to, seek, modification of, rulings by the arbitrators is strictly limited. The panel of arbitrators will typically include arbitrators who were or are affiliated with the securities industry.

9. Severability. Each part of this Agreement is intended to be severable. If any portion, of this Agreement is invalid, or, unenforceable, such, validity, or, unenforceability, shall, not, affect, the, validity, or, enforceability of, the remaining portions.

369 First Street, Brooklyn, New York 11215
+1-646-662-0240 +1-718-369-7945

5

Form 251 (Rev 03/2001)

MUS 0322

# NEW YORK FINANCIAL, LLC
## INVESTMENT NETWORK – INDEPENDENT CONSULTANTS

enforceability of the remaining portions of this Agreement, which shall remain in full force and effect and shall be binding upon the parties hereto.

**10. Entire Agreement.**
This Agreement, including any attachments related hereto, including but not limited, other disclosures, documents and sub-agreements constitutes the entire agreement between Manager and Client, and supersedes any and all prior agreements, representations or understandings of the parties, written or oral.

Agreement, as executed by the parties hereto, shall be deemed an original for the purposes of presentment to any bank, securities brokerage firm, other business entity, or and federal, state, local, governmental or self regulatory organization having dealings with or authority over the parties.

**THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE IN SECTION IX, (a) ABOVE. CLIENT HEREBY ACKNOWLEDGES RECEIPT OF A COPY OF THIS AGREEMENT BY EXECUTION BELOW.**

**IN WITNESS WHEREOF,** The parties hereto have caused this Agreement to be duly executed and sealed as of the date noted by each respective signature below.

FIRST PARTY:                                SECOND PARTY:

NEW YORK FINANCIAL LLC.                      MUSALLI FACTORY FOR
                                             GOLD AND JEWELLERY.

Signature:                                   Signature:
Name: Amir Bektor                            Ahmed A. Musalli
Position: Vice President                     Position: General Manager

Date:                                        Date: August 4, 2004

369 First Street, Brooklyn, New York 11215
+1-646-662-0240 +1-718-369-7945

Form 251 (Rev 03/2001)                                      6.

MUS 0323

Create PDF with GO2PDF for free, if you wish to remove this line, click here to buy Virtual PDF Printer



معمل مصلي للذهب والمجوهرات
MUSALLI FACTORY FOR GOLD & JEWELLERY

## Appendix ( A )

**_Business Nature:_**
Musalli Factory business nature is Gold trading and Gold & Jewellery
manufacturing

**_Source of Fund:_**
As per financial statements our sources of fund are coming from our
revenue from Gold & Jewellery manufacturing and local bank credit
facilities



MUS 0324

Limited Liability Company With A Capital S.R 100,000,000
JEDDAH: AL-DULMANA - EAST HIGH WAY - TEL.: 6392222 - FAX: 8291111 - P.O.BOX: POST JEDDAH: 21413 - C.R E409000405 - C.C.J.: 29247
http://www.musallifactory.com / e-mail: info@musallifactory.com  ISO 9002 ( 07/ 2402 7810)( •٧ / ٧٤-•٧ ٧٨١• )

reate PDF with GO2PDF for free, if you wish to remove this line. click here to buy Virtual PDF Printer

Exhibit 4



مصنع مصلي للحلي والمجوهرات

**MUSALLI FACTORY** FOR GOLD & JEWELLERY

**IRREVOCABLE FULL POWER OF ATTORNEY**

وكالة / تفويض

Name: Musalli Factory For Gold & Jewellery Co.

الاســـم: شـــركة مصـــنع مصـــلي للحلـــي والمجوهرات

1.  **AGENT'S AUTHORITY TO ACT.**

١- صلاحية الوكيل:

I hereby authorize: (whose signature appears below) as my agent ("Agent") and attorney-in-fact to buy, sell, (including short sales) and trade stocks, bonds, options, OTC options, and other instruments and any other securities and/or contracts relating to the same on margin or otherwise in accordance with your terms and conditions for my account and risk and in my name, or number on your books. I hereby agree to indemnify and hold you harmless from and to pay you promptly on demand any and all losses arising therefrom of debit balance due thereon.

أفوض بموجب هذا نيويورك فاينانشــال كوكيــل ومثل قانوني في للبيع والشراء بما فيهـا عمليـات البيع قصر الأجل والمتاجرة بالأسهم والســندات والمشتقات المالية وتجارة العملات وأي ســندات مالية أخرى أو تجارة عقود المادن وكافة العقـود المتعلقة باستثمار التأمين النقـدي المـودع لـدى الوكيل وذلك لحسابي وعلى مسئوليتي كما هـي مدونة في دفاتركم ومع حسمانا المحافظة علـى الأرصدة المدينة الناتجة عـن تسـهيلاتنا البنكيـة الممنوحة لنا منكم.

2.  **INSTRUCTIONS.**

٢- تعليمات:

You are authorized to follow the instructions of my Agent and attorney-in-fact in every respect concerning my account with you, and make deliveries of securities and payment of moneys to him or as he may order and direct. In all matters and things above, as well as in all other things necessary or incidental to the behalf in the same manner and with the same force and effect as I might or could do.

إننا نخولكم في اتباع تعليمات وكيلي بشأن تنفذ عمليات تحويل الأموال أو المادن من قـبلكم إلى حسابنا وكذلك في كل التعليمات الصادرة منـه لأجل تشغيل حسابنا أو حساباتنا لديكم.

3.  **RATIFICATION.**

٣- تعزيز / تصديق:

I hereby ratify and confirm any and all transactions with you heretofore or hereafter made by the aforesaid against or for my account. **INDEMNITY.** This authorization and indemnity is in addition to (and in no way limits or restricts) any rights which you may have under any other agreement or agreements between your firm and me. This authorization and indemnity is also a continuing one and

إنني أعزز وأؤكد أي أو كل العمليات التي تــتم معكم بخصوص حساباتنا بموجب هذا التفـويض. إضافة إلى أي حقوق ممنوحة تحـت أي اتفاقيـات أخرى تمت أو ستتم مع بنككم. ويظل التفـويض اري المفعول بكامل قوته التنفيذية حتى يـتم لإخطاركم كتابياً وعلى أن يسلم هذا الإلغاء منكم



A Limited Liability Company With A Capital SR 100,000.000

شركة ذات مسئولية محدودة - رأس المال ١٠٠,٠٠٠,٠٠٠ ريال

جــدة - السليمانية - شرق الخط السريع - تليفـون : ٦٢٩٢٢٢٢ - فاكـس : ٦٢٩١١١١ - س.ب : ٩٠٨٧ - جــدة : ٢١٤١٣ - س.ت : ٤٠٣٠٠٨٥٤٨٥ - ف.ت.ج : ٢٦٣٤٧

JEDDAH · AL-SULIMANIA · EAST HIGH WAY · TEL. : 6292222 · FAX : 6291111 · P.O.BOX : 9087 JEDDAH : 21413 · C.R : 4030085485 · C.C.J : 26347

http://www.musallifactory.com / e-mail:Info@musallifactory.com ISO 9002 ( 07/ 2402 7810)( ٠٧ / ٢٤٠٢ ٧٨١٠ ) ٩٠٠٢ أيزو

MUS 0157

**MUSALLI FACTORY** FOR GOLD & JEWELLERY

مصنع مصلي للحلي والمجوهرات

shall remain in full force and effect until revoked by me by written notice addressed to and actually received by you, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation.

رسمياً، ولا يؤثر هذا الإلغاء على أي عقود اتفاقيات تم تنفيذها قبل تاريخ هذا الإلغاء.

**4. ASSIGNMENT AND SUCCESSOR FIRMS.**
This authorization and indemnity shall inure to the benefit of your present firm and of any successor firm or firms irrespective of any change or changes at any time in the personnel thereof for any cause whatsoever, and of the assigns of your present firm or any successor firm.

٤- التنازل عن التفويض:

هذا التفويض سيظل ساري المفعول لديكم أو لدى أي من شركائكم أو بنوركم يحق لها إتمام الاتفاقيات المومة بينكم وبيننا.

Date: 30 Aug, 2004.     City: Jeddah

State:

Kingdom of Saudi Arabia

Signature:

Authorized Signature: Ahmed A. Musalli

Printed Name: Ahmed A. Musalli

Musalli Factory For Gold & Jewellery

التاريخ: 30 أغسطس 2004

المدينة: جدة

المملكة العربية السعودية

التوقيع:

المفوض بالتوقيع: أحد عبداله مصلي

اسم المفوض: أحد عبداله مصلي

شركة مصنع مصلي للحلي والمجوهرات

Witness:

Signature of Agent:

Printed name of Agent: New York Financial LLC.

Address of Agent:

City: New York     State: New York

United States of America

Zip Code:

Witness:

شاهد:

توقيع الوكيل:

اسم الوكيل: نيويورك فاينانشال

عنوان الوكيل:

المدينة: نيويورك

الولايات المتحدة الأمريكية

الرمز البريدي:

شاهد:

MUS 0158

A Limited Liability Company With A Capital SR 100,000,000
JEDDAH · AL-SULIMANIA · EAST HIGH WAY · TEL. : 6292222 · FAX : 6291111 · P.O.BOX : 9087 JEDDAH : 21413 · C.R : 4030085485 · C.C.J : 2634
http:// www.musallifactory.com / e-mail:info@musallifactory.com   ISO 9002 ( 07/ 2402 7810)



## GENERAL AUTHENTICATION CERTIFICATE

| | |
|---|---|
| Kingdom of Saudi Arabia | ) |
| Western Province | )  ss: |
| City of Jeddah | ) |
| American Consulate General | ) |

I Certify that the official named below, whose true signature and official seal are, respectively, subscribed and affixed to the annexed document, was, on this day, empowered to act in the official capacity designated in the annexed document, to which faith and credit are due. The Consulate does not assume any responsibility for the contents of the attached document.

Abdulrahman S. Al-Bassam

LOREN G. MEALEY
VICE-CONSUL OF THE
UNITED STATES OF AMERICA

September 6, 2004

SEAL

MUS 0159

جـــدة · الـسليمـانيـة · شرق الخـط الـسريـع · تليفـون · ٦٢٩٢٢٢٢ · فاكـس · ٦٢٩١١١١ · ص . ب · ٩٠٨٧ · جـــدة · ٢١٤١٣ · س . ت . ج . ٤٠٣٠٠٨٥٤٨٥ · ث . ث . ج : ٢٦٣٤٧
JEDDAH · AL-SULIMANIA · EAST HIGH WAY · TEL : 6292222 · FAX : 6291111 · P.O.BOX : 9087 JEDDAH : 21413 · C.R : 4030085485 · C.C.J : 26347
http:// www.musailifactory.com · e-mail:info@musailifactory.com  ISO 9002 ( 07/ 2402 7810)( ٠٧ / ٢٤٠٢٧٨١٠ )  ٩٠٠٢ أيـــزو



SECURITIES DEPARTMENT

# IRREVOCABLE FULL POWER OF ATTORNEY

**WITH PRIVILEGE TO WITHDRAW MONEY AND/OR SECURITIES**

Name: _____

1. **AGENT'S AUTHORITY TO ACT.**
   I hereby authorize: (whose signature appears below) as my agent ("Agent") and attorney-in-fact to buy, sell, (including short sales) and trade stocks, bonds, options, OTC options, and other instruments and any other securities and/or commodities and/or contracts relating to the same on margin or otherwise in accordance with your terms and conditions for my account and risk and in my name, or number on your books. I hereby agree to indemnify and hold you harmless from and to pay you promptly on demand any and all losses arising therefrom of debit balance due thereon. **INSTRUCTIONS.**

2. You are authorized to follow the instructions of my agent and attorney-in-fact in every respect concerning my account with you, and make deliveries of securities and payment of moneys to him or as he may order and direct. In all matters and things above, as well as in all other things necessary or incidental to the furtherance or conduct of my account, my agent and attorney-in-fact is authorized to act for me and in my behalf in the same manner and with the same force and effect as I might or could do.

3. 4. **RATIFICATION.** I hereby ratify and confirm any and all transactions with you heretofore or hereafter made by the aforesaid against or for my account. **INDEMNITY.** This authorization and indemnity is in addition to (and in no way limits or restricts) any rights which you may have under any other agreement or agreements between your firm and me. This authorization and indemnity is also a continuing one and shall remain in full force and effect until revoked by me by written notice addressed to and actually received by you, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation.

5. **ASSIGNMENT AND SUCCESSOR FIRMS.** This authorization and indemnity shall inure to the benefit of your present firm and of any successor firm or firms irrespective of any change or changes at any time in the personnel thereof for any cause whatsoever, and of the assigns of your present firm or any successor firm.

_____    _____    _____
Date                       City                State

For: _____

_____         Signature of Account
Signature of Agent              Holder

MUS 0160

Exhibit 5



**PORTFOLIO MANAGER PROGRAM**
CHASE PERSONAL FINANCIAL SERVICES

INVESTMENT STRATEGY REPORT

PREPARED September 2, 2004 FOR
New York Financial LLC
Musalli Factory Sub.



CHASE

MUS 0260



Prepared September 2, 2004 for
New York Financial LLC

## Investment Profile Objectives

This report is designed to help you understand how the Portfolio Manager Program Program, together with the information provided by you to your Investment Professional, determines your recommended portfolio. The table below summarizes this information. This information is critically important, as it forms the foundation for recommendations contained in this report. Please read all sections carefully and check off each item in the column provided below to confirm the information is accurate.

Our analysis indicates that your investment profile is most consistent with "Standard Growth Focus."



JP MORGAN CHASE BANK
BROOKLYN, NY 11215-2299

MUS 0261

Prepared September 2, 2004 for
New York Financial LLC

## Investment Management

With the Portfolio Manager Program, all investment decisions are made specifically to help you achieve the investment objective stated in your Investor Profile. The risk level associated with the proposed investments is determined using proprietary software technology with the aid of your Personal Financial Advisor. The profiling process analyzes a combination of factors, including financial requirements, time horizon, and your calculated risk tolerance level.

Your recommended portfolio was created using investments selected specifically to meet the criteria outlined in your Investor Profile. A comprehensive universe of separate account managers was evaluated using quantitative and qualitative methods to arrive at the final selection of investments. Portfolios are created and managed to provide returns based upon the highest acceptable level of risk, as expressed in your Investor Profile.

## Asset Allocation and Diversification

Portfolios are created to provide an appropriate return for each level of risk undertaken, based on extensive investment research. The starting point is the allocation of assets across investment classes (equity, fixed income and cash) to create appropriate portfolio diversification.

These investment classes are further divided into sub-classes—such as large-cap growth equity funds, international equity funds and short-term bond funds—to achieve an additional level of diversification.

## Separate Account Manager Selection, Monitoring and Replacement

The universe of Separate Account Managers is evaluated according to a set of parameters governing the Portfolio Manager Program (see table below). A proprietary technical model initially screens and ranks all investments for additional evaluation and selection for your portfolio. Additional research is performed on each manager that passes the initial screening. Each manager's correlation with others in the portfolio, and its volatility impact on the entire portfolio, are also examined.

| Evaluation criteria may include, but are not limited to: | |
|---|---|
| Performance (return) over various time periods | Cash position |
| Volatility of returns (risk) | After-tax performance |
| Risk-adjusted performance | Manager's experience and tenure |
| Industry sector concentration | Assets under management |
| Management style consistency | Expenses |

MUS 0262



Prepared September 2, 2004 for
Next York Financial LLC

## Putting Your Investment Strategy To Work

The risk indicator below illustrates the risk levels associated with different investment categories and the relative degree of risk for your recommended portfolio based on your asset allocation. The further to the right on the risk indicator chart, the higher volatility you can expect from month to month.



**Portfolio Risk Indicator**

Low Risk — Portfolio — High Risk

Money Market · Fixed Income · US Stocks · International Stocks · Precious Metals

Based on your investor profile and asset allocation strategy, the following investments have been selected in asset classes deemed most appropriate for you. Taken together, these investments have the combined characteristics needed to help your specific investment goals, time horizon and risk tolerance.

Your Recommended Standardized Asset Allocation as of 9/2/2004

| Class | Asset Name (Category) | Ticker | $ Amount | % | % |
|---|---|---|---|---|---|
| Equities | Awad Asset Management Small Core (Small Blend) | SepAc | $100,000 | 10% | 50% |
| | Federated Investors Strategic Value (Mid Value) | SepAc | $200,000 | 20% | |
| | JPMorgan Large Growth Tax Neutral (Large Gr... | SepAc | $200,000 | 20% | |
| Bonds | Sage Intermediate Taxable Bond (Int-Term) | SepAc | $500,000 | 50% | 50% |

| | | | | | |
|---|---|---|---|---|---|
| Equities (50) | Awad Asset Management Small Core | 10.00% | 77.25% | 33.82% | 37.96% |
| | Federated Investors Strategic Value | 20.00% | 94.66% | 13.58% | 20.55% |
| | JPMorgan Large Growth Tax Neutral | 20.00% | -24.28% | -11.84% | 12.41% |
| Bonds (50) | Sage Intermediate Taxable Bond | 50.00% | 38.64% | 19.01% | 9.50% |
| **Blended Portfolio Return** | | | | | |

MUS 0263

Exhibit 6

# CHASE

101-00101-8012                    W X-2 00

Care of:
New York Financial, LLC
Russell Factory Sub.

Managed Investment
Money Market

Statement of Account
Start of Investment Period

**Relationship Manager:**
Branch Manager

September 18 - October 19, 2004
Page 1 of 1

**Customer Service**
Call Business ServiceLine

• Updated Account Information

Primary Account Number: ████0177

**Financial Consultant:**
JP Morgan Investment

## OVERVIEW

| | Opening Balance | Total Credits | Total Debits | Ending Balance |
|---|---|---|---|---|
| Managed Investment | 1,000,000.00 | 10,000.00 | 0.00 | 1,011,000.00 |
| Money Market | 1,000,000.00 | 10,000.00 | 0.00 | 1,009,000.00 |
| **Total** | 2,000,000.00 | 20,000.00 | 0.00 | 2,020,000.00 |

Average Monthly Managed Account Balance

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|---|---|
| 09/04 | 1,000,000.00 | 10/04 | 1,011,000.00 | | | | |

Average Monthly Money Market Account Balance

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|---|---|
| 09/04 | 1,000,000.00 | 10/04 | 1,009,000.00 | | | | |

Average Cash Reserve Balance 60,000.00

Average Balance Adjustment Variance 1.0%

YIELDS

| Percentage Yield Earned | Interest Credited |
|---|---|
| Interest Earned for 09/18 to 10/19 at Interest Reset: | 1.1 %  Managed Investment |
| | 0.8 %  Money Market |

## THIS ENDS YOUR STATEMENT OVERVIEW

Next statement due at end of quarter 01/05

BUSINESS TEAM AT CHASE ℠

MUS 0272

Exhibit 7



**PORTFOLIO MANAGER PROGRAM**
CHASE PERSONAL FINANCIAL SERVICES [SM]

# INVESTMENT STRATEGY REPORT

PREPARED February 17, 2005 FOR
New York Financial



MUS 0528

Prepared February 17, 2005 for
New York Financial

## Investment Profile Objectives

This report is designed to help you understand how the Portfolio Manager Program Program, together with the information provided by you to your Investment Professional, determines your recommended portfolio. The table below summarizes this information. This information is critically important, as it forms the foundation for recommendations contained in this report. Please read all sections carefully and check off each item in the column provided below to confirm the information is accurate.

Our analysis indicates that your investment profile is most consistent with "Standard Growth Focus."

Check to confirm ✓

| | | |
|---|---|---|
| Primary Investment Goal | Build Wealth | |
| Time Horizon | More than 12 Years | |
| Income Requirement | None required | |
| Federal Tax Rate | 35.0% | |
| Tax Sensitive Investing Requested | No | |
| Approximate Value of Assets | $900,000,000 | |
| Approximate Outstanding Liabilities | $0 | |
| Potential $10,000 Emergency Cash Requirement | Yes | |
| Approximate Yearly Household Income | Over $100,000 | |
| Expected 3-year Change in Household Income | Increase 5% to 20% | |
| Expected 3-year Change in Household Expenses | Increase 5% to 20% | |
| Planned Investment | $46,000,000 | |
| The Portfolio we have chosen for you | Standard Growth Focus | |

1 of 7

MUS 0529

## The Importance of Asset Allocation

### Your Suggested Asset Allocation



A well-designed asset allocation strategy is the foundation of a sound investment portfolio. The asset allocation strategy is the blueprint that dictates how your investments will be diversified among the different asset classes: equities (stocks), fixed income (bonds), and short-term or cash instruments. Each of these asset classes has its own risk/return profile. Spreading your investments across different asset classes can mitigate the effects of a downturn in any of the chosen classes, and thus allows you to effectively manage risk. The specific blend of asset classes—your asset allocation—depends on your investment goals, time horizon, and risk tolerance. The pie chart to the left represents an asset allocation strategy that is consistent with the investment objectives detailed in your profile. Monitoring your portfolio and maintaining your asset allocation in the face of market changes are key considerations for the Portfolio Manager Program Program, thus ensuring your portfolio continues to be consistent with your investment objectives.

### About Your Allocation Strategy

The asset allocation we have recommended for you has above average risk and is growth oriented. It reflects both your risk profile and your time horizon of More than 12 Years. Your risk profile and time horizon suggest that you will generally be able to ride out typical stock market cycles and take full advantage of the potentially higher returns historically offered by stocks.

The chart on the right illustrates the hypothetical performance of your suggested asset allocation, had you started the investment process 12 years ago. With your current holdings of $46,000,000 and anticipated savings of $0 per year you would have approximately $128,543,045 today.



Over your time horizon, this asset allocation has had a historical annualized return of 8.94%. Please note that we also have assumed for the purpose of the chart that the asset allocation is rebalanced each year. Rebalancing resets the asset allocation back to the original recommendation to ensure you maintain an appropriate risk profile.

As always, it is important to remember that past performance is no guarantee of future results.

The above graph and table of index performance is for illustrative purposes only and is not indicative of the performance of any investment. Portfolio return calculated with average stock fund, average bond fund, and average 30-day T-bill data provided by Morningstar Inc. as of January 31, 2005. Performance does not reflect investment management fees.

2 of 7

MUS 0530

Prepared February 17, 2005 for
New York Financial

## Putting Your Investment Strategy To Work

The risk indicator below illustrates the risk levels associated with different investment categories and the relative degree of risk for your recommended portfolio based on your asset allocation. The further to the right on the risk indicator chart, the higher volatility you can expect from month to month.



Based on your investor profile and asset allocation strategy, the following investments have been selected in asset classes deemed most appropriate for you. Taken together, these investments have the combined characteristics needed to fit with your specific investment goals, time horizon and risk tolerance.

Your Recommended Standard Growth Focus Asset Allocation as of 2/17/2005

| Class | Asset Name (Category) | Ticker | $ Amount | % | % |
|---|---|---|---|---|---|
| Equities | !PMorgan ADR (Foreign) | SepAc | $4,600,000 | 10% | 80% |
| | otsoff Capital Mgmt Smid Core (Mid Blend) | SepAc | $11,500,000 | 25% | |
| | Federated Investors Strategic Value (Mid Value) | SepAc | $11,500,000 | 25% | |
| | Navellier Large Growth (Large Gr) | SepAc | $9,200,000 | 20% | |
| Bonds | Sage Intermediate Taxable Bond (Int-Term) | SepAc | $9,200,000 | 20% | 20% |

Data provided by Morningstar, Inc.

*I have reviewed the portfolio recommendations with my investment consultant, and agree that the personal asset allocation and security recommendations shown above suit my current financial profile and investment objectives for the Portfolio Manager Program.*

Client Signature(s): _____ Date: _____

_____ Date: _____

42R-8AZ

CHASESAR

3 of 7

MUS 0531

Prepared February 17, 2005 for
New York Financial.

## Investment Management

With the Portfolio Manager Program, all investment decisions are made specifically to help you achieve the investment objective stated in your Investor Profile. The risk level associated with the proposed investments is determined using proprietary software technology with the aid of your Personal Financial Advisor. The profiling process analyzes a combination of factors, including financial requirements, time horizon, and your calculated risk tolerance level.

Your recommended portfolio was created using investments selected specifically to meet the criteria outlined in your Investor Profile. A comprehensive universe of separate account managers was evaluated using quantitative and qualitative methods to arrive at the final selection of investments. Portfolios are created and managed to provide returns based upon the highest acceptable level of risk, as expressed in your Investor Profile. .

## Asset Allocation and Diversification

Portfolios are created to provide an appropriate return for each level of risk undertaken, based on extensive investment research. The starting point is the allocation of assets across investment classes (equity, fixed income and cash) to create appropriate portfolio diversification.

These investment classes are further divided into sub-classes—such as large-cap growth equity funds, international equity funds and short-term bond funds—to achieve an additional level of diversification.

## Separate Account Manager Selection, Monitoring and Replacement

The universe of Separate Account Managers is evaluated according to a set of parameters governing the Portfolio Manager Program (see table below). A proprietary technical model initially screens and ranks all investments for additional evaluation and selection for your portfolio. Additional research is performed on each manager that passes the initial screening. Each manager's correlation with others in the portfolio, and its volatility impact on the entire portfolio, are also examined.

| Evaluation criteria may include, but are not limited to: | |
|---|---|
| ▪ Performance (return) over various time periods | ▪ Cash position |
| ▪ Volatility of returns (risk) | ▪ After-tax performance |
| ▪ Risk-adjusted performance | ▪ Manager's experience and tenure |
| ▪ Industry sector concentration | ▪ Assets under management |
| ▪ Management style consistency | ▪ Expenses |

4 of 7

## Key Investment Points

**Federated Investors Strategic Value**

- Seeks to outperform Russell Mid-Cap Value Index while maintaining a high yield and a significantly below-average risk profile
- Employs a bottom-up value approach, emphasizing overlooked stocks that exhibit superior performance potential and catalysts for stock price appreciation
- Holds approximately 50-60 stocks with position size being limited to 1% minimum and 4% maximum

**JPMorgan ADR**

- Bottom-up approach, utilizing the best ideas from both its locally based regional specialists and its gloal sector analysts
- Focuses on controlling portfolios' active risks relative to its benchmark
- Holds 50-70 stocks in the portfolios with portfolio turnover around 31-35% per year

**Lotsoff Capital Mgmt SmId Core**

- Value manager identifies undervalued managers using long- and short-term valuation factors
- Bottom-up, sector-neutral approach which remains fully invested
- Attention to tax impact on all changes made to portfolios

**Navellier Large Growth**

- Growth-oriented approach implements investment discipline through highly quantitative analysis
- Proprietary computer screening process reviews a universe of over 9,000 equities to discover those with attractive reward-to-risk characteristics
- Combines quantitative screening with fundamental analysis for stock selection

**Sage Intermediate Taxable Bond**

- Combines fundamental economic and quantitative security analysis to identify optimal gross, risk-adjusted and after-tax return opportunities
- Relatively risk-aware portfolio managed in line with client's risk tolerance
- Focuses primarily on the use of high-quality investment-grade securities

5 of 7

MUS 0533

Prepared February 17, 2005 for
New York Financial

## Blended Portfolio Returns

This table illustrates the weighted blended returns of your recommended portfolio on an historical basis, calculated cumulatively. This is intended to provide you with a perspective on the quality of managers that have met certain criteria to be included in your program. Important to keep in mind is the value of a diversified portfolio that has been developed for you. In any one year, one asset class may perform better than the other. However, since no one can accurately predict which asset class this will be, it is best to be diversified across several areas of the market.

| | | Port. | 5 yr. | 3 yr. | 1 yr. |
|---|---|---|---|---|---|
| Equities (80) | JPMorgan ADR | 10.00% | -0.79% | 36.73% | 19.45% |
| | Lotsoff Capital Mgmt Smid Core | 25.00% | 101.32% | 55.37% | 23.14% |
| | Federated Investors Strategic Value | 25.00% | 138.13% | 52.19% | 17.39% |
| | Navellier Large Growth | 20.00% | -20.63% | 24.32% | 18.73% |
| Bonds (20) | Sage Intermediate Taxable Bond | 20.00% | 40.83% | 16.73% | 3.17% |
| Blended Portfolio Return | | 100.00% | 63.22% | 38.77% | 16.56% |

MUS 0534

## Definitions

This Account will be managed according to, among other things, the portfolio named in the "The Portfolio we have chosen for you" field within the "Investment Profile Objectives" section of the ISR. For Client's reference, the universe of portfolios available through this Service and their respective definitions are as follows:

**GROWTH***  It is believed that this portfolio investment objective is appropriate for the investor interested in achieving real capital growth over the long term, through its focus on the equity markets. The portfolio will be invested primarily in equity securities. The investor with this portfolio investment objective may encounter significant volatility and should have a high tolerance for risk. Investment horizon: at least 5 years.

**GROWTH FOCUS***  It is believed that this portfolio investment objective is appropriate for the investor interested in achieving real capital growth and generating portfolio income, but who wishes greater emphasis placed on the former, through investment in equities. A moderate weighting in fixed income securities is intended to provide some protection against the downside risks characteristic of a growth-oriented portfolio dominated by equities. The typical allocation to equity securities will be 70% to 90% of assets with the remainder invested in fixed income securities. The investor with this portfolio investment objective is considered to have an above-average tolerance for risk. Investment horizon: at least 3-5 years.

**GROWTH EMPHASIS***  It is believed that this portfolio investment objective is appropriate for the investor attracted by the opportunity to earn the higher returns generated by equity markets, but who is prepared to limit equity participation in order to avoid large declines in portfolio value over the intermediate term. This portfolio investment objective emphasizes equities but also is intended to add stability through exposure to the less volatile bond market. The equity allocation will range from 50% to 70% of assets with the remainder invested in fixed income securities. The investor with this portfolio investment objective is considered to have a slightly above-average tolerance for risk. Investment horizon: at least 3 years.

**BALANCED***  It is believed that this portfolio investment objective is appropriate for the investor who seeks some appreciation of capital to help preserve it from inflation, and can tolerate possible short-term losses in order to achieve that goal. The normal asset allocation is equally divided between fixed income and equities in an effort to balance stability and growth. Both equity and fixed income investments may range from 40% to 60% of assets. The investor with this portfolio investment objective is considered to have an average tolerance for risk. Investment horizon: at least 3 years.

**INCOME EMPHASIS***  It is believed that this portfolio investment objective is appropriate for the investor who is concerned most with avoiding short-term losses, but who also wants to see some growth in capital to help preserve it from inflation. Performance is intended to benefit from a moderate exposure to equity markets, while the large position in fixed income is intended to offer protection during times of market volatility. The typical allocation to fixed income will be 60% to 80% of assets, with the remainder invested in equities. The investor with this portfolio investment objective is considered to have a below-average tolerance for risk. Investment horizon: at least 1-3 years.

**INCOME FOCUS***  It is believed that this portfolio investment objective is appropriate for the investor who seeks current income and principal stability with a secondary focus on capital growth. The portfolio will be primarily invested in fixed income securities and fixed income funds with a smaller amount dedicated to the equity markets. Some short-term volatility may be expected. The typical fixed income allocation will be 70% to 90% of assets. The investor with this portfolio investment objective has a below-average tolerance for risk. Investment horizon: 1-3 years.

**INCOME***  It is believed that this portfolio investment objective is appropriate for the investor who seeks a high level of current income while at the same time preserving principal and providing liquidity. The portfolio will be invested primarily in fixed income securities. The investor with this portfolio investment objective typically has a below-average tolerance for risk. Investment horizon: at least 1 year.

**SHORT-TERM FIXED INCOME***  It is believed that this portfolio investment objective is appropriate for the investor who seeks to maximize return subject to the preservation and stability of principal. The portfolio will be invested exclusively in fixed income instruments with maturities of five years or less. The investor with this portfolio investment objective typically has a below-average tolerance for risk.

**CASH MANAGEMENT***  It is believed that this portfolio investment objective is appropriate for the investor who seeks to maximize return while at the same time preserving principal and providing liquidity. The portfolio will be invested exclusively in fixed income instruments with maturities of two years or less. The investor with this portfolio investment objective typically has a low tolerance for risk.

*Each of the above-referenced portfolio investment objectives has a Tax Advantaged equivalent portfolio investment objective wherein there is greater emphasis on tax sensitive investments.*

Exhibit 8

## EXCLUSIVE INVESTMENT MANAGEMENT
## AND REPRESENTATION AGREEMENT

**First Party :**   New York Financial, LLC (369 First Street, New York 11215, USA) ("Manager")

**Second Party :**   Musalli Factory For Gold and Jewellery  (P.O. Box 9087, Jeddah 21413 Kingdom of Saudi Arabia)

WHEREAS, the second party, Musalli Factory For Gold and Jewellery, is represented by the first party pursuant to a delegation and authorization letter issued on March 12, 2004 and renewed by this agreement;

WHEREAS, the first party has the necessary and sufficient experience and background accepted by the second party to negotiate and enter into transactions on behalf of the second party, and whereas the first party is hereby authorized to represent and act on behalf of the second party in examining, approving investments and transactions in the United States and the United Kingdom, ALL PARTIES HAVE AGREED ON THE FOLLOWING:

**First Party Activities and Responsibilities:**
- Represent the second party in any and all actions that should be taken as far as any agreed upon transaction is concerned, including but not limited to acting pursuant to the previously issued powers of attorney and/or examining and recommending for or against entering into investment opportunities.
- Notify and communicate with the second party about all documents and funds required to process transactions such as LC(s) drafts, applications and other documentation for banking and investment transactions.
- Hire and appoint lawyers or other regulatory professionals if necessary to protect the interests and rights of the second party at that party's cost.
- Produce necessary commitments and undertakings on behalf of the second party with second party being held solely and irrevocably responsible therefore, and second party has the right of recourse against the first party.

**Second Party Activities and Responsibilities:**
- Second Party is responsible for providing any documentation required to process any agreed upon transaction in order to enable First Party to perform its duties hereunder.
- Second Party is directly responsible for bearing any administrative, out of pocket, or professional expenses due as a result of any transaction processing.

1.  **Appointment of Manager.**

The Second Party engages the Manager and the Manager hereby accepts such engagement, to render investment advice and treasury management services with respect to assets of the Second Party ("the Assets") for the period and on the terms set forth in this Agreement.

2.  **Duties of Manager.**

(a)  **General Duties.** The Manager shall act as investment and treasury manager to the Assets and shall supervise investments on behalf of the second party.
Without limiting the generality of the foregoing, the Manager shall; (i) furnish advice and recommendations with respect to the investment of Assets, including the taking of such other steps as may be necessary to implement such advice and recommendations; (ii) furnish reports, statements and other data on securities, economic conditions and other pertinent subjects which may be reasonably requested in writing; (iii) manage the investments subject to the ultimate supervision and direction of the Manager, and request material changes in group business decisions covering subjects not encompassed by this agreement which nonetheless may affect the performance of Manager's duties hereunder.

(b)  **Investment Management Services.** The Manager agrees to monitor, supervise and direct the investments of Second Party in accordance with investment objectives as communicated to Manager, in writing by the Second Party, from time to time. Manager agrees to provide the Second Party a written report of valuation when of the Second Party's investments under the supervision and management of Manager on an quarterly basis (or as made available nonparties who are housekeeping the Asset(s) such as banks issuing bank statements) and consultations as requested in writing by the Second Party.

The Second Party hereby agrees and authorizes Manager to have discretion to supervise and instruct banks, brokers, dealers or issuers designated to forward to the Second Party (and custodian if applicable) copies of all Investment confirmations promptly after execution of all transactions, and to manage and direct the investments and Assets made available to Manager by the Second Party, consistent with its investment objectives. The Second Party further authorizes Manager to act as the Second Party's agent and attorney-in-fact, without prior consultation, to (a) purchase, sell, invest, reinvest, write options, exchange, convert, trade in and otherwise deal with such Assets, including limited partnerships investing in financial futures, consistent with investment limitations and objectives as stated above, regardless of the length of time such assets have been held and regardless of the resulting rate of portfolio turnover, and (b) place all orders for the purchase or sale of portfolio securities for the Second Party with or through brokers, dealers or issuers selected by Manager or which the Second Party may designate. Manager may take any action or non-action as he may deem appropriate, without specific authorization from the Second Party, and may exercise his discretion and deal with its investment objectives.

2

NYF000113

The Second Party may change investment objectives, in consultation with Manager, but must provide Manager with written notification of such change of objectives. The Second Party agrees that it shall not in any manner and at any time, refuse, delay or hinder completion of any transaction (whether with JP Morgan in London or any other transaction) which is initiated on its behalf by Manager, and that any such refusal, hindrance or delay shall be deemed a material breach of this Agreement, Automatically entitling Manager to collect, or retain for itself, from the breaching party the sum of $1 million as liquidated damages. The parties agree that such breach would result in damages that would be hard to quantity with precision, and they hereby agree that the liquidated amount 1$ million would in such event be fair and reasonable.

(c)    Banking Credit Management Services. The Manager agrees to review, analyze and provide recommendations with respect to the financial situation of the Second Party and its companies and to other investments not managed by the Manager in accordance with the investment objectives of the Second Party as communicated to Manager, in writing by the Second Party, from time to time. Manager further agrees to provide the Second Party with general banking and financial credit services as made available by New York Financial, LLC and the Manager's business partners and banks to provide any trade services and/or finance and/or credit facilities subject to bank's and the Second Party's approval, and subject to terms and conditions applicable to the Second Party's situation at the time that the services are needed.

3.    Best Efforts and Judgment.

The Manager shall use its best judgment and efforts in rendering the advice and services as contemplated by this Agreement.

Limit:

Manager at all times will act in good faith with respect to its management duties. The Second Party understands that there is risk (including a risk of loss) associated with investments to be made by Manager in managing the Portfolio and with decisions and trading strategy. It agrees that Manager will not be liable for any loss incurred in connection with recommendations or investments made or other actions taken on behalf of the Portfolio due to errors of judgment or by reason of his advice, including action taken or omitted prior to a written notice of termination. Manager will not be excluded from liability for losses occasioned by reason of his willful misfeasance, bad faith or negligence in the performance of his duties, or by reason of his reckless disregard of his obligations and duties under the Agreement. Provided, however, that nothing in the Agreement will constitute a waiver or limitation of any rights that Second Party may have under applicable federal or state law, Manager will not be responsible for any loss incurred by reason of any act or omission of Second and Third Party, including, without limitation, early withdrawal from any transaction,

3

the decision to terminate or delay any transaction, the decision to enter into and/ or consummate any transaction, and/ or any other act or omission by Manager.

### 4. Independent Contractor.

The Manager shall, for all purposes herein, be deemed to be an independent contractor. It is expressly understood and agreed that the services to be rendered by the Manager under the provisions of this Agreement are exclusive, but the Manager shall be free to render similar or different services to others so long as its ability to render the services provided for in this Agreement shall not be impaired thereby.

### 5. Manager's Personnel.

The Manager shall, at its own expense, maintain such staff and employ or retain such personnel and consult with such other persons as it shall from time to time determine to be necessary to the performance of its obligations under this Agreement.
Without limiting the generality of the foregoing, the staff and personnel of the Manager shall be deemed to include persons employed or retained by the Manager to furnish statistical information, research, and other factual information, advice regarding economic factors and trends, information with respect to technical and scientific developments, and such other information, advice and assistance as the Manager may desire and reasonably request.

### 6. Effect of Agreement.

This agreement supersedes any previous communications and/ or written commitments exchanged between both parties and signifies the transaction causing the issuance of such an agreement, and any conflict arising from any other exchanged documentation would not affect enforcement of this agreement, which is final and enforcing to both parties and may only be altered, modified or cancelled by a writing signed by all parties.

### 7. Outsourcing Not Intended.

This document is not to be viewed as outsourcing of funds or recommendation to take any action not intended by the authorized signatory of second party and all actions are based on their requests, whereby second party is assigning to the first party the role of representative to process the transaction, and the parties understand that the second party is relying not on the Manager in connection with monetary returns or projections or objectives, but rather on its own objectives, which objectives the second party may change at any time either internally or in entering in a new contract with any other entity.

4

NYF000115

8. **Investment Manager and Advisory Compensation.**

Investment Management and Portfolio Management Services are generally provided for a fee upon a percentage of the total account value gains of the Assets under management. Pursuant to this agreement, New York Financial, LLC shall be entitled to compensation of (a) $260,000 annually, plus (b) 10% of the gross profits (or investments returns) of any transaction. All fees due to New York Financial, LLC should be deducted/ paid from the client account proceeds, if any, under New York Financial LLC's control, or by direct wire transfer from the second party to New York Financial, LLC.

The Second Party hereby authorizes the payment of management fees by automatic deduction at the beginning of each month. Unpaid fees expenses payable to Manager shall in any case constitute a line upon the Assets.

The Second Party hereby approves New York Financial, LLC with an irrevocable general power of attorney with any party, approve and implement any transaction that will help it realize the Second Party's objectives.

The Second Party hereby accept New York Financial, LLC reserving its rights to debit on the Second Party's accounts any debit interest or charges in excess to the fees mentioned in this contract after submitting related documents to the Second Party for approval.

In case the Second Party violates any of these contract terms and conditions, New York Financial, LLC has the right to call back any credit facility given out to the Second and Third Party as a result of this contract after setting the margin account due to them, and to deduct, and retain for itself, the liquidated damage amount of $1 million directly from the second the party's accounts.

The Second Party agrees that no withdrawals of invested principal should be made before 5 years unless the Manager approves such action.

Fixed fee: The second party to pay to the first party the fixed fees as follows:
- The day which the portfolio manager program (copy attached) starts its operations. And this will be the day which the fee amounting $260,000 will be paid annually.
- The 10% fees shall be payable annually, the date which the portfolio manager starts the operations.

The above two fees will be made during the term of this agreement.

The parties shall pay to the Manager, and the Manager agrees to accept, as full compensation for all administrative and investment management and advisory services furnished or provided to the parties pursuant to this Agreement, a management fee as set forth herein and as may be amended in writing from time to time by the Manager.

5

NYF000116

## 9. Formal Retention.

The undersigned hereby retains New York Financial, LLC ("Manager"), A Registered United States of America Company acting through Banks, Advisers, Registered Brokers and Dealers to perform Investment Management Services and provide Financial Solutions for the undersigned in accordance with terms and conditions set forth hereafter.

## 10. Specific Scope of Services.

The undersigned specifically requests New York Financial, LLC to provide the following:

- [x]  Investments Management Services
- [x]  Banking Credit Management Services (gold credit, not less than 320,000 pure gold ounces, to be delivered to the Second party upon Cash Margin payment security of 35% "Accumulated to 46$ Millions" of the total gold loan value on date of drawn down of each quantity)
- [x]  Business Consultation & Financial Planning Services
- [x]  Financial Analysis or Evaluation Services
- [x]  Others

## 11. Contractual Effect.

For the purposes of this provision, a contract is considered entered into when all parties to the Agreement have signed on it and stamped two original copies with a notarized photocopy delivered to New York Financial, LLC.

## 12. Assignment and Termination.

This Agreement may not be assigned, in whole or in part, by Manager or the Second Party, without the prior written consent of all parties hereto. This Agreement may be terminated by either Manager or the Second Party upon thirty (30) days' prior written notice to the other party. All written notices, assignments, and terminations required hereunder shall be deemed effective when actually received by Manager at its office of record at 369 First Street, New York 11215, and the Second and Third Party address: Jeddah, Kingdom of Saudi Arabia, P.O. Box 9087, Jeddah 21413. Each party shall be entitled to presume the validity of the authority of the individual who purports to act on behalf of the Second Party or Manager and correctness of such address until notified in writing to the contrary. The Second Party agrees to indemnify Manager against reasonable fees of traveling expenses of trips conducted for the purpose of their business representation, if any.

This Agreement is automatically terminated incase the condition relating to Banking Credit Management Services mentioned in article 10 if not fulfilled by the Manager.

6

At the end of the term of the agreement (after 5 years), the final settlement between the First Party and the Second Party will be as follows:

1) The Second Party will pay the outstanding gold ounces withdrawn by the Second Party to the Manager or any party that is specified by the manager. And the Manager shall pay to the Second Party the balance of current account (cash margin security plus return on investment as per the portfolio investment program attached).

<div align="center">**OR**</div>

2) The Second Party will authorize the Manager to buy number of ounces outstanding as per the Second Party request. The value of these ounces to be debited (offset) against the Second Party current account (cash margin security plus return on investment as per the portfolio investment program attached), and excess of funds to be transferred to the Second Party.

### 13. Confidentiality.

All information and advice furnished by any of the parties hereto, including their respective agents or employees, shall be treated as confidential, and shall not be disclosed to outside parties except upon written request of the Second Party, or as may be required of Manager in fulfilling his responsibilities hereunder, or by operation of law. Notwithstanding the foregoing, the Second Party accepts that all such information with respect to its account will be provided for purpose of complying with Securities requirements pursuant to the provisions of Article III, Section 40 of the Rules of Fair Practice, and as a consequence will be available to the employees thereof, and to federal, state and regulatory entities.

### 14. Governing Law.

This Agreement shall be constructed and interpreted in accordance with the laws of the State of New York.

### 15. Arbitration Clause.

The Second agrees, and by acknowledgment and acceptance of this Agreement, Manager agrees, that all controversies which may arise between or among the parties which in breach of this agreement, shall be determined by arbitration before the American Arbitration Association. At least one of the arbitrators shall be then employed or associated with a member firm of the Association. Any arbitration under this Agreement shall be governed by the laws of the State of New York. The award of the arbitrators, or of the majority of them, shall be final, and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction.

<div align="center">7</div>

Arbitration is final and binding on the parties. The parties are waiving their right to seek remedies in court, including the right to jury trial. Pre-arbitration discovery is generally more limited than, and different from, court proceedings. The arbitrators' award is not required to include factual findings or legal reasoning, and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. The panel of arbitrators will typically include arbitrators who were or are affiliated with the securities industry.

16.   Severability.

Each part of this Agreement is intended to be severable. If any portion of this Agreement is invalid or unenforceable, such validity or unenforceability shall not affect the validity or enforceability of the remaining portions of this Agreement, which shall remain in full force and effect and shall be binding upon the parties hereto.

17.   Entire Agreement.

This Agreement, including any attachments related hereto, including but not limited to other disclosures, documents and sub-agreements constitutes the entire agreement between Manager and the Second Party, and supersedes any and all prior agreements, representations or understandings of the parties, written or oral.

18.   Manager's Liabilities.

(a)   The Manger shall be liable of all: willful misfeasance, bad faith, negligence, or reckless disregard of the obligations or duties hereunder on the part of the Manager, the Manager shall not be subject to liability to the parties for any act or mission in the course of, or connected with, rendering services hereunder or for any losses that may be however, that this provision shall not be constructed as a waiver or limitation of any rights under applicable federal securities laws.

(b)   The parties shall indemnify and hold harmless the Manager, its managing member and the shareholders, directors, offices and employees of each of them (any such person, an "Indemnified Party") against any loss, liability, claim, damage or expense (including the reasonable cost of investigating and defending any alleged loss, liability, claim, damage or expenses and reasonable counsel fees incurred in connection therewith) arising out of the Indemnified Party's performance or non-performance of any duties under this Agreement; provided, however, that nothing herein shall be deemed to protect any Indemnified Party against any liability to which such Indemnified Party would otherwise be subject by reason of willful misfeasance, bad faith or negligence in the performance of duties hereunder or by reason of reckless disagreed of obligations and duties under this Agreement; and provided, further, that this provision shall not construed as a waiver or limitation of any rights which the parties may have under applicable federal securities laws.

8

NYF000119

19. **Exclusivity.**

The parties' employment of the Manager is an exclusive arrangement, and the Second Party may not employ other individuals or entities to furnish them with the services provided for herein.

20. **Term.**

This Agreement shall become effective on the first day which the portfolio Manager Program starts, and shall remain in effect for a period not to exceed five years.

21. **Anti-Money Laundering Compliance.**

The Manager acknowledges that, in compliance with the Bank Secrecy Act, as amended and implementing regulations ("BSA"), it has adopted an Anti-Money Laundering Policy. The Manager agrees to comply with the Anti-Money Laundering Policy and the BSA, as the same may apply to the Manager, now and in the future. The Manager further agrees to provide to the parties contractual assurances as may be reasonably requested by the parties. The parties may disclose information respecting the Manager to governmental and/ or regulatory or self-regulatory authorities to the extent required by applicable law or regulation and may file reports with such authorities as may be required by applicable law or regulation.

The parties hereto in executing, and carrying out the provisions of this Agreement are relying solely on the representation, warranties and agreements contained in this Agreement or in any writing delivered pursuant to provisions of this Agreement or at the closing of the transactions herein provided for, and not upon any representation, warranty, agreement, promise, or information, written or oral, made by any person other than as specifically set forth herein or therein. This Agreement, and all additional instruments executed to carry out this Agreement, shall be construed in accordance with the laws of the State of New York.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE. THE SECOND AND THIRD PARTY HEREBY ACKNOWLEDGE RECEIPT OF A COPY OF THIS AGREEMENT BY EXECUTION BELOW.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and sealed as of the date noted be each respective signature below.

FIRST PARTY:                          SECOND PARTY:
NEW YORK FINANCIAL, LLC               MUSALLI FACTORY FOR GOLD AND
                                      JEWELLERY

Signature:                            Signature:
Name: Amir Boktor                     Name: Ahmed A. Musalli
Position: Vice President              Position: General Manager

9



NYF000120

Exhibit 9

# CHASE

101-00101-8012

December 31, 2004
Updated Account Information

New York Financial, LLC
Musalli Factory Sets,

Managed Investment
Money Market

Balance Statement

Primary Account Number: ●●●●●0177

End of Year 2004

**Relationship Manager:**
Branch Manager

**Financial Consultant:**
JP Morgan Investment

## Account Balance

| | |
|---|---|
| Managed Investment | 1,000,000.00 |
| Money Market | 1,000,000.00 |
| **Total** | 2,000,000.00 |
| Interest Due To Accounts | |
| Managed Investment | 36,000.00 |
| Money Market | 24,000.00 |
| **Total** | 60,000.00 |

Average Cash Reserve Balance $6,000.00
Average Balance Adjustment Variance 10%

**THIS ENDS YOUR STATEMENT**

BUSINESS TEAM AT CHASE℠

MUS 0273

Exhibit 10

| From: | <elnajjar_asm@hotmail.com> |
| To: | <karim.tannir@jpmorgan.com> |
| Sent: | Sunday, April 17, 2005 2:30 PM |
| Subject: | Musalli Deal |

*Dear Mr. Karim,*

*I tried to call you last week but I couldn't get you;*
*Would you please send me an e-mail explain to us:*

1) *Expected date to start our deal with your Bank, and schedule of drawn down to enable us of new planning of production; as the season of sales starts from May to August 2005.*
2) *Any information you need to complete our deal with you.*
3) *The investment program with JP MORGAN NEW YORK is ready, and we are waiting your credit facility contract to advise JP MORGAN NEW YORK to pledge the investment program in favor of JP MORGAN LONDON.*
4) *According to last telephone call with you; I expect to receive the draft of the documents during this week to review by ourselves and reach to final agreement.*
5) *Mr. AMIR BOKTOR & Mr. NICK GAMBLA (Investment Vice president of JP MORGAN NEW YORK) are ready for any arrangements required by you, and they are ready to visit you to arrange for pledging if you wish.*
6) *Mr. AHMED MUSALLI and me; got the visa to UK, and we are planning to come to LONDON to sign the credit facility with your Bank.*

*Best Regards,*

*Abubaker El-Najjar*

MUS 1194

9/8/2006

Exhibit 11

Yahoo! Mail - finrate2000@yahoo.com                                          Page 1 of 2

꒦꒦ MAIL ꒦꒦

Subject: Re: Musalli Deal
To:        elnajjar_asm@hotmail.com
CC:        finrate2000@yahoo.com, martin.r.stokes@jpmorgan.com
From:      karim.tannir@jpmorgan.com
Date:      Fri, 29 Apr 2005 11:09:18 +0100

Dear Abu Baker

Thank you for your email

I apologize for not coming back to you earlier as we have been trying to
sort out the internal constraint that we have regarding the use of moneys
placed in NY as a collateral for a transaction done out of London.

We are still in the process of finalizing these discussions internally and
we are meeting again early next week. I will give you a call with Martin
Stokes later next week with an update on the situation.

I sincerely apologize for the delay in getting the transaction completed
but we have some Fed regulations and Legal compliance points that we need
to finalize. From you side you have supplied us with all the information we
need and given us most of the assurance required. So the ball is in our
court to get back to you.

Again I would like to assure you that we are doing all we can to speed up
the process and make sure we are ready to transact. I appreciate your
patience and your assistance as well as the warm hospitality that you and
the Musalli family have showed us and we endeavor to get back to you on
this as soon as we can.

Regards

Karim Tannir
Vice President
Middle East Investment Banking
Tel + 44 207 325 9144
Fax +44 207 325 8186
Mobile +44 7768 793 404


                    "AbuBaker
                    Elnajjar"              To:

                    <elnajjar_asm@hot      cc:

                    mail.com>              Subject:  Musalli Deal


http://us.f211.mail.yahoo.com/ym/ShowLetter?box=Inbox&MsgId=4055_771168_3518_1512_...  5/26/2005

NYF000697

28/04/2005 23:03

Dear    Mr.    Karim,<?xml:namespace    prefix    =    c    ns
=
"urn:schemas-microsoft-com:office:office" />

Reference    my    e-mail    dated    <?xml:namespace    prefix    =    st1
ns    =
"urn:schemas-microsoft-com:office:smarttags"    />17 Apr., 2005 and no
reply
from you up to now:
Would  you please inform me the situation of our deal, if the deal is
going
on  or  no? if  the  deal  is need more time to finalize; would you
please
inform me the following:
1)      The expected duration you need to complete our deal.
2)      The first consignment amount ( Gold & Amount ) you bank want to
start
with, To enable us to arrange for the bank cash collateral in favor of
your
bank.


 Best Regards,


Abubaker El-Najjar

This communication is for informational purposes only. It is not
intended
as an offer or solicitation for the purchase or sale of any financial
instrument or as an official confirmation of any transaction. All
market prices,
data and other information are not warranted as to completeness or
accuracy and
are subject to change without notice. Any comments or statements made
herein
do not necessarily reflect those of JPMorgan Chase & Co., its
subsidiaries
and affiliates

NYF000698

Exhibit 12

## Amir Boktor

| | |
|---|---|
| **From:** | <aboktor@newyork-financial.com> |
| **To:** | <stephen_abbriano@scoliacapital.com> |
| **Sent:** | Tuesday, May 31, 2005 1:53 PM |
| **Attach:** | jpmorgan.zip |
| **Subject:** | JP Morgan Investment Program attachement |

Dear Stephen

Reference our discussions regarding New York Financial's client
Musalli Factory for Gold and Jewellery (Gulf Production Facility),
please allow me to update you with the client's case.

After you offered your hedging strategy against gold price
fluctuations covering the buyers/consignee side from $375/oz to
$450/oz to help the client avoid exposure to margin calls from the
local lenders (Saudi British Bank, Saudi American Bank and Saudi
fransi Bank) every time the gold prices goes up and your other
offer/proposal to lend the client gold on consignment against a
standby LC, both in April 2004; The client considered other
management strategies to satisfy his local lenders at that time and
delayed studying these offers.

New York Financial has advised the client that your offers are
extremely practical while the client had the final decision on the
matter and decided not to proceed further.

Now its almost a whole year and the client asked to refresh the
subject with your bank; New York Financial extends its apologies
for your good self and your team on the long time consumed from its
client to decide on moving forward with the transaction and commits
itself to close this transaction for good ASAP and move forward
with its business relationship with you.

Client current situation, evaluated at today's gold price/oz is
$100 million to $120 million gold loans from local lenders, 20% to
30% cash margin bearing ZERO credit interest held with local
lenders, shareholders personal guarantee signed to local lenders,
utilized production capacity of almost 10tons of gold as compared
to optimum capacity of the factory (24tons), total cover insurance
policy to local lenders.

The client is in need of the following:

1- Utilize the optimum capacity using leased gold.
2- Lower loans rate to match international gold lease rates.
3- Realize a credit return on its cash margin.

New York Financial is requesting to proceed with the transaction of
your bank lending gold to the client after acquiring satisfactory

1/11/2006

NYF000879

collateral to your bank and proceed with your hedging strategy to hedge against gold price fluctuations.

New York Financial has required the client to commit himself to make a decision on your bank written proposal and reply to it in maximum 15 days of its issuance by your bank.

The client has requested to lease gold of the amount of $120 million (total leased gold) evaluated at today's gold price/oz to start with $5 million of equity collateral and ramp up gradually in a period of 3 months to 6 months to reach $46 million (proposed Investment portfolio collateral) as your bank agrees to the proposed collaterals.

The client has offered to provide your bank with any of, or blend of, collateral as follows:

1- JP Morgan Investment, New York, investment portfolio pledged to your bank in addition to its proceeds against leased gold to act as self settlement collateral. ($5 million + future returns in 5 years portfolio to be increased gradually as mentioned above) strategy contract issued by JP Morgan copy attached
2- AXA Equitable Fixed or Variable annuities (using different investment products of JP Morgan, Commerz Bank, UBS, Fidelity, Wells Fargo and other investment houses investment products) AXA call it investment insurance and it is offered with one of 2 options, -1- principal guaranteed or -2- return guaranteed, with your bank as the beneficiary to the annuity principal plus future value at the end of its term. AXA program prospectus copy attached
3- Standby LC - copy attached
4- Shareholders Personal Guarantees
5- Full cover insurance policy
6- If your bank qualifies to World Bank (MIGA) political risk insurance policy the client agrees to bear the costs of issuing a policy for your bank as a foreign lender to a Gulf Corporation.

Please advise if you accept the concept and let's meet sometime this week or at your convenience to close this matter; we also can invite JP Morgan Investment New York -Vice president - as the financial/Investment advisor to New York Financial (if you advise to do so) to discuss the collateralization of JP Morgan investment portfolio and AXA Annuities and its applicability as collaterals to the deal.

Thank you again for all your efforts during the past year on this deal and we really are looking forward to close this deal with you and proceed with fruitful business.

NB: Please advice if you want us to forward this communication to any of your bank Dubai regional officers Sunil Kashyap sunil_kashyap@scotiacapital.com or Mahesh Shukla shuklam@nbd.co.ae

1/11/2006

NYF000880

as we were notified that the client tried approaching them. Since last time you advised that arrangements might be done through Dubai office; I really prefer to deal directly with you this time too as it is easier and faster to communicate with New York office for any arrangements capitalizing on us being based in New York and being within the same time zone. I advised the client not to circumvent yours and our efforts since you are handling this matter from the beginning and we built together a common ground for this deal. When we meet we shall propose a non-circumvention agreement for all parties of this deal.

Looking forward to hearing from you.

Best regards,
Amir Boktor

212-729-7568
212-725-2089
212-725-0389 Fax

Email: aboktor@newyork-financial.com

1/11/2006

Exhibit 13

07109

**JPMorganChase**

JPMorgan Chase Bank, N.A.
Funds Transfer
P.O. Box 31239
Tampa, FL 33631-3339

Date 05/07/21
Our Ref. (TRN) NO. 5546400202 JS
Please mention our Reference No. (TRN) in any correspondence.
Originator's Date 05/07/21
Related Ref. No. SWF OF 05/07/21

ORIGINAL
ADVICE OF CREDIT

WE CREDIT YOUR ACCOUNT NO [███]7765
FOR PAYMENT INDICATED        SAME DAY FUNDS

$99,977.00**

ORDERING CUSTOMER
/10142714000201

MUSALLI FACTORY FOR GOLD

JEDDAH K S A

ORDERING BANK
THE NATIONAL COMMERCIAL BANK
MR. HANY F. FAIDY, MGER-INT'L
P O BOX 3555
JEDDAH SAUDI ARABIA 21481

NEW YORK FINANCIAL LLC
369 FIRST STREET, 2ND FL
BROOKLYN NY 11215

IMA:

FOR OUR INVESTMENT PROG WITH CHAS

BANK TO BANK INFORMATION
/CHGS/USD0,//CHGS/USD23,00/
/OCMT/USD100000;/

Authorized Signature

NYF000004

07677

**JPMorganChase**

JPMorgan Chase Bank, N.A.
Funds Transfer
P.O. Box 31339
Tampa, FL 33631-3339

ORIGINAL
ADVICE OF CREDIT

WE CREDIT YOUR ACCOUNT NO ███████7765
FOR PAYMENT INDICATED          SAME DAY FUNDS

$149,977.00**

Date 05/07/22
Our Ref. (TRN) NO. 8099300202JS
Please mention our Reference No. (TRN) in any correspondence.
Originator's Date 05/07/21
Related Ref. No. SWF OF 05/07/21

ORDERING CUSTOMER
/10142714000201

MUSALLI FACTORY FOR GOLD

JEDDAH K S A

ORDERING BANK
THE NATIONAL COMMERCIAL BANK
    MR. HANY F. FAIDY, MGER-INT'L
P O BOX 3555
JEDDAH SAUDI ARABIA 21481

NEW YORK FINANCIAL LLC
369 FIRST STREET, 2ND FL
BROOKLYN NY 11215

IMA:

FOR OUR INVESTMENT PROG WITH CHAS

BANK TO BANK INFORMATION
/CHGS/USD0,//CHGS/USD23,00/
/OCMT/USD150000,/

Authorized Signature

NYF000005

07444

**JPMorganChase**

JPMorgan Chase Bank, N.A.
Funds Transfer
P.O. Box 31339
Tampa, FL 33631-3339

Date 05/07/26
Our Ref. (TRN) NO. 0523600205JS
Please mention our Reference No. (TRN) in any correspondence.
Originator's Date 05/07/25
Related Ref. No. SWF OF 05/07/24

ORIGINAL
ADVICE OF CREDIT

WE CREDIT YOUR ACCOUNT NO ████7765
FOR PAYMENT INDICATED    SAME DAY FUNDS

$149,977.00**

ORDERING CUSTOMER
/1D142714000201

MUSALLI FACTORY FOR GOLD

JEDDAH K S A

ORDERING BANK
THE NATIONAL COMMERCIAL BANK
     MR. HANY F. FAIDY , MGER-INT'L
P O BOX 3555
JEDDAH SAUDI ARABIA 21481

NEW YORK FINANCIAL LLC
369 FIRST STREET, 2ND FL
BROOKLYN NY 11215

IMA:

FOR OUR INVESTMENT PROG WITH CHAS

BANK TO BANK INFORMATION
/CHGS/USD0,//CHGS/USD23,00/
/OCMT/USD150000,/

Authorized Signature

07615

◉ JPMorganChase

JPMorgan Chase Bank, N.A.
Funds Transfer
P.O. Box 31339
Tampa, FL 33631-3339

ORIGINAL
ADVICE OF CREDIT

WE CREDIT YOUR ACCOUNT NO ███████ 7765
FOR PAYMENT INDICATED     SAME DAY FUNDS

$99,977.00**

Date 05/07/27
Our Ref. (TRN) NO. 8305400206.5 S
Please mention our Reference No. (TRN) in any correspondence.
Originator's Date 05/07/25
Related Ref. No. SWF OF 05/07/25

ORDERING CUSTOMER
/10142714000201

HUSALLI FACTORY FOR GOLD

JEDDAH K S A

ORDERING BANK
THE NATIONAL COMMERCIAL BANK
      MR. HANY F. FAIDY, MGER-INT'L
P O BOX 3555
JEDDAH SAUDI ARABIA 21481

NEW YORK FINANCIAL LLC
369 FIRST STREET, 2ND FL
BROOKLYN NY 11215

IMA:

FOR OUR INVESTMENT PROG WITH CHAS

BANK TO BANK INFORMATION
/CHGS/USD0,//CHGS/USD23,00/
/OCHT/USD100000,/

Authorized Signature

NYF000007

07723

**JPMorganChase**

JPMorgan Chase Bank, N.A.
Funds Transfer
P.O. Box 31330
Tampa, FL 33631-3339

Date 05/07/28
Our Ref. (TRN) NO. 4340600207FS
Please mention our Reference No. (TRN) in any correspondence.
Originator's Date 05/07/26
Related Ref. No. SWF OF 05/07/26

ORIGINAL
ADVICE OF CREDIT

WE CREDIT YOUR ACCOUNT NO ████████7765 SAME DAY FUNDS
FOR PAYMENT INDICATED

$99,977.00**

ORDERING CUSTOMER
/10142714000201

MUSALLI FACTORY FOR GOLD

JEDDAH K S A

NEW YORK FINANCIAL LLC
369 FIRST STREET, 2ND FL
BROOKLYN NY 11215

ORDERING BANK
THE NATIONAL COMMERCIAL BANK
    MR. HANY F. FAIDY, MGER-INT'L
P O BOX 3555
JEDDAH SAUDI ARABIA 21481

IHA:

FOR OUR INVESTMENT PROG WITH CHAS

BANK TO BANK INFORMATION
/CHGS/USD0,//CHGS/USD23,00/
/OCMT/USD100000,/

Authorized Signature

05312

**JPMorganChase**

JPMorgan Chase Bank, N.A.
Funds Transfer
P.O. Box 31239
Tampa, FL 33631-3339

Date 05/08/22
Our Ref. (TRN) NO. 4766000233F S
Please mention our Reference No. (TRN) in any correspondence.
Originator's Date 05/08/22
Related Ref. No. SWF OF 05/0 8/21

ORIGINAL
ADVICE OF CREDIT

) WE CREDIT YOUR ACCOUNT NO ▓▓▓▓▓7765
FOR PAYMENT INDICATED    SAME DAY FUNDS

$149,977.00**

ORDERING CUSTOMER
/10142714000201

MUSALLI FACTORY FOR GOLD

JEDDAH K S A

ORDERING BANK
THE NATIONAL COMMERCIAL BANK
MR. HANY F. FAIDY, MGER-INT'L
P O BOX 3555
JEDDAH SAUDI ARABIA 21481

NEW YORK FINANCIAL LLC
369 FIRST STREET, 2ND FL
BROOKLYN NY 11215

IMA:

FOR OUR INVESTMENT PROG WITH CHAS

BANK TO BANK INFORMATION
/CHGS/USD0,//CHGS/USD23,00/
/OGNT/USD150000,/

Authorized Signature

05311

**JPMorganChase**

JPMorgan Chase Bank, N.A.
Funds Transfer
P.O. Box 31339
Tampa, FL 33631-3339

ORIGINAL
ADVICE OF CREDIT

WE CREDIT YOUR ACCOUNT NO ████████7765
FOR PAYMENT INDICATED    SAME DAY FUNDS

$399,977.00**

Date 05/08/22
Our Ref. (TRN) NO. 4765900233FS
Please mention our Reference No. (TRN) in any correspondence.
Originator's Date 05/08/22
Related Ref. No. SWF OF 05/08/21

ORDERING CUSTOMER
/10142714000201

MUSALLI FACTORY FOR GOLD

JEDDAH K S A

ORDERING BANK
THE NATIONAL COMMERCIAL BANK
MR. HANY F. FAIDY, MGER-INT'L
P O BOX 3555
JEDDAH SAUDI ARABIA 21481

NEW YORK FINANCIAL LLC
369 FIRST STREET, 2ND FL
BROOKLYN NY 11215

IMA:

FOR OUR INVESTMENT PROG WITH CHAS

BANK TO BANK INFORMATION
/CHGS/USD0,//CHGS/USD23,00/
/OCMT/USD400000,//

Authorized Signature

NYF000010

06721

**JPMorganChase**

JPMorgan Chase Bank, N.A.
Funds Transfer
P.O. Box 81339
Tampa, FL 33631-3339

ORIGINAL
ADVICE OF CREDIT

WE CREDIT YOUR ACCOUNT NO ████████7765
FOR PAYMENT INDICATED     SAME DAY FUNDS

$199,977.00**

NEW YORK FINANCIAL LLC
369 FIRST STREET, 2ND FL
BROOKLYN NY 11215

Date 05/08/23
Our Ref. (TRN) NO. 5816400234FS
Please mention our Reference No. (TRN) in any correspondence.
Originator's Data 05/08/22
Related Ref. No. SWF OF 05/08/22

ORDERING CUSTOMER
/10142714000201

MUSALLI FACTORY FOR GOLD

JEDDAH K S A

ORDERING BANK
THE NATIONAL COMMERCIAL BANK
MR. RANY F. FAIDY, MGER-INT'L
P O BOX 3555
JEDDAH SAUDI ARABIA 21481

IMA:

FOR OUR INVESTMENT PROG WITH CHAS

BANK TO BANK INFORMATION
/CHGS/USD0,//CHGS/USD23,00/
/OCMT/USD200000,/

Authorized Signature

NYF000011

Exhibit 14



August 18 – September 17, 2004
Page 2 of 5

101-00101-B012-00101-    -024-5-01-W X -2 00-

Primary Account Number:  101-0830177-65

### Deposits and Credits

| Date | Description | Amount |
|------|-------------|--------|
| 09/01 | Incoming INT'L Funds Transfer B/O: Mr. Mamdoh Abdullah M. Musalls | 59,310.00 |
| | **Total** | **1,619,212.00** |

### Withdrawals and Debits

| Date | Description | Amount |
|------|-------------|--------|
| 08/19 | NYCE ATM Withdrawal On 08/18; Card # **** 2857 | |
| | Serial# 009683; 3700 W Flamingo, Las Vegas, NV | 204.00 |
| 08/23 | Transfer To Chk # 987-0397674-65 | 13,000.00 |
| 08/23 | ATM Withdrawal On 08/22; Card # **** 2857 | |
| | Serial# 005823; 127 Seventh Ave, Brooklyn, NY (00101/04) | 100.00 |
| 08/24 | Stop Payment Fee–Check | 25.00 |
| 08/27 | Funds Transfer (Domestic) A/C: Lc.Com N | 59,310.00 |
| 08/27 | Funds Transfer Fee | 25.00 |
| 09/01 | Funds Transfer (Domestic) A/C: Autobahn-Motors D | 15,440.00 |
| 09/01 | Transfer To Chk # 101-0832543-65 | 4,000.00 |
| 09/01 | ATM Withdrawal; Card # **** 2857 | |
| | Serial# 007926; 127 Seventh Ave, Brooklyn, NY (00101/01) | 100.00 |
| 09/01 | Funds Transfer Fee | 25.00 |
| 09/09 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 564101; 230 4th Avenue, Brooklyn, NY | 121.60 |
| 09/13 | NYCE ATM Withdrawal On 09/11; Card # **** 2857 | |
| | Serial# 464024; 698 8th Avenue, Manhattan, NY | 101.75 |
| 09/14 | CIRRUS ATM Withdrawal On 09/13; Card # **** 2857 | |
| | Serial# 860914; Pdn Bank Jamaica NY | 101.50 |
| | **Total** | **92,553.85** |

### Checks Paid

| Check | Date Paid | Amount | Check | Date Paid | Amount | Check | Date Paid | Amount |
|-------|-----------|--------|-------|-----------|--------|-------|-----------|--------|
| 1007 | 08/19 | 45,570.00 | 1014 | 09/02 | 315.00 | | | |
| 1013* | 09/08 | 2,039.00 | 1015 | 09/01 | 1,000.00 | | | |

* indicates gap in check sequence                **Total (4 checks)**    **48,924.00**

### Daily Balances

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|------|---------|
| 08/19 | 1,154,540.67 | 08/25 | 1,791,456.67 | 09/01 | 1,980,542.67 | 09/13 | 1,978,265.32 |
| 08/20 | 1,504,603.67 | 08/26 | 1,991,432.67 | 09/02 | 1,980,527.67 | 09/14 | 1,978,163.82 |
| 08/23 | 1,491,503.67 | 08/27 | 1,932,097.67 | 09/08 | 1,978,488.67 | | |
| 08/24 | 1,491,478.67 | 08/31 | 1,942,097.67 | 09/09 | 1,978,367.07 | | |

### Service Fee Explanation

All service fees were waived on your account this month.

*(handwritten notes)* note the lc.com & Autobahn motors transfers.

THE S



September 18 - October 19, 2004
Page 2 of 4

101-00101-B012-00101-    -023-5-01-W X -2 00-

Primary Account Number: 101-0830177-65

BusinessPlus Checking    Account # 101-0830177-65    NEW YORK FINANCIAL LLC

## Withdrawals and Debits

| Date | Description | Amount |
|------|-------------|--------|
| 10/04 | NYCE ATM Withdrawal On 10/03; Card # **** 2857<br>Serial# 445828; 168 7th Avenue, Brooklyn, NY | 101.60 |
| 10/08 | ATM Withdrawal On 10/07; Card # **** 2857<br>Serial# 007467; 127 Seventh Ave, Brooklyn, NY (00101/04) | 100.00 |
| 10/12 | Transfer To Chk # 101-0832543-65 | 10,000.00 |
| 10/12 | NYCE Purchase On 10/09; Card # **** 2857<br>Serial# 004059; 203 Grand St, New York, NY | 429.00 |
| 10/13 | CBC Purchase On 10/11; Card # **** 2857<br>Ref# 5554750ME08Lnw5ND; Fedex Shp 10/06/04 Ab#, 848-405988344, TN | 77.75 |
| 10/18 | NYCE ATM Withdrawal On 10/16; Card # **** 2857<br>Serial# 894154; 168 7th Avenue, Brooklyn, NY | 101.60 |
| 10/18 | NYCE Purchase; Card # **** 2857<br>Serial# 753586; C Mart #1, Durham, NC | 36.51 |
| 10/19 | NYCE ATM Withdrawal; Card # **** 2857<br>Serial# 005731; Stumpy Lane - N SD, Pennsgrove 1, NJ | 102.00 |
| 10/19 | CBC Purchase On 10/17; Card # **** 2857<br>Ref# 5550361MI09A11377; Wise Guys Pizza Rest, Statesville, NC | 39.65 |
| | **Total** | **1,961,867.52** |

## Checks Paid

| Check | Date Paid | Amount | Check | Date Paid | Amount | Check | Date Paid | Amount |
|-------|-----------|--------|-------|-----------|--------|-------|-----------|--------|
| 1016 | 10/08 | 316.00 | | | | | | |

* indicates gap in check sequence

Total (1 check)    316.00

## Daily Balances

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|------|---------|
| 09/22 | 978,163.82 | 09/28 | 27,384.41 | 10/06 | 26,867.81 | 10/13 | 16,261.06 |
| 09/24 | 28,163.82 | 09/30 | 27,284.41 | 10/08 | 26,767.81 | 10/18 | 16,122.95 |
| 09/27 | 27,484.41 | 10/04 | 27,182.81 | 10/12 | 16,338.81 | 10/19 | 15,981.30 |

## Service Fee Explanation

All service fees were waived on your account this month.

Business Money Market Account    Account # 101-0830-7065    NEW YORK FINANCIAL LLC

| Summary | Number | Amount |
|---------|--------|--------|
| Opening Balance | | 58,616.40 |
| Deposits and Credits | 2 | 950,759.19 |
| Withdrawals and Debits | 0 | 0.00 |
| Checks Paid | 0 | 0.00 |
| Ending Balance | | 1,009,375.59 |

THE SMALL BUSINESS TEAM AT CHASE℠

NYF004869

# CHASE ○

October 20 - November 17, 2004
Page 2 of 4

101-00100-B012-00101-    -023-5-01-K X-2K00-    Primary Account Number: 101-08301177-6S

## Business Checking®

| Account Number: | | | NEW YORK, NY (region) |
|---|---|---|---|

### Withdrawals and Debits

| Date | Description | Amount |
|---|---|---|
| 10/25 | CbrPulse ATM Withdrawal On 10/23; Card # **** 2857<br>Serial# 013994; Mgm Gd Room Elev, Las Vegas, NV | 503.00 |
| 10/25 | CbrPulse ATM Withdrawal On 10/22; Card # **** 2857<br>Serial# 030538; Mgm Gd Room Elev, Las Vegas, NV | 203.00 |
| 10/25 | CBC Purchase On 10/21; Card # **** 2857<br>Ref# 5554186N1T231WK184; Spago Las Vegas, Las Vegas, NV | 182.62 |
| 10/25 | CbrPulse ATM Withdrawal On 10/22; Card # **** 2857<br>Serial# 002435; Mgm Lobby Area, Las Vegas, NV | 103.00 |
| 10/25 | CbrPulse ATM Withdrawal On 10/22; Card # **** 2857<br>Serial# 025281; Mgm Lobby Area, Las Vegas, NV | 103.00 |
| 10/25 | CbrPulse ATM Withdrawal On 10/22; Card # **** 2857<br>Serial# 004538; Mgm Lobby Area, Las Vegas, NV | 103.00 |
| 10/25 | CbrPulse ATM Withdrawal On 10/22; Card # **** 2857<br>Serial# 005229; Mgm Gd Food Ct A, Las Vegas, NV | 63.00 |
| 10/27 | NYCE ATM Withdrawal; Card # **** 2857<br>Serial# 684716; 270 5th Ave, Brooklyn, NY | 101.50 |
| 10/29 | CIRRUS ATM Withdrawal; Card # **** 2857<br>Serial# 812247; 423 Market Street Camden NJ | 102.00 |
| 11/01 | CbrPulse ATM Withdrawal On 10/31; Card # **** 2857<br>Serial# 008870; Terminal #8 Upper, JFK Airport, NY | 302.00 |
| 11/01 | CBC Purchase On 10/28; Card # **** 2857<br>Ref# 854867TAxDbpaxsh1; ABC Cellular, Brooklyn, NY | 75.00 |
| 11/01 | CBC Purchase On 10/29; Card # **** 2857<br>Ref# 85184G0N1Wgn9BS4P; Susanna Foo Chinese Cu, Philadelphia, PA | 63.67 |
| 11/01 | CBC Purchase On 10/29; Card # **** 2857<br>Ref# 55327323N42S0W1VqSP; 00440 Pkwy-15th And C, Philadelphia, PA | 25.75 |
| 11/09 | American Express Elec Remi 110904 0411805103476S | 2,475.73 |
| 11/12 | Transfer To Chk # 101-083325453-6S | 3,500.00 |
| 11/15 | NYCE ATM Withdrawal; Card # **** 2857<br>Serial# 937281; 266 4th Ave, Brooklyn, NY | 101.75 |
| 11/17 | CBC Purchase On 11/15; Card # **** 2857<br>Ref# 854887SNATZVXT4JIO; Golden Touch Car Wash, Brooklyn, NY | 72.72 |
| | **Total** | **8,242.01** |

### Checks Paid

| Check | Date Paid | Amount | Check | Date Paid | Amount |
|---|---|---|---|---|---|
| 1017 | 11/09 | 315.00 | | | |

| | Total (1 check) | 315.00 |
|---|---|---|

* indicates gap in check sequence

### Daily Balances

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 10/27 | 14,446.41 | 11/09 | 11,098.76 | 11/17 | 7,424.28 |
| 10/25 | 14,547.91 | 11/01 | 13,883.49 | 11/15 | 7,497.01 |
| 10/20 | 15,808.53 | 10/29 | 14,344.41 | 11/12 | 7,598.76 |

### Service Fee Explanation

The number of basic transactions you performed were less than 250. As a result, you will not be charged a fee this month for your account. Thank you for being a JPMorgan Chase customer.

THE SMALL BUSINESS TEAM AT CHASE℠

NYF004873



November 18 - December 16, 2004
Page 2 of 4

101-00101-B012-00101-    -023-5-01-K X -2K00-

Primary Account Number: 101-0830177-65

| Business PLUS Checking | Account # 101-0830177-65 | NEW YORK FINANCIAL LLC |
|---|---|---|

## Withdrawals and Debits

| Date | Description | Amount |
|---|---|---|
| 11/19 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 154754; 202 Ave Of The Ame, New York, NY | 101.75 |
| 11/24 | Chase Online Wire Transfer A/C: Refcofx Associates LLC N | 100,000.00 |
| 11/26 | ATM Withdrawal On 11/25; Card # **** 2857 | |
| | Serial# 001785; 127 Seventh Ave, Brooklyn, NY (00101/02) | 100.00 |
| 11/29 | CBC Purchase On 11/27; Card # **** 2857 | |
| | Ref# 5554186Nx03Pg8Ljk; Century Twenty One #1, New York, NY | 1,194.78 |
| 11/29 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 526895; 346 7th Avenue, Brooklyn, NY | 201.50 |
| 11/29 | CBC Purchase On 11/26; Card # **** 2857 | |
| | Ref# 5548051Nxe7J5Xagj; Shoppers Parking, New York, NY | 33.00 |
| 12/02 | Chase Online Wire Transfer A/C: Diana A. Sahwani | 15,000.00 |
| 12/03 | CBC Purchase On 12/02; Card # **** 2857 | |
| | Ref# 5543845P1K6MH20P9; PC Richard And Son 35, Brooklyn, NY | 2,151.00 |
| 12/07 | Chase Online Wire Transfer A/C: Diana A. Sahwani | 10,000.00 |
| 12/07 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 724882; 168 7th Avenue, Brooklyn, NY | 101.60 |
| 12/08 | Chase Online Wire Transfer A/C: Refcofx Associates LLC N | 100,000.00 |
| 12/10 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 824667; 168 7th Avenue, Brooklyn, NY | 101.60 |
| 12/13 | Chase Online Wire Transfer A/C: Refcofx Associates LLC N | 100,000.00 |
| 12/13 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 001107; 160 Broadway, New York, NY | 81.50 |
| 12/14 | Chase Online Wire Transfer A/C: Refcofx Associates LLC N | 100,000.00 |
| 12/14 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 966896; 215 4th Ave, Brooklyn, NY | 121.60 |
| 12/15 | Chase Online Wire Transfer A/C: Refcofx Associates LLC N | 100,000.00 |
| 12/16 | Chase Online Wire Transfer A/C: Refcofx Associates LLC N | 100,000.00 |
| | **Total** | **629,188.33** |

## Checks Paid

| Check | Date Paid | Amount | Check | Date Paid | Amount | Check | Date Paid | Amount |
|---|---|---|---|---|---|---|---|---|
| 1018 | 11/26 | 1,224.23 | 1019 | 12/07 | 5,950.00 | 1020 | 12/08 | 315.00 |

* indicates gap in check sequence                                                Total (3 checks)    7,489.23

## Daily Balances

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|---|---|
| 11/19 | 7,322.54 | 11/29 | 14,859.03 | 12/08 | 181,656.43 | 12/14 | 81,036.73 |
| 11/23 | 117,612.54 | 12/02 | 19,859.03 | 12/09 | 181,341.43 | 12/15 | 181,036.73 |
| 11/24 | 17,612.54 | 12/03 | 17,708.03 | 12/10 | 181,239.83 | 12/16 | 81,036.73 |
| 11/26 | 16,288.31 | 12/07 | 281,656.43 | 12/13 | 181,158.33 | | |

## Service Fee Explanation

The number of basic transactions you performed were less than 250. As a result, you will not be charged a fee this month for your account. Thank you for being a JPMorgan Chase customer.

THE SMALL BUSINESS TEAM AT CHASE℠

NYF004877



**CHASE**

January 20 - February 16, 2005
Page 2 of 4

101-00101-B012-00101-     -023-5-01-K X -2K00-

Primary Account Number:  101-0830177-65

**BusinessPlus Checking** (continued)  **NEW YORK FINANCIAL LP**

## Withdrawals and Debits

| Date | Description | Amount |
|---|---|---|
| 01/20 | ATM Withdrawal; Card # **** 2857; Serial# 000690 | 100.00 |
| 01/25 | ATM Withdrawal On 01/24; Card # **** 2857 Serial# 001090 | 100.00 |
| 01/26 | Cbt/Pulse ATM Withdrawal; Card # **** 2857 Serial# 713223; 379 Park Ave. Sout, New York, NY | 101.75 |
| 01/31 | CIRRUS ATM Withdrawal; Card # **** 2857 Serial# 184435; Pdn Bank Jamaica NY | 101.50 |
| 02/01 | Chase Online Wire Transfer A/C: Diana A. Sahwani | 29,000.00 |
| 02/16 | ATM Withdrawal; Card # **** 2857 Serial# 009042; 127 Seventh Ave, Brooklyn, NY (00101/01) | 100.00 |
| | **Total** | **29,503.25** |

## Checks Paid

| Check | Date Paid | Amount | Check | Date Paid | Amount | Check | Date Paid | Amount |
|---|---|---|---|---|---|---|---|---|
| 1025 | 01/24 | 2,183.00 | 1026 | 02/03 | 10,000.00 | | | |

* indicates gap in check sequence                                        **Total (2 checks)**  **12,183.00**

## Daily Balances

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|---|---|
| 01/20 | 62,001.19 | 01/25 | 59,718.19 | 01/31 | 59,519.94 | 02/03 | 20,519.94 |
| 01/24 | 59,818.19 | 01/26 | 59,616.44 | 02/01 | 30,519.94 | 02/16 | 20,419.94 |

## Service Fee Explanation

The number of basic transactions you performed were less than 250. As a result, you will not be charged a fee this month for your account. Thank you for being a JPMorgan Chase customer.

**Business Money Market Account**  **NEW YORK FINANCIAL LP**

### Summary

| | Number | Amount |
|---|---|---|
| Opening Balance | | 100,961.13 |
| Deposits and Credits | 1 | 112.14 |
| Withdrawals and Debits | 0 | 0.00 |
| Checks Paid | 0 | 0.00 |
| Ending Balance | | 101,073.27 |
| Average Balance | | 100,965.13 | Annual Percentage Yield Earned | 1.46% |
| Interest Earned for 28 Day(s) | | 112.14 | Interest Credited in 2005 | 289.76 |
| Interest Rate(s): | 01/20 to 01/31 at 1.59% | | | |
| | 02/01 to 02/16 at 1.34% | | | |

### Deposits and Credits

| Date | Description | Amount |
|---|---|---|
| 02/16 | Interest Credit | 112.14 |
| | **Total** | **112.14** |

THE SMALL BUSINESS TEAM AT CHASE℠



101-00101-B012-00101-    -023-5-01-K X -2K00-

Primary Account Number:  101-0830177-65

**Business Checking** *continued* Account # 101-0830177-65 NEW YORK FINANCIAL LLC

## Withdrawals and Debits

| Date | Description | Amount |
|---|---|---|
| 03/21 | Chase Online Wire Transfer A/C: Diana A. Sahwani | 60,000.00 |
| 03/24 | ATM Withdrawal; Card # **** 2857 | |
| | Serial# 009323; 127 Seventh Ave, Brooklyn, NY (00101/02) | 100.00 |
| 03/29 | NYCE ATM Withdrawal On 03/28; Card # **** 2857 | |
| | Serial# 531057; 168 7th Avenue, Brooklyn, NY | 101.60 |
| 04/01 | Bank Miscellaneous Debit | 1,113.89 |
| 04/01 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 682099; 168 7th Avenue, Brooklyn, NY | 121.60 |
| 04/04 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 795136; 168 7th Avenue, Brooklyn, NY | 121.60 |
| 04/12 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 087627; 168 7th Avenue, Brooklyn, NY | 121.60 |
| | **Total** | **61,680.29** |

## Checks Paid

| Check | Date Paid | Amount | Check | Date Paid | Amount | Check | Date Paid | Amount |
|---|---|---|---|---|---|---|---|---|
| 1031 | 03/22 | 2,279.07 | | | | | | |

* indicates gap in check sequence

**Total (1 check)** 2,279.07

## Daily Balances

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|---|---|
| 03/21 | 26,288.25 | 03/24 | 23,909.18 | 04/01 | 22,572.09 | 04/12 | 22,328.89 |
| 03/22 | 24,009.18 | 03/29 | 23,807.58 | 04/04 | 22,450.49 | | |

## Service Fee Explanation

The number of basic transactions you performed were less than 250. As a result, you will not be charged a fee this month for your account. Thank you for being a JPMorgan Chase customer.

**Business Money Market Account** Account # 101-0830177-65 NEW YORK FINANCIAL LLC

## Summary

| | Number | Amount |
|---|---|---|
| Opening Balance | | 51,149.10 |
| Deposits and Credits | 1 | 9.72 |
| Withdrawals and Debits | 1 | 50,000.00 |
| Checks Paid | 0 | 0.00 |
| **Ending Balance** | | **1,158.82** |
| Average Balance | 7,210.00 | Annual Percentage Yield Earned | 1.50% |
| Interest Earned for 33 Day(s) | 9.72 | Interest Credited in 2005 | 375.31 |
| Interest Rate(s): | 03/17 to 04/18 at 1.49% | | |

## Deposits and Credits

| Date | Description | Amount |
|---|---|---|
| 04/18 | Interest Credit | 9.72 |
| | **Total** | **9.72** |

THE SMALL BUSINESS TEAM AT CHASE℠

NYF004895



April 19 - May 17, 2005
Page 2 of 3

101-00101-B012-00101-       -023-5-01-K X -1K00-

Primary Account Number: 101-0830177-65

| Business Plus Checking | | Account # 101-0830177-65 | | NEW YORK FINANCIAL LLC |

## Withdrawals and Debits

| Date | Description | Amount |
|------|-------------|--------|
| 05/09 | NYCE ATM Withdrawal On 05/07; Card # **** 2857 | |
| | Serial# 002226; 7415 5th Avenue, Brooklyn, NY | 501.50 |
| 05/11 | ATM Withdrawal; Card # **** 2857 | |
| | Serial# 001658; 127 Seventh Ave, Brooklyn, NY (00101/04) | 100.00 |
| 05/13 | Chase Online Wire Transfer A/C: Diana A. Boktor | 5,000.00 |
| 05/16 | NYCE ATM Withdrawal On 05/13; Card # **** 2857 | |
| | Serial# 030058; 788 A Union St, Brooklyn, NY | 101.50 |
| 05/17 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 302712; 296 4th Ave, Brooklyn, NY | 101.75 |
| | Total | 7,107.93 |

## Checks Paid

| Check | Date Paid | Amount | Check | Date Paid | Amount | Check | Date Paid | Amount |
|-------|-----------|--------|-------|-----------|--------|-------|-----------|--------|
| 1033 | 05/02 | 2,138.44 | 1035 | 04/22 | 315.00 | | | |
| 1034 | 05/10 | 2,295.36 | 1036 | 04/22 | 315.00 | | | |

* indicates gap in check sequence                                          Total (4 checks)     5,063.80

## Daily Balances

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|------|---------|
| 04/22 | 21,698.89 | 05/04 | 18,257.27 | 05/11 | 15,360.41 | 05/17 | 10,157.16 |
| 04/25 | 21,577.39 | 05/09 | 17,755.77 | 05/13 | 10,360.41 | | |
| 05/02 | 18,378.87 | 05/10 | 15,460.41 | 05/16 | 10,258.91 | | |

## Service Fee Explanation

The number of basic transactions you performed were less than 250. As a result, you will not be charged a fee this month for your account. Thank you for being a JPMorgan Chase customer.

| Business Money Market Account | | Account # 101-0830177-65 | | NEW YORK FINANCIAL LLC |

### Summary

| | Number | Amount |
|--|--------|--------|
| Opening Balance | | 1,158.82 |
| Deposits and Credits | 1 | 1.38 |
| Withdrawals and Debits | 0 | 0.00 |
| Checks Paid | 0 | 0.00 |
| Ending Balance | | 1,160.20 |

| | | | |
|--|--|--|--|
| Average Balance | 1,158.86 | Annual Percentage Yield Earned | 1.51% |
| Interest Earned for 29 Day(s) | 1.38 | Interest Credited in 2005 | 376.68 |
| Interest Rate(s): | 04/19 to 05/15 at 1.49% | | |
| | 05/16 to 05/17 at 1.59% | | |

## Deposits and Credits

| Date | Description | Amount |
|------|-------------|--------|
| 05/17 | Interest Credit | 1.38 |
| | Total | 1.38 |

**THE SMALL BUSINESS TEAM AT CHASE** ℠

NYF004900

 **CHASE**

May 18 - June 16, 2005
Page 2 of 5

101-00101-B012-00101-   -023-5-01-K X -2K00-

Primary Account Number:  101-0830177-65

**Business Plus Checking**   Account #101-0830177-65   NEW YORK FINANCIAL CE

### Summary

| | Number | Amount |
|---|---|---|
| Opening Balance | | 10,157.16 |
| Deposits and Credits | 2 | 1,299,962.00 |
| Withdrawals and Debits | 10 | 49,830.09 |
| Checks Paid | 3 | 9,181.71 |
| Ending Balance | | 1,251,107.36 |

### Deposits and Credits

| Date | Description | Amount |
|---|---|---|
| 05/31 | Incoming Funds Transfer B/O: Almusalli Fac For Je P | 1,049,985.00 |
| 05/31 | Incoming Funds Transfer B/O: The National Commercial Bank | 249,977.00 |
| | Total | 1,299,962.00 |

### Withdrawals and Debits

| Date | Description | Amount |
|---|---|---|
| 05/20 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 554471; 168 7th Avenue, Brooklyn, NY | 121.60 |
| 05/26 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 776374; 168 7th Avenue, Brooklyn, NY | 121.60 |
| 05/31 | CBC Purchase On 05/28; Card # **** 2857 | |
| | Ref# 05483074Mlm7Nzyig; Hess 32530, Brooklyn, NY | 46.36 |
| 06/01 | Bank Miscellaneous Debit | 1,030.56 |
| 06/03 | NYCE ATM Withdrawal On 06/02; Card # **** 2857 | |
| | Serial# 063579; 168 7th Avenue, Brooklyn, NY | 121.60 |
| 06/06 | Chase Online Wire Transfer A/C: Diana A. Boktor | 48,000.00 |
| 06/07 | ATM Withdrawal On 06/06; Card # **** 2857 | |
| | Serial# 009856; 127 Seventh Ave, Brooklyn, NY (00101/06) | 100.00 |
| 06/09 | NYCE ATM Withdrawal; Card # **** 2857 | |
| | Serial# 580553; 447 Amsterdam Aven, New York, NY | 101.75 |
| 06/09 | Continental Card Annual Fee | 65.00 |
| 06/13 | NYCE ATM Withdrawal On 06/12; Card # **** 2857 | |
| | Serial# 468545; 168 7th Avenue, Brooklyn, NY | 121.60 |
| | Total | 49,830.09 |

### Checks Paid

| Check | Date Paid | Amount | Check | Date Paid | Amount | Check | Date Paid | Amount |
|---|---|---|---|---|---|---|---|---|
| 1037 | 06/14 | 7,929.89 | 1038 | 06/15 | 936.82 | 1039 | 06/14 | 315.00 |

* Indicates gap in check sequence

Total (3 checks)   9,181.71

### Daily Balances

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|---|---|
| 05/20 | 10,035.56 | 06/01 | 1,308,799.02 | 06/07 | 1,260,577.42 | 06/14 | 1,252,044.18 |
| 05/26 | 9,913.96 | 06/03 | 1,308,677.42 | 06/09 | 1,260,410.67 | 06/15 | 1,251,107.36 |
| 05/31 | 1,309,829.58 | 06/06 | 1,260,677.42 | 06/13 | 1,260,289.07 | | |

### Service Fee Explanation

The number of basic transactions you performed were less than 250. As a result, you will not be charged a fee this month for your account. Thank you for being a JPMorgan Chase customer.

THE SMALL BUSINESS TEAM AT CHASE℠

NYF004903

# CHASE

August 17 - September 19, 2005
Page 2 of 4

101-00101-B012-00101-        -023-5-01-T X -2K00-

Primary Account Number:  101-0830177-65

| Business Plus Checking | | Account # 101-0830177-65 | | NEW YORK FINANCIAL LLC |

## Summary

| | Number | Amount |
|---|---|---|
| Opening Balance | | 628,947.82 |
| Deposits and Credits | 8 | 2,754,836.46 |
| Withdrawals and Debits | 14 | 3,303,293.58 |
| Checks Paid | 2 | 6,479.11 |
| Ending Balance | | 74,011.59 |

## Deposits and Credits

| Date | Description | Amount |
|---|---|---|
| 08/22 | Incoming Funds Transfer B/O: The National Commercial Bank | 399,977.00 |
| 08/22 | Incoming Funds Transfer B/O: The National Commercial Bank | 149,977.00 |
| 08/23 | Incoming Funds Transfer B/O: The National Commercial Bank | 199,977.00 |
| 08/24 | Incoming Funds Transfer B/O: The National Commercial Bank | 99,977.00 |
| 08/25 | Incoming Funds Transfer B/O: The National Commercial Bank | 199,977.00 |
| 08/31 | Bank Miscellaneous Credit | 500,000.00 |
| 09/09 | Transfer From Chk # 101-0830177-66 | 1,000,000.00 |
| 09/15 | Online Bnkg Trnsf Fr Chk # 101-0830177-66 471340 | 204,951.46 |
| | Total | 2,754,836.46 |

## Withdrawals and Debits

| Date | Description | Amount |
|---|---|---|
| 08/22 | NYCE ATM Withdrawal; Card # **** 6494 | |
| | Serial# 259042; 296 4th Ave, Brooklyn, NY | 101.75 |
| 08/24 | NYCE ATM Withdrawal; Card # **** 6494 | |
| | Serial# 020963; *150 Broadway, New York, NY | 102.00 |
| 08/29 | ATM Withdrawal; Card # **** 6494 | |
| | Serial# 007289; 127 Seventh Ave, Brooklyn, NY (00101/01) | 100.00 |
| 08/30 | NYCE ATM Withdrawal; Card # **** 6494 | |
| | Serial# 027488; 480 Park Avenue, S, New York, NY | 100.00 |
| 09/01 | Chase Online Wire Transfer BEN: Refcofx Associates LLC | 100,000.00 |
| 09/01 | JPMC Bank, N.A. Cf Payment 090105 Dm 701195787 | 1,108.33 |
| 09/01 | Cbt/Pulse ATM Withdrawal On 08/31; Card # **** 6494 | |
| | Serial# 408184; 300 Reunion Boulev, Dallas, TX | 303.25 |
| 09/01 | Analysis Fee For The Month Of August | 75.00 |
| 09/06 | Cbt/Pulse ATM Withdrawal On 09/03; Card # **** 6494 | |
| | Serial# 131049; 300 Reunion Boulev, Dallas, TX | 303.25 |
| 09/09 | Funds Transfer (Domestic) A/C: Refcofx Associates LLC N | 3,000,000.00 |
| 09/13 | ATM Withdrawal; Card # **** 6494 | |
| | Serial# 003129; 127 Seventh Ave, Brooklyn, NY (00101/05) | 100.00 |
| 09/15 | Chase Online Wire Transfer BEN: Refcofx Associates LLC | 100,000.00 |
| 09/15 | Chase Online Wire Transfer BEN: Refcofx Associates LLC | 100,000.00 |
| 09/19 | Chase Online Wire Transfer A/C: Diana Boktor Amir Fouad Boktor | 1,000.00 |
| | Total | 3,303,293.58 |

## Checks Paid

| Check | Date Paid | Amount | Check | Date Paid | Amount | Check | Date Paid | Amount |
|---|---|---|---|---|---|---|---|---|
| 1042 | 08/19 | 3,000.00 | 1043 | 09/08 | 3,479.11 | | | |

* indicates gap in check sequence

| | Total (2 checks) | 6,479.11 |

THE SMALL BUSINESS TEAM AT CHASE℠

NYF004916

# CHASE ⬤

101-00101-B012-00101-     -023-5-01-T X -2K00-

Primary Account Number:  101-0830177-65

| Business Plus Checking | | Account 101-0830177-65 | | NEW YORK FINANCIAL LTD. |
|---|---|---|---|---|

## Summary

| | Number | Amount |
|---|---|---|
| Opening Balance | | 74,011.59 |
| Deposits and Credits | 2 | 8,777.00 |
| Withdrawals and Debits | 10 | 43,063.32 |
| Checks Paid | 4 | 20,900.62 |
| Ending Balance | | 18,824.65 |

## Deposits and Credits

| Date | Description | Amount |
|---|---|---|
| 09/22 | Online Bnkg Trnsf Fr Chk # 101-0830177-66 622928 | 1,800.00 |
| 09/28 | Incoming Funds Transfer B/O: The National Commercial Bank | 6,977.00 |
| | Total | 8,777.00 |

## Withdrawals and Debits

| Date | Description | Amount |
|---|---|---|
| 09/20 | NYCE ATM Withdrawal; Card # **** 6494 | |
| | Serial# 131832; 168 7th Avenue, Brooklyn, NY | 121.60 |
| 09/22 | Chase Online Wire Transfer A/C: Diana Boktor Amir Fouad Boktor | 20,000.00 |
| 09/26 | NYCE ATM Withdrawal; Card # **** 6494 | |
| | Serial# 365885; 168 7th Avenue, Brooklyn, NY | 121.60 |
| 09/30 | NYCE ATM Withdrawal; Card # **** 6494 | |
| | Serial# 501598; 156 7th Ave, Brooklyn, NY | 101.50 |
| 10/03 | JPMC Bank, N.A. Cl Payment 100305 Dm 701195787 | 3,935.42 |
| 10/03 | NYCE ATM Withdrawal; Card # **** 6494 | |
| | Serial# 634142; 168 7th Avenue, Brooklyn, NY | 121.60 |
| 10/03 | Analysis Fee For The Month Of September | 140.00 |
| 10/06 | NYCE ATM Withdrawal; Card # **** 6494 | |
| | Serial# 743246; 168 7th Avenue, Brooklyn, NY | 121.60 |
| 10/17 | Chase Online Wire Transfer A/C: Diana Boktor Amir Fouad Boktor | 18,000.00 |
| 10/17 | ATM Withdrawal On 10/14; Card # **** 6494 | |
| | Serial# 008729 | 400.00 |
| | Total | 43,063.32 |

## Checks Paid

| Check | Date Paid | Amount | Check | Date Paid | Amount | Check | Date Paid | Amount |
|---|---|---|---|---|---|---|---|---|
| 1044 | 09/22 | 10,000.00 | 1046 | 10/03 | 7,000.00 | | | |
| 1045 | 10/12 | 3,505.62 | 1047 | 10/18 | 395.00 | | | |

\* indicates gap in check sequence     Total (4 checks)     20,900.62

## Daily Balances

| Date | Balance | Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|---|---|
| 09/20 | 73,889.99 | 09/28 | 52,545.39 | 10/06 | 41,125.27 | 10/18 | 18,824.65 |
| 09/22 | 45,689.99 | 09/30 | 52,443.89 | 10/12 | 37,619.65 | | |
| 09/26 | 45,568.39 | 10/03 | 41,246.87 | 10/17 | 19,219.65 | | |

THE SMALL BUSINESS TEAM AT CHASE℠

NYF004920