UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MUSALLI FACTORY FOR GOLD                  :
& JEWELLRY CO.,                           :        1:08-cv-01720 (LAP)
                                          :
                    Plaintiff,            :
                                          :
                                          :
            -against-                     :        NOTICE OF MOTION
                                          :
                                          :
JPMORGAN CHASE BANK N.A., CHASE           :
INVESTMENT SERVICES CORPORATION,          :
and NICHOLAS GAMBELLA,                    :
                                          :
                    Defendants.           :
-------------------------------------------------------------X

     PLEASE TAKE NOTICE that upon the attached Declaration of Andrea Likwornik Weiss and the accompanying Memorandum of Law, defendants JPMorgan Chase Bank, N.A., Chase Investment Services Corporation and Nicholas Gambella will move this Court, before the Honorable Loretta A. Preska, United States District Court Judge for the Southern District of New York, on a date and at a time to be determined by the Court, at the Courthouse located at 500 Pearl Street, New York, New York 10007, for an Order pursuant to Fed. R. Civ. P. 12(b)(6) dismissing the amended complaint; and

     PLEASE TAKE FURTHER NOTICE that, pursuant to Stipulation, papers in Opposition to the motion shall be served and filed on or before August 29, 2008 and papers in Reply to the Opposition shall be served and filed on or before September 19, 2008.

Dated:  New York, New York
        July 25, 2008

LEVI LUBARSKY & FEIGENBAUM, LLP

By:  _____/s/_____
        Andrea Likwornik Weiss
        Alan H. Scheiner
        1185 Avenue of the Americas, 17th Floor
        New York, New York 10036
        (212) 308-6100

*Attorneys for Defendants JPMorgan Chase Bank, N.A.,
Chase Investment Services Corporation, and Nicholas
Gambella*

TO (via ECF):

THE LAURO LAW FIRM
John F. Lauro, Esq.
101 East Kennedy Blvd.
Bank of America Plaza – Suite 3100
Tampa, FL 33602
T: (813) 222-8990
F: (813) 222-8991

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

MUSALLI FACTORY FOR GOLD                    :              1:08-cv-01720 (LAP)
 & JEWELLRY,

                                            :              DECLARATION OF
                        Plaintiff,                         ANDREA LIKWORNIK
                                            :              WEISS IN SUPPORT OF
            -against-                                      DEFENDANTS' MOTION
                                            :              TO DISMISS

JPMORGAN CHASE BANK, N.A.., CHASE
INVESTMENT SERVICES CORPORATION,   :
and NICHOLAS GAMBELLA,

                                            :

                        Defendants.
-------------------------------------------------------------------x

ANDREA LIKWORNIK WEISS, pursuant to 18 U.S.C. § 1746, hereby declares as

follows:

1.      I am a member of the law firm of Levi Lubarsky & Feigenbaum LLP,

attorneys for the defendants in this action.

2.      I submit this declaration in support of defendants' motion to dismiss the

Amended Complaint pursuant to Rule 12(b)(6).

3.      Attached as Exhibit A is a true and correct copy of the Amended

Complaint filed by plaintiffs in this action on May 30, 2008.

4.      Attached as Exhibit B is a true and correct copy of an "Invoice and

Statement" dated September 9, 2005, referred to in paragraph 100 of the Amended Complaint.

Plaintiff annexed this document to a complaint that it filed in this Court against New York

Financial, LLC and Amir Boktor on January 15, 2006, captioned <u>Mussalli Factory for Gold and

Jewellry v. New York Financial, LLC and Amir Boktor</u>, 2:06-cv-0082 (AKH), which action was

stayed for arbitration by Judge Hellerstein.

5.      Attached as Exhibit C is a true and correct copy of email communications between Martin Stokes, Nicholas Gambella and others between the dates of April 1, 2005 and April 4, 2005, Bates numbered JPM 00212-213.

6.      Attached as Exhibit D is a true and correct copy of email communications between  Martin Stokes, Nicholas Gambella and others between the dates of April 20, 2005 and April 28, 2005, Bates numbered JPM 00218-00219.

7.      My firm produced the emails annexed as Exhibits C and D to the parties in response to a subpoena issued in the arbitration between Musalli, on the one hand, and NYF and Boktor on the other.   On information and belief, the reference to communications between Stokes and Gambella in paragraph 81 of the Amended Complaint is a reference to these email communications.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  July 24, 2008
              New York, New York

_ANDREA LIKWORNIK WEISS_

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

MUSALLI FACTORY FOR GOLD & JEWELLRY CO.,:

                        **Plaintiff,**       :

                                     :       1:08-cv-01720 (LAP)

               -against-         :     <u>NOTICE OF FILING</u>

                                     :     <u>AMENDED COMPLAINT</u>

JPMORGAN CHASE BANK, N.A.,       :     <u>JURY TRIAL DEMANDED</u>
CHASE INVESTMENT SERVICES CORPORATION, :
and NICHOLAS GAMBELLA,           :

                                     :

                    **Defendants.**    :

-----------------------------------------------------------------X

       Please take notice that the undersigned counsel for Musalli Factory For Gold & Jewellry

Co. hereby files as Exhibit A, the attached Amended Complaint and Demand for Jury Trial in the

above entitled matter.

Dated:        May 30, 2008
              New York, New York

                              Respectfully Submitted,

                              **LAURO LAW FIRM**

                              By:       /s/John F. Lauro
                              John F. Lauro, Esq. (NY Bar JFL-2635)
                              101 E. Kennedy Blvd., Su ite 3100
                              Tampa, Florida 33602
                              P: 813 222 8990  F: 813 222 8991
                              1540 Broadway, Suite 1604
                              New York, NY 10036
                              P: 646 746 8659  F: 212 938 0858
                              E-mail: jlauro@laurolawfirm.com
                              *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system and was sent by U.S. mail May 30, 2008 to:

Andrea Likwornik Weiss
1185 Avenue of the Americas
17th Floor
New York, NY 10036
*Counsel for Defendants*

_____/s/John F. Lauro_____
John F. Lauro

2

Case 1:08-cv-01720-LAP   Document 10-2   Filed 07/25/2008   Page 6 of 7

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

MUSALLI FACTORY FOR GOLD & JEWELLRY CO.,:

                      **Plaintiff,**         :        **1:08-cv-01720 (LAP)**

          **-against-**         :      <u>**AMENDED COMPLAINT**</u>

                            :      <u>**JURY TRIAL DEMANDED**</u>

JPMORGAN CHASE BANK, N.A.,
CHASE INVESTMENT SERVICES CORPORATION, :
and NICHOLAS GAMBELLA,

                  **Defendants.**    :

------------------------------------------------------------------X

Plaintiff, Musalli Factory For Gold & Jewellry Co. ("Musalli"), through its undersigned counsel, the Lauro Law Firm, for its amended complaint against defendants JPMorgan Chase Bank, N.A., Chase Investment Services Corporation (collectively "JPMorgan"), and Nicholas Gambella ("Gambella") alleges as follows:

## I. PRELIMINARY STATEMENT

1.     This case is about trusted investment advisors, and those who assisted them, who diverted $5 million of Musalli's investment funds, which were to be maintained in a safe and secure JPMorgan investment program. The advisors – New York Financial LLC ("NYF") and Amir Boktor ("Boktor") – fraudulently induced Musalli to transfer $5 million to JPMorgan, and then unlawfully converted the investment funds to their own use.

2.     JPMorgan and Gambella (collectively "defendants") knew of the investment advisors' wrongful actions, and they did nothing to prevent the diversion or advise Musalli of the missing investment funds. Instead, at every opportunity, defendants and other employees of

JPMorgan knowingly participated in a scheme to conceal and perpetuate the fraud, causing Musalli to lose its invested funds. If defendants had disclosed the wrongful diversion of funds, then Musalli would have been able to recover the invested funds and would have ceased investing (and losing) additional funds with JPMorgan.

3.    Defendants' repeated affirmative misrepresentations and failure to disclose the wrongful diversion not only violated their duties of care to Musalli, but constituted fraud and commercial bad faith for which Musalli is entitled to damages.

## II. PARTIES

4.    Musalli is a corporation organized under the laws of the Kingdom of Saudi Arabia and is engaged in the business of manufacturing gold and jewelry products. Musalli has been in business for over 80 years and has over 700 employees. Its principal place of business is in Jeddah, Saudi Arabia. Abubaker El-Nagar ("El-Nagar") is the chief financial officer for Musalli and resides in Saudi Arabia. Defendants knew that Musalli and El-Nagar were not familiar with the U.S. legal and financial systems.

5.    JPMorgan Chase & Co., Inc. ("JPMorgan Chase") is the corporate parent of defendants JPMorgan Chase Bank, N.A., and Chase Investment Services Corporation. It is a full-service global financial firm organized under the laws of the State of Delaware, with its principal place of business at 270 Park Avenue, New York, New York. JPMorgan Chase is a financial holding company created by the merger of J.P. Morgan & Co., Inc. and the Chase Manhattan Corporation. It also uses the brand names "JPMorgan Chase" and "Chase" when marketing to and servicing its clients.

6.    JPMorgan Chase is a leading global financial services firm and one of the largest

financial institutions in the United States, with over $1 trillion in assets and $100 billion in stockholders' equity. It has operations in more than 50 countries, and is a worldwide leader in investment banking, financial services, and private and retail banking. JPMorgan Chase serves more than 90 million customers, including consumer and wholesale clients. Its retail banking business includes consumer banking, small business banking, and consumer lending activities.

7.    JPMorgan Chase Bank, N.A. ("JPMorgan Bank") is a national banking association with its designated main office in Columbus, Ohio. It is one of the principal bank subsidiaries of JPMorgan Chase. JPMorgan Bank has branches throughout the world, including in this district and elsewhere, and provides consumer banking, business banking, and lending services. It serves more than 30,000 customers, including corporations, municipalities, financial institutions, and not-for-profit entities. JPMorgan Bank represents that it offers customers industry knowledge, experience, a dedicated service model, comprehensive solutions to financial issues, and local expertise.

8.    JPMorgan Chase offers securities and investment advisory services through Chase Investment Services Corporation ("Chase Investment"), an affiliate of JPMorgan Bank. Chase Investment is organized under the laws of the State of Delaware and has its principal place of business in Chicago, Illinois. Chase Investment has offices throughout the United States, including in this district and elsewhere. It provides a full range of investment and brokerage services, including developing investment strategies, structuring securities portfolios, and advising private clients on securities transactions.

9.    In short, JPMorgan through its various subsidiaries and affiliates, is a fully integrated financial firm with worldwide reach. Its various components work closely to provide

3

comprehensive financial and banking services. JPMorgan Chase and its affiliates, including JPMorgan Bank and Chase Investment, collect customer information from a number of sources and share that information with each other.   Indeed, JPMorgan Chase markets itself and constituent entities such as JPMorgan Bank and Chase Investment as a "family" of related financial services companies.  In this case, each member of the "family" was aware of each other's activities.

10.     Gambella is a citizen of New York and a vice president of Chase Investment.  At all relevant times, Gambella's office was in a JPMorgan Bank branch located at 127 Seventh Avenue, Brooklyn, New York., and he acted as an agent of JPMorgan Bank and Chase Investment.  Gambella was the individual at JPMorgan primarily responsible for the safekeeping of Musalli's investment funds.  His acts described herein were carried out to benefit JPMorgan Bank and Chase Investment and were within the scope of his employment duties.

## III. NON-PARTIES

11.     NYF is a Nevada limited liability company with its principal place of business in New York. Boktor formed NYF to carry out the fraudulent scheme and conversion described herein.  On its business stationery, NYF identified a primary office at 369 1st Street, Brooklyn, New York.  Moreover, NYF had accounts at JPMorgan Bank and Chase Investment and assured Musalli that it would place the Musalli investment funds with JPMorgan.  Although NYF purports to be an investment advisor, it is not properly registered as one with either the U.S. Securities and Exchange Commission or the State of New York. NYF also represented that it had offices in Manhattan.

12.     Boktor is the principal of NYF and a self-described broker, corporate consultant,

4

and investment advisor. Boktor used NYF as his alter ego in order to achieve his unlawful objectives and convert Musalli's investment funds.   Also, acting in his individual capacity, Boktor made numerous false representations to Musalli and converted its investment funds. Boktor is believed to be a citizen of Egypt.

13.     Upon information and belief, Martin Stokes is a resident of London, England and is a former vice-president with JPMorgan Bank's London branch.  At all relevant times, Stokes acted as an agent of JPMorgan.

14.     Upon information and belief, Karim Tannir is a resident of London, England and is employed as an investment banker by JPMorgan Bank's London branch.  Tannir specializes in mergers and acquisitions in the Middle East.  At all relevant times, Tannir acted as an agent of JPMorgan.

## IV. JURISDICTION AND VENUE

15.     Subject matter jurisdiction is founded upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).  Musalli is a citizen of Saudi Arabia. JPMorgan Bank is a citizen of Ohio pursuant to 28 U.S.C. § 1348.  Chase Investment is a citizen of Delaware.  Gambella is a citizen of New York. The amount in controversy exceeds $75,000 exclusive of interest and costs.

16.     This Court has personal jurisdiction over defendants under Article 3 of New York's CPLR, which provides for jurisdiction over defendants who are New York citizens, who transact any business in New York, or who engage in tortious acts in New York. In this case, defendants regularly engage in business in this State. Furthermore, defendants committed tortious acts in New York such that exercising personal jurisdiction over them would not offend traditional notions of fair play and substantial justice.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## V.  THE "KNOW-YOUR-CUSTOMER" REQUIREMENTS FOR JPMORGAN

18.     JPMorgan is subject to certain laws, rules, and self-imposed obligations that are commonly referred to under the term "Know-Your-Customer" ("KYC").

### A.    The Patriot Act

19.     Following the events of September 11, 2001, the United States enacted section 352 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, Pub. L. 107-56, § 352, 115 Stat. 296, 322 (2001) (codified as amended at 31 U.S.C. § 5318(h)) ("the Patriot Act"), which requires, among other things, that financial institutions guard against unlawful activities of its customers by establishing KYC policies, procedures, and controls; designating a compliance officer knowledgeable about KYC requirements; providing ongoing KYC training programs; and engaging an independent auditor to test KYC internal controls.

20.     Under the Patriot Act and otherwise, JPMorgan must verify customer identity, understand customer business and account activities, and assess the potential for illegal activities carried out by customers.

21.     The Patriot Act also requires JPMorgan to determine customers' sources of funds, identify customers' normal and expected transactions, and monitor customer transactions.

22.     Upon information and belief, JPMorgan uses specialized transaction monitoring software, including "names analysis" and "trend monitoring" software, to carry out its KYC

obligations. Also, JPMorgan uses internal and external sources of information to identify suspicious activities that would require the filing of a Suspicious Activity Report ("SAR") with the Financial Crimes Enforcement Network ("FinCEN").

23.    In sum, based on the requirements of the Patriot Act, we believe that JPMorgan has established comprehensive KYC policies, procedures, and controls consistent with the requirements of federal law.

**B.    The Financial Action Task Force and Wolfsberg Group**

24.    All banks with international operations must also adopt KYC policies in accordance with the Financial Action Task Force ("FATF"). The FATF is an inter-governmental body that develops and promotes policies for financial institutions to combat illegal activities by customers. The United States is a participant in the FATF, and JPMorgan is bound by its standards.

25.    FATF issues written principles requiring financial institutions to exercise due diligence to identify customers and monitor account activities. Financial institutions, such as JPMorgan, must identify transactions that do not conform with identified customer norms. KYC policies must constitute a core feature of risk management and control procedures, and financial institutions must complete regular compliance reviews and internal audits. These obligations exist independently of any particular transaction.

26.    The FATF's Special Recommendations on Terrorist Financing ("FATF Recommendations") provide that financial institutions should take certain KYC actions, including those set forth in FATF Recommendation 5:

The customer due diligence (CDD) measures to be taken are as follows:

7

a) Identifying the customer and verifying that customer's identity using reliable, independent source documents, data or information.

b) Identifying the beneficial owner, and taking reasonable measures to verify the identity of the beneficial owner such that the financial institution is satisfied that it knows who the beneficial owner is. For legal persons and arrangements this should include financial institutions taking reasonable measures to understand the ownership and control structure of the customer.

c) *Obtaining information on the purpose and intended nature of the business relationship*.

d) *Conducting ongoing due diligence on the business relationship and scrutiny of transactions undertaken throughout the course of that relationship to ensure that the transactions being conducted are consistent with the institution's knowledge of the customer, their business and risk profile, including, where necessary, the source of funds*.

*See Exhibit 1* at ¶ 5 (emphasis added).

27.    Moreover, JPMorgan is a leading member of the Wolfsberg Group, which is an association of twelve global financial institutions that develop financial services industry standards for KYC, Anti-Money Laundering, and Counter-Terrorist Financing policies.

28.    The Wolfsberg Group formulated strict policies to prevent illegal activities carried out in the international financial system. JPMorgan adheres to the KYC policies and procedures developed by the Wolfsberg Group.

29.    The Wolfsberg Statement on the Suppression of the Financing of Terrorism provides at statement 6:

Recognising the difficulties inherent in identifying financial transactions linked to the financing of terrorism (many of which appear routine in relation to information known at the time) *the Wolfsberg Group is committed to the continued application of existing monitoring procedures for identifying unusual or suspicious transactions*. The Wolfsberg Group recognises that while the motive for such transactions may be unclear, monitoring and then identifying and reporting unusual or suspicious transactions may assist government agencies by linking seemingly unrelated activity to the financing of terrorism.

8

In addition, the Wolfsberg Group is committed to:

*• Exercising heightened scrutiny in respect of customers engaged in sectors identified by competent authorities as being widely used for the financing of terrorism.*
• Monitoring account and transactional activity (to the extent meaningful information is available to financial institutions) against lists generated by competent authorities of known or suspected terrorists or terrorist organisations.
• Working with governments and agencies in order to recognise patterns and trends identified as related to the financing of terrorism.
• Considering the modification of existing monitoring procedures as necessary to assist in the identification of such patterns and trends.

*See Exhibit 2* (emphasis added).

30.     The KYC regulations and policies are particularly important in this case because JPMorgan was required to investigate NYF and its business activities. JPMorgan thus had a duty to determine the reasons for transfers of funds to and from NYF. Moreover, in carrying out its policies and sharing information with the corporate members of its "family," defendants knew, or should have known, about the financial transactions engaged in by NYF on behalf of Musalli. Indeed, under the strict KYC requirements for financial institutions, such knowledge should be presumed as a matter of law.

## VI.  MUSALLI'S RELATIONSHIP WITH JPMORGAN

### A.     Boktor and NYF Agree To Act as Musalli's Investment Advisors with JPMorgan

31.     In 2002, Boktor visited Saudi Arabia looking for business opportunities. He used his cultural ties to the region to ingratiate himself with Musalli and gain its trust. At his initiative, Boktor met with El-Nagar in Jeddah to discuss Musalli's investment and credit needs. He represented that he could help Musalli establish banking relationships outside of Saudi Arabia and could obtain gold loans on favorable terms. For a variety of reasons, however, at first

Musalli decided not pursue any business with Boktor.

32.     At the time, Musalli had substantial gold loans with Saudi banks for working capital, which required the placement of 20% cash collateral. The collateral, however, was deposited interest-free and there was no opportunity for growth.  Moreover, as the price of gold increased, Musalli was required to place additional collateral, creating cash flow problems for the company.

33.     In early 2004, Boktor re-initiated contact with El-Nagar, and once again proposed a business relationship with Musalli. Specifically, Boktor represented that he had a company, NYF, which could act as Musalli's investment advisor in the United States and could place Musalli's investment funds with U.S. entities such as JPMorgan.  Further, Boktor claimed that he could obtain substantial profits for Musalli and develop safe and secure investment strategies. He also stated that NYF had been in business for many years and could also assist in obtaining credit facilities for Musalli.

34.     Boktor told Musalli that he had a special relationship with JPMorgan and urged Musalli to place its funds in a "JPMorgan Investment Program" through NYF. Indeed, Boktor stated that investing with JPMorgan would result in substantial returns and also lead to obtaining a credit facility. Boktor promised to develop a strategy through JPMorgan that would maximize growth, and then use an investment portfolio to collateralize a gold loan from the bank.

35.     Boktor sent El-Nagar two particularly important documents.[1] The first is an e-mail dated February 7, 2004, containing a request for a delegation of authority and a detailed description of NYF as a "full investment services firm" that could provide "investment banking strategies through its connected network of sound business partners . . . [such as JPMorgan]."

---

[1] As set forth below, Boktor communicated regularly with El-Nagar, whether by e-mail, telephone, or express mail, from his offices in New York.

Boktor represented NYF as having a "talented group of financial advisors, analysts and bankers . . . [who have been] consistent with their recommendations and track record." Moreover, NYF claimed that it had a team capable of producing investment returns "even upward by 30%," while ensuring an investment strategy "with the highest security and return." All of these statements were false.

36.     The second key document is a letter dated March 26, 2004, which Boktor drafted and sent to Musalli under the name of NYF's "compliance director." In the letter, Boktor suggested a two-phase program in which he would develop an investment program for Musalli, and then use those investment funds to collateralize a gold loan on favorable terms for the company.

37.     This proposal had an obvious benefit for Musalli, which up until that time was unable to realize any gains on its loan collateral. Boktor proposed that the investment funds should be placed in an account "under an American firm name and management [that] will let you enjoy . . . benefits that are only granted for American companies . . . higher credit facilities; preferential rates; discounts on gold purchases, better interest rates . . . not accessible by foreign entities." Boktor also represented that "we will need to open and maintain accounts for you under New York Financial, LLC name as an American company sponsoring your firm and acting as your US local guarantor."

**B.      Musalli Places Its Investment Funds with JPMorgan**

38.     In August 2004, Musalli executed an Investment Management Agreement (the "First Agreement"), in substantially the form proposed by NYF. *See Exhibit 3.* In the First Agreement, NYF and Boktor assured Musalli that they would: (1) "manage and direct the

11

investments . . . consistent with [Musalli's] Investment Objectives;" (2) "act as [Musalli's] agent and attorney-in-fact;" (3) "act with due consideration, care, prudence and diligence . . . that a fiduciary . . . would use under such circumstances;" (4) "monitor, supervise, and direct the investments of [Musalli] in accordance with [Musalli's] investment objectives;" and (5) provide Musalli with a written report, on at least a quarterly basis, of the valuation of its investments.

39.     The First Agreement identified the bank of record as JPMorgan and Nicholas Gambella as the JPMorgan vice-president responsible for the JPMorgan Investment Program. Needless to say, having the investment with a major financial institution such as JPMorgan gave Musalli trust and confidence that the funds would be handled appropriately. Simply stated, Musalli wanted to place its funds in a secure JPMorgan Investment Program, as promised by Boktor.

40.     In order to proceed with the JPMorgan Investment Program, however, Boktor insisted that Musalli give him a power of attorney in a form issued by JPMorgan. To that end, in June 2004, Boktor sent Musalli a JPMorgan power of attorney, to be translated into Arabic, and a proposed Investment Management Agreement.   Musalli translated and executed a power of attorney and returned it to Boktor. *See Exhibit 4.*

41.     The power of attorney is particularly significant because it allowed Boktor and NYF to act on behalf of Musalli in their dealings with JPMorgan. The power of attorney was to be used only in connection with Musalli's placement of funds in the JPMorgan Investment Program and in order to facilitate transactions with JPMorgan. It limited the type of investments Boktor and NYF were permitted to make on Musalli's behalf. The Power of Attorney did not allow Boktor or NYF to transfer funds out of the JPMorgan Investment Program for their own

benefit or to a speculative currency trading account. Gambella knew that Musalli limited Boktor's use of the power of attorney to investing its funds in the JPMorgan Investment Program.

42.     In connection with the JPMorgan Investment Program, NYF and Boktor also sent Musalli an "Investment Strategy Report" dated September 2, 2004 (the "First Strategy Report") containing a JPMorgan logo and bank stamp. The First Strategy Report provided an itemization of investment objectives as well as a portfolio "mix" that would be the centerpiece of a JPMorgan Investment Program. The First Strategy Report was signed by NYF, and provided Musalli with additional comfort that its funds were to be invested with JPMorgan. *See Exhibit 5.*

43.     In August of 2004, Musalli wired $2.05 million to NYF's JPMorgan Bank account #XXX-XXXXX77-65 (the "JPMorgan Bank Account")[2] to be invested in the JPMorgan Investment Program. Musalli completed wire transfer applications indicating that the funds came from Musalli through the National Commercial Bank and the Saudi British Bank, both of which are located in Saudi Arabia.

44.     Consistent with its KYC obligations, the collective knowledge of its "family" members, and Gambella's personal knowledge of the Musalli-NYF relationship, JPMorgan knew the source of the funds and purpose of the investment. Upon receipt of these funds, JPMorgan also assumed a duty to maintain the Musalli investment funds in accordance with Musalli's wishes. Further, JPMorgan internal documents and account statements tracked the investment funds from Musalli to JPMorgan.

---

[2] This account was maintained at the JPMorgan Bank branch at 127 Seventh Avenue, Brooklyn, New York. The account numbers in this complaint and on the exhibits have been partially redacted to preserve the confidentiality of the financial information contained in the documents.

45.     NYF also maintained an investment account with Chase Investment (Account ##XXXXX4375; XXXXX4170; XXXXX4189; and XXXXX4197 – the "JPMorgan Investment Account"), and Gambella was the representative for the account.[3]

46.     On September 22, 2004, NYF transferred $1 million of Musalli's investment funds from the JPMorgan Bank Account to the JPMorgan Investment Account. Gambella invested 50% of the Musalli funds in bonds and the remaining 50% in equities. JPMorgan internal documents and account statements tracked the transfer of the Musalli investment funds from the JPMorgan Bank Account to the JPMorgan Investment Account.

47.     At the time of these transfers, Gambella knew that Boktor and NYF held themselves out as "investment advisors" for Musalli, had a limited power of attorney in favor of Musalli, and maintained a fiduciary relationship with Musalli. Through Gambella and otherwise, defendants all knew that funds NYF and Boktor placed in the JPMorgan Investment Account belonged to Musalli, and that NYF and Boktor invested them for the benefit of Musalli.

### C.     The Conversion of Musalli's JPMorgan Investment Program Funds and the Use of Sham JPMorgan Account Statements

48.     Although Boktor made preliminary inquiries of JPMorgan regarding a credit facility for Musalli, this effort went nowhere in late 2004. Rather, Boktor provided various excuses why he could not proceed with obtaining a gold loan, including purported "regulatory" problems. In any event, despite Musalli's clear objective to pledge the JPMorgan Investment Program funds as collateral for a gold loan, initially Boktor and NYF did nothing to pursue such a credit facility.

49.     Instead, unknown to Musalli, in the fall of 2004, Boktor and NYF began converting the JPMorgan Investment Program funds by transferring them to a currency trading

---

[3] The JPMorgan Investment Account was maintained by Gambella at the JPMorgan Bank branch at 127 Seventh Avenue, Brooklyn, New York.

firm – Refco FX ("Refco") -- and for Boktor's personal expenses, including transfers to his wife. In the fall of 2004, Boktor transferred about $800,000 of the investment funds to a secret Refco currency trading account. The surreptitious diversion of investment funds was not authorized by Musalli, which would have never allowed its funds to be placed in a risky and speculative currency trading account. Further, the transfers were not permitted by the limited power of attorney executed by Musalli. Neither JPMorgan, Gambella, Boktor, nor NYF gave Musalli written notice of the transfer of funds, nor did they provide Musalli with account statements or documentation showing the unlawful transfer of the funds.

50.    JPMorgan and Gambella knew that the purpose of the JPMorgan Investment Program was to collateralize the gold loan and that the transfer of funds for Boktor's personal uses and into a speculative and risky currency trading account directly contradicted Musalli's investment plan.    Neither Gambella nor JPMorgan prevented or disclosed the obviously wrongful diversion of funds, even though they assumed a duty to safeguard Musalli's investment funds in the JPMorgan Investment Program.    Indeed, JPMorgan generated and maintained account statements showing the movement of the funds coming into the JPMorgan Investment Program from Musalli and transferred out to Refco and Boktor.

51.    Upon information and belief, defendants, NYF and Boktor conspired and agreed to participate in a scheme to aid Boktor and NYF to unlawfully convert Musalli's investment funds out of the JPMorgan Investment Program for their personal uses, and further agreed to conceal and perpetuate the scheme, causing Musalli to invest (and lose) its investment funds. Defendants, NYF, and Boktor took overt and parallel steps in furtherance of this common purpose by misrepresenting and failing to disclose that NYF and Boktor had diverted the funds.

15

Instead, defendants, NYF, and Boktor lulled Musalli into a false sense of security that its funds were safe and secure in the JPMorgan Investment Program. Because of the common plan and purpose of the defendants, NYF, and Boktor, the acts (and omissions) of each of the co-conspirators are attributable to the others.

52.    In order to keep the conversion hidden, and to further the fraudulent scheme, Boktor and NYF sent Musalli fictitious JPMorgan Investment Program account statements. In October 2004, Musalli requested a statement regarding its investment funds, and Boktor provided a sham account statement showing Musalli's funds in a JPMorgan account held: "Care of: New York Financial, LLC, Musalli Factory Sub." The statement indicates that Musalli's "Relationship Manager" was the "JPMorgan Branch Manager" and that Musalli's funds were placed in a "JPMorgan Investment." The account statement is an entirely false document. A copy is attached as *Exhibit 6*.

53.    In December of 2004, following the initial diversion of investment funds, Gambella had a telephone conversation with El-Nagar and Boktor. Gambella and Boktor were at JPMorgan's office in Brooklyn, New York, and El-Nagar was in Saudi Arabia.  Boktor introduced Gambella as the vice-president of the investment department of JPMorgan New York and the representative for the JPMorgan Investment Program. Gambella described in detail the benefits of a JPMorgan Investment Program and his role at JPMorgan in an effort to further the business relationship between Musalli and JPMorgan.  In this respect, Gambella had unique and specialized expertise regarding the JPMorgan investment services and the JPMorgan Investment Program.

54.    At the time of the call, JPMorgan and Gambella knew, or should have known, that

Boktor and NYF had breached their fiduciary duties to Musalli by fraudulently diverting Musalli's funds in the JPMorgan Investment Program contrary to Musalli's specific investment objectives. JPMorgan documents reveal that between November 1, 2004, and December 23, 2004, Boktor removed over $840,000 from the JPMorgan Investment Program, including $25,000 for his wife and $800,000 to Refco, a speculative and secret currency trading account. JPMorgan and Gambella possessed superior knowledge with respect to the diverted funds, which information was not readily available to Musalli; nor was Musalli aware of the diversion of its funds. Further, JPMorgan and Gambella knew that Musalli was unaware of the diversion and that Musalli was acting (or failing to take appropriate action to protect its invested funds) on the mistaken belief that its investment funds were safe and secure in the JPMorgan Investment Program.

55.    During the call, Gambella also intentionally failed to advise El-Nagar that Boktor and NYF had diverted the Musalli investment funds, contrary to the investment objectives the parties discussed on the call. At no time did Gambella or JPMorgan tell Musalli that a significant amount of its investment funds were no longer in the JPMorgan Investment Program. Instead, Gambella knowingly lulled Musalli into believing that the full amount of its investment funds were safe with JPMorgan, and that it should continue to do business with Boktor, NYF and JPMorgan. Gambella made these statements (or failed to make necessary material disclosures) with the intent of having Musalli rely on them and in furtherance of an agreement with NYF and Boktor to prevent Musalli from recovering its invested funds and to deceive Musalli into transferring additional funds to the JPMorgan Investment Program.

56.    Musalli reposed trust and confidence in the expertise of Gambella and JPMorgan

in creating and managing the JPMorgan Investment Program. Indeed, Musalli invested its funds with JPMorgan so that it could use this expertise to maximize its returns and obtain a favorable credit facility. However, JPMorgan breached its duties to Musalli by, among other things, knowingly concealing the wrongful diversion of funds by Boktor and NYF.

57.     Musalli justifiably relied on Gambella's statements and omissions by continuing to transfer funds to be invested through NYF in the JPMorgan Investment Program. If Gambella or JPMorgan had advised Musalli that its funds had been diverted by Boktor, then Musalli would have been able to recover the diverted funds and would not have invested additional funds with the JPMorgan Investment Program.

58.     Gambella possessed a financial motive and opportunity to make these statements described above and to neglect to make necessary disclosures of material information to Musalli. If Musalli continued to transfer funds to NYF to invest with JPMorgan, Gambella would earn additional commissions.

59.     Gambella's statements and omissions substantially assisted Boktor's and NYF's breach of fiduciary duty to Musalli and their scheme to defraud Musalli.

**D.     Musalli Negotiates a Proposed Gold Loan with JPMorgan**

*1)     The Second Agreement Between Musalli and NYF*

60.     In late 2004 and early 2005, Boktor informed Musalli that NYF's "regulatory issues" had been resolved, and proposed to move forward to arrange a gold loan with JPMorgan bankers in London. Boktor further stated that he, along with JPMorgan, would design an expanded JPMorgan Investment Program that could be pledged as collateral for the loan. Indeed, Boktor contacted JPMorgan bankers in London, including Martin Stokes and Karim Tannir, who

would help to arrange the credit facility.

61.     Boktor assured Musalli that the expanded investment program would be highly profitable and would enable Musalli to secure financing on favorable terms. He also claimed that, based on his contacts with the JPMorgan Bank representatives in London, he would be able to arrange for the investment funds held in New York to serve as collateral for a London loan.

62.     In addition, Boktor advised that JPMorgan Bank would need to conduct "due diligence" on Musalli. As a result, Musalli provided the JPMorgan Bank representatives in London with extensive information about its business activities. To track Musalli in its internal system, JPMorgan Bank assigned Musalli a client identification number and Boktor was designated Musalli's principal contact.

63.     Because Boktor anticipated that the JPMorgan Investment Program would be pledged directly to JPMorgan, he also proposed that the parties enter into a new Investment Management Agreement. NYF's counsel prepared a draft agreement and Boktor sent it to Musalli in Saudi Arabia, along with a new JPMorgan Investment Strategy Report (the "Second Strategy Report"). *See Exhibit 7.*

64.     Musalli redrafted the proposed agreement by correcting various errors. On March 12, 2005, Musalli sent NYF and Boktor an Exclusive Investment Management and Representation Agreement (the "Second Agreement"), which provided that NYF and Boktor would act as investment managers and advisors for Musalli, and "supervise and direct the investments of [Musalli] in accordance with investment objectives communicated to [NYF] ...." Furthermore, NYF was to serve as Musalli's "attorney-in-fact" with respect to its investment decisions, and the Second Agreement tracks the parties' understanding that NYF and Boktor

would continue to serve as investment advisors with respect to Musalli's funds placed in the JPMorgan Investment Program. *See Exhibit 8.*

65.    The Second Strategy Report sets forth a blended portfolio for the JPMorgan Investment Program. It also confirmed that NYF and Boktor would invest Musalli's funds with JPMorgan using a "proprietary technical model" and a "well designed asset allocation strategy [as] the foundation of a sound investment portfolio."

66.    Musalli again requested an "official document" from NYF confirming the investment with JPMorgan. Boktor had no choice but to manufacture another false JPMorgan document, since he had already diverted about $800,000 to Refco. Boktor then created a second sham account statement, again lulling Musalli into a false sense of security that its funds were in the JPMorgan Investment Program. A copy of this statement is attached as *Exhibit 9.* The second false statement, like the first, is remarkably similar to the statements JPMorgan sent to NYF, and indicates that the investment funds were being held by NYF on behalf of Musalli in a "sub" JPMorgan account. The sham account statements, though, clearly link JPMorgan to the investment funds, which was exactly the false impression Boktor and NYF sought to create.

67.    Thereafter, Musalli was assured by Boktor and NYF that the JPMorgan Investment Program would be managed in accordance with the Second Agreement and the Second Strategy Report.

### 2) *The JPMorgan Bankers Conduct Due Diligence on the Gold Loan*

68.    By March 2005, Boktor represented that the negotiations with JPMorgan had moved forward and that the JPMorgan Bank representatives were prepared to visit Musalli in Jeddah. Indeed, Boktor suggested that this meeting was a mere formality and that JPMorgan had

substantially agreed to the gold loan along the lines suggested by Boktor.

69.     In particular, Boktor advised that funds in the JPMorgan Investment Program would be pledged as part of a JPMorgan Bank gold loan. He assured Musalli that he had communicated directly with the JPMorgan Bank representatives in London and that, acting as Musalli's representative, he would be able to secure a credit facility with JPMorgan.

70.     In an e-mail dated March 4, 2005, Karim Tannir at JPMorgan Bank in London requested Boktor to provide certain information about Musalli that was needed to satisfy JPMorgan's internal KYC requirements.  Tannir also copied El-Nagar and Martin Stokes with the e-mail.  Tannir and Stokes thus had actual knowledge that Boktor was acting on Musalli's behalf in a fiduciary capacity.

71.     On March 6, 2005, El-Nagar responded by e-mail to Tannir indicating that "according to arrangements between New York Financial LLC and JPMorgan Investments New York," Musalli was prepared to collateralize 110% of the gold loan by using "25% to 35% upfront cash collateral to be placed with JPMorgan Investments" and the remaining collateral would be treasury bonds and other investments pledged directly to JPMorgan Bank in London. El-Nagar indicated that more information would be provided at the meeting in Jeddah.

72.     The JPMorgan bankers – Martin Stokes and Karim Tannir – met with Musalli representatives in mid-March 2005 to discuss the gold loan.  The gold loan transaction required extensive due diligence, regulatory investigation, and substantial interaction between the parties. During the negotiations, Stokes and Tannir discussed how Musalli's funds in the JPMorgan Investment Program would be used to collateralize a gold loan from JPMorgan Bank in London. Stokes confirmed to El-Nagar that Musalli had already invested $2.05 million with the JPMorgan

Investment Program.

73.    Besides completing a significant amount of due diligence on Musalli, Stokes and Tannir possessed unique and specialized expertise regarding JPMorgan's loan programs and the contemplated gold loan. Thus, Musalli justifiably relied on this expertise in maintaining its funds and continuing to invest in the JPMorgan Investment Program.

74.    Stokes's statements to Musalli, however, were false since the JPMorgan Investment Program only contained approximately $1 million due to the diversion of $1.05 million to Refco and to Boktor. Stokes knew, or should have known, that Boktor and NYF had improperly transferred money out of the JPMorgan Investment Program contrary to Musalli's investment objectives. Musalli reasonably relied on the statements (and omissions) made by Stokes and Tannir.

75.    Thus, at the time of the gold loan negotiations, defendants knew that Musalli was acting on the mistaken belief that Boktor and NYF were loyal fiduciaries and that all of Musalli's funds were in the JPMorgan Investment Program.

76.    Therefore, defendants possessed superior knowledge with respect to all matters discussed in connection with the JPMorgan Investment Program and the proposed gold loan.

77.    Musalli placed trust and confidence in the expertise and knowledge of Stokes, Tannir, and JPMorgan, who betrayed that trust by knowingly or negligently providing false information and concealing the true status of the JPMorgan Investment Program.

78.    Further, Stokes made these statements (or omissions) intending to have Musalli rely on them and to invest additional funds in the JPMorgan Investment Program.

79.    Stokes's statements and omissions substantially assisted Boktor's and NYF's

breach of fiduciary duty to Musalli and their scheme to defraud Musalli.

80.    Musalli justifiably relied on Stokes's statements to its detriment by continuing to transfer funds to NYF for the JPMorgan Investment Program, and by failing to recover the invested funds already diverted by Boktor and NYF.

81.    After this meeting in Jeddah, JPMorgan conducted further due diligence on Musalli and communicated with Gambella and Boktor about how the JPMorgan Investment Program would be used as collateral for the gold loan from JPMorgan Bank in London. Indeed, in a subsequent telephone conversation with El-Nagar, Boktor again confirmed that the JPMorgan bankers were well aware of Musalli's funds in the JPMorgan Investment Program.

82.    By mid-April, Musalli became anxious to move forward with the deal. On April 17, 2005, El-Nagar sent an e-mail to Tannir confirming the outline of the transaction and asking if JPMorgan required any further information. *See Exhibit 10.* In addition, El-Nagar confirmed that "[t]he investment program with JPMORGAN NEW YORK is ready, and we are waiting your credit facility contract to advise JPMORGAN NEW YORK to pledge the investment program in favor of JPMORGAN LONDON." The e-mail recounts that Boktor and Gambella had put the JPMorgan Investment Program in place and it was ready to serve as collateral for the JPMorgan gold loan.

83.    On April 29, 2005, Tannir responded to El-Nagar, with a copy to Boktor and Stokes, in the following e-mail:

Thank you for your email.

I apologize for not coming back to you earlier as we have been trying to sort out the internal constraint that we have *regarding the use of moneys placed in NY as a collateral for transaction done out of London.*

23

We are still in the process of finalizing these discussions internally and we are meeting again early next week with an update on the situation.

I sincerely apologize for the delay in getting the transaction completed but we have some Fed regulations and Legal compliance points that we need to finalize. *From your side you have supplied us with all the information we need* and given us most of the assurance required. So the ball is in our court to get back to you.

Again I would like to assure you that we are doing all we can to speed up the process and make sure we are ready to transact. I appreciate your patience and your assistance as well as the warm hospitality that you and the Musalli family have showed us and we endeavor to get back to you on this as soon as we can.

*See Exhibit 11.* (emphasis added). Tannir thus confirmed once again that the funds placed in the JPMorgan Investment Program were to be used to collateralize a gold loan with JPMorgan Bank in London.

### E.   JPMorgan Fails to Offer a Gold Loan Upon Terms Acceptable to Musalli

84.   Despite extensive negotiations, JPMorgan Bank in London was unwilling to make a suitable loan proposal. For one thing, the JPMorgan bankers concluded that banking regulations would allow funds held in the JPMorgan Investment Program in New York to be used as collateral for a London loan. Instead, the bankers suggested placing cash collateral in London equal to 120% of the loan. This proposal was not significantly different from – or even worse than – the credit terms Musalli had with Saudi banks. Putting up cash collateral, rather than having its funds grow in a suitable investment program, did not meet Musalli's objectives. This arrangement, then, was completely unacceptable to Musalli.

85.   Although for a time, Musalli believed that the gold loan could be worked out with JPMorgan Bank, and the parties continued to negotiate a possible resolution, the transaction was never completed. Thus, by mid-2005, Boktor and NYF had not been able to successfully

negotiate a gold loan with JPMorgan on Musalli's behalf.

### F.    Boktor Suggests Using the JPMorgan Investment Program to Collateralize a Standby Letter of Credit

86.    When it appeared that JPMorgan Bank would not offer a suitable gold loan, Boktor proposed another strategy to Musalli: JPMorgan Bank could issue a standby letter of credit against the existing JPMorgan Investment Program and the letter of credit would then be used as collateral for a gold loan with another banking institution.

87.    Thus, Boktor suggested that he could obtain a standby letter of credit from JPMorgan Bank and could also negotiate a credit facility with a new lending institution, such as the National Bank of Dubai. Boktor told Musalli, however, that the JPMorgan Investment Program would need to be increased from $2.05 million to $5 million in order for the strategy to work. Boktor proposed using the letter of credit to free-up Musalli's pre-existing cash collateral, which would then be placed in the JPMorgan Investment Program.

88.    Boktor sent an e-mail dated May 31, 2005, to Stephen Abbriano of the Bank of Nova Scotia (which acted as the Bank of Dubai's representative for gold loans) under the subject "JPMorgan Investment Program." In the e-mail, Boktor confirms that he is acting as Musalli's U.S. representative and he sets forth his new proposal, including using a letter of credit issued against the JPMorgan Investment Program funds as collateral for a gold loan. In this e-mail, Boktor states that the collateral to be used would be the "JP Morgan Investment, New York, investment portfolio . . . $5 million [plus] future returns  . . . to be increased gradually as mentioned [in the] strategy contract issued by JP Morgan copy attached." Further, Boktor told Abbriano that he could contact Gambella at JPMorgan in order to "discuss the collateralization

theft. There was never any undisclosed banking relationship between Musalli and JPMorgan, and the screen shot merely reflected internal client identification numbers that JPMorgan established when Boktor first approached JPMorgan about obtaining a gold loan on behalf of Musalli.

103.    El-Nagar made a very personal appeal to obtain answers from Boktor, and Musalli sent numerous correspondence to Boktor and NYF in order to find out what happened.

104.    On September 12, 2005, El-Nagar spoke by telephone with Gambella in Brooklyn. El-Nagar tried to explain that Musalli did not have an undisclosed relationship with JPMorgan. Gambella stated falsely that Musalli had participated in a direct business relationship with JPMorgan Bank in London. Gambella further misrepresented that he was in possession of a June 2005 e-mail from Martin Stokes indicating that Musalli was a JPMorgan Bank client in London and had therefore violated the Non-Circumvention Agreement. Gambella knew that these statements were false. Moreover, although he knew that Boktor wrongfully had diverted Musalli's funds, Gambella never disclosed these facts to El-Nagar.

105.    Gambella made the above statements to intimidate Musalli, to falsely suggest that Musalli breached a legal obligation to NYF, and to aid NYF and Boktor in its fraudulent schemes. Gambella intended Musalli to rely on these statements in order to further the conspiracy and to substantially assist Boktor's and NYF's breach of fiduciary duties to Musalli and their scheme to defraud Musalli.

106.    If Gambella had disclosed the true circumstances, then Musalli could have taken steps immediately to recover its funds from NYF and Boktor.

107.    In the conversation with El-Nagar, Gambella further feigned disappointment with Musalli over its purported dealings with the JPMorgan Bank in London because he and others

had spent considerable time creating the JPMorgan Investment Program for Musalli in New York. Thus, once again, defendants perpetuated and concealed the fraud, rather than making full disclosure to Musalli.

108.    In a subsequent telephone conversation (secretly recorded by Boktor), Gambella and Boktor joked about how Boktor obtained the "screen shot" and the implications of such a document being released by JPMorgan. This conversation confirmed Gambella's active and knowing participation in the effort to conceal the diversion and perpetuate the fraud by misleading Musalli about an alleged "circumvention."

109.    Thereafter, Boktor threatened Musalli with legal action and referred the matter to Jacques Catafago, NYF's lawyer. Trying to be completely cooperative, Musalli provided Mr. Catafago with all the information it had been able to accumulate regarding the purported circumvention and confirmed that there was no secret relationship with JPMorgan Bank in London.

110.    On October 5, 2005, Catafago and Musalli representatives met with the JPMorgan Bank representatives in London to discuss the screen shot and whether there was any undisclosed relationship with the bank. At the meeting, Mr. Catafago was advised, in no uncertain terms, that no such secret accounts existed and that there was no undisclosed banking relationship between JPMorgan Bank in London and Musalli.

111.    After Boktor and NYF diverted about $3.8 million to Refco, the firm later filed for bankruptcy and Musalli's investment funds were lost.

J.    **JPMorgan's Actual Notice of the Diversion and Breach of Its Duties to Musalli**

112.    Since neither Gambella nor Boktor would inform Musalli about the status of its investment funds, on October 21, 2005, El-Nagar called Stokes inquiring about the $5 million that Musalli had transferred to the JPMorgan Investment Program. Stokes replied that he would investigate the circumstances of Musalli's transfer of funds to JPMorgan through NYF. Stokes knew that Musalli trusted him to carefully investigate the matter.

113.    Stokes e-mailed Gambella that same day with a copy to Karim Tannir, stating that Musalli transferred $5 million to Gambella and asking him to confirm that the funds remained in the JPMorgan Investment Program.

114.    Gambella responded to Stokes by denying that Musalli had ever placed funds in the JPMorgan Investment Program. Gambella knew these statements were false because he had personal knowledge that Musalli transferred the funds to JPMorgan Bank with explicit instructions to place them in "our investment program with Chase." Gambella also knew, or should have known, that Boktor and NYF had fraudulently diverted Musalli's investment funds from the JPMorgan Investment Program to themselves and to Refco.

115.    In an e-mail that same day, Stokes replied to Gambella that "NO accounts were opened" at JPMorgan Bank in London for Musalli. Stokes reiterated to Gambella – again with a copy to Tannir – that the Musalli "funds were sent to you via NY Financial." Stokes further stated that he was "somewhat concerned about what has happened to this money." He also wondered how JPMorgan's confidential "internal paperwork" (e.g., the screen shots) had been released from the bank.

116.    Gambella responded by again falsely denying that he was aware of Musalli placing any funds in the JPMorgan Investment Program. Gambella knew that his statements

were intentionally misleading and part of an effort to fraudulently conceal NYF's and Boktor's unlawful scheme. Gambella intended Stokes to convey this false information to Musalli in order to aid the agreement with NYF and Boktor to perpetuate and conceal NYF's and Boktor's fraud and breach of fiduciary duty.

117. Gambella's statements and omissions substantially assisted Boktor's and NYF's breach of fiduciary duty to Musalli and their scheme to defraud Musalli.

118. Further, on December 15, 2005, El-Nagar e-mailed Stokes stating that he needed his help regarding the JPMorgan Investment Program. El-Nagar told Stokes that Musalli's "relationship with New York Financial LLC (Mr. Amir Boktor) is under investigation from JPMorgan New York legal counsel" and that Musalli's lawyer had written to JPMorgan counsel to investigate the location of the funds Musalli transferred to NYF for the JPMorgan Investment Program.

119. Defendants had a duty to inquire of Boktor's and NYF's actions and to protect Musalli's funds, however they breached those duties. If defendants had exercised their duty of care to Musalli, they would have safeguarded the funds in the JPMorgan Investment Program. Instead, JPMorgan closed the JPMorgan Investment Account on or about December 31, 2005, and transferred the remaining Musalli investment funds (about $1 million) into Boktor's personal accounts.

120. Defendants were aware of the unlawful diversion of Musalli's investment funds, and they failed to inform Musalli of the theft and prevent further diversion of Musalli's funds from the JPMorgan Investment Program. If Gambella had disclosed NYF's and Boktor's diversion of funds, Musalli would have prevented the diversion of the remaining $1 million to

Boktor and NYF.

121.    Based upon the above facts, JPMorgan and its employees had a duty to safeguard the funds placed in the JPMorgan Investment Program. By virtue of its KYC obligations and the collective knowledge of its employees, JPMorgan knew that the funds were invested on Musalli's behalf and were to be maintained in a manner consistent with Musalli's investment objectives. By accepting these funds and using its collective expertise and knowledge to assist Musalli in achieving its investment objectives, JPMorgan not only became an agent of Musalli's but was a fiduciary that had a duty to safeguard and protect the investment funds. JPMorgan breached it's duties to Musalli by failing to protect those funds from the unlawful diversion by Boktor and NYF.

122.    As a direct and proximate result of the defendants' misrepresentations, actions, and omissions, Musalli lost all of the $5 million placed in the JPMorgan Investment Program

## VII. CAUSES OF ACTION

### COUNT 1 – COMMON LAW FRAUD

123.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

124.    Defendants intentionally made various material misrepresentations and non-disclosures to Musalli, including, but not limited to, the statements described above.

125.    Defendants knew of the falsity of their misrepresentations and materiality of their non-disclosures when made, and at the time of making the misrepresentations, made them with the intent of deceiving and defrauding Musalli.

126.    Musalli was unaware of the falsity of the representations, believed them to be

true, and reasonably relied upon them.

127.   As a result of defendants' misrepresentations and omissions, Musalli has suffered economic harm.

## COUNT 2 – AIDING AND ABETTING FRAUD

128.   Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

129.   NYF and Boktor committed fraud against Musalli as described herein.

130.   Gambella and JPMorgan, through its employees, had actual knowledge of NYF's and Boktor's fraud against Musalli.

131.   Defendants provided substantial assistance to NYF and Boktor to advance the commission of the fraud.

132.   As a result of the defendants' actions, Musalli has suffered economic harm.

## COUNT 3 – CONSPIRACY TO DEFRAUD

133.   Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

134.   NYF, Boktor, and defendants, through their employees, agreed to induce Musalli to transfer funds to NYF in order to effectuate the fraudulent scheme described herein.

135.   NYF, Boktor, and defendants, through their employees, performed one or more overt acts in furtherance of this agreement as described herein.

136.   NYF, Boktor, and defendants, through their employees, intentionally participated in the furtherance of their common plan or purpose of inducing Musalli to transfer funds to NYF in order to effectuate the fraudulent scheme described herein.

137.    Musalli was damaged as a result of the actions of Boktor, NYF, and defendants.

## COUNT 4 – FRAUDULENT CONCEALMENT

138.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

139.    The relationship between defendants and Musalli imposed a duty on defendants to disclose that NYF and Boktor were diverting Musalli's funds.

140.    Defendants possessed superior knowledge of the diversion that was not readily available to Musalli.

141.    Defendants further knew that Musalli was unaware of the diversion and was acting on the basis of a mistaken belief that NYF and Boktor were investing its funds as specifically directed by Musalli.

142.    Defendants also made intentionally false statements or omitted material facts, as described above, which misled Musalli into believing that its investment funds were being maintained and safeguarded in a JPMorgan investment program.

143.    Musalli was unaware of NYF and Boktor's diversion of its investment funds, and reasonably relied upon defendants' false statements and omissions.

144.    As a result of defendants' misrepresentations and omissions, Musalli has suffered economic harm.

145.    In view of the flagrant, wanton, and intentionally fraudulent conduct on the part of the defendants, Musalli is entitled to punitive damages in an amount to be determined at trial.

## COUNT 5 – NEGLIGENT MISREPRESENTATION/NONDISCLOSURE

146.    Musalli repeats and realleges each and every allegation contained and set forth in

paragraphs 1 through 119 as though fully set forth herein.

147.    Defendants and their employees possessed unique or specialized expertise and had a duty to use reasonable care to impart correct information to Musalli due to a special relationship of trust and confidence between the parties.

148.    Defendants breached that duty by imparting false information, and/or failing to impart correct information to Musalli, upon which Musalli and others were expected to rely, as described above.

149.    Musalli, unaware of the misstatements and nondisclosures made by defendants, reasonably and justifiably relied on the representations and nondisclosures of defendants. Defendants were aware of Musalli's reliance, and Musalli's reliance caused it to act or fail to act.

150.    Defendants induced Musalli to act on the basis of information that defendants and others supplied to Musalli or failed to disclose to Musalli.

151.    As a result of defendants' misrepresentations and nondisclosures, Musalli has suffered economic harm.

### COUNT 6 – NEGLIGENCE

152.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

153.    Musalli placed its investment funds with JPMorgan through NYF and Boktor, who defendants knew to be fiduciaries of Musalli.

154.    Defendants knew the purpose of the funds that Musalli transferred to JPMorgan.

155.    Defendants acquired actual knowledge that Boktor and NYF were diverting Musalli's funds to themselves and a secret foreign currency trading account.

156.    Having such knowledge, defendants owed Musalli, at a minimum, a duty to make a reasonable inquiry and prevent the diversion.

157.    Defendants breached the duty owed to Musalli as described herein by failing to make a reasonable inquiry and prevent the diversion.

158.    As a proximate result of defendants' breach, Musalli has been damaged.

### COUNT 7 – BREACH OF FIDUCIARY DUTY

159.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 though fully set forth herein.

160.    At all times relevant hereto, defendants had control over Musalli's investment funds, which were to be placed in the JPMorgan Investment Program, and then to be used as collateral for a credit facility with JPMorgan.

161.    Defendants knew that Musalli reposed trust and confidence in defendants with respect to the funds Musalli placed with JPMorgan.

162.    Defendants owed Musalli a fiduciary duty to act in Musalli's best interest with respect the investment funds placed with JPMorgan.  Defendants were bound to exercise the utmost good faith and reasonable care in the performance of the duties owed to Musalli.

163.    Musalli trusted and relied upon defendants to act in Musalli's best interest.

164.    Defendants breached their fiduciary duty and betrayed Musalli's trust by, among other things, the actions described herein.

165.    By reason of defendants' failure to serve Musalli in a proper, skillful, prudent, and diligent manner as alleged herein and because defendants directly breached their fiduciary duty, Musalli has been damaged in an amount not yet fully determined.

## COUNT 8 – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

166.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

167.    NYF and Boktor owed a fiduciary duty to Musalli to act in Musalli's best interest with respect to its funds.  NYF and Boktor were bound to exercise the utmost good faith and reasonable care in the performance of the duties owed to Musalli.

168.    Musalli trusted and relied upon NYF and Boktor to provide financial and investment advice with reasonable skill, care, and diligence and to act in Musalli's best interest.

169.    In breach of those fiduciary duties, NYF and Boktor, among other things, (1) failed to safeguard the investment funds; (2) failed to create a portfolio for the investments based on a profile of Musalli's risk tolerance level; (3) failed to maintain the investment funds in the JPMorgan Investment Program as promised; (6) made false and misleading oral and written statements to Musalli; (7) placed their own interests ahead of Musalli's; (8) failed to make and preserve account records and information concerning the investment funds; (9) diverted Musalli's funds to themselves and a speculative currency trading firm; and (10) concealed their unlawful conduct through false statements and sham legal positions.

170.    Defendants knew of the fiduciary relationship between Musalli and NYF and Boktor.

171.    Further, defendants knew of NYF's and Boktor's diversion of the Musalli investment funds.

172.    Defendants knowingly induced or participated in the breach of the fiduciary duties NYF and Boktor owed to Musalli as described herein.

38

173.    As a result of defendants' actions, Musalli has suffered economic harm.

### COUNT 9 – COMMERCIAL BAD FAITH

174.    Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 119 as though fully set forth herein.

175.    Defendants, NYF, and Boktor engaged in a scheme or acts of wrongdoing against Musalli, for the purpose of wrongfully diverting Musalli's funds, as described herein

176.    Defendants had actual knowledge of the fraudulent diversion of funds that amounts to bad faith.

177.    Defendants and their employees were complicit in and knowingly participated with NYF and Boktor in effectuating the fraudulent diversion of funds in the JPMorgan Investment Program.

178.    Musalli was damaged as a result of the actions of Boktor, NYF, and defendants.

### VIII. DEMAND FOR RELIEF

By reason of the foregoing, Musalli requests relief with respect to all of the counts as follows:

(i)     Awarding Musalli damages in the amount of at least $5 million with interest;

(ii)    Awarding Musalli pre-judgment and post-judgment interest as a result of the wrongs complained of herein;

(iii)   Awarding Musalli its costs, expenses and reasonable attorney's fees;

(iv)    Awarding Musalli punitive damages in the amount of compensatory damages trebled in view of the flagrant, wanton, and intentional fraudulent conduct described herein; and

(v)     Awarding Musalli such other relief as the Court shall deem just and proper.

## IX. DEMAND FOR JURY TRIAL

Musalli hereby demands a jury trial in this action as to all claims so triable under law.

Dated:    May 30, 2008
          New York, New York

Respectfully Submitted,

LAURO LAW FIRM

By: _____

John F. Lauro, Esq. (NY Bar JFL-2635)
101 E. Kennedy Blvd., Su ite 3100
Tampa, Florida 33602
P: 813 222 8990  F: 813 222 8991
1540 Broadway, Suite 1604
New York, NY 10036
P: 646 746 8659  F: 212 938 0858
E-mail: jlauro@laurolawfirm.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system and was sent by U.S. mail May 30, 2008 to:

Andrea Likwornik Weiss
1185 Avenue of the Americas
17th Floor
New York, NY 10036
*Counsel for Defendants*

_____
John F. Lauro

EXHIBIT B

 

## New York Financial

INVOICE
AND STATEMENT

September 9, 2005

To:   Musalli Factory for Gold & Jewellery
      Kingdom of Saudi Arabia, P.O.Box 9087 – Jeddah 21413
      Tel: +966-2-629-2222          Fax: +966-2-629-1111

For the following:

$1 Million Owed For Violation of paragraph. 1 (b) of
Exclusive Investment Management
And Representation Agreement......................................................$1,000,000.00

$1 Million Demand Note, Demand for Payment
Now Made....................................................................................$1,000,000.00

$1 Million Demand Note, Demand for Payment
Now Made ...................................................................................$1,000,000.00

Amount Due For Violation of Non-circumvention
Agreement; Liquidated Damages Pursuant to
Agreement....................................................................................$1,000,000.00

Set-Up Fee Pursuant To Investment Management
Agreement (2 years, 2004 and 2005)..............................................$520,000.00

Total Paid From Funds Held By New York Financial............................ $4,520,000.00

IN ADDITION, NEW YORK FINANCIAL LLC HEREBY RESERVES ALL RIGHTS FOR
REIMBURSEMENT OF EXPENSES, LOST REVENUES AND FOR ADDITIONAL DAMAGES
FOR BREACH OF CONTRACT AND FRAUD, AND HEREBY DEMANDS ALL INFORMATION
AND DOCUMENTATION REGARDING YOUR SECRET SETTING UP AND ACTIVATION OF
BANK ACCOUNTS AND BUSINESS DEALS (including the attached accounts)
AND OTHER ACCOUNTS AND BUSINESS DEALS MADE AVAILABLE TO YOU AS A
RESULT OF NEW YORK FINANCIAL LLC INTRODUCTION, EFFORTS, WORK AND
SERVICES, ALL AS PART OF A FLAGRANT VIOLATION OF YOUR OBLIGATIONS AND
ASSURANCES TO NEW YORK FINANCIAL LLC. FURTHER, NEW YORK FINANCIAL LLC
HEREBY RESERVES ALL OTHER RIGHTS AND CLAIMS IN CONNECTION WITH YOUR
IMPROPER CONDUCT.

EXHIBIT C



Nicholas Gambella
04/04/2005 09:46 AM

**\*\*ARCHIVED\*\***

To:      Martin R Stokes/JPMCHASE@JPMCHASE
cc:      Karim Tannir/JPMCHASE@JPMCHASE
Subject:  Re: A collateral question

Martin-
It was great speaking with you and Karim the other day.
On a side note...I met with Mr. Amir Boktor this morning and he stated that you did not receive a copy of
this E-Mail that Dagmar had forwarded to me. There was one area that I was a little confused about, we
consider a Fund of Funds, Mutual Funds, the portfolio that we are setting up for Musalli will be Individual
Stocks and Bonds, NOT mutual Funds. It is a Liquid portfolio, the stocks will not be speculative and there
will be no Junk bonds in the mix. We can also change the allocation, asset class and Portfolio Manager,
and make it as Conservative or Aggressive as the client desires. It can be a very flexible portfolio. We can
send you a copy of the ISR (Investment Strategy Report) as an Example.
Let me know if you need anything else!
Nick Gambella

            Dagmar X Einoeder        To:  Martin R Stokes/JPMCHASE@JPMCHASE
            04/01/2005 11:53 AM      cc:  Karim Tannir/JPMCHASE@JPMCHASE, Nicholas
                                          Gambella/JPMCHASE@JPMCHASE, Mokgadi
                                          Maunatlala/JPMCHASE@JPMCHASE
                                     Subject:  Re: A collateral question

    Martin

    first of all we don't have collateral confidence in clients incorporated in Saudi Arabia.
    Secondly we have not accepted funds and fund of funds before. We currently are looking into AAA
    liquidity funds managaged by JPM Flemmings, but we only started the process and are not there to accept
    it yet. There are various issues around accepting collateral from JPM and its affiliates due to 23A/B
    issues. Further operational problems that need to be resolved and are at the moment being discussed.
    The answer for the moment would be no -  we do not accept it, but we are looking into it - AAA liquidity
    funds.

    Hope that helps.

    Please let me know if you need anything else.


    Regards
    de

    Dagmar Einoeder
    Credit Portfolio Group - CPS Collateral
    e-mail: dagmar.einoeder@jpmorgan.com
    Tel: +44-207-777-1466
    Fax: +44-207-777-1423
    Martin R Stokes

            Martin R Stokes         To:  Dagmar X Einoeder/JPMCHASE@JPMCHASE
            01/04/2005 17:32        cc:  Karim Tannir/JPMCHASE@JPMCHASE, Nicholas
                                         Gambella/JPMCHASE@JPMCHASE
                                    Subject:  A collateral question

**CONFIDENTIAL**
**JPM 00212**

Hi Dagmar,

We have a potential Saudi Arabian client who wants to borrow some gold from us on a collateralised basis.

The client is considering to open an "institutional investment account" with JPM Investments, a division of Chase Investments in NY. This account would be managed by Nick Gambella ( cc'd above ) and would comprise a portfolio of bonds, blue chip equities and some portion with a guaranteed yield. It is envisaged that the investment would be left with JPM Investments for around 5 years.

Nick has the ability to get immediate real time revals of such portfolios.

Assuming that we satisfy all credit and documentational issues and that we are able to levy a margin of 120% vs the Gold, would you be able to accept the funds under management with Nick as collateral for the Gold loan to the client ?

Rgds Martin

Any commentary/trade idea included herein was prepared by sales or trading personnel and does not represent the views of any JP Morgan research analyst. J.P.Morgan Securities Ltd., J.P.Morgan plc, J.P.Morgan Europe Limited and JPMorgan Chase Bank N.A., London Branch are each authorised by the FSA.

CONFIDENTIAL
JPM 00213

EXHIBIT D

Nicholas Gambella
04/28/2005 02:59 PM

## **ARCHIVED**

To:        Martin R Stokes/JPMCHASE@JPMCHASE
cc:        Karim Tannir/JPMCHASE@JPMCHASE
Subject:   Re: Musalli - fairly urgent...

Sorry for the delay in getting back to you...As far as I knew, Musalli didn't proceed with opening the Managed Investment Accounts here with JP Morgan Investments so I assumed he was no longer interested. If you have any questions or comments you can call me.
Nick Gambella

Martin R Stokes

|  | |
|---|---|
| **Martin R Stokes** | To: Nicholas Gambella/JPMCHASE@JPMCHASE |
| 04/28/2005 03:48 AM | cc: Karim Tannir/JPMCHASE@JPMCHASE |
|  | Subject: Musalli - fairly urgent... |

Nick,

We are getting intense pressure from Musalli to finalise the Gold borrowing structure vs US$ collateral.

It is of course possible for us to do this with funds that they place with us in London - and Musalli are happy to consider this alternative.

However, as you have already done a fair amount of work on this, we would like to keep the $ investment with your group as part of the deal.

### REDACTED

Rgds Martin

Any commentary/trade idea included herein was prepared by sales or trading personnel and does not represent the views of any JP Morgan research analyst. J.P.Morgan Securities Ltd., J.P.Morgan plc, J.P.Morgan Europe Limited and JPMorgan Chase Bank N.A., London Branch are each authorised by the FSA.
----- Forwarded by Martin R Stokes/JPMCHASE on 28/04/2005 08:41 -----

|  | |
|---|---|
| **Martin R Stokes** | To: Nicholas Gambella/JPMCHASE@JPMCHASE |
| 25/04/2005 14:02 | cc: Karim Tannir/JPMCHASE@JPMCHASE |
|  | Subject: Musalli - fairly urgent... |

Nick,

Any chance to give me a reply on this please......

Rgds Martin

**CONFIDENTIAL**
**JPM 00218**

Any commentary/trade idea included herein was prepared by sales or trading personnel and does not represent the views of any JP Morgan research analyst. J.P.Morgan Securities Ltd., J.P.Morgan plc, J.P.Morgan Europe Limited and JPMorgan Chase Bank N.A., London Branch are each authorised by the FSA.

----- Forwarded by Martin R Stokes/JPMCHASE on 25/04/2005 14:01 -----

| | |
|---|---|
| **Martin R Stokes** | To: Nicholas Gambella/JPMCHASE@JPMCHASE |
| 20/04/2005 11:21 | cc: Karim Tannir/JPMCHASE@JPMCHASE |
| | Subject: Musalli - fairly urgent... |

Hello Nick,

We have a few questions about the institutional investment account which Musalli is proposing to open with you.

1) Please can you give me the precise name of the legal entity which will hold the funds - is it JPM Investments, a division of Chase Investments ??

2) Please can you forward to me all the documentation which would cover this account ( preferably by e-mail)

3) Please can you confirm that the client's funds can if necessary be restricted to investment in AAA bonds

4) In which name is Musalli proposing to open the account with you ?

5) Do you have any issues in accepting funds from S. Arabia ?

6) Please can you confirm that the client's portfolio can be valued daily.


Thanks/Rgds Martin


Any commentary/trade idea included herein was prepared by sales or trading personnel and does not represent the views of any JP Morgan research analyst. J.P.Morgan Securities Ltd., J.P.Morgan plc, J.P.Morgan Europe Limited and JPMorgan Chase Bank N.A., London Branch are each authorised by the FSA.

**CONFIDENTIAL**
**JPM 00219**

of [the Musalli] JP Morgan investment portfolio . . . ." *See Exhibit 12.*

**G.  Musalli Places a Total of $5 Million in the JPMorgan Investment Program**

89.  As described above, Boktor insisted that Musalli would need to fund the JPMorgan Investment Program with a total of $5 million. Musalli had discussed with representatives of JPMorgan Bank that it already had $2.05 million in the JPMorgan Investment Program. Thus, Musalli believed it needed to transfer an additional $2.95 million to the JPMorgan Investment Program.

90.  In July 2005, relying on Boktor's representations, and on the previous false statements and omissions of JPMorgan representatives, Musalli transferred additional funds to the JPMorgan Bank Account, bringing its total investment in the JPMorgan Investment Program up to $3.95 million. These transfers were tracked by internal JPMorgan documents and account statements. Upon receipt of the funds, JPMorgan was under a duty to maintain them in a safe and secure JPMorgan Investment Program.

91.  In making the transfers, Musalli noted on its wire applications that the funds were "for our investment program with JPMorgan New York." Upon receiving the funds, JPMorgan Bank issued an advice of credit and sent it to Boktor and NYF, indicating that the funds were sent by Musalli "FOR OUR INVESTMENT PROG WITH CHASE," thus confirming that the funds should go into the JPMorgan Investment Program. *See Exhibit 13.* These documents further confirm JPMorgan's responsibility to safeguard Musalli's funds in a safe and secure JPMorgan Investment Program.

92.  Again, consistent with its KYC policies, the collective knowledge of its "family," including JPMorgan Bank and Chase Investment, and Gambella's personal knowledge,

JPMorgan was well aware that Musalli's funds were to be maintained in the JPMorgan Investment Program in accordance with Musalli's instructions.

93.    At or about the time Musalli wired its investment funds to JPMorgan, bank employees were also working on issuing a letter of credit supported by the JPMorgan Investment Program. JPMorgan also engaged in further due diligence regarding Musalli's desire to use a JPMorgan letter of credit to obtain a credit facility. During this time, JPMorgan employees and Boktor exchanged draft letters of credit.

94.    In reliance upon the previous statements (and omissions) made by JPMorgan, by the end of August 2005, Musalli wired an additional $1.05 million to JPMorgan Bank in order to fully fund the $5 million JPMorgan Investment Program. Thus, internal JPMorgan documents tracked all of the transfers from Musalli as described above; as well as transfers into and out of the JPMorgan Investment Program accounts. *See Exhibit 14.*

### H.    Boktor and NYF Induce Musalli To Execute a Non-Circumvention Agreement

95.    Also, in August of 2005, Boktor represented falsely that, in order to move forward with a standby letter of credit, Musalli would need a signed "non-circumvention" agreement. Boktor sent to El-Nagar by e-mail a proposed Non-Circumvention Agreement along with an application for a letter of credit. At that time, Boktor and NYF were acting as Musalli's trusted advisors.

96.    Because Musalli believed reasonably that the agreement was needed in order to obtain a letter of credit, it signed the Non-Circumvention Agreement and sent it to Boktor and NYF.

97.    However, the Non-Circumvention Agreement was procured by fraud and was intended to be used for an unlawful purpose, it is void and not legally binding. Nevertheless, as discussed below, the investment advisors, with defendants' assistance, later used the Non-Circumvention Agreement to try to conceal the theft of Musalli's investment funds.

**I.    The Theft of Musalli's Investment Funds on September 9**

98.    On September 9, 2005, Boktor spoke by telephone from Brooklyn with El-Nagar regarding obtaining the standby letter of credit from JPMorgan Bank. Boktor appeared nervous and out of breath and told El-Nagar that he was going to JPMorgan Bank to obtain the standby letter of credit.

99.    On that same day, and unknown to Musalli, Boktor and NYF transferred $3 million of Musalli's investment funds from the JPMorgan Investment Program to a secret Refco account controlled by NYF and Boktor.

100.    To try to justify the theft, Boktor sent Musalli by Federal Express an "Invoice and Statement" dated September 9, 2005, claiming, among other things, that Musalli had breached the Non-Circumvention Agreement by having an undisclosed banking relationship with JPMorgan. Although there was absolutely no basis for Boktor's "demand," he tried to claim he was owed about as much as Musalli had invested with JPMorgan Investment Program.

101.    As part of the Federal Express package, Boktor also included a JPMorgan computer "screen shot" that Boktor alleged showed an undisclosed banking relationship between Musalli and JPMorgan. Boktor later claimed he obtained the screen shot from Gambella. In any event, the screen shot was a confidential document that Boktor was not entitled to possess.

102.    The screen shot was used by NYF and Boktor as part of a subterfuge to justify the