UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MUSALLI FACTORY FOR GOLD                      :
& JEWELLRY CO.,                               :        1:08-cv-01720 (LAP)
                                              :
                        Plaintiff,            :
                                              :
                                              :
            -against-                         :
                                              :
                                              :
JPMORGAN CHASE BANK N.A., CHASE               :
INVESTMENT SERVICES CORPORATION,              :
and NICHOLAS GAMBELLA,                        :
                                              :
                        Defendants.           :
-------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS**


LEVI LUBARSKY & FEIGENBAUM
1185 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 308-6100

Attorneys for Defendants
JPMorgan Chase Bank N.A., Chase Investment Services Corporation,
and Nicholas Gambella

July 25, 2008

<u>TABLE OF CONTENTS</u>

Pg.

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ........................................................................................ 3

    A.    Boktor Induces Musalli to Appoint NYF as "Investment Advisor" ........................... 3

    B.    Musalli Delegates to NYF Broad Authority to Manage Musalli's Money ................. 4

    C.    Musalli Executes a Broad Power of Attorney Authorizing
        NYF to Conduct Financial Transactions on its Behalf ............................... 5

    D.    Boktor's Alleged Conversion of Musalli's Funds ....................................... 6

        1.    Boktor's Alleged Conversion in the Fall of 2004 ............................... 6

        2.    Musalli's Communications With Chase in London Regarding a
            Gold Loan ......................................................................... 8

        3.    Boktor's Alleged Conversion in the Fall of 2005 ............................... 9

ARGUMENT ...................................................................................................... 11

POINT I
PLAINTIFF FAILS TO STATE A CLAIM FOR FRAUD ........................................... 11

    A.    The Amended Complaint Fails to Allege Facts Establishing Reliance
        on Gambella's Statements ..................................................................... 12

    B.    The Amended Complaint Fails to Allege Facts Establishing Scienter ................... 13

        1.    The Amended Complaint Fails to Plead Motive ................................ 14

        2.    The Amended Complaint Fails to Plead Strong Circumstantial
            Evidence of Intent to Defraud ................................................... 15

POINT II
PLAINTIFF FAILS TO STATE A CLAIM FOR AIDING AND ABETTING FRAUD ............ 18

    A.    The Power of Attorney Defeats Any Inference that Defendants
        Had Actual Knowledge of the Fraud ....................................................... 18

B.    Musalli's Wire Transfer Memos Do Not Support An Inference of
      Actual Knowledge ..................................................................................19

C.    The Screen Shot Does Not Support An Inference of Actual Knowledge ................20

D.    "Actual Knowledge" of the Fraud May Not Be "Presumed" ..................................20

E.    "Collective Knowledge" Does Not Establish Actual Knowledge............................21

POINT III
PLAINTIFF FAILS TO STATE A CLAIM FOR COMMERCIAL BAD FAITH......................22

POINT IV
PLAINTIFF FAILS TO STATE A CLAIM FOR CONSPIRACY TO DEFRAUD....................23

POINT V
THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR
FRAUDULENT CONCEALMENT....................................................................................25

POINT VI
THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR BREACH
OF FIDUCIARY DUTY....................................................................................................27

POINT VII
PLAINTIFF FAILS TO STATE A CLAIM FOR AIDING AND ABETTING
BREACH OF FIDUCIARY DUTY ...................................................................................29

POINT VIII
THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENCE..............30

POINT IX
THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENT
MISREPRESENTATION AND NON-DISCLOSURE .................................................................32

POINT X
THE CLAIMS FOR PUNITIVE DAMAGES SHOULD BE DISMISSED ................................35

CONCLUSION..................................................................................................................35

TABLE OF AUTHORITIES

Pg.

**Cases**

Aaron Ferer & Sons. Ltd. v. Chase Manhattan Bank, 731 F.2d 112 (2d Cir. 1984) ................... 27

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995) ........................................... 14

Aiken v. Interglobal Mergers & Acquisitions,
    2006 WL 1878323 (S.D.N.Y. July 5, 2006) ............................................................ 21

American Fin. Int'l Group-Asia, L.L.C. v. Bennett,
    2007 WL 1732427 (S.D.N.Y.  June 14, 2007) ........................................................ 14

Armstrong v. McAlpin, 699 F.2d 79 (2d Cir. 1983) ................................................... 25

Banca Commerciale Italiana v. Northern Trust Int'l Banking Corp.,
    1997 WL 217591 (S.D.N.Y. Apr. 30, 1997) ............................................................ 24

Beck v. Manufacturers Hanover Trust Co., 820 F 2d 46 (2d Cir. 1987) ........................ 14

Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955 (2007) .................................. 15 n.14

Bischoff ex. rel. Schneider v. Yorkville Bank, 112 N.E. 759 (1916) ....................................... 31-32

Brass v. American Film Techs., Inc., 987 F.2d 142 (2d Cir. 1993) ................................. 34

Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42 (2d Cir. 1991) ...................................... 9 n.9

Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc.,
    429 F. Supp. 2d 582 (S.D.N.Y. 2006) ................................................................... 34

Curley v. AMR Corp., 153 F.3d 5 (2d Cir. 1998) ....................................................... 30

DDJ Capital Mgmt., LLC v. Rhone Group LLC.,
    2008 WL 1837442 (Sup. Ct. N.Y. Co. Apr. 24, 2008) ............................................ 33

Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of N.Y.,
    375 F.3d 168 (2d Cir. 2004) ............................................................................. 13, 33-34

Ferber v. Travelers Corp., 785 F. Supp. 1101 (D. Conn. 1991) ................................. 14

Ferman v. Chase Manhattan Bank,
    1999 WL 1568298 (Sup. Ct. N.Y. Co. Apr. 19, 1999) ............................................ 31

Fierro v. Gallucci,
    2008 WL 2039545 (E.D.N.Y. May 12, 2008) .................................................24-25

Filler v. Hanvit Bank,
    2003 WL 22110773 (S.D.N.Y. Sept. 12, 2003) ..............................................24-25

First Equity Corp. of Florida v. Standard & Poor's Corp.,
    690 F. Supp. 256 (S.D.N.Y. 1988)................................................................... 22

Fitzgerald v. Field,
    1999 WL 1021568 (S.D.N.Y.  Nov. 9, 1999) ..................................................... 24

Frutico, S.A. de C.V. v. Bankers Trust Co., 833 F. Supp. 288 (S.D.N.Y. 1993) ......................... 26

Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8 (2d Cir. 2000) .................................. 33

In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,
    289 F. Supp. 2d 416 (2d Cir. 2003) ................................................................. 14

International Audiotext Network v. American Tel. & Tel. Co.,
    62 F.3d 69 (2d Cir. 1995) ......................................................................... 9 n.9

JPMorgan Chase Bank v. Winnick, 350 F. Supp. 2d 393 (S.D.N.Y. 2004) ........................... 12, 18

Kaufman v. Cohen, 760 N.Y.S.2d 157 (1st Dep't 2003)................................................. 29

Kolbeck v. LIT America, Inc., 923 F. Supp. 557 (S.D.N.Y. 1996).......................... 21 n.17, 28-30

Korea First Bank of N.Y. v. Noah Enters., Ltd., 787 N.Y.S.2d 2 (1st Dep't  2004).............. 28, 33

Lerner v. Fleet Bank, N.A.,
    459 F.3d 273 (2d Cir. 2006)........................... 11 n.10, 12-13, 18, 20, 22 n.18, 22-23, 26, 30-31

Melnitzky v. Rose, 299 F. Supp. 2d 219 (S.D.N.Y. 2004) ..................................................24-25

Murray v. Xerox Corp., 811 F.2d 118 (2d Cir. 1987).................................................... 11

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) ............................................... 13 n.13, 14

Papasan v. Allain, 478 U.S. 265 (1986)................................................................ 15 n.14

Peoples Westchester Sav. Bank v. Federal Deposit Ins. Corp.,
    961 F.2d 327 (2d Cir. 1992)........................................................................ 27

Prudential-Bache Sec., Inc. v. Citibank, N.A., 536 N.E.2d 1118 (N.Y. 1989)............................ 23

Renner v. Chase Manhattan Bank,
    2000 WL 781081 (S.D.N.Y. June 16, 2000) ........................................................ 14, 21, 30, 32

River Glen v. Merrill Lynch Credit Corp., 743 N.Y.S.2d 870 (1st Dep't 2002) .................... 28, 33

Rosner v. Bank of China, 528 F. Supp. 2d. 419 (S.D.N.Y. 2007) ...................... 13, 15, 18, 22 n.18

Roth v. Jennings, 489 F.3d 499 (2d Cir. 2007) .......................................................................... 4 n.3

Ryan v. Hunton & Williams,
    2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ................................................... 12, 21 n.17, 27

Scala v. Sequor Group, Inc.,
    1995 WL 225625 (S.D.N.Y. Apr. 14, 1995) ............................................................................ 24

Schweitzer v. Mulvehill, 93 F. Supp. 2d 376 (S.D.N.Y. 2000) ................................................ 34-35

Shanahan v. Vallat,
    2004 WL 2937805 (S.D.N.Y. Dec. 19, 2004) ........................................................................ 35

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) ................................................ 14

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,
    ___F.3d___, 2008 WL 2521676 (2d Cir. June 26, 2008) ....................................................... 22

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    ____ U.S. ____, 127 S.Ct. 2499 (2007) ...................................................................... 13, 15, 18

The Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. LLC,
    2007 WL 2948115 (S.D.N.Y. Oct. 3, 2007) ........................................................................... 28

Thermal Imaging, Inc. v. Sandgrain Secs., Inc.,
    158 F. Supp. 2d 335 (S.D.N.Y. 2001) ............................................................................ 25-26, 28

Thomson v. New York Trust Co., 56 N.E.2d 32 (N.Y. 1944) ..................................................... 31

Tzaras v. Evergreen Int'l Spot Trading, Inc.,
    2003 WL 470611 (S.D.N.Y. Feb. 25, 2003) .............................................................. 19, 26, 30

Walker v. Sheldon, 179 N.E.2d 497 (N.Y. 1961) ....................................................................... 35

Williams v. Bank Leumi Trust Co. of N.Y.,
    1997 WL 289865 (S.D.N.Y. May 30, 1997) ................................................................... 13 n.12

World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.,
    530 F. Supp. 2d 486 (S.D.N.Y. 2007) ..................................................................................... 28

**Statutes**

9 N.Y. Jur. Banks and Fin. Inst., § 284 ........................................................................... 32

**Fed. Appx.**

148 Fed. Appx. 11 (2d Cir. 2005) ..................................................................................... 24

**NY Banking Law**

NY Banking Law § 134 (5) ................................................................................................ 32

Defendants JPMorgan Chase Bank, N.A. ("Chase" or the "Bank"), Chase Investment Services Corporation ("CISC") (collectively, "JPMorgan"), and CISC employee Nicholas Gambella ("Gambella") (all collectively, "defendants") submit this memorandum of law in support of their motion to dismiss the Amended Complaint.

## PRELIMINARY STATEMENT

Swindled of five million dollars by its handpicked investment advisor, Amir Boktor, the principal of New York Financial LLC ("NYF"), plaintiff Musalli Factory for Gold & Jewellry Co. ("Musalli") now seeks to blame financial institutions with "deep pockets" for the losses it sustained. Musalli claims that Boktor fraudulently induced it to transfer money to NYF's bank account at a Chase Bank branch in New York, which he then stole, and that defendants, either intentionally or negligently, permitted Boktor to execute that scheme. Despite its 40 pages and 178 paragraphs, the Amended Complaint fails to allege facts with respect to any defendant sufficient to support liability on any theory.

Stripped of its legal conclusions that defendants had knowledge of Boktor's scheme and participated in it, the allegations in the Amended Complaint support only the following: Boktor induced Musalli to send money to NYF's Chase bank account in New York, representing that the money would be managed by CISC employee Gambella in a so-called "JPMorgan Investment Program," and that the invested funds then would be used to collateralize a gold loan to Musalli from Chase in London, to be negotiated by Boktor. Rather than investing the funds for Musalli's benefit, Boktor transferred the money out of NYF's accounts, principally to NYF's foreign currency exchange ("forex") account at Refco FX.

The Amended Complaint is devoid of factual allegations that any JPMorgan employee was informed that the money held in accounts in NYF's name belonged to Musalli, and was

being managed by NYF as a fiduciary. Moreover, even if the allegations of the Amended Complaint could establish such knowledge, the Amended Complaint contains no factual allegation that any JPMorgan employee had knowledge that NYF's transactions with Musalli's funds were beyond the scope of its authority as Musalli's agent. Indeed, the Amended Complaint sets forth compelling facts demonstrating just the opposite: Musalli gave NYF an exceedingly broad power of attorney (annexed to the Amended Complaint), of which JPMorgan allegedly had knowledge. That document unambiguously authorized NYF's withdrawal of Musalli's funds, about which Musalli now complains.

Plaintiff's claims should be dismissed for the following reasons:

(i)    Plaintiff fails to state a claim for fraud (Count 1) because it does not allege facts sufficient to support either detrimental reliance on defendants' alleged false statements, or *scienter*, or both.

(ii)    Plaintiff fails to allege facts sufficient to support a strong inference that defendants had actual knowledge of Boktor's fraud, and for that reason (among others discussed below) fails to state a claim for aiding and abetting fraud, commercial bad faith, and conspiracy to defraud (Counts 2, 9 and 3, respectively).

(iii)    Plaintiff fails to state a claim for fraudulent concealment (Count 4) because defendants had no duty to disclose information to Musalli, and because plaintiff fails to allege facts sufficient to support that defendants acted with *scienter*.

(iv)    Plaintiff fails to state a claim for breach of fiduciary duty (Count 7) because defendants did not owe Musalli a fiduciary duty, or for aiding and abetting breach of fiduciary duty (Count 8) because (among other reasons discussed below), plaintiff does not allege facts sufficient to support a strong inference that defendants knew of Boktor's and NYF's breach of

2

fiduciary duty.

(v)    Plaintiff fails to state a claim for negligence or negligent misrepresentation (Counts 6 and 5, respectively) because defendants did not owe Musalli a duty to act or to speak with care.

## STATEMENT OF FACTS

The allegations of the Amended Complaint are as follows.[1]

### A.    Boktor Induces Musalli to Appoint NYF as "Investment Advisor"

In early 2004, Boktor, the principal and "alter-ego" of NYF, a Nevada limited liability company, sought to become an investment advisor to Musalli, a Saudi company engaged in manufacturing gold and jewelry products.  ¶¶ 1, 4, 11.  To that end, Boktor represented to Musalli that he could invest Musalli's funds with U.S. financial institutions, such as JPMorgan.[2] ¶ 33.  Boktor urged Musalli to place its funds with JPMorgan through NYF, asserting that he had a "special relationship with JPMorgan," that investments with JPMorgan would lead to substantial returns, and that the investment account ultimately could be used to collateralize a gold loan from JPMorgan.  ¶ 34.

Boktor further explained to Musalli that American companies received benefits not available to foreign companies like Musalli, such as "higher credit facilities" and "better interest rates."  ¶ 37.  To obtain these benefits, according to Boktor, Musalli would have to invest in the name of an American company -- i.e., NYF -- rather than in Musalli's own name.  Id.  Thus,

---

[1] The Amended Complaint is Exhibit A to the Declaration of Andrea Likwornik Weiss dated July 24, 2008 ("Weiss Dec.").  For brevity, it is referred to solely by "¶" followed by the paragraph number, and where an exhibit to the Complaint is cited, as "Ex." followed by the exhibit number.

[2] The Amended Complaint uses the term "JPMorgan" to refer, collectively, to Chase and CISC, which are separate entities: Chase is a national banking association; CISC is a Delaware Corporation.  Complaint, at 1 & ¶¶ 7, 8.

Boktor's proposal, as he explained it to Musalli, required Musalli to invest under NYF's name in order to conceal from U.S. financial institutions Musalli's ownership of invested funds.

**B.**    **Musalli Delegates to NYF Broad Authority to Manage Musalli's Money**

In order to gain the "obvious benefit" of Boktor's proposal, Musalli, in August 2004, entered into an "Investment Management Agreement" (the "First Agreement") with NYF.  ¶¶ 37-38, Ex. 3.  Although the First Agreement provided Musalli with the opportunity to limit the types of investments which NYF could make by checking off boxes identifying investment limitations, Musalli did not exercise that option.  Id. Ex. 3, p. 1, I.[3]  Thus, by the terms of the First Agreement, NYF's authority included transacting in various financial instruments, including in "forex," or foreign exchange.  Id.  The First Agreement also designated NYF as Musalli's "agent and attorney-in-fact, without consultation with Musalli."  Id. Ex. 3, p. 3.

The Amended Complaint alleges that the First Agreement identified "JPMorgan Chase Bank" as the so-called "bank of record" for NYF's investment management services, and Gambella as the "JPMorgan Chase Investment Contact."  Ex. 3, p. 2.  ¶ 39. While Plaintiff alleges that the First Agreement identified Gambella as the "vice president responsible for the JPMorgan Investment Program," ¶ 39, the Agreement itself has no reference to any such program.  Ex. 3.  Moreover, the Agreement does not require NYF's investments on Musalli's behalf to be made exclusively, or even in part, through JPMorgan.   See Ex. 3.  Neither Chase, nor CISC, nor Gambella, is a party to the First Agreement, Ex. 3, and there is no allegation that either Gambella or any other employee of either entity ever saw it or became privy to its contents.

---

[3] Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered on a motion to dismiss under Rule 12(b)(6).  Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007).

**C.    Musalli Executes a Broad Power of Attorney Authorizing
        NYF to Conduct Financial Transactions on its Behalf**

Musalli also gave NYF a power of attorney (the "Power of Attorney"), which "allowed Boktor and NYF to act on behalf of Musalli in their dealings with JPMorgan." Id. ¶¶ 40, 41, 47, Ex. 4.  Although Musalli now puts a revisionist spin on the Power of Attorney, alleging that it "limited the types of investments Boktor and NYF were permitted to make on Musalli's behalf," and that it "did not allow Boktor or NYF to transfer funds out of the JPMorgan Investment Program for their own benefit or to a speculative currency trading account," these allegations are belied by the document itself, which is annexed to the Amended Complaint.

The Power of Attorney, drafted on Musalli's stationery, grants NYF authority to "buy, sell . . . and trade stocks, bonds, options, OTC options, *and other instruments and any other securities* and/or contracts relating to the same on margin or otherwise in accordance with your terms and conditions for my account and risk . . . ." Ex. 4, ¶ 1 (emphasis added).  The Power of Attorney does not limit NYF's authority to conduct transactions to those conducted through JPMorgan, and indeed, does not even reference JPMorgan.

The Power of Attorney expressly authorizes the person or entity presented with it to follow NYF's instructions in every respect, including, specifically, paying all of Musalli's money to NYF or as NYF directs:

> 2.  INSTRUCTIONS.
> You are authorized to follow the instructions of my Agent and attorney-in-fact in every respect concerning my account with you, *and make deliveries of securities and payment of moneys to him or as he may order and direct.*

Ex. 4.  The Power of Attorney also expressly provides that the principal "ratifies and confirms" the agent's transactions, and indemnifies a party who acts upon the Power of Attorney.  Ex. 4, ¶ 3.  Thus, the Power of Attorney limited neither the type of investment that NYF was authorized

to make, nor the institutions through which such investments could be made, nor the amount of Musalli's money or securities that could be delivered to NYF or transferred out of JPMorgan at NYF's sole discretion.[4]

The Amended Complaint makes the conclusory allegation that Gambella knew of the Power of Attorney, and "knew that Musalli limited Boktor's use of the power of attorney to investing its funds in the JPMorgan Investment Program." ¶¶ 41, 47. There is no factual allegation as to how Gambella acquired such knowledge: the Amended Complaint is silent regarding whether Gambella was given the Power of Attorney. Even if Gambella knew of the Power of Attorney, however, there is no factual allegation to support plaintiff's conclusory allegation that he also knew that it was "limited" in the manner alleged, which is wholly inconsistent with the document itself.

**D.**    **Boktor's Alleged Conversion of Musalli's Funds**

    **1.**    **Boktor's Alleged Conversion in the Fall of 2004**

In August of 2004, Musalli wired $2.05 million to NYF's Chase bank account (the "Chase Bank Account"). ¶ 43. On September 22, 2004, NYF transferred $1,000,000 of the funds from that account to an investment account at CISC in NYF's name (the "CISC Account"), on which Gambella was the account representative. ¶¶ 45-50.

In the Fall of 2004, Boktor and NYF transferred $800,000 from the "JPMorgan Investment Program" to a foreign currency trading firm, Refco FX ("Refco"), and transferred an

---

[4] The Amended Complaint alleges that Boktor told Musalli that Musalli needed to execute "a power of attorney in a form issued by JPMorgan," and sent the form to Musalli to be translated into Arabic. ¶ 40. (A copy of a blank form power of attorney, alleged to be a "JPMorgan Securities Department" form, is located behind the executed Power of Attorney annexed as Exhibit 4 to the Amended Complaint). The executed Power of Attorney, unlike the JPMorgan form, does not reference JPMorgan. In all events, the text of the JPMorgan Securities form, much of which appears to have been copied into the Power of Attorney that Musalli executed, provides the agent with powers as expansive as the executed Power of Attorney.

unspecified sum which was used to pay personal expenses.  ¶¶ 49, 54.[5]  To conceal their diversion, "Boktor and NYF sent Musalli fictitious JPMorgan account statements," reflecting that Musalli's funds were held at JPMorgan, in a JPMorgan investment, and that a "JPMorgan Branch Manager" was "Musalli's 'Relationship Manager.'" ¶¶ 51, 52.  Defendants are not alleged to have known of Boktor's falsification of documents.[6]

The Amended Complaint asserts that "JPMorgan and Gambella knew that the purpose of the JPMorgan Investment Program was to collateralize the gold loan," ¶ 50, and that the transfer of funds "directly contradicted Musalli's investment plan." Id.  But there is no factual allegation that *anyone* at JPMorgan had been given any information about plaintiff's purported interest in a gold loan prior to or at the time of these transfers.  Nor is there any factual allegation that any JPMorgan employee had been informed that the funds in NYF's account were being held for Musalli's benefit, or that they had been advised of "Musalli's investment plan." Id.

The Amended Complaint alleges that Gambella spoke to a representative of Musalli on the telephone in December 2004, during which he described "the benefits of a JPMorgan investment program," purportedly "in an effort to further the business relationship between Musalli and JPMorgan."  Plaintiff alleges that Gambella did not disclose during the call that NYF had "diverted the Musalli investment funds." ¶¶ 53, 55.

---

[5] Plaintiff does not allege whether the funds were transferred from the Chase Bank Account or the CISC Account or both.

[6] The falsified account statements annexed as Exhibits 6 and 9 to the Amended Complaint reflect a "Chase" account titled "New York Financial, LLC, Musalli Factory Sub."  There is no allegation that the actual NYF account statements had any reference to Musalli.

2.    **Musalli's Communications With Chase in London Regarding a Gold Loan**

In late 2004 and early 2005, Boktor told Musalli that he would commence negotiating a gold loan for Musalli through Chase in London.  ¶ 60.  In connection with the negotiation of the loan, NYF and Musalli entered into a new investment management agreement (the "Second Agreement"), ¶ 63, which, like the First Agreement, gave NYF broad authority to invest Musalli's funds in NYF's discretion.  Ex. 9, p. 2, ¶ 2(b).[7]  The Second Agreement re-affirmed NYF's authority to act pursuant to "the previously issued powers of attorney." Ex. 8, p. 1.  In addition, again without any allegation of defendants' knowledge, Boktor created and sent to Musalli false account statements.  ¶ 66, Ex. 9.

In March of 2005, Musalli, directly and through Boktor, communicated with two Chase bankers in London, Martin Stokes and Karim Tannir, regarding a gold loan.  ¶¶ 68-72, 81-83. Musalli advised the bankers that it "was prepared to collateralize 110% of the gold loan by using 25% to 35% upfront cash collateral to be placed with JPMorgan Investments."  ¶¶ 71, 82, Ex. 10. The Amended Complaint alleges that at a meeting shortly thereafter, Stokes and Tannir discussed how the funds in the "JPMorgan Investment Program would be used to collateralize the loan."  ¶ 72.  Stokes allegedly "confirmed" that Musalli "had already invested $2.05 million with the JPMorgan Investment Program," ¶ 72, but did not advise Musalli that Boktor had previously diverted $1.05 million of that sum to Refco and himself.  ¶ 74.  Musalli makes the vague allegation that the London bankers "communicated" with Gambella about "how the JPMorgan Investment Program would be used as collateral for the loan."  ¶ 81.  By mid-2005, however, the London bankers rejected the loan.  ¶¶ 84-85.

---

[7] JPMorgan is not a party to the Second Agreement, and there is no allegation that JPMorgan or any of its employees saw that document or otherwise became privy to its contents.

3.     **Boktor's Alleged Conversion in the Fall of 2005**

In July and August of 2005, Musalli sent an additional $2.95 million to NYF's Chase Bank Account, based on Boktor's representation that JPMorgan could issue a "standby letter of credit against the existing JPMorgan investment in New York" and that the letter of credit could then be used as collateral for a gold loan to be made by another financial institution.  ¶¶ 86, 87, 90, 94.  There is no allegation that defendants knew of any of these representations.

According to the Amended Complaint, on September 9, 2005, Boktor transferred $3,000,000 from the "JPMorgan Investment Program" to Refco.  ¶ 99.[8]  "To try to justify the theft, Boktor sent Musalli an 'Invoice and Statement' dated September 9, 2005" claiming, among other things, that Musalli had breached a so-called "non-circumvention agreement" by having an "undisclosed banking relationship" with JPMorgan.  ¶ 100.  The Invoice and Statement, sent by Federal Express, advised Musalli that due to breach of the agreement and other matters, Musalli owed NYF the sum of $4,520,000.00, which had been "Paid From Funds Held By New York Financial."  ¶ 100, Weiss Dec., Ex. B.[9]  Thus, Musalli knew that Boktor had taken millions of dollars of its money.

Boktor included in the Federal Express package a "JPMorgan computer 'screen shot' reflecting Musalli's banking relationship with Chase in London, which he later "claimed" he

---

[8] The account from which the transfer was made is not specified.

[9] Although it is not annexed to the Amended Complaint, the Court may consider the "Invoice and Statement" on a motion to dismiss because it is integral to plaintiff's allegations and was necessarily known to plaintiff when it prepared the Amended Complaint.  See International Audiotext Network v. American Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (documents "integral to the complaint" may be considered on a motion to dismiss); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991) (documents may be considered where plaintiff had actual notice of them and relied upon them in framing the complaint).  Indeed, plaintiff annexed that document to its complaint against Boktor and NYF which was filed in this Court on January 15, 2006.  Weiss Dec. ¶ 4.

obtained from Gambella.  ¶ 101.  Plaintiff alleges that, during a phone call surreptitiously taped by Boktor, Boktor and Gambella "joked" about "how" Boktor obtained the screen shot.  ¶ 108. Although plaintiff clearly has listened to the tape, the Amended Complaint does not allege what either person said during the conversation.  Plaintiff never alleges that Gambella actually provided the screen shot.

On September 12, 2005, Musalli called Gambella and told him that Musalli did not have an "undisclosed" relationship with JPMorgan. ¶ 104. Gambella allegedly told Musalli that Musalli had a "direct business relationship" with Chase in London, and that he had an email from Stokes indicating that Musalli was a client of that entity in London.  ¶ 104.  Gambella expressed disappointment that Musalli had elected to take its business to Chase in London, when he "had spent considerable time" creating an investment program for Musalli in New York. Id. Musalli alleges that Gambella did not disclose Boktor's diversion.

On October 21, 2005, at Musalli's request, Stokes emailed Gambella that "Musalli had transferred $5 million to Gambella and asked him to confirm that the funds remained in the JPMorgan Investment Program." ¶¶ 112-13.  Gambella denied that Musalli had sent any funds to him.  ¶ 114.  Stokes then advised Gambella that Musalli's "funds were sent to you via NY Financial," and  Gambella again denied that he was aware of any funds invested by Musalli.  ¶¶ 115-16.

Thereafter, Musalli wrote JPMorgan's counsel to request an investigation into the whereabouts of the funds it allegedly transferred to the "JPMorgan Investment Program."  ¶ 118. On December 31, 2005, NYF's accounts were closed, and the remaining funds (approximately $1,000,000) were transferred into Boktor's personal accounts.  ¶ 119.

# ARGUMENT

## POINT I

### PLAINTIFF FAILS TO STATE A CLAIM FOR FRAUD

The Amended Complaint fails to plead fraud against any defendant because it fails to allege facts sufficient to establish either detrimental reliance, or a strong inference of *scienter*, or both, with respect to the allegedly false statements upon which it appears to predicate its claim.

The elements of common law fraud in New York are: "(1) that [the defendant] made a misrepresentation (2) as to a material fact (3) which was false (4) and known to be false by [the defendant] (5) that was made for the purpose of inducing [the plaintiff] to rely on it (6) that [the plaintiff] rightfully did so rely (7) in ignorance of its falsity (8) to his injury." Murray v. Xerox Corp., 811 F.2d 118, 121 (2d Cir. 1987). Allegations of fraud must be pled with particularity. Fed. R. Civ. P. 9(b).

Although plaintiff does not specify the statements upon which it bases its fraud claim, see ¶ 124, the Amended Complaint alleges two intentionally false statements made by Gambella, and one intentionally false statement made by Stokes.[10] These are:

(i) Gambella's denial to Stokes on October 21, 2005 that Musalli had sent money to him for investment through NYF, which statements Gambella allegedly intended to be communicated to Musalli. ¶ 114-16.

(ii) Gambella's statement to Musalli on September 12, 2006 that "Musalli had participated in a direct business relationship with JPMorgan, London" and that "he was in possession of a June 2005 email from Martin Stokes indicating that Musalli was a JPMorgan client in London." ¶ 104.

(iii) Stokes' statement in March 2005 that "Musalli had already invested $2.05 million

---

[10] There are circumstances, not sufficiently pled here, in which non-disclosure can result in liability for fraudulent concealment. See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 291-92 (2d Cir. 2006). Plaintiff asserts that claim separately in Count 4, the insufficiency of which is addressed in Point III, *infra*.

with the JPMorgan Investment Program," when at the time of the statement, $1.05 million had been withdrawn. ¶¶ 72, 74.

A.    **The Amended Complaint Fails to Allege Facts
      Establishing Reliance on Gambella's Statements**

The Amended Complaint fails to plead facts sufficient to establish reliance on either of Gambella's two allegedly false statements, because Musalli knew the true facts at the time the statements were made, i.e., that it did not have an undisclosed banking relationship with JPMorgan in London, ¶ 102, and that it had sent money to NYF's Chase Bank accounts. ¶¶ 43, 90, 94.[11]  Where, as here, Musalli knew the alleged statements were false, it could not have relied on them.  See JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 405 (S.D.N.Y. 2004) ("[W]here a plaintiff actually knew at the time a representation was made that it was false, she cannot claim to have relied on the truth of that representation, and any injury she suffers is therefore not attributable to the defendant.").

Moreover, a misrepresentation occurring on or after September 12, 2005, well after Musalli had given its funds to NYF, could not be deemed a proximate cause of any loss to Musalli.  See Lerner, 459 F.3d at 291 (plaintiff cannot show reliance because it had already made its investment before the alleged misrepresentation by the bank); Ryan v. Hunton & Williams, No. 99-CV-5938 (JG), 2000 WL 1375265, at *4-5 (E.D.N.Y. Sept. 20, 2000) (dismissing fraud claim against a bank because, *inter alia*, bank's alleged misrepresentation was not a proximate cause of plaintiff's loss where plaintiff made its decision to invest independent of any representation by the bank).  Musalli's allegation that it failed to take immediate action to recover its money in reliance on Gambella's statements and omissions in September 2005, ¶ 106, Weiss Dec. ¶ 4, Ex. B, is disingenuous at best, since at the time of those statements, it already

---

[11] Indeed, the Complaint does not even allege that Gambella's statement to Stokes was repeated to Musalli, so it could not have relied on it for that reason as well.  See ¶¶ 114-116.

knew that Boktor had taken the funds based on the Invoice and Statement that Boktor sent to Musalli on September 9.

**B.    The Amended Complaint Fails to Allege Facts Establishing *Scienter***

To withstand a motion to dismiss, a plaintiff "must allege facts that give rise to a strong inference of fraudulent intent." Lerner, 459 F.3d at 29.[12]   The Supreme Court has interpreted the pleading requirement of a "strong inference of *scienter*," adopted by Congress in the Private Securities Litigation Reform Act, to require that a plaintiff plead facts from which the inference of fraudulent intent is "more than merely 'reasonable' or 'permissible,'" but rather "cogent and compelling." Tellabs, Inc. v. Makor Issues & Rights, Ltd., ____ U.S. ____, 127 S. Ct. 2499, 2510 (2007).  Under Tellabs, "[a] complaint will survive . . . only if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. (emphasis added).[13]

To establish the required *scienter* for a fraud claim, a complaint must allege facts that show a defendant had the "motive and opportunity to commit fraud" or "that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004).  Where the factual allegations do not establish motive, "'the strength of circumstantial allegations must be correspondingly greater.'" Rosner v. Bank of China, 528 F. Supp. 2d 419, 425 (S.D.N.Y. 2007)

---

[12] Where, as here, a plaintiff alleges fraudulent intent upon information and belief, the complaint must state the factual basis for the belief.  Williams v. Bank Leumi Trust Co. of N.Y., No. 96 Civ. 6695 (LMM), 1997 WL 289865, at *4 (S.D.N.Y. May 30, 1997).

[13] Although Tellabs ruled on a claim under the PSLRA and not common law fraud, the PSLRA standard was adopted from the Second Circuit's "strong inference" pleading standard which is applicable to any fraud claim.  See Novak v. Kasaks, 216 F.3d 300, 309-10 (2d Cir. 2000) (PSLRA "strong inference" requirement is identical to the pre-existing Second Circuit standard for fraud pleading generally).  Accordingly, there is no reason why the Tellabs formulation of the standard for "strong inference" should not apply to plaintiff's fraud claim here.

(quoting Beck v. Manufacturers Hanover Trust Co., 820 F 2d 46, 50 (2d Cir. 1987)).

### 1.    The Amended Complaint Fails to Plead Motive

To plead motive, a plaintiff must allege that the defendants have "benefitted in some concrete and personal way from the purported fraud." Novak, 216 F.3d at 307-8.  Gambella's alleged motive was the prospect of earning additional commissions if Musalli continued to transfer funds to invest with JPMorgan; Stokes' alleged motive was to have "Musalli invest additional funds in the JPMorgan Investment Program."  ¶¶ 58, 78.  The law is well settled that "'incentive compensation can hardly be the basis on which an allegation of fraud is predicated.'" Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (quoting Ferber v. Travelers Corp., 785 F. Supp. 1101, 1107 (D. Conn. 1991)); see also In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation, 289 F. Supp. 2d 416, 428 (2d Cir. 2003) (allegations that defendant sought to attract investment banking business in order to increase his bonus compensation "are insufficient as a matter of law to establish concrete and personal benefits"); American Fin. Int'l Group-Asia, L.L.C. v. Bennett, No. 05 Civ. 8988(GEL), 2007 WL 1732427, at *8 (S.D.N.Y. June 14, 2007) (rejecting argument that defendants had a motive to commit fraud because they were able to realize hundreds of millions of dollars in commissions and fees from trading services).  Nor is motive established by the desire to attract additional business.  Renner v. Chase Manhattan Bank, No. 98 Civ. 926(CSH), 2000 WL 781081, at *10 (S.D.N.Y. June 16, 2000) (argument that bank branch manager's motive to commit fraud was to attract more business to the bank insufficient to establish "strong inference of fraudulent intent"; plaintiff "'must do more than merely charge that executives aim to prolong the benefits of the positions they hold,' whether it be compensation or prestige") (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130-31 (2d Cir. 1994)).  Accordingly, plaintiff has failed to plead a legally sufficient

motive for fraud.

**2.    The Amended Complaint Fails to Plead Strong Circumstantial
Evidence of Intent to Defraud**

Nor does the Amended Complaint plead strong circumstantial evidence of "conscious behavior" by Gambella, Stokes, or any other JPMorgan employee, Rosner, 528 F. Supp. 2d. at 425, sufficient to support an inference of *scienter* as "cogent and at least as compelling" as the opposing inference, Tellabs, 127 S. Ct. at 2510.  Musalli claims that Gambella denied that Musalli had invested money with him through NYF's accounts in order to conceal Boktor's fraud.[14]¶¶ 114-117.  But an inference of intent to defraud in making this statement is implausible, because Musalli obviously would have known the denial was false, and that denial would have *raised* Musalli's suspicions and the likelihood of detection.  Far more plausible is that Gambella was, in fact, unaware that Musalli had placed money in NYF's accounts.  Indeed, the Amended Complaint, though filled with innuendo attempting to establish Gambella's knowledge, fails to plead facts sufficient to support a "cogent and compelling" inference of knowledge.

*First*, the Amended Complaint does not allege that Gambella had ever been informed that the money in NYF's accounts belonged to Musalli.  To the contrary, it alleges that Musalli engaged NYF as its "investment advisor" so that it could, apparently surreptitiously, invest its money in the United States under NYF's name in order to obtain economic benefits allegedly not otherwise available to it.  ¶ 37.  *Second*, Musalli does not raise a plausible inference of knowledge with its allegation that Gambella was "aware" of the Power of Attorney.  ¶ 47.  The

---

[14] The court is "not bound to accept as true a legal conclusion couched as a factual allegation." See Papasan v. Allain, 478 U.S. 265, 286 (1986).  Even under the notice pleading standard of Fed. R. Civ. P. 8(a), to survive a motion to dismiss, a complaint must allege "enough *facts* to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, __ U.S.__, 127 S. Ct. 1955, 1965 (2007) (emphasis added).

Amended Complaint does *not* allege that Gambella had been given the Power of Attorney with respect to managing money in NYF's accounts. Indeed, NYF did not need a power of attorney to manage money in its own JPMorgan accounts. Moreover, it simply does not follow that *if* Gambella *were* aware that NYF had a Power of Attorney for Musalli, that he then knew that Musalli's money was in accounts in NYF's name at JPMorgan. *Third*, knowledge is not plausibly inferred from the allegation that, in the Spring of 2005, Stokes and Gambella spoke about using the "JPMorgan Investment Program" as collateral for a gold loan. ¶ 81. If, as Musalli is apparently trying to suggest, Gambella had acknowledged to Stokes in the Spring that Musalli had invested money with him, it would have been absurd for him to deny that fact six months later.[15]

It is likewise implausible to infer that Gambella's September 12, 2005 statement that Musalli had a "direct" banking relationship with Chase in London was made in order to advance Boktor's fraud. ¶ 105. First, the allegations of the Amended Complaint show that Gambella's statement was true: although the loan transaction did not come to fruition, Musalli admits that it *did* directly negotiate the gold loan with JPMorgan in London, rather than simply relying on Boktor for that purpose. ¶¶ 71-72, 82-83. Second, there is no logical reason that Gambella would have tried to deceive Musalli regarding its relationship with Chase in London, because Musalli had to know the true facts regarding any such relationship. Lying about the relationship, like lying about whether Musalli's money was in NYF's account, would have raised Musalli's

---

[15] The "communications" upon which Musalli relies are wholly inconsistent with any inference that Gambella knew that Musalli had previously invested money with him. Musalli is aware of this, because JPMorgan produced these communications (contained in emails) in response to a subpoena in an arbitration between Musalli and NYF and Boktor. The emails reveal that, in April 2005, Stokes and Gambella discussed Musalli's *plan* to invest funds with Gambella that would be used to collateralize the loan. Ultimately, however, Gambella advised Stokes that Musalli "didn't proceed with opening the Managed Investment Accounts here with JPMorgan so I assumed he was no longer interested." Weiss Dec. ¶¶ 5-7, Ex. C & D.

suspicions and made detection more likely.  It is a far more plausible inference that Gambella believed what he said and honestly expressed "disappointment" that Musalli had chosen to establish a relationship in London rather than New York.  ¶¶ 104, 107.

With respect to Stokes' "confirmation" that Musalli had already invested $2.05 million in a "JPMorgan Investment Program," the Amended Complaint fails to establish *scienter* for multiple reasons.  *First*, the allegation is nonsensical, because there would be no need for Stokes to "confirm" to Musalli information it already knew, i.e., the amount it had invested.  *Second*, there is nothing alleged about the context in which the statement was made that would have made the omission of information about the withdrawals misleading.  There is not, for example, an allegation that Musalli had inquired about the current balance in the accounts, as opposed to simply discussing with Stokes sums that Musalli had available to post as collateral should Chase approve its loan application.  *Third*, although Musalli makes the conclusory allegation that Stokes "knew or should have known" of the withdrawals, ¶ 74, the Amended Complaint does not allege that Stokes (or Tannir) had been informed that Musalli had "invested" its money in NYF's name, such that Stokes would even have examined NYF's accounts, let alone known that any withdrawal in those accounts was of Musalli's money.  *Fourth*, even if Stokes did know the money in NYF's accounts belonged to Musalli, there is no factual allegation that Stokes was aware that the withdrawals were unknown to Musalli, or that they were beyond the scope of NYF's authority (which under the Power of Attorney, they were not).

For all of these reasons, the fraud claim should be dismissed.

## POINT II

## PLAINTIFF FAILS TO STATE A CLAIM FOR AIDING AND ABETTING FRAUD

The aiding and abetting fraud claim must be dismissed because the Amended Complaint fails to allege facts supporting a *strong inference* of *actual knowledge* of the fraud. See, e.g., Lerner, 459 F.3d at 292-93.

The elements of aiding and abetting fraud in New York are well settled: "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Lerner, 459 F.3d at 292 (quoting Winnick, 406 F. Supp. 2d at 252). Under New York law, to satisfy the "knowledge" element, the defendant must have had *actual*, as opposed to constructive, knowledge of the primary fraud. Lerner, 459 F.3d at 292 (affirming dismissal of claim for aiding and abetting fraud for failure to plead actual knowledge); Rosner, 528 F. Supp. 2d at 426 (same). The claim is subject to the pleading requirements of Rule 9(b). Rosner, 528 F. Supp. 2d at 425-26.

The Amended Complaint's conclusory allegation that "defendants had actual knowledge of Boktor's fraud against Musalli" (¶ 130) is insufficient under any pleading standard. Musalli is required to plead facts supporting a strong, i.e., "cogent and compelling," inference, Tellabs, 127 S. Ct. at 2510, that defendants actually knew not only that NYF and Boktor were acting as Musalli's investment manager, but that defendants *also* actually knew of their "outright looting of client funds." Lerner, 459 F.3d at 293. The Amended Complaint alleges no facts supporting a "strong inference" – and certainly not a "cogent and compelling" one – that defendants knew that Boktor was stealing Musalli's money.

### A.    The Power of Attorney Defeats Any Inference that Defendants Had Actual Knowledge of the Fraud

Assuming, *arguendo*, that defendants knew that NYF was acting as a fiduciary to Musalli

with respect to monies in NYF's accounts (which, as explained above, supra at 15-17, is not adequately alleged), there can be no inference that they knew that NYF was misappropriating Musalli's funds.  The Power of Attorney pursuant to which Boktor allegedly acted gave NYF discretion to invest Musalli's funds as NYF saw fit, and instructed the recipient of it to follow the instructions of NYF "in every respect" concerning Musalli's money, including instructions to transfer funds to NYF.  Ex. 4, ¶¶ 1-3.  Defendants could thus only conclude that Musalli had given NYF full discretionary authority over Musalli's funds, which they were required to honor. Accordingly, there would be no basis for any defendant to know that NYF's transfers out of the JPMorgan accounts to Refco and otherwise were unauthorized.  The Amended Complaint contains no allegations that countervail the strong inference of *ignorance* of the fraud that is supported by the terms of the Power of Attorney.

**B.** **Musalli's Wire Transfer Memos Do Not Support An Inference of Actual Knowledge**

Plaintiff alleges that notations on its wire transfer applications that the funds were "for our investment program with JPMorgan New York," ¶¶ 90-91; Ex. 14, "confirm[ed] JPMorgan's responsibility to safeguard Musalli's funds in a safe and secure JPMorgan investment program." ¶ 74.  The wire transfer memos fail as a matter of law to advise JPMorgan of any specific purpose for or restrictions on the funds that Musalli gave to NYF.  See Tzaras v. Evergreen Int'l Spot Trading, Inc., No. 01 Civ. 10726(LAP), 2003 WL 470611, at *6 (S.D.N.Y. Feb. 25, 2003) (wire transfer memos on investments with purported currency trader stating "for further credit" to plaintiff were inadequate to impose duty on bank to protect plaintiff's funds).

Moreover, Musalli does not allege that Gambella or any other JPMorgan employee read

the wire transfer memos, a fact required to impart *actual* knowledge.[16]  But even if someone did

read them, the statement "for our investment program with JPMorgan New York" hardly

constitutes a direction to defendants to hold funds indefinitely, until further notice from Musalli.

Even if defendants knew that Musalli intended *at the time of the transfers* to have its money at

"JPMorgan New York," the allegations of the Amended Complaint are insufficient to raise any

inference that defendants knew that NYF was not acting with Musalli's authority in later

transferring the funds – an authority Musalli gave to NYF in the Power of Attorney.  Plaintiff's

allegation that "JPMorgan was under a duty to maintain" Musalli's funds in a "safe and secure

JPMorgan investment fund," ¶ 75, is a conclusory and irrational *non-sequitur*.

**C.**    **The Screen Shot Does Not Support An Inference of Actual Knowledge**

Plaintiff alleges that because Gambella allegedly "joked" with Boktor about "how"

Boktor obtained the JPMorgan screen shot that he used to support his "claim that Musalli had

violated the "non-circumvention agreement," Gambella was an "active and knowing" participant

in the effort to conceal Boktor's fraud "by misleading Musalli about an alleged 'circumvention.'"

¶ 108.  Vague assertions that Gambella "joked" with Boktor about "how" Boktor got the screen

shot can hardly be the basis for a "cogent and compelling" inference that Gambella knew that

Boktor had been "outright looting" Musalli's money.  Lerner, 459 F.3d at 293.  Although

Musalli apparently has heard the tape, it does not allege that there is any evidence on the tape

that Gambella either provided the screen shot or knew anything about Boktor's scheme.

**D.**    **"Actual Knowledge" of the Fraud May Not Be "Presumed"**

Plaintiff alleges that JPMorgan's knowledge should be "presumed as a matter of law"

because of the "know-your-customer" requirements of the Patriot Act and financial industry

---

[16] Indeed, there is no basis to infer that Gambella, a vice president of CISC, not the Bank, even
had access to these documents.  ¶ 10.

guidelines. Ex. A, ¶ 30.  These allegations do not save the insufficient Amended Complaint.

Nothing in the Patriot Act or industry guidelines purports to create any enforceable right in private entities or individuals.  Aiken v. Interglobal Mergers & Acquisitions, No. 05 Civ. 5503(LAP), 2006 WL 1878323, at *2 (S.D.N.Y. July 5, 2006) (Patriot Act does not afford private right of action).  In Aiken, this Court held that where New York courts had declined to impose upon banks a duty of care to non-customers, the Court could not impose such a duty based on the Patriot Act, which does not permit a private right of action.  Id.  The Court's reasoning in Aiken is equally applicable here: where, under New York law, *actual* knowledge is an element of aiding and abetting liability, the Court cannot substitute "presumptive" knowledge for that element based upon a statute that does not create a private right of action.

Furthermore, plaintiff's allegation that JPMorgan should be "presumed" to have knowledge is no more than an assertion that JPMorgan *should have known* of the fraud because it was required to investigate its customer, NYF, and the transactions at issue.  Allegations that establish merely that a bank "should have known" of the possibility of fraud are insufficient to state a claim for aiding and abetting fraud.  See Renner 2000 WL 781081 at *7-8 (allegations that bank employee was suspicious of transactions and that bank refused to honor suspicious transaction insufficient to allege actual knowledge).[17]

**E.    "Collective Knowledge" Does Not  Establish Actual Knowledge**

Finally, to the extent that Musalli attempts to rely on "collective knowledge" see, e.g., ¶¶ 30, 44, to establish the knowledge element of its claim, that theory is unavailing.  Rather, "the

---

[17] See also Ryan, 2000 WL 1375265 at *9 (bank's investigation of possible fraud and knowledge of prior irregular transactions by the wrongdoer were insufficient to allege actual knowledge as required for aiding and abetting liability); Kolbeck v. LIT America, Inc., 939 F. Supp. 240, 247 (S.D.N.Y. 1996) (broker's receipt of order to show cause alleging that its customer was engaged in fraud insufficient to charge broker with actual knowledge).

pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., __ F.3d __, No. 06-2902-CV., 2008 WL 2521676, at *4 (2d Cir. June 26, 2008); see also First Equity Corp. of Florida v. Standard & Poor's Corp., 690 F. Supp. 256, 260 (S.D.N.Y. 1988) (where tort requires culpable state of mind, "[a] corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual"), aff'd, 869 F.2d 175 (2d Cir. 1989).  As explained above (supra at 14-20), the Amended Complaint fails to plead *scienter* with respect to any such person.[18]

For all of these reasons, the claim for aiding and abetting fraud must be dismissed.

## POINT III

## PLAINTIFF FAILS TO STATE A CLAIM FOR COMMERCIAL BAD FAITH

Plaintiff's claim for commercial bad faith (Count 9) must be dismissed because (i) a claim for commercial bad faith cannot be asserted by a non-customer of the bank, and (ii) the Amended Complaint fails to plead facts supporting a strong, or even plausible, inference of actual knowledge of wrongdoing, which is required in an action for commercial bad faith.

A complaint for commercial bad faith must set forth facts supporting a "strong inference" of a bank's "actual knowledge of facts and circumstances that amount to bad faith," such that the bank "itself becom[es] a participant in [the] fraudulent scheme." Lerner, 459 F.3d at 293.  As the Second Circuit noted in Lerner, "the New York Court of Appeals fashioned the

---

[18] The Amended Complaint also fails to allege facts sufficient to satisfy the third element of aiding and abetting fraud, i.e., that the defendants "provided substantial assistance to advance the fraud's commission." Lerner, 459 F.3d at 292.  Merely permitting NYF to conduct transactions in its JPMorgan accounts, through which it allegedly stole Musalli's money, does not constitute substantial assistance. See Rosner, 528 F. Supp. 2d at 427 (bank's transfer of funds by commodities broker who defrauded investors did not constitute substantial assistance because it was not "doing anything more than providing its usual banking services to a customer . . . .").

doctrine of 'commercial bad faith' as an exception to the general rule that a bank is absolved of liability for a check made out to a fictitious payee when the maker knows that the payee is fictitious."  Id. (citing Prudential-Bache Sec., Inc. v. Citibank, N.A., 536 N.E.2d 1118, 1124 (N.Y. 1989).  In Lerner, the Second Circuit expressed "considerable doubt" whether the cause of action could be brought where, as here, the plaintiff was a non-customer of the bank asserting that their money was stolen by the bank's customer, who engaged in transactions in its own account that did not involve forged signatures or fictitious payees.  Id.  Although the Second Circuit found it unnecessary to decide the issue, this Court should not entertain a common law claim for which there is no basis on these facts in New York law, and accordingly the claim should be dismissed.

Even if this Court were to recognize a commercial bad faith claim in this context, the claim fails here "for the same reason as do[es] the[] claim[] for aiding and abetting fraud."  Id.  A complaint alleging commercial bad faith must be pled with particularity under Rule 9(b) and, as is the case with aiding and abetting fraud, must "plead facts giving rise to the 'strong inference' of actual knowledge of fraud . . . ."  Id.  For the reasons explained above (see Point II, supra at 18-20), Musalli has failed to plead that defendants had actual knowledge of the fraud committed by Boktor and NYF, and accordingly the commercial bad faith claim must be dismissed.  See Id. (affirming dismissal of commercial bad faith claim for failure to plead facts supporting a strong inference of actual knowledge by bank).

## POINT IV

## PLAINTIFF FAILS TO STATE A CLAIM FOR CONSPIRACY TO DEFRAUD

Plaintiff's claim for conspiracy to defraud (Count 3) should be dismissed because (1) the Amended Complaint does not plead an underlying fraud by any defendant, and (2) the Amended

Complaint does not plead facts sufficient to support a conspiracy between any defendant and Boktor to commit Boktor's fraud.

For the reasons stated above (Points I - II, <u>supra</u>), the Amended Complaint does not set forth a claim for fraud committed by, or aided and abetted by, any of the defendants. Because New York law does not recognize an independent tort of conspiracy to defraud absent an actionable fraud by at least one of the defendants, the claim for conspiracy must be dismissed. <u>See</u> <u>Banca Commerciale Italiana v. Northern Trust Int'l Banking Corp.</u>, No. 95 Civ. 10700(LAP), 1997 WL 217591, at *10 (S.D.N.Y. Apr. 30, 1997) (dismissing conspiracy claim because fraud claim dismissed); <u>Scala v. Sequor Group, Inc.</u>, No. 94 Civ. 0449(LAP), 1995 WL 225625, at *9 (S.D.N.Y. Apr. 14, 1995) (same); <u>see also</u> <u>Melnitzky v. Rose</u>, 299 F. Supp. 2d 219, 227 (S.D.N.Y. 2004), *aff'd and vacated in part on other grounds*, 148 Fed. Appx. 11 (2d Cir. 2005) (dismissing conspiracy claim where breach of contract claim dismissed).

Even if a claim were cognizable for conspiracy with Boktor, although he is not a defendant here, the claim must be dismissed because the Amended Complaint fails to plead facts establishing: "(1) an agreement among two or more parties, (2) a common objective, (3) acts in furtherance of the objective and (4) knowledge." <u>Filler v. Hanvit Bank</u>, No. 01 Civ. 9510(MGC), 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003) (quotation and citation omitted). "'[T]o survive a motion to dismiss, a complaint must contain more than general allegations in support of the conspiracy. Rather, it must allege the specific times, facts, and circumstances of the alleged conspiracy.'" <u>Fierro v. Gallucci</u>, No. 06-CV-5189 (JFB)(WDW), 2008 WL 2039545, at *16 (E.D.N.Y. May 12, 2008) (quoting <u>Fitzgerald v. Field</u>, No. 99 Civ. 3406(RWS), 1999 WL 1021568, at *4 (S.D.N.Y. Nov. 9, 1999)). A claim for conspiracy to defraud is subject to the pleading requirements of Rule 9(b). <u>Filler</u>, 2003 WL 22110773, at *3.

Where, as here, the Amended Complaint makes the bare assertion that the defendants conspired to commit a fraud (¶ 134), but contains no specific facts supporting an inference of a conspiratorial agreement, the claim must be dismissed.  <u>Fierro</u>, 2008 WL 2039545, at *16 (dismissing conspiracy claim for failure to allege specific facts supporting the existence of an agreement to defraud); <u>Filler</u>, 2003 WL 22110773, at *3-4 (same).

Moreover, as established in detail above (Points I - II, <u>supra</u>, at 14-17 & 18-20), none of the specific factual allegations against the defendants support an inference of the actual knowledge by any person that Boktor intended to loot Musalli's accounts, let alone "intentional participation in the furtherance of a plan or purpose" to loot Musalli's accounts.  <u>Melnitzky</u>, 299 F. Supp. 2d at 227.  Accordingly, the claim for conspiracy to defraud must be dismissed.

**POINT V**

**THE AMENDED COMPLAINT FAILS TO STATE
A CLAIM FOR FRAUDULENT CONCEALMENT**

Plaintiff's fraudulent concealment claim (Count 4) should be dismissed because plaintiff fails to allege the basis for any duty to disclose NYF's alleged wrongful transactions to Musalli, and fails to allege facts supporting a strong inference of any intent by Gambella, Stokes or anyone at JPMorgan to defraud Musalli.

The elements of a claim for fraudulent concealment under New York law are (i) the defendant's failure to disclose material information that he had a duty to disclose; (ii) the defendant's intention to defraud plaintiff thereby; (iii) plaintiff's reasonable reliance upon the representation; and (iv) plaintiff's damages resulting from such reliance.  <u>Thermal Imaging, Inc. v. Sandgrain Secs., Inc.</u>, 158 F. Supp. 2d 335, 345-46 (S.D.N.Y. 2001) (dismissing claim for failure to allege basis for duty to disclose).  A fraudulent concealment claim is subject to the pleading requirements of Rule 9(b).  <u>Armstrong v. McAlpin</u>, 699 F.2d 79, 88 (2d Cir. 1983).

A duty to disclose, sufficient to support fraudulent concealment, arises either in a fiduciary relationship, or where, "during the course of negotiations surrounding a business transaction . . . one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." Lerner, 459 F.3d at 292. As explained below (at 27-29, infra), JPMorgan was not a fiduciary to its actual customer, NYF, see Frutico, S.A. de C.V. v. Bankers Trust Co., 833 F. Supp. 288, 301 (S.D.N.Y. 1993), let alone to Musalli, a non-customer. See Tzaras, 2003 WL 470611, at *6. Indeed, on the very same facts as plaintiff has alleged here – a non-customer wire transferred funds to the bank's depositor indicating that the funds were for an investment account – this Court held that no fiduciary duty, indeed no duty at all, arose between the bank and the non-customer. Id.

Nor was JPMorgan a party to any business transaction with Musalli which could give rise to a duty to disclose "superior information." With respect to NYF's bank and brokerage accounts, JPMorgan's only business transaction was with NYF. See Thermal Imaging, 158 F. Supp. 2d at 346. And, in all events, the Amended Complaint fails to allege any facts to support its allegation that Gambella "knew or should have known" of the transfers of money, ¶ 54, which are not even alleged to have been made from a CISC Account. Moreover, even if Gambella knew of the transfers out of NYF's accounts, there is no factual allegation to support that he knew the transactions were unauthorized (particularly since they were in fact authorized by the Power of Attorney), or that Musalli had not been informed of them (as they had been by virtue of the Invoice and Statement).[19]

---

[19] As discussed in Point I, above (supra at 17), for much the same reasons, Stokes's alleged failure to inform Musalli of the transfers cannot form the basis of a fraudulent concealment claim.

Indeed, not only did the defendants have no duty to disclose NYF's transactions to Musalli, they had a duty not to do so.  "[A] bank should keep its own customers' affairs confidential."  Ryan, 2000 WL 1375265, at *6 (no claim for fraudulent concealment for bank's non-disclosure of its customer's sub-account transactions) (quoting Aaron Ferer & Sons. Ltd. v. Chase Manhattan Bank, 731 F.2d 112, 123 (2d Cir. 1984)).  Because of this duty, a bank is not liable to a non-customer for "fraudulent concealment" of a customer's transactions, and even on plaintiff's allegations NYF was a customer of the bank and Musalli was not.  See, e.g., Ryan, 2000 WL 1375265, at *6 (dismissing fraudulent concealment claim against bank by victim of Ponzi scheme).  If Musalli wished the bank to report to it the transactions in NYF's accounts, it had a means to do so: by putting its own name on those accounts.  Instead Musalli chose to conceal its interest in the NYF accounts for a perceived economic advantage.  ¶ 37.  The consequences to Musalli of its own stratagem cannot be laid at JPMorgan's door.

## POINT VI

### THE AMENDED COMPLAINT FAILS TO
### STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY

Musalli's claim that it was owed a fiduciary duty (Count 8) by defendants is entirely without merit under well-settled law.  To the extent that Musalli's claim is premised on any deposit relationship with Chase, the law is clear that "[t]he relationship between a bank and its depositor is not a fiduciary one, but only that of a debtor and creditor."  Ryan, 2000 WL 1375265, at *10 (citing Aaron Ferer, 731 F.2d at 122).  Moreover, even where a bank knows that the depositor owes a fiduciary duty to a third person, such as the beneficiary of an attorney trust account, the bank owes no fiduciary duty to the third party.  See Peoples Westchester Sav. Bank v. Federal Deposit Ins. Corp., 961 F.2d 327, 332 (2d Cir. 1992) ("In maintaining an IOLA account, the lawyer, not the bank, is charged with a fiduciary duty to the client.").

To the extent that Musalli may premise its fiduciary duty claim on its prospective lending relationship with Chase in London, the law is clear that there is no fiduciary relationship created between a borrower and a lending bank. Korea First Bank of N.Y. v. Noah Enters., Ltd., 787 N.Y.S.2d 2, 3 (1st Dep't 2004) (bank-borrower relationship is not a confidential or fiduciary relationship); River Glen v. Merrill Lynch Credit Corp., 743 N.Y.S.2d 870, 871 (1st Dep't 2002) ("an arms length borrower-lender relationship is not of a confidential or fiduciary nature").

Although CISC, alleged to be a broker and investment advisor, might under some circumstances have had a fiduciary duty to NYF, there is no basis in the Amended Complaint to infer a fiduciary relationship to Musalli, who was never a customer of CISC. See Kolbeck v. LIT America, Inc., 923 F. Supp. 557, 571-72 (S.D.N.Y. 1996) (commodities broker had no fiduciary duty to non-customer defrauded by customer of the broker); Thermal Imaging, 158 F. Supp. 2d at 344 (securities broker had no fiduciary duty to a non-customer who was defrauded by customer of the broker). Here, Musalli was at most "a client of a client," a status entirely insufficient to create a fiduciary duty. Thermal Imaging, 158 F. Supp. 2d at 343 (securities broker had no duty to plaintiff, the client of a client, where brokerage account was opened in client's name, not plaintiff's, and broker had no direct transaction with plaintiff).

 A fiduciary relationship cannot be created by one party unless the "purported fiduciary voluntarily accepts the entrustment of confidence." The Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. LLC, No. 00 Civ. 9214 (RWS), 2007 WL 2948115, at *22 (S.D.N.Y. Oct. 3, 2007). Here, the Amended Complaint alleges no facts indicating that JPMorgan ever consented to undertake any sort of fiduciary duty to Musalli. "That plaintiffs may have regarded defendants as their fiduciaries is not enough to establish a fiduciary duty when that duty otherwise would not exist." Kolbeck, 923 F. Supp. at 572. If Musalli wanted JPMorgan to serve as its investment

advisor and fiduciary, it should have "negotiated and paid for that degree of loyalty." World Wrestling Entm't, Inc. v. Jakks Pacific, Inc., 530 F. Supp. 2d 486, 505 (S.D.N.Y. 2007). Musalli chose instead to deposit funds through an intermediary, in order to obtain more favorable terms from JPMorgan than it believed it could obtain as a customer of the bank. ¶ 34. Plaintiff cannot now claim that JPMorgan undertook investment advisory or other fiduciary duties to Musalli, when Musalli deliberately chose to have NYF as its investment advisor rather than JPMorgan.

**POINT VII**

**PLAINTIFF FAILS TO STATE A CLAIM FOR
AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

Plaintiff's claim for aiding and abetting a breach of fiduciary duty must be dismissed for the same reasons as its claim for aiding and abetting fraud: it has failed to allege actual knowledge of or substantial assistance to NYF's breach of fiduciary duty.

The elements of a claim for aiding and abetting a breach of fiduciary duty are: "(i) a breach by a fiduciary of obligations to another, (ii) that the defendant knowingly induced or participated in the breach, and (iii) that plaintiff suffered damage as a result of the breach." Kaufman v. Cohen, 760 N.Y.S.2d 157, 169 (1st Dep't 2003); accord Kolbeck v. LIT America, Inc., 939 F. Supp. 240, 245 (S.D.N.Y. 1996). As with aiding and abetting fraud, New York law requires "actual knowledge of the breach of duty . . . . Constructive knowledge of the breach of fiduciary duty by another is legally insufficient to impose aiding and abetting liability." Kaufman, 760 N.Y.S.2d at 169 (citation omitted). Furthermore, as with fraud, "[a] person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator." Id. (citations omitted); see Kolbeck, 939 F. Supp. at 247. Where, as here, the breach of fiduciary duty is in the nature of a fraud, the same Rule 9(b)

29

pleading requirements apply to aiding and abetting a breach of fiduciary duty as applies to fraud claims. Kolbeck, 939 F. Supp. at 245.

Plaintiff has not pled actual knowledge of or substantial assistance to Boktor's breach of fiduciary duty for the same reasons that it has not pled actual knowledge of or substantial assistance to Boktor's fraud (see Point III, supra, at 18-27). Accordingly, plaintiff's claim for aiding and abetting breach of fiduciary duty should be dismissed.

## POINT VIII

## THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENCE

To maintain a claim for negligence (Count 6) under New York law, Musalli must show that (1) defendants owed Musalli a cognizable duty of care as a matter of law; (2) defendants breached that duty; and (3) Musalli suffered damages as a proximate cause of that breach. See Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998). The negligence claim should be dismissed because defendants did not owe Musalli a duty of care to prevent Boktor's diversion of the funds it sent to NYF's JPMorgan accounts.

Musalli fails to state a claim for negligence because a bank generally owes no duty of care to a non-customer. See Tzaras, 2003 WL 470611, at *6. The same is true for brokers and investment advisors. See Renner, 2000 WL 781081, at *21-22 (financial advisor defendants had no duty of care to non-customer victim of fraud); Kolbeck v. LIT America, Inc., 923 F. Supp. at 571-72 (dismissing negligence claim against commodities brokers by non-customer who was the victim of a fraud by brokers' customer). This general rule applies to fiduciary accounts maintained by a bank at its branches. Lerner, 459 F.3d at 287 (depository banks generally owe no duty to monitor fiduciary accounts in order to safeguard the funds in those accounts from misappropriation by the fiduciary).

An exception to this rule arises only when the bank has actual or "adequate notice" that a diversion is intended or being executed.  Id.  "Adequate notice" to rebut the presumption that the fiduciary is acting in a lawful manner "'may come from circumstances which reasonably support the *sole inference that a misappropriation is intended* . . . .'"  Id. (emphasis added) (quoting Bischoff ex. rel. Schneider v. Yorkville Bank, 112 N.E. 759, 761 (1916)).  Only when a bank has notice of circumstances that support the *sole inference* that a misappropriation is intended, is the bank under a duty to make reasonable inquiry and endeavor to prevent a diversion.  See Lerner, 459 F.3d at 287-88.  Assuming, *arguendo*, that defendants had actual knowledge that the funds in NYF's accounts belonged to Musalli, Musalli fails to allege circumstances supporting the *sole inference* that Boktor intended to divert Musalli's funds to his benefit.

Because the Power of Attorney authorized the transactions about which Musalli complains, defendants could not infer that Musalli's funds were being misappropriated.  Indeed, Courts have consistently rejected negligence claims by beneficiaries of fiduciary accounts when the transactions complained of were within the scope of a Power of Attorney executed by the beneficiary, on the grounds that the bank was not on notice of circumstances suggesting misappropriation by the agent.  See, e.g., Thomson v. New York Trust Co., 56 N.E.2d 32, 35 (N.Y. 1944) (dismissing negligence claim asserted against bank by depositor's estate for permitting attorney-in-fact to sign for loan to decedent and then transfer funds from decedent's account to her own, where such conduct was within the broad scope of power of attorney); Ferman v. Chase Manhattan Bank, No. 603245/98, 1999 WL 1568298, at *1-3 (Sup. Ct. N.Y. Co. Apr. 19, 1999) (dismissing negligence claim against bank where broad power of attorney gave "complete discretion and authority to conduct banking in the [e]state's account").

Furthermore, even absent the Power of Attorney, the allegations of the Amended Complaint do not establish a "sole inference of misappropriation," because there is no allegation that defendants were told that NYF was not authorized to make the transfers to Refco.  See Renner, 2000 WL 781081, at *21-22  (dismissing negligence claim based on theory that bank violated purported duty to inquire when fiduciary diverted funds from bank account by transferring them into investments unauthorized by the plaintiff, because bank was not privy to agreements between fiduciary and plaintiff that prohibited transactions).  Indeed, even a transfer by a fiduciary to its own account, without more, is insufficient as a matter of law to establish a bank's notice of potential misappropriation by fiduciary.  See Bischoff, 112 N.E. at 761.

Musalli alleges that a duty of care to safeguard its remaining funds arose in or about December 2005, when its counsel wrote to JPMorgan's counsel requesting that counsel "investigate the location of the funds Musalli transferred to NYF for the JPMorgan Investment Program," and that JPMorgan breached that duty by subsequently closing the accounts and transferring about $1,000,000 to Boktor.  ¶¶ 118, 119.  Pursuant to N.Y. Banking Law § 134 (5), however, banks have no duty to recognize an adverse claim (like Musalli's) to a deposit of cash or securities to the credit of any person, unless directed by court order to do so, or given an indemnity bond by the adverse claimant.  9 N.Y. Jur. Banks and Fin. Inst., § 284 (2008).  Thus, JPMorgan had no duty to "safeguard" for Musalli the funds in NYF's accounts simply because Musalli made a claim to those funds.

## POINT IX

### THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION AND NON-DISCLOSURE

The negligent misrepresentation and non-disclosure claim (Count 5) should be dismissed because defendants were under no duty to (i) speak with care or (ii) disclose information to

Musalli.

In New York, the elements of negligent misrepresentation are "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000). "The failure to plead a fiduciary or similar relationship is generally fatal to the claim." DDJ Capital Mgmt., LLC v. Rhone Group LLC., No, 601832/07, 2008 WL 1837442 (Sup. Ct. N.Y. Co. Apr. 24, 2008) (citing Korea First Bank, 787 N.Y.S.2d at 4 (negligent misrepresentation claim is deficient "absent a confidential or fiduciary relationship giving rise to a duty to speak with care"); River Glen, 743 N.Y.S.2d at 871 (same). As explained above (supra at 27-29), defendants had no fiduciary relationship with Musalli and therefore had no duty to speak with care. For that reason alone, the negligent misrepresentation claim should be dismissed.

Plaintiff alleges that defendants had a duty to speak with care because they had "unique or specialized expertise." ¶ 147. Absent a relationship of trust or confidence, however, a claim based on this theory can survive only if it "emphatically alleges" both that the person making the representation held or appeared to hold unique or special expertise and that "the speaker was aware of the use to which the information would be put and supplied it for that purpose." Eternity Global Master Fund Ltd., 375 F.3d at 188.

Musalli alleges that Gambella had "unique and specialized expertise regarding the JPMorgan investment services and the JPMorgan Investment Program," ¶ 53, and that Stokes

had "unique and specialized expertise regarding JPMorgan's loan programs and the contemplated gold loan." ¶ 73. "Unique and specialized expertise" in these matters has nothing to do with the misrepresentations Stokes and Gambella are alleged to have made, which related to whether Musalli had a banking relationship with JPMorgan in London and whether Musalli had invested funds at JPMorgan using NYF's accounts. ¶¶ 72, 104, 114-116. On *these* matters, Musalli was well aware of the true facts (see supra at 12). Accordingly, Musalli has no claim for negligent misrepresentation. See Eternity Global Master Fund Ltd., 375 F.3d at 189 (relationship sufficiently special to justify reliance may arise when a person wholly without knowledge seeks assurances from one with exclusive knowledge).[20]

Nor does Musalli state a claim based on negligent nondisclosure. "New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc., 429 F. Supp. 2d 582, 609 (S.D.N.Y. 2006) (quoting Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)). As explained above (supra at 27-20, 32-34) none of the foregoing circumstances apply.

For these reasons, the negligent misrepresentation/nondisclosure claim should be dismissed.

---

[20] Moreover, Musalli fails to plead reliance, for the reasons explained in Point I, supra at 12.

## POINT X

## THE CLAIMS FOR PUNITIVE DAMAGES SHOULD BE DISMISSED

Plaintiff demands punitive damages on its fraud (and possibly its fiduciary duty) claims. ¶ 145 & Demand for Relief (iv).  Under New York law, punitive damages are "not available in the ordinary fraud and deceit case."  Shanahan v. Vallat, No. 03 Civ. 3496 (MBM), 2004 WL 2937805, at *11 (S.D.N.Y. Dec. 19, 2004) (dismissing claim for punitive damages where fraud alleged).  Rather, punitive damages may be available only where the conduct alleged is "is gross and involves high moral culpability."  Id. (quoting Walker v. Sheldon, 179 N.E.2d 497, 498-99 (N.Y. 1961)); see also Schweitzer v. Mulvehill, 93 F. Supp. 2d 376, 409 (S.D.N.Y. 2000) (punitive damages are allowable for breach of fiduciary duty only if high threshold of moral culpability is met).  Because there is nothing in the Amended Complaint to support that defendants "acted with greater moral culpability than is involved in an 'ordinary' fraud case," Shanahan, 2004 WL 2937805, at *12, the claims for punitive damages should be dismissed.

## CONCLUSION

For all of the reasons set forth above, the Court should dismiss the Amended Complaint with prejudice.

Dated:  New York, New York
      July 25, 2008

LEVI LUBARSKY & FEIGENBAUM, LLP

By:  _____/s/_____

    Andrea Likwornik Weiss
    Alan H. Scheiner
    1185 Avenue of the Americas, 17th Floor
    New York, New York 10036
    (212) 308-6100

*Attorneys for Defendants JPMorgan Chase Bank, N.A., Chase Investment Services Corporation, and Nicholas Gambella*