UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____
```

------------------------------------X

MUSALLI FACTORY FOR GOLD
& JEWELLRY,

              Plaintiff,

              1:08-CV-01720 (LAP)

          -against-

              MEMORANDUM AND ORDER

JPMORGAN CHASE BANK, N.A., CHASE
INVESTMENT SERVICES CORPORATION,
and NICHOLAS GAMBELLA,

           Defendants.

------------------------------------X

LORETTA A. PRESKA, United States District Judge:

      Plaintiff Musalli Factory for Gold & Jewellry

("Musalli") brings this diversity action against JPMorgan

Chase Bank, N.A. ("Chase"), Chase Investment Services

Corporation ("CISC"), and Nicholas Gambella ("Gambella"),

asserting claims arising from the alleged diversion of $5

million of Musalli's funds from a "JP Morgan investment

program." The Defendants now move, pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure, to

dismiss all nine counts against them. For the reasons

stated herein, the motion is GRANTED.

## I. BACKGROUND

### A. Factual Allegations[1]

    i. *Musalli's Initial Contact with Boktor and NYF*

Musalli is a corporation organized under the laws of the Kingdom of Saudi Arabia engaged in the business of manufacturing gold and jewelry products. (Compl. ¶ 4.) Abubaker El-Nagar ("El-Nagar") is its chief financial officer. Id. In early 2004, Amir Boktor ("Boktor"), the principal of New York Financial LLC ("NYF"), a Nevada corporation, proposed a "business relationship" with Musalli whereby NYF would serve as Musalli's investment advisor. (Id. ¶¶ 11, 33.) Boktor urged Musalli to invest in the United States using NYF as an intermediary to place Musalli's funds in a "JPMorgan Investment Program."[2] (Id. ¶ 34.) Boktor claimed to have a special relationship with "JPMorgan"[3] and that the proposed investment would lead to substantial profits and a credit facility, which Musalli

_____

[1] This section is derived from the allegations in Plaintiff's Amended Complaint and exhibits attached thereto (the "Complaint," cited as "Compl.").

[2] Although the Complaint repeatedly refers to this purported program, it provides no further details and is unclear as to whether such a program actually existed or was fabricated by Boktor.

could ultimately use to collateralize a gold loan on favorable terms. (Id. ¶¶ 34, 36.)

Boktor explained that Musalli had to use an account under NYF's name to invest because, as a foreign company, Musalli could not reap the "benefits that are only granted for American companies [such as] higher credit facilities; preferential rates; discounts on gold purchases[; and] better interest rates" if it opened its own JPMorgan account. (Id. ¶ 37.)

### ii. *The First Agreement*

On August 4, 2004, Musalli followed Boktor's advice and entered into an "Investment Management Agreement" (the "First Agreement") with NYF. (Id. ¶ 38.) The First Agreement designated NYF and Boktor as Musalli's "agent and attorney-in-fact" and stated that NYF would (1) "act with due consideration, care, prudence and diligence . . . that a fiduciary . . . would use under such circumstances," and (2) "monitor, supervise, and direct the investments of [Musalli] in accordance with [Musalli's] investment objectives." (Id.) The First Agreement identified "JP Morgan Chase Bank, New York" as the "Bank of Record" and

---

³ The Complaint also repeatedly refers to "JPMorgan" without defining which Defendant entity is referenced.

Gambella, described as Vice President of JPMorgan

Investments, as the "JP Morgan Chase Investment Contact."[4]

(Id. Ex. 3.)  NYF and Musalli were the only parties to the

First Agreement. See id.

### iii. *The Power of Attorney*

In June of 2004, Boktor sent Musalli a form bearing a

JPMorgan logo entitled "Irrevocable Full Power of

Attorney." (Id. ¶ 40; see id. Ex. 4 (the "POA").)  The POA

was translated into Arabic and executed by Musalli on

August 30, 2004.[5] (Id. ¶ 40; see id. Ex. 4.)  According to

Plaintiff, the POA "allowed Boktor and NYF to act on behalf

of Musalli in their dealings with JPMorgan" but did not

allow Boktor or NYF to transfer Musalli's funds out of the

proposed "JPMorgan Investment Program." (Id. ¶ 41.)

However, the POA attached to the Complaint contains no

such limitation. (Id. Ex. 4.)  It unequivocally authorizes

NYF to "buy, sell . . . and trade . . . instruments and any

other securities" and at no point references an investment

program. (Id. Ex. 4 ¶ 1.)  The POA also directs a bank

---

[4] The First Agreement and other documents referenced in this
memorandum are properly considered on the instant motion as
they were both included in the Complaint and integral to
Plaintiff's allegations. See Chambers v. Time Warner, Inc.,
282 F.3d 147, 153 (2d Cir. 2002).

[5] The executed POA contains no reference to JPMorgan.

4

holding accounts in Musalli's name to "follow the instructions of [the] Agent and attorney-in-fact . . . and make deliveries of securities and payment of moneys to him or as he may order and direct." (Id. Ex. 4 ¶ 2.)

The Complaint further alleges that Gambella knew Musalli limited Boktor's POA to investing funds in the "JPMorgan Investment Program." (Id. ¶ 41.)

### iv. Musalli's Initial Investment and the Subsequent Conversion

In August of 2004, Musalli wired $2.05 million to NYF's Chase account (the "NYF Bank Account").[6] (Id. ¶ 43.) In the wire transfer application, Musalli indicated both the source of the funds (two banks located in Saudi Arabia) and its intention to invest in the "JPMorgan Investment Program." (Id. ¶ 43.) According to the Complaint, "JPMorgan [thereby] assumed a duty to maintain the Musalli investment funds in accordance with Musalli's wishes." (Id. ¶ 44.) On September 22, 2004, NYF transferred $1 million of Musalli's funds out of the NYF Bank Account and into an investment account (the "NYF Investment Account")

---

[6] The account was maintained at a Chase branch at 127 Seventh Avenue, Brooklyn, New York. (Compl. ¶ 43 n.2.)

5

maintained by NYF and consisting of four separate accounts.[7] (Id. ¶¶ 45-46.) Gambella was the bank's representative for the NYF Investment Account. (Id. ¶ 45.)

Sometime in the fall of 2004, Boktor and NYF transferred approximately $800,000 in funds from the NYF Accounts to a foreign currency trading firm, Refco FX ("Refco"), as well as an unspecified additional sum for Boktor's personal expenses. (Id. ¶ 49.) Boktor sent Musalli fictitious "JPMorgan" account statements "to keep the conversion hidden." (Id. ¶ 52.) Musalli asserts that neither "JPMorgan" nor Gambella provided notice of the

---

[7] Although the Complaint is perhaps deliberately opaque in its description of the mechanics of Plaintiff's planned investment, it is clear that all of Musalli's money transfers were made to the NYF Bank Account. (See, e.g., Compl. ¶ 43) ("Musalli wired $2.05 million to NYF's JPMorgan Bank account."). NYF kept some of the money in this account and transferred some into the NYF Investment Account. Fraudulent account statements sent by Boktor to Musalli reflected that half of the invested funds were put into a money market account, and half were put into an actively managed investment program. (Id. Ex. 6.) It appears that Gambella's role was to control the actively managed portion of NYF's Investment Account. However, regardless of any subsequent transfers, the Complaint implies that as soon as the funds were wired into the NYF Bank Account, Musalli considered them to be part of the "JPMorgan Investment Program." (See, e.g., id. ¶ 90) ("Musalli transferred additional funds to the JPMorgan [NYF] Bank Account, bringing its total investment in the JPMorgan Investment Program up to $3.95 million.") Unless the Complaint gives some indication of which account is being referred to, both the NYF Bank Account and the investment accounts will hereafter be collectively referenced as the "NYF Accounts."

6

transfers but does not allege that either Defendant knew of the falsified bank statements. (Id. ¶ 49.)

In December of 2004, Gambella, in the presence of Boktor, allegedly spoke over the telephone with El-Nagar. Gambella, who was introduced as the vice-president "of the investment department of JP Morgan New York," described in detail "the benefits of a JPMorgan Investment Program." (Id. ¶ 53.) At that time, Gambella did not disclose to El-Nagar anything regarding the diversion of Musalli's funds. (Id. ¶ 55.) Instead, he "knowingly lulled Musalli into believing that the full amount of its investment funds were safe." (Id.)

### v. *The Second Agreement*

In late 2004 and early 2005, Boktor attempted to secure a gold loan for Musalli through a Chase branch in London. (Id. ¶ 60.) To this end, he contacted Chase London bankers Martin Stokes and Karim Tannir to arrange a credit facility. (Id.) Boktor assured Musalli that its investment funds in the NYF Accounts could be utilized as collateral for the loan. (Id. ¶ 61.)

On March 12, 2005, Musalli sent NYF and Boktor an Exclusive Investment Management and Representation Agreement (the "Second Agreement") in connection with the

loan negotiation. (Id. ¶ 64.) Like the First Agreement, the Second Agreement provided that NYF and Boktor would "supervise and direct the investments of [Musalli]" and authorized NYF to act as Musalli's "agent and attorney-in-fact." (Id. Ex. 8 ¶ 2(b).) The Second Agreement makes no reference to "JPMorgan" or any of the Defendants. (See id. Ex. 8.) Musalli claims that the Second Agreement tracked the parties' understanding that NYF and Boktor would continue to serve as investment advisors for Musalli's funds in the NYF Accounts. (Id. ¶ 64.)

### vi. *Musalli's Communications Regarding a Gold Loan*

Tannir and Stokes, the London bankers, met with Musalli representatives to discuss the prospective gold loan in March of 2005. (Id. ¶ 72.) They allegedly discussed how the $2.05 million Musalli had invested in the NYF Accounts could be used as collateral. (Id.) Neither banker mentioned that the NYF Accounts at that time contained only approximately $1 million because of Boktor's diversions. (Id. ¶ 74.) The Complaint further asserts that an unspecified individual at "JPMorgan" communicated with Gambella and Boktor the mechanics of using money in the NYF Accounts as collateral for the gold loan. (Id. ¶ 81.) An

8

email from Tannir to El-Nagar confirms that the parties were exploring this possibility.[8] (Id. ¶ 83, Ex. 11.) Ultimately, the arrangement offered by Chase's London branch was unacceptable to Musalli, and the transaction was never completed. (Id. ¶¶ 84-85.)

### vii. *Boktor's Further Diversion*

Once the London gold loan fell through, Boktor suggested that Musalli could obtain a standby letter of credit from Chase and then utilize that credit as collateral for a gold loan with a new lending institution. (Id. ¶¶ 87-88.) However, Boktor said that Musalli would need to increase its investment from $2.05 million to $5 million "for the strategy to work." (Id. ¶ 87.) There is no allegation that any of the Defendants knew of these representations.

On Boktor's advice, Musalli transferred additional funds to the NYF Accounts. Internal JPMorgan documents track these transfers. (Id. ¶¶ 90-91, 94.) To further the plan for obtaining a standby letter of credit, Musalli also signed a "non-circumvention agreement" in August of 2005.

---

[8] In relevant part, the e-mail states "we have been trying to sort out the internal constraint that we have regarding the use of moneys placed in NY as a collateral for a transaction done out of London." (Id. Ex. 11.)

(Id. ¶¶ 95-96.)   The Complaint does not identify the
parties to this agreement.   However, it appears that the
agreement prohibited Musalli from circumventing NYF and
forming an undisclosed banking relationship with a third
party. (See id. ¶ 100.)

On September 9, 2005, Boktor and NYF transferred $3
million of Musalli's investment funds out of the NYF
Accounts to a secret Refco account. (Id. ¶ 99.)   To justify
this diversion, Boktor sent Musalli an "Invoice and
Statement" claiming that Musalli had breached the non-
circumvention agreement by having an undisclosed banking
relationship with "JPMorgan" and therefore owed Boktor
damages. (Id. ¶ 100.)   To prove the breach, Boktor included
with the invoice a "JPMorgan" computer "screen shot," which
he claimed he obtained from Gambella, showing a purportedly
undisclosed relationship between Musalli and "JP Morgan."
(Id. ¶ 101.)

Three days later, El-Nagar had a telephone
conversation with Gambella in which he explained that
Musalli had no undisclosed relationship with "JPMorgan."
(Id. ¶ 104.)   To further Boktor and NYF's conspiracy to
defraud Musalli, Gambella "misrepresented" in this
conversation that he was in possession of an email from
Stokes indicating that Musalli was a Chase client in

10

London. (Id. ¶¶ 104-05.) Gambella did not disclose the latest diversion of Musalli's funds during this conversation. (Id. ¶ 104.)

In a telephone conversation secretly taped by Boktor an unspecified amount of time later, Gambella and Boktor allegedly joked about "how Boktor obtained the 'screen shot'" he had sent Musalli to prove breach of the non-circumvention agreement and "the implications of such a document being released by JPMorgan." (Id. ¶ 108.)

viii.    *JPMorgan's Alleged Notice of the Diversion*

Because neither Boktor nor Gambella would tell Musalli the status of its funds, El-Nagar contacted Stokes on October 21, 2005 to inquire about them. (Id. ¶ 112.) Stokes then emailed Gambella, asking him to confirm that Musalli's funds remained in the "JP Morgan Investment Program." (Id. ¶ 113.) Gambella denied that Musalli had ever transferred funds to the "JP Morgan Investment Program." (Id. ¶ 114.) When Stokes responded that Musalli's "funds were sent to you via NY Financial," Gambella again denied that he was aware of any such funds. (Id. ¶¶ 115-16.)

11

Two months later, El-Nagar again asked for Stokes's
help in an email sent mid-December of 2005. (Id. ¶ 118.)
El-Nagar said that "Musalli's lawyer had written to
JPMorgan counsel" and that Musalli's relationship with NYF
was "under investigation" by unspecified "JPMorgan New York
legal counsel." (Id.)

On December 31, 2005, JPMorgan closed NYF's accounts
and transferred the remainder of Musalli's funds,
approximately $1 million, to Boktor's personal accounts.
(Id. ¶ 119.)

## B.   Musalli's Claims

Musalli now asserts nine claims in connection with the
facts described above.  Counts 1 and 4 allege common law
fraud and fraudulent concealment; Counts 2 and 8 allege
aiding and abetting fraud and breach of fiduciary duty;
Count 9 alleges commercial bad faith; Count 3 alleges
conspiracy to defraud; Count 7 alleges breach of fiduciary
duty; Count 6 alleges common law negligence; and Count 5
alleges negligent misrepresentation/nondisclosure.

12

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss under Rule 12(b)(6), "[t]he
issue is not whether a plaintiff will ultimately prevail
but whether the claimant is entitled to offer evidence to
support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236
(1974), abrogated on other grounds by Harlow v. Fitzgerald,
457 U.S. 800 (1982). The Court will therefore "assess the
legal feasibility of the complaint," Geisler v. Petrocelli,
616 F.2d 636, 639 (2d Cir. 1980), which must provide
"plausible grounds . . . [with] enough fact to raise a
reasonable expectation that discovery will reveal evidence"
to support its allegations. Bell Atl. Corp. v. Twombly, 550
U.S. 544, 556 (2007). While the Court is obliged to draw
all reasonable inferences in Plaintiff's favor, Gregory v.
Daly, 243 F.3d 687, 691 (2d Cir. 2001), the Complaint will
nonetheless be deemed deficient if it does not "raise a
right to relief above the speculative level." Bell Atl.
Corp., 550 U.S. at 555.

In analyzing Musalli's claims, this Court will apply
the law of New York State, which both parties agree governs
this diversity action. (See, e.g., Memorandum of Law in
Support of Defendant's Motion to Dismiss ("Def. Mem.") at
11 (laying out the elements of common law fraud in New

13

York); Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Opp. Mem.") at 23 (citing a case applying New York law regarding commercial bad faith).)

### B.    Count 1:  Common Law Fraud

#### i.    Applicable Law

There are five elements of a fraud claim under New York common law:  (1) representation or omission of a material existing fact, (2) knowledge by the defendant of its falsity, (3) scienter or intent to defraud, (4) reasonable reliance on the representation by the plaintiff, (5) and resulting damage or injury. See Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997); Pope v. Saget, 29 A.D.3d 437, 441 (1st Dep't 2006); Nat'l Med. Health Card Sys., Inc. v. Fallarino, 863 N.Y.S.2d 556, 562 (N.Y. Sup. Ct. 2008).  Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  To satisfy this requirement, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).

14

Although a more general standard is applied to
pleading the element of scienter, "plaintiffs must allege
facts that give rise to a strong inference of fraudulent
intent." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d
Cir. 1995) (citing Shields v. Citytrust Bancorp, Inc., 25
F.3d 1124, 1128 (2d Cir. 1994)). This may be done "'either
(a) by alleging facts to show that defendants had both
motive and opportunity to commit fraud, or (b) by alleging
facts that constitute strong circumstantial evidence of
conscious misbehavior or recklessness.'" Lerner v. Fleet
Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006) (quoting
Shields, 25 F.3d at 1128). Conclusory allegations of
fraudulent conduct are not sufficient to satisfy Rule 9(b).
Trinity Bui v. Indus. Enters. of Am., No. 08 Civ. 0583,
2009 U.S. Dist. LEXIS 6639, at *15 (S.D.N.Y. Jan. 15,
2009).

In light of the unusual facts of this case, it is
worth emphasizing a plaintiff must have relied on the
fraudulent statement "in ignorance of its falsity" to state
a fraud claim. Murray v. Xerox Corp., 811 F.2d 118, 121 (2d
Cir. 1987); see also JP Morgan Chase Bank v. Winnick, 350
F. Supp. 2d 393, 405 (S.D.N.Y. 2004) ("Reliance is
necessary in order to demonstrate causation; where a
plaintiff actually knew at the time a representation was

15

made that it was false, she cannot claim to have relied on the truth of that representation, and any injury she suffers is therefore not attributable to the defendant."); DDJ Mgt., LLC v. Rhone Group L.L.C., Nos. 4994, 4995, 601832/07, 2009 N.Y. App. Div. LEXIS 1542, at *6-7 (1st Dep't March 5, 2009) (affirming dismissal of plaintiff's fraud claim on the ground that it could not properly allege reasonable reliance on the purported misrepresentations). Furthermore, even if a plaintiff does not know an allegedly fraudulent representation was false, reliance on the representation must have been reasonable. Although assessing reasonableness of any reliance is often "fact-intensive," there are undoubtedly "[c]ircumstances [that] may be so suspicious as to suggest to a reasonably prudent plaintiff that the defendants' representations may be false, and that the plaintiff cannot reasonably rely on those representations, but rather must 'make additional inquiry to determine their accuracy.'" Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) (quoting Keywell Corp. v. Weinstein, 33 F.3d 159, 164 (2d Cir. 1994)). The entire context of a transaction must be analyzed in any determination of whether reliance was reasonable, and relevant factors include the transaction's "complexity and magnitude, the sophistication of the

16

parties, and the content of any agreements between them."
Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,
343 F.3d 189, 195 (2d Cir. 2003).

### ii. Allegedly Fraudulent Statements

The Defendants observe that while Plaintiff does not
specify which statements it is basing its fraud claim upon,
the Complaint alleges Stokes made one intentionally false
statement, (Compl. ¶¶ 72, 74), and Gambella made two. (Def.
Mem. at 11; Compl. ¶¶ 104, 114-16). I conclude that these
allegations are insufficient to support a fraud claim both
because Musalli could not reasonably have relied on the
statement at issue and they fail to allege sufficient facts
to support a strong inference of fraudulent intent.

#### a. Stokes' Statement Was Not False

Stokes allegedly made the first fraudulent statement
in March 2005, when he confirmed to El-Nagar that Musalli
had already invested $2.05 million with JPMorgan. (Compl.
¶ 72.) According to the Complaint, this statement was
untrue because the account at this time contained
approximately only $1 million due to Boktor's diversion of
funds to himself. (Id. ¶ 74.) However, as alleged, the
statement was not actually untrue. The Complaint asserts

17

only that Stokes confirmed that Musalli "had already invested $2.05" million. (Id. ¶ 72.(emphasis added)) Therefore it was not a false statement, because at this point in time Musalli had in fact wired this amount to the NYF Account at Chase. (Id. ¶ 43.) Accordingly, not only was this statement not fraudulent as alleged, but Musalli cannot claim it relied on the statement in ignorance of its falsity.[9]

### b.    Gambella's Statements Could Not Be Reasonably Relied Upon

Nor could Plaintiff have reasonably relied on the two allegedly fraudulent statements made by Gambella.  The first of these occurred on September 12, 2005, when "Gambella stated falsely that Musalli had participated in a direct business relationship with JPMorgan Bank in London," and "further misrepresented that he was in possession of a June 2005 email from Martin Stokes indicating that Musalli was a JPMorgan Bank client in London and had therefore violated the Non-Circumvention Agreement." (Id. ¶ 104.)

---

[9] The Complaint could also be read to mean that Stokes concealed Boktor's activities and his failure to disclose the diversion of Musalli's funds amounted to fraud by omission.  However, as discussed in Part II.C below, any such claim is deficient because Musalli could not reasonably rely on Stokes for information on an account belonging to NYF, and the Defendants had no duty to disclose such information.

18

Musalli cannot have relied on this statement because it knew the statement was false. According to the Complaint, "[t]here was never any undisclosed banking relationship between Musalli and JPMorgan." (Id. ¶ 102.)

Gambella wrote his second allegedly fraudulent statement in an email to Stokes on October 21, 2005. Stokes initially asked Gambella to confirm that Musalli's $5 million in funds remained in the "JPMorgan Investment Program". (Id. ¶ 113.) In response, Gambella denied that Musalli had ever deposited funds in the "JPMorgan Investment Program." (Id. ¶¶ 114-16.)

As a threshold matter, it is not entirely clear that this statement was even false. The Complaint never defines the term "JPMorgan Investment Program." Rather, it indicates only that Musalli sent money directly to NYF's Chase bank account. NYF then was to invest the funds, pursuant to the various agreements between Musalli and NYF, and it is not clear that the money ever went to a formal investment program.

However, even assuming the statement was false and the money was invested in the "JP Morgan Investment Program" as soon as it was wired to the NYF bank account, and further assuming that Gambella intended that the statement be conveyed to Musalli, it cannot form the basis of Musalli's

19

fraud claim because Musalli allegedly knew it was false. Musalli knew it had invested this money: it allegedly wired $2.05 million to the NYF Bank Account in August of 2004, (id. ¶ 43), another $1.9 million in July 2005, (id. ¶ 90), and finally an additional $1.05 million in August of 2005. (Id. ¶ 94.)

             c.     Even if Musalli Could Have Reasonably Relied Upon the Allegedly False Statements, Musalli has not Adequately Alleged Scienter

Even if Musalli could be said to have reasonably relied upon the alleged misstatements or omissions, it has not sufficiently alleged scienter. As stated above, a plaintiff must plead facts supporting a strong inference of fraudulent intent, which can be established either through motive and opportunity to commit fraud or through facts that demonstrate strong circumstantial evidence of conscious misbehavior or recklessness. Acito, 47 F.3d at 52. Musalli's Complaint does neither.

First, Musalli has not adequately alleged motive. Gambella and Stokes allegedly wanted to ensure Musalli's continued investment with JPMorgan so they could possibly earn commissions. (Compl. ¶¶ 58, 78.) However, a sufficiently pleaded motive must "entail concrete benefits that could be realized" as a result of the fraud. Renner v.

Chase Manhattan Bank, No. 08 Civ. 926, 2000 WL 781081, at
*10 (S.D.N.Y. June 16, 2000) ("Renner II") (quoting
Shields, 25 F.3d at 1130). The desire to attract business
alone is not enough. See id. Here, the Complaint lacks any
allegation of a concrete benefit for Stokes or Gambella.
While in some cases the enhancement of a defendant's
personal compensation may be sufficient to establish
motive, the case cited by Musalli for this proposition
involved "unusually large brokerage fees" and "'exorbitant'
amounts of interest," neither of which is alleged here. See
Allied Irish Banks, P.L.C. v. Bank of America, No. 03 Civ.
3748, 2006 WL 278138, at *7 (S.D.N.Y. Feb. 2, 2006).
Furthermore, Musalli's contrary assertions notwithstanding,
Gambella's alleged business relationship with Boktor, the
alleged perpetrator of the fraud, does not alone translate
into a motive. See Renner II, 2000 WL 781081 at *10.
Therefore, Plaintiff has not adequately alleged a "'minimal
factual basis for [its] conclusory allegations of
scienter.'" Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d
Cir. 1996) (quoting Cohen v. Koenig, 25 F.3d 1168, 1173 (2d
Cir. 1994).

Nor has Musalli pleaded facts constituting strong
circumstantial evidence of conscious misbehavior or
recklessness by Gambella or Stokes. The Complaint's

21

general and repeated assertions that they knew what Boktor was doing are insufficient. See Papsan v. Allain, 478 U.S. 265, 286 (1986) (court not bound to accept legal conclusions couched as factual allegations). With respect to Gambella, the Complaint fails to plead facts showing Gambella knew that the money in the NYF Accounts actually belonged to Musalli, thereby negating any possible inference of fraudulent intent in connection with his alleged misrepresentations and omissions. Indeed, the Complaint makes clear that Musalli tried to hide its identity when it invested. Furthermore, even if Gambella knew NYF's funds belonged to Musalli, he had no reason to doubt Boktor's authority to dispose of the investment as he saw fit. After all, Musalli gave Boktor a POA with no express limitation or reference to JPMorgan Investment Funds.

Musalli's claim that Stokes "knew, or should have known" that Boktor improperly transferred the money is likewise deficient. The Complaint alleges no factual basis to support this assertion, especially because Boktor had a POA and the account was under NYF's name.

Even if neither Gambella nor Stokes actually knew of Boktor's theft, they had the requisite intent if their behavior was reckless. Musalli has not pleaded sufficient

22

facts to support such a claim. A defendant is reckless
when its conduct is "'highly unreasonable and . . .
represents an extreme departure from the standards of
ordinary care . . . to the extent that the danger was
either known to the defendant or so obvious that defendant
must have been aware of it." Sweringen v. N.Y. State
Dispute Resolution Ass'n, 05 Civ. 428, 2007 U.S. Dist.
LEXIS 60609, at *15 (S.D.N.Y. Aug. 17, 2007) (quoting Roth
v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir.
1978)). Although courts have recognized an inference of
recklessness in the case of "[a]n egregious refusal to see
the obvious, or to investigate the doubtful," Goldman v.
McMahan, Brafman, Morgan & Co., 706 F. Supp. 256, 259
(S.D.N.Y. 1989), the Complaint provides no particular
reason for any JPMorgan employee to be suspicious of
Boktor's account withdrawals, even if he or she was aware
of them. As discussed above, the account was in NYF's name
and NYF had a POA.


C.    Count 4: Fraudulent Concealment

Musalli claims that the Defendants fraudulently hid
Boktor's diversion of its funds. "The elements of
fraudulent concealment under New York law are:  a
relationship between the contracting parties that creates a

23

duty to disclose, knowledge of the material facts by the party bound to disclose, scienter, reliance, and damage." Richards v. AXA Equitable Life Ins. Co., 2007 U.S. Dist. LEXIS 78052, at *15 (S.D.N.Y Oct. 22, 2007) (quoting Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 582 (2d Cir. 2005)); P.T. Bank Cent. Asia v. ABN Amro Bank, N.V., 301 A.D.2d 373, 376 (1st Dep't 2003). A fraudulent concealment claim is held to the heightened pleading standards of Rule 9(b). Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983). Here, Musalli's allegations are defective for two reasons: (1) Musalli could not have reasonably relied on Defendants to apprise it of Boktor's activities, and (2) Defendants had no duty to disclose the allegedly concealed information to Musalli.

### i. No Reasonable Reliance

To support its fraudulent concealment claim, Musalli points to omissions allegedly made by Gambella in December of 2004 when he "failed to advise El-Nagar that Boktor and NYF had diverted the Musalli investment funds . . . [or] tell Musalli that a significant amount of its investment funds were no longer in [the NYF accounts]." (Compl. ¶ 55.) Taken in context, any reliance by Musalli on omissions made by Gambella (or, for that matter, even on affirmative

24

misrepresentations by Gambella or Stokes) was plainly unreasonable. When analyzing reasonable reliance, the entire context of the transaction must be examined, not merely the alleged fraudulent conduct. See Emergent, 343 F.3d at 195. In this case, Musalli structured its investment in a purposefully surreptitious manner in order to obtain benefits to which it was not entitled due to its status as a foreign company. To that end, Musalli gave NYF a broad POA and allowed Boktor to place of all its funds in accounts under NYF's name. Musalli now claims that Gambella, Stokes, or some other unspecified JPMorgan employee should have told it that Boktor was taking money from the NYF Accounts. However, given that Musalli deliberately obscured its ownership of the funds, it had no reason to expect bank employees to inform it of activity in another entity's bank accounts. It also had no reason to expect bank employees to inform it of activity apparently authorized by the POA. Stated differently, Musalli could not reasonably rely on Defendants who were not parties to its investment agreements with Boktor and had no reason to believe that Boktor was doing anything wrongful to protect it from the consequences of its own flawed, and possibly fraudulent, investment plan.

ii.   Defendants Owed No Duty to Disclose

Even subtracting reasonable reliance from the legal equation, Musalli has not stated a fraudulent concealment claim because Defendants owed it no duty to disclose the allegedly concealed information.   There are three circumstances under which a duty to disclose may arise, none of which is adequately pleaded here.   The first occurs when there is a fiduciary or confidential relationship between the parties. See Spencer v. Green, 42 A.D.3d 521, 522, (2d Dep't 2007); Frigitemp Corp. v. Fin. Dynamics Funds, Inc., 524 F.2d 275, 283 (2d Cir. 1975); Coface v. Optique Du Monde, Ltd., 521 F. Supp. 500, 504 (S.D.N.Y. 1980).   As discussed below with respect to the breach of fiduciary duty claim, no such relationship existed between Musalli and Defendants because of the general rule that banks do not owe fiduciary duties to customers or non-customers in a deposit or lending relationship. See infra Part II.F.

The second circumstance occurs when one party is acting on superior knowledge not readily available to the other in connection with a business transaction and knows that the other is acting on the basis of mistaken knowledge. See Williams v. Sidley Austin Brown & Wood, L.L.P., 38 A.D.3d 219, 220 (1st Dep't 2007); Jana L. v. W.

129th St. Realty Corp., 22 A.D.3d 274, 277 (1st Dep't 2005). Here, even if Defendants had superior knowledge, there is no indication that they knew Musalli was acting on the basis of inaccurate information. See Ryan v. Hunton & Williams, No. 99-CV-5938, 2000 WL 1375265, at *6 (E.D.N.Y. Sept. 20, 2000). In other words, there was no way for the bank to know that Musalli was unaware of Boktor's transfers or that they were improper. Again, not only was the account in NYF's name, but NYF also had POA to dispose of Musalli's funds.

Third, an affirmative duty to disclose may arise from the need to complete or clarify one party's partial or ambiguous statement. See Junius Constr. Corp. v. Cohen, 257 N.Y. 393, 400 (1931); Williams, 38 A.D.3d at 220. This last circumstance was not briefed by the parties and appears inapplicable here.

D. Count 2:  Aiding and Abetting Fraud; Count 8: Aiding and Abetting Breach of Fiduciary Duty; Count 9:  Commercial Bad Faith

I analyze Counts 2, 8, and 9 simultaneously because they share a common deficiency:  they do not adequately plead actual knowledge by the bank or its employees of the underlying fraud committed by Boktor.

27

To establish aiding and abetting fraud under New York law, a plaintiff "must show (1) the existence of a violation by the primary wrongdoer; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." Renner v. Chase Manhattan Bank, No. 98 Civ. 926, 1999 WL 47239, at *11 (S.D.N.Y. Feb. 3, 1999) ("Renner I"); see also Egnotovich v. Katten Muchin Zavis & Roseman LLP, No. 604101/06, 2008 N.Y. Misc. LEXIS 196, at *10 (N.Y. Sup. Ct. Jan. 23, 2008) (same), aff'd 2008 N.Y. App. Div. LEXIS 8009 (1st Dep't Oct. 28, 2008). Of course, the pleading requirements of Rule 9(b), previously discussed, apply to a claim of aiding and abetting fraud. ABF Capital Mgmt. v. Askin Capital Mgmt., L.P., 957 F. Supp. 1308, 1328 (S.D.N.Y. 1997) (stating that a "claim of aiding and abetting fraud must meet the pleading requirements of Rule 9(b)"). Furthermore, "actual knowledge is required to impose liability on an aider and abettor under New York law." Kolbeck v. LIT Am., Inc., 939 F. Supp. 240, 246 (S.D.N.Y. 1996) (emphasis added); see also Murray Hill v. Adas Yereim, Inc., 233 A.D.2d 305, 306 (2d Dep't 1996). The facts alleged must support a "strong inference" of fraudulent intent. ABF Capital Mgmt., 957 F. Supp. at 1331.

To state a claim for aiding and abetting a breach of
fiduciary duty, one must plead "(i) a breach by a fiduciary
of obligations to another, (ii) that the defendant
knowingly induced or participated in the breach, and (iii)
that plaintiff suffered damage as a result of the breach."
Kaufamn v. Cohen, 307 A.D.2d 113, 125 (1st Dep't 2003). As
with fraud, actual knowledge of the breach must be
demonstrated. Id. Although the particularized pleading
standards of Rule 9(b) do not apply to this claim,
plaintiff must nonetheless "allege some facts, in non-
conclusory terms" to show knowing participation by
defendants in the alleged breach. Goldin Assocs., L.L.C. ex
rel. SmarTalk Teleservices, Inc. v. Donaldson, Lufkin &
Jenrette Sec. Corp., No. 00 Civ. 8688, 2003 U.S. Dist.
LEXIS 16798, at *27 (S.D.N.Y. Sept. 25, 2003) (quoting
Official Comm. of Unsecured Creditors ex rel. SmarTalk
Teleservices, Inc. Bankruptcy Estate v. Donaldson, Lufkin &
Jenrette Sec. Corp., No. 00 Civ. 8688, 2002 U.S. Dist.
LEXIS 3747, at *32 (S.D.N.Y. Mar. 6, 2002)).

Lastly, "[t]o state a claim for commercial bad faith
against a bank, a plaintiff must allege: (1) a scheme or
acts of wrongdoing; together with either: (2) allegations
of the bank's actual knowledge of the scheme or wrongdoing
that amounts to bad faith; or (3) allegations of complicity

29

by bank principals in alleged confederation with the wrongdoers." Mazzaro de Abreau v. Bank of Am. Corp., 525 F. Supp. 2d 381, 394-95 (S.D.N.Y. 2007). The New York Court of Appeals has explained that commercial bad faith is alleged when a "bank acts dishonestly—where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in the fraudulent scheme." Prudential-Bache Sec., Inc. v. Citibank, N.A., 73 N.Y.2d 263, 275 (N.Y. 1989); see also Wight v. Bankamerica Corp., 219 F.3d 79, 91 (2d Cir. 2000) (finding that "knowledge of the underlying wrong" is a "required element" under New York law). A claim for commercial bad faith is also subject to the pleading requirements of Rule 9(b), such "that the circumstances of the alleged fraud [must] be alleged with particularity." Williams v. Bank Leumi Trust Co., 1998 U.S. Dist. LEXIS 10636, at *24 (S.D.N.Y. July 15, 1998).[10]

---

[10] I note that it is unclear whether a commercial bad faith claim is even viable in this case. Commercial bad faith is a judicial concept created by the New York Court of Appeals within the context of fraudulent checks. See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 293 (2d Cir. 2006). The Lerner court expressed doubt as to whether the doctrine had applicability in that case because fraud was not alleged in the making and cashing of checks, and therefore a similar concern must be expressed in this case. Nonetheless, even if this court were to recognize such a claim, in this context it ultimately fails both the second and third elements.

### i.   No Actual Knowledge

Thus, the threshold question with respect to all three of these claims is whether the Complaint sufficiently alleges facts demonstrating that Gambella, Stokes, or any other of Defendants' employees actually knew that Boktor was looting Musalli's funds. It does not. Conclusory statements used throughout the Complaint, i.e., that Gambella "knew, or should have known, that Boktor and NYF had fraudulently diverted Musalli's investment funds from the JPMorgan Investment Program to themselves and to Refco," (Compl. ¶ 114), or that "Stokes knew, or should have known, that Boktor and NYF had improperly transferred money out of the JPMorgan Investment Program", (Compl. ¶ 74), are clearly insufficient.

To state these claims, Plaintiff must show that Gambella or Stokes knew that:   (1) the money in the NYF Account actually belonged to Musalli, (2) Boktor made transfers, and (3) that the transfers made by Boktor were improper.[11]

---

[11] Throughout the Complaint, Musalli relies heavily upon the "Know-Your-Customer" requirements under both the Patriot Act and the Wolfsberg Group, as well as the collective knowledge of the JPMorgan "family," to support the inference that the Defendants had actual knowledge of Boktor's fraudulent activity. However, this "collective knowledge" claim is insufficient to establish actual

(cont'd on next page)

There is ample cause to question whether Gambella or Stokes even knew the money in the NYF accounts belonged to Musalli. The account belonged to NYF and Boktor, not Musalli. Even assuming that Gambella and Stokes knew the money was Musalli's and that Boktor had diverted some of the funds, the facts as alleged give no real indication of how would know the transfers were improper. After all, Musalli gave Boktor and NYF virtually unlimited POA.[12] (See Compl., Ex. 4.)

Musalli alleges that Gambella, at least, knew that the transfers were improper because he joked with Boktor about how Boktor obtained a JPMorgan computer screen shot which he sent to Musalli as proof that he had an undisclosed

---

(cont'd from previous page)

knowledge, which must be pleaded with particularity. While it is true that "a corporation may be charged with the collective knowledge of its employees," First Equity Corp. of Florida v. Standard & Poor's Corp., 690 F. Supp. 256, 260 (S.D.N.Y. 1988), Musalli may not use this principle to shore up a claim of essentially fraudulent conduct when it is unable to allege that any specific employee(s) had the requisite knowledge. See id. ("A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual.").

[12] Musalli contends that the bank should have known Musalli's investment was not to be diverted because Musalli's wire applications sent when it transferred funds to the NYF Bank Account said that they were "for our investment program with JPMorgan New York." (Compl. ¶ 91.) However, there is no allegation suggesting what the scope of this program was or why Defendants would have equated this with the dubious proposition that NYF could not invest the funds as it saw fit.

banking relationship with JPMorgan in London, thereby violating the non-circumvention agreement. (Compl. ¶¶ 101, 108.) The Complaint alleges that this telephone conversation "confirmed Gambella's active and knowing participation in the effort to conceal the diversion and perpetuate the fraud." (Compl. ¶ 108.)

However, it is unclear why this should be so. The Complaint alleges that the conversation concerned "how Boktor obtained" the screen shot and "the implications of such a document being released." (Id.) It does not assert that Gambella had anything to do with creating or releasing the screen shot or even that he knew it was fake. Thus, the purported phone conversation does not support a "strong inference" that Gambella knew Boktor had looted millions of Musalli's money. The Complaint's allegations are simply too vague to show actual knowledge of fraud that occurred before this alleged conversation even took place.

### ii. Additional Deficiencies

However, even if Musalli had adequately pleaded actual knowledge of Boktor's nefarious dealings, the aiding and abetting fraud claim would fail because Gambella's and Stokes' actions did not rise to the level of providing "substantial assistance," a requisite element of an aiding

33

and abetting claim. See Oei v. Citibank, N.A., 957 F. Supp. 492, 520 (S.D.N.Y. 1997). In general, substantial existence is found where "(1) a defendant 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed'; and (2) 'the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.'" Rosner v. Bank of China, No. 06 CV 13562, 2008 U.S. Dist. LEXIS 105984, at *13 (S.D.N.Y. Dec. 18, 2008) (quoting Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001)). The "mere fact that participants in a fraudulent scheme 'use accounts at [a bank] to perpetrate it, without more, does not in and of itself rise to the level of substantial assistance.'" Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., No. 98 Civ. 4960, 1999 U.S. Dist. LEXIS 11599, at *26-27 (S.D.N.Y. July 30, 1999) (quoting Williams v. Bank Leumi Trust Co., No. 96 Civ. 6695, 1997 U.S. Dist. LEXIS 7538, at *14 (S.D.N.Y. May 30, 1997)). Here, there is no factual allegation that Gambella, Stokes, or any other bank employee did anything sufficient to constitute substantial assistance to Boktor's diversion of Musalli's funds.

Furthermore, to the extent that Musalli bases its aiding and abetting claim on JPMorgan's failure to prevent

the diversion by failing to shut down the account or to
inform Musalli of the account withdrawals, these omissions
also do not rise to the level of substantial assistance
because there was no fiduciary relationship between the
bank and Musalli. See Renner II, 2000 WL 781081, at *12
(finding that in the absence of a fiduciary duty, inaction
does not constitute substantial assistance). This point is
discussed more fully in the section on Musalli's negligence
claim below. See infra Part II.G.

## E.    Count 3:  Conspiracy to Defraud

New York law does not recognize an independent tort of
civil conspiracy. Scala v. Sequor Group, Inc., No. 94 Civ.
0499, 1995 WL 225625, at *9 (S.D.N.Y. Apr. 14, 1995); ABKCO
Indus., Inc. v. Lennon, 52 A.D.2d 435, 441 (1st Dep't
1976). In this case, it is clear that Musalli is basing
its conspiracy claim on the underlying fraud committed by
NYF, Boktor, and allegedly the defendants.  Therefore,
since the fraud claim and the aiding and abetting claims
have already been dismissed, there is no fraudulent hook
for Musalli to hang his conspiracy claim on. Scala, 1995 WL
225625 at *9 ("[Plaintiff's] claim for conspiracy to commit
fraud is based upon the fraud claim; if the fraud claim

fails, so must the civil conspiracy to commit that fraud.").

F.   Count 7: Breach of Fiduciary Duty

To plead a claim of breach of fiduciary duty successfully under New York law, a plaintiff must demonstrate both a fiduciary relationship between the parties and a breach of the duty implied in connection with such a relationship. See Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp., No. 98 Civ. 6907, 2000 U.S. Dist. LEXIS 3941, at *31 (S.D.N.Y. Mar. 30, 2000).   This inquiry cannot be solely resolved "by recourse to rigid formulas." Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 767 F. Supp. 1220, 1231 (S.D.N.Y. 1991), rev'd on other grounds, 967 F.2d 742 (2d Cir. 1992).

New York courts generally avoid dismissing a claim of breach of fiduciary duty under Rule 12(b)(6) because it usually involves a question of fact:  whether someone reposed trust and confidence in another who thereby gains a resulting superiority or influence. See id. at 1231. Nevertheless, even drawing all inferences in Musalli's favor, the Complaint does not allege facts that establish a fiduciary relationship.  Musalli has not made any factual allegations that would lead the Court to set aside the general rule that banks do not owe fiduciary duties either

to non-customers or even to customers in a deposit or lending relationship. See Renner I, 1999 WL 47239, at *13 ("it is well settled that a bank owes no such duty to a non-customer third-party"); Korea First Bank of N.Y. v. Noah Enters., Ltd., 12 A.D.3d 321, 323 (1st Dep't 2004) (bank-borrower relationship is not a fiduciary relationship).

There are two theories under which Musalli argues that a fiduciary relationship was nonetheless established here: the first is premised on the deposit relationship, and the second is premised on the proposed lending relationship.

As for the funds deposited with the defendant, Musalli claims that it "reposed trust and confidence in defendants" with respect to those funds and that "Defendants owed Musalli a fiduciary duty to act in Musalli's best interest with respect [to] the investment funds placed with JPMorgan." (Comp. ¶¶ 161-62.) However, unilateral trust or confidence "does not automatically create a fiduciary relationship; the trust or confidence must be accepted as well." Thermal Imaging, Inc., v. Sandgrain Sec., Inc., 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001) (citing Litton, 767 F. Supp. at 1231). Therefore, although the Plaintiff alleges that it "trusted and relied on Defendants and their superior knowledge and expertise," (Opp. Mem. at 29), no

37

acceptance of this duty by the Defendants is alleged in the
Complaint.  Rather, it was NYF which served as Musalli's
investment advisor and thereby accepted Musalli's trust and
confidence.  At best, Musalli could be viewed as a
depositor of JPMorgan.  However, as Defendant has pointed
out, "[t]he relationship between a bank and its depositor
is not a fiduciary one, but only that of a debtor and
creditor," Ryan, 2000 WL 1375265, at *10 (citing Aaron
Ferer & Sons, Ltd. v. Chase Manhattan Bank, 731 F.2d 112,
122 (2d. Cir. 1984)), and "under New York law no fiduciary
relationship arises from a long-standing debtor-creditor or
creditor-guarantor relationship," Village on Cannon v.
Bankers Trust Co., 920 F. Supp. 520, 532 (S.D.N.Y. 1996).

Musalli also argues that a fiduciary relationship was
established through the gold loan negotiations.  However,
Musalli never signed a contract with Defendants for its
investment services, and no agency-principal relationship
was established which would give rise to a fiduciary duty.
Mere loan negotiations, which never even came to fruition,
can hardly be the basis of a fiduciary relationship.  Even
if Musalli had obtained a loan from Chase's London branch,
no fiduciary duty would have arisen.  It is a clear
principle under New York law that a lender is not the
fiduciary of a debtor.  See BCH Interim Funding, L.P. v.

Finantra Capital, Inc., 283 F. Supp. 2d 968, 989 (S.D.N.Y. 2003). This claim must therefore be dismissed.

### G. Count 6: Negligence

To plead a prima facie claim of negligence under New York law, the plaintiff must allege three material elements: "(1) the defendant owed the plaintiff a cognizable duty of care as a matter of law; (2) the defendant breached that duty; and (3) plaintiff suffered damage as a proximate result of that breach." Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998); see also Solomon v. City of New York, 66 N.Y.2d 1026, 1027 (N.Y. 1985). The issue of whether a duty of care was owed by the Defendants to Musalli is a question of law that the Court may properly determine on a motion to dismiss. See Purdy v. Public Adm'r of Westchester, 72 N.Y.2d 1, 8 (N.Y. 1988) ("[W]hether a member or group of society owes a duty of care to reasonably avoid injury to another is of course a question of law for the courts.").

Musalli's negligence claim must be dismissed for failure to allege facts from which it can be inferred that the Defendants owed it such a duty. As an initial matter, "[b]anks do not owe non-customers a duty to protect them from the intentional torts of their customers." In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765,

830 (S.D.N.Y. 2005); see also Burnett v. Al Baraka Inv.
Dev. Corp., 274 F. Supp. 2d 86, 109 (D.D.C. 2003)
("Plaintiffs offer no support, and we have found none, for
the proposition that a bank is liable for injuries done
with money that passes through its hands in the form of
deposits, withdrawals, check clearing services, or any
other routine banking service."); Renner I, 1999 WL 47239,
at *13 ("it is well settled that a bank owes no such duty
to a non-customer third-party"). To find otherwise would
unreasonably expand a "banks' orbit of duty." Century Bus.
Credit Corp. v. N. Fork Bank, 246 A.D.2d 395, 396 (1st
Dep't 1998).

The facts in the present case are similar to the facts
in both Renner and in Tzaras v. Evergeen Int'l. Spot
Trading, Inc., No. 01 Civ. 10726, 2003 WL 470611 (S.D.N.Y.
Feb. 25, 2003), in which no cognizable duty was found. In
Tzaras, the Plaintiff invested more than $1.7 million with
the defendant's company, Evergreen, through deposits in a
bank account at JPMorgan Chase. Thus, as in this case,
Chase took on the role as the depository bank. Tzaras
repeatedly inquired of Evergreen employees as to the status
of his investment, and he was assured that that the money
was being securely held in the Chase accounts. Eventually,
once the Plaintiff learned of the sham and Evergreen's

40

fraudulent conduct, he filed suit against the bank for a multitude of claims, including one for common law negligence. Tzaras claimed that the bank ignored suspicious activities taking place in the account and therefore breached its duty to exercise ordinary and reasonable care. Thus, just as in the instant case, Tzaras was essentially claiming that JPMorgan Chase owed him a duty to prevent Evergreen from defrauding him. Here, Musalli contends that JPMorgan and its employees owed him a duty of care which "at a minimum, [was] a duty to make a reasonable inquiry and prevent the diversion [by NYF and Boktor]." (Compl. ¶ 156.) However, just as Tzaras was not a customer of the bank, neither was Musalli. The actual customer was NYF because the accounts were in its name. Plaintiff acknowledges that it did this intentionally for the purpose of enjoying benefits "that are only granted for American companies." (Compl. ¶ 37.)

Plaintiff emphasizes that there was a "significant relationship" between Musalli and the bank employees "that went well beyond participating in routine financial transactions." (Opp. Mem. at 31.) Even assuming this to be true, these actions do not make Musalli a customer of the bank to whom it owed a duty of care.

41

Accordingly, because no cognizable duty of care of the bank to Musalli was sufficiently pleaded, this count must be dismissed.

## H. Count 5: Negligent Misrepresentation/ Nondisclosure

With respect to negligent misrepresentation, under the common law of New York, the necessary elements are that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).

Similarly to Plaintiff's fraud claim, as discussed above, this claim must be dismissed because Musalli had no reasonable justification for relying upon the representations by Gambella or Stokes. However, even if such reliance were sufficiently alleged, no requisite special or "privity-like" relationship existed. DDJ Capital Mgmt., LLC v. Rhone Group LLC, No. 601832/07, 2008 WL

42

1837442, at *12 (N.Y. Sup. Ct. Apr. 24, 2008), rev'd in part on other grounds at 2009 WL 537535 (1st Dep't Mar. 5, 2009). The lack of such a relationship has been deemed "fatal" to such a claim. Id. In Kimmell v. Schaefer, 89 N.Y.2d 257 (N.Y. 1996), the New York Court of Appeals described three factors which must be weighed to ascertain whether a "special relationship" exists. These factors go hand-in-hand with whether reasonable reliance is justified:

> In determining whether justifiable reliance exists in a particular case, a fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.

Id. at 264. Although the standard of a special relationship in the context of a negligent misrepresentation claim is less rigorous than that of a fiduciary duty, such a relationship was insufficiently pleaded here because there is no allegation that either Gambella or Stokes professed special expertise with respect to the disposition of Musalli's funds, and there is no other indication in the Complaint why they should have known that Musalli was unaware of the disposition of its funds.

Here there was no duty to speak arising out of a professional status. See id. at 263 (noting that "[p]rofessionals, such as lawyers and engineers, by virtue of their training and expertise, may have special relationships of confidence and trust with their clients, and in certain situations we have imposed liability for negligent misrepresentation when they have failed to speak with care"). Gambella and Stokes were not lawyers or engineers, with special training or expertise in the traditional sense. As for "unique or special expertise," although Gambella and Stokes certainly had knowledge regarding the Chase and CISC's loan programs, this fact alone is insufficient. Kimmell, 89 N.Y.2d at 264. The alleged misrepresentations mainly involved the balance of Musalli's funds in the NYF Accounts, and this did not require any unique or specialized knowledge to access. NYF had clear access to this information, and it was not Defendants' fault that NYF did not provide accurate information to Musalli.

Finally, with respect to nondisclosure, there must be a showing of a duty to disclose. As discussed above in the context of fraudulent concealment, no such duty arose in this case.

III. CONCLUSION

It seems clear that Musalli was the victim of fraud. However, that fraud appears to have been purported solely by Boktor and NYF, who are not parties to this suit. For the foregoing reasons, the Motion to Dismiss [dkt. no. 15] is GRANTED.

The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED:

Dated:     March _31_, 2009
           New York, New York

_Loretta A. Preska_

LORETTA A. PRESKA, U.S.D.J.